IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

------------------------------------------

UNITED STATES OF AMERICA,

Plaintiff;

v. Criminal Action 3:14CR12

ROBERT F. McDONNELL and
MAUREEN G. McDONNELL,

Defendants.

------------------------------------------

July 30, 2014
Richmond, Virginia
9:50 a.m.

JURY TRIAL - VOLUME III

BEFORE: HONORABLE JAMES R. SPENCER
United States District Judge

APPEARANCES: MICHAEL S. DRY, ESQ.
DAVID V. HARBACH, II, ESQ.
JESSICA D. ABER, ESQ.
RYAN S. FAULCONER, ESQ.
Counsel for Government;

JOHN L. BROWNLEE, ESQ.
HENRY W. ASBILL, ESQ.
JAMES M. BURNHAM, ESQ.
DANIEL I. SMALL, ESQ.
CHRISTOPHER M. IAQUINTO, ESQ.
Counsel for Robert F. McDonnell;

WILLIAM A. BURCK, ESQ.
HEATHER H. MARTIN, ESQ.
STEPHEN M. HAUSS, ESQ.
Counsel for Maureen G. McDonnell.

JEFFREY B. KULL
OFFICIAL COURT REPORTER

P-R-O-C-E-E-D-I-N-G-S

(In Chambers.)

THE COURT: Whatever the problem is, let's deal with it succinctly.

MR. BROWNLEE: Yes, sir. Last night about 9 o'clock, Your Honor, we were notified by government counsel of what we believe to be pretty highly exculpatory evidence just now provided to us after opening statement. The evidence they provided was during Mr. Williams' first interview on January 23rd, 2012. Apparently, at the conclusion of that interview, they asked Williams if he would wear a body wire or do some sort of recording of Bob McDonnell. Williams declined and lawyered up.

We think that that information is important for two reasons. One, it signaled to Williams immediately that the government was in fact looking at the Governor at that time hard; and then secondly, the fact that he declined, we think, goes to his state of mind.

THE COURT: So you know now. What do you want?

MR. BROWNLEE: What we request is a 48-hour delay for Jonnie Williams. We have about eight questions we provided to the government this morning that we think we should -- we are entitled to the answers to, how this information came to light, why we didn't know it, what the agents actually asked him, and to be able to scrub this

down. We are not accusing anyone of bad faith or anything like that. But we do ask for a 48-hour delay for Williams, he is supposed to be called today, to allow us to scrub this down. And we think that's fair. So that's our request.

THE COURT: Your request will be denied. If you all can't effectively cross-examine Jonnie Williams, you should leave the profession. I mean really. Let's go.

(Recess taken from 9:54 a.m. to 10:00 a.m.)

THE CLERK: Criminal Number 3:14-CR12: United States of America versus Robert F. McDonnell and Maureen G. McDonnell. Mr. Michael Dry, Ms. Jessica Aber, Mr. David Harbach, II, and Mr. Ryan Faulconer represent the United States. Mr. John Brownlee, Mr. Daniel Small, Mr. Henry Asbill, Mr. James Burnham, and Mr. Christopher Iaquinto represent the defendant, Robert F McDonnell. Ms. Heather Martin and Mr. William Burck and Mr. Stephen Hauss represent the defendant, Maureen G. McDonnell. Are counsel ready to proceed?

MR. DRY: The United States is ready.

MR. BROWNLEE: Defense is ready.

MR. BURCK: Maureen McDonnell is ready.

THE COURT: All right. Let's bring in the jury, please.

MR. HARBACH: Would you like the witness in the

stand first?

THE COURT: Yes, have her come on up. Ms. Fulkerson, you realize you are still under oath?

THE WITNESS: Yes, sir.

(The jury entered the courtroom.)

JERRI FULKERSON,

called as a witness by and on behalf of the government, having been previously sworn by the Clerk, was examined further and testified as follows:

DIRECT EXAMINATION (Cont'd.)

THE COURT: All right. Good morning, ladies and gentlemen. Glad to see everybody is back. I apologize for the delay. I had a sentencing that went longer than I thought it would. Stuff happens. Government?

MR. HARBACH: Thank you, Your Honor.

BY MR. HARBACH:

Q Good morning, Ms. Fulkerson.

A Good morning.

Q I'd like to start this morning by asking you about whether in your time working for Mr. Williams there were occasions when Mr. Williams would pay for something with his own money and then expense it to Star; did that ever happen?

A Yes.

Q Did you guys have a system in place to process those

expenses?
A Yes.
Q Tell us about what you would do.
A It is an expense report. I tried to do them at the end of every month or the beginning of the next month. The bills would come in, we would go over them, he would tell me what was to be expensed and the purpose of the expense, and I would submit it to Star.
Q How often would you prepare those expense reports?
A Hopefully every month. Sometimes it was longer.
Q Could we take a look for identification at Government's 182. Ms. Fulkerson, do you recognize this to be an expense report of the type you have been testifying about?
A Yes.

MR. HARBACH: The government offers Government's 182.

THE COURT: It will be admitted.

BY MR. HARBACH:
Q Could we blow up the text, please, Mr. Starnes? Thank you, sir. Okay, you know, I think let's do the left-hand side of the screen so we get the columns and description and then we will scroll over to get the amounts. Okay? Thank you, sir. Are you able to see the first entry on there of May 31st, 2011 and then in the

payee column it says "Kinloch"?
A Yes.
Q What's Kinloch?
A Golf club in Goochland.
Q Was Mr. Williams a golfer?
A Yes.
Q Was he a member at the Kinloch Golf Club?
A Yes.
Q You said it is in Goochland?
A I believe so.
Q Now, on this expense report, there is an entry for May 31st of 2011 that says "Kinloch." Do you see that there?
A Yes.
Q Okay. And then let's, on June 30th, 2011, is that another entry for Kinloch?
A Yes.
Q And then finally, on July 31st of 2011, a third one?
A Yes.
Q Okay. Now, let's briefly scroll over to the right if we could and just see the amounts that are associated with those three entries.
A Yes.
Q How much is associated with the first entry for Kinloch?

A It looks like $2,604.49.
Q Okay. And now, before we go on to the others, let me ask you a question. That one was dated May 31st, correct?
A Yes.
Q Now, does that mean that all of those charges were incurred on Mr. Williams' account on May 31st?
A No.
Q Please explain.
A Kinloch's statements come out once a month, and the statement is dated May 31st, so it was charges for throughout the month.
Q So the 2,600 and change there is the total to Kinloch for the month of May, 2011?
A Yes.
Q Related to this purpose.
A Yes.
Q Namely, meetings with and golf merchandise for Governor McDonnell; have I read that right?
A Yes.
Q Let's go to the next entry now. The second one, second Kinloch entry on the expense report, how much is that one?
A $2,099.29.
Q For this one, Mr. Starnes, we need to zoom out a little bit. Scroll over. That's fine. Do you see where

it is written in the margin there, "Dues, $2,000"?
A Yes.
Q Do you know what that refers to?
A National dues for Kinloch Golf Club.
Q Is $2,000 the correct annual amount for national dues?
A Yes.
Q So for that month, only $99.29 is attributable to Mr. McDonnell, correct?
A Yes.
Q Okay. And that's for the entire month of June?
A Yes.
Q All right. Now, the third entry down there on the bottom, that one is for how much?
A $2,133.91.
Q And again, so the record is clear, is that an entry for the entire month of July?
A It is.
Q And could you scroll a little bit to the left, Mr. Starnes, and so that entire amount, $2,133.91 is attributable to what's listed in the "Purpose" block?
A Yes. Meetings with and golf merchandise for Governor McDonnell.
Q Thank you. You can take that down, Mr. Starnes. Yesterday, you may recall that we talked a little bit

about the Roskamp Institute in Florida; do you remember that?
A Yes.
Q Do you recall testifying about an e-mail exchange you had with Ms. Block about whether Governor McDonnell might be able to attend?
A Yes.
Q And I think we learned yesterday that he did not attend; is that right?
A Yes.
Q Now, did you assist in making flight arrangements for that trip for other folks?
A I believe I did.
Q Let's take a look at Government's 146, please, for identification. Can you blow up the middle part so she can see the description, please, Mr. Starnes?
Ms. Fulkerson, do you recognize this to be paperwork related to the flight arrangements for a trip to the Roskamp Institute that you prepared?
A Yes.
MR. HARBACH: The government offers Government's 146.
THE COURT: It will be admitted.
BY MR. HARBACH:
Q What's the date of the trip down to Roskamp according

to these papers?
A May 31st, 2011.
Q All right. Take that down, Mr. Starnes. Let's take a look for identification at Government's 151, please. Same drill. Could you please just blow up the description in the middle? Thank you, sir. Take a look at that, Ms. Fulkerson. Does this appear to you to be paperwork related to the return trip from Roskamp that you helped prepare?
A Yes.
MR. HARBACH: The government offers Government's 151.
THE COURT: It will be admitted.
BY MR. HARBACH:
Q What was the date of the return trip from Roskamp?
A June 1st, 2011.
Q All right. The next subject is going to start with an exhibit for identification, it is Government's 161, please. Can you blow up the text for her, please? Thank you, sir. Ms. Fulkerson, do you recognize this document?
A Yes.
Q Is this an e-mail that you prepared, excuse me, that you sent to Mary-Shea Sutherland with a couple of attachments?
A Yes.

MR. HARBACH: The government offers Government's 161.

THE COURT: It will be admitted.

BY MR. HARBACH:

Q All right. Let's start with this cover page. Could you read for us the text of the e-mail? What does it say?

A "Jonnie asked that I forward the attached letter and information to you."

Q Would you have sent this e-mail to Ms. Sutherland if Mr. Williams had not asked you to do so?

A No.

Q Does it indicate that there are a couple of attachments?

A Yes.

Q What's the first attachment?

A Letter to Governor McDonnell.

Q And before we go to the attachment, what's the date and time of the e-mail, ma'am?

A June 16th, 2011 at 4:38 p.m.

Q Let's take a look at Page 2 of Government's 161, please. Blow up the text, please, Mr. Starnes. Thank you. This appears to be a letter to Governor McDonnell; do you see that there?

A Yes.

Q Now, do you have any recollection about how this

letter came to be?
A He either dictated it to me or it was forwarded to me.
Q Okay. And then the signature at the bottom, is that Mr. Williams' signature or is that an example of you signing his name for him?
A I believe it is an example of me signing his name.
Q And to reiterate, is that something that you ever did without his express authorization?
A I never signed his name without his direct authorization.
Q All right. Were you involved in drafting this letter at all other than physically putting it together?
A No.
Q If we could look at Page 3 of Government's 161. Actually, before we do that, I'm sorry, Your Honor, could we go back to Page 1, please? Blow up the header there. What's the second attachment, Ms. Fulkerson?
A "Approved Protocol for CRP Study."
Q All right. Now let's take a look at at least Page 3 of Government's 161. You have reviewed this document before you came to Court here today, correct?
A Yes.
Q Is this a multi-page report?
A Yes.

Q Do you recall where it came from?
A I believe it came from Roskamp.
Q You can take the exhibit down, please. One last question. Why did you send the e-mail to Mary-Shea Sutherland?
A Mr. Williams asked me to.
Q The next subject concerns a trip to the Homestead in June of 2011. Do you recall Mr. Williams making a trip over there for an event?
A Yes.
Q And were you involved at all in making travel preparations for some people in connection with that event?
A Yes.
Q All right. First let's start with Government's 160, please. Ms. Fulkerson, is this an e-mail exchange between you and Ms. Block on the subject of a trip to the Homestead?
A Yes.
MR. HARBACH: The government offers Government's 160.
THE COURT: It will be admitted.
BY MR. HARBACH:
Q Now, I'd like to focus with you on the date of this e-mail, ma'am. It says Wednesday, June 15th. Do you see

that there?

A I do.

Q And Ms. Block is inquiring of you whether Mr. Williams is going to attend the Governors' Retreat next weekend at the Homestead.

A Yes.

Q So the following weekend, would that be the weekend that begins Friday, June 24th?

A I believe so.

Q Now, you mentioned a moment ago that you were involved in making some flight arrangements. Tell me what you remember about that.

A First of all, I can never book the plane or agree to anything without Mr. Williams' approval. They asked could the Governor's Office, or Ms. Block asked could Jonnie fly, I believe it was, Ms. McDonnell to the Homestead. Then things changed. He agreed to it. Then things changed and they asked if he could take the two children, two of the children, to the Homestead.

Q Okay. Let's take a look at Government's 163, please. Ms. Fulkerson, is this an e-mail exchange between you and Mary-Shea Sutherland on the subject of these flight arrangements?

A Yes.

MR. HARBACH: The government offers Government's

163.

THE COURT: It will be admitted.

BY MR. HARBACH:

Q Let's start with the e-mail at the bottom of the page, please, the one that you got the beginning of from Ms. Sutherland. What's the date of this one, Ms. Fulkerson?

A June 21st, 2011.

Q So approximately three days before the event?

A Yes.

Q It mentions a change that you just talked about, the first -- says, "The First Lady just requested and Jonnie agreed to skip the Thursday flight. She will drive out with our security detail. And instead, the plane will take the twins and Jeanine to the Homestead on Friday." Did I read that correctly?

A Yes.

Q Do you recall confirming this with Mr. Williams?

A I remember discussing it with him.

Q All right. If we could, it says, "I'm waiting on a time..." If we could see the next page to finish this e-mail from Ms. Sutherland, "...that they would be able to go."

All right, now, read the last sentence for us there, the one that begins "The route would include..."

A "The route would include the twins getting on board in Richmond, the plane would then go to Virginia Beach to get Jeanine, and then take the three of them to the Homestead."
Q Do you recall that issue?
A Yes.
Q Tell us what you remember about that.
A I remember Mr. Williams not wanting to go to Virginia Beach.
Q Not wanting the plane to go to Virginia Beach?
A Yes, I'm sorry, not wanting the plane to go to Virginia Beach.
Q So what ended up happening?
A I believe everybody left out of Richmond.
Q Instead of making the trip to Virginia Beach?
A Correct.
Q Now, as you sit here today, how long have you worked for Mr. Williams approximately?
A 19 years.
Q And over the years, we have talked about the fact that Mr. Williams has allowed politicians to use his plane from time to time?
A Yes.
Q Do you recall any other occasion in your experience where a politician requested the use of Mr. Williams'

plane to transport one of their children across the span of an hour-and-a-half drive?
A No.
Q Do you recall in your experience with Mr. Williams any other occasion where a politician ever asked for use of Mr. Williams' plane to transport their children, period?
A No.
Q Do you recall whether Mr. Williams received an invitation to Mr. and Ms. McDonnell's anniversary party?
A Yes.
Q Can we take a look at Government's 164, please, for identification. Is this the invitation that you just described?
A Yes.
MR. HARBACH: The government offers Government's 164.
THE COURT: It will be admitted.
BY MR. HARBACH:
Q Mr. Starnes, if you could back out, please, I just need the two headers at the top. Both of them, please. Ms. Fulkerson, this e-mail from Maureen McDonnell is directed to jwilliams@starscientific.com. Remind us which of Mr. Williams' two addresses that was.
A jwilliams is the public.

Q The public one?
A Yes.
Q Not the sort of private one?
A Correct.
Q Okay. And is this an example of you forwarding an e-mail from Mr. Williams' public account to his private account?
A Yes.
Q Next subject. Did Mr. Williams have any vacation homes?
A Yes.
Q In particular, did he own one at Smith Mountain Lake?
A Yes.
Q Let's take a look at what's already in evidence as Page 2 of Government's 181. Do you recognize that photo?
A Yes.
Q What is that?
A Mr. Williams' Smith Mountain Lake home.
Q Okay. What about, for identification, please, the first page of Government's 181. Do you recognize that?
A That's the front side.

MR. HARBACH: The government offers Page 1 of Government's 181.

THE COURT: It will be admitted.

BY MR. HARBACH:

Q Same house?
A Yes.
Q One last question. Is there a dock associated with this house?
A Yes.
Q That you can bring up boats to?
A Yes.
Q Can we please take a look at Page 3 of -- excuse me, Page 4 of Government's 181. Do you recognize that?
A Yes.
MR. HARBACH: The government offers Page 4 of 181.
THE COURT: It will be admitted.
BY MR. HARBACH:
Q Is that the dock we are talking about?
A Yes.
Q On the right side of the page?
A Yes.
Q You can take that down, Mr. Starnes. To your recollection, were you ever involved in helping make arrangements for the McDonnells to stay at Mr. Williams' Smith Mountain Lake home?
A Yes.
Q Do you recall what year that was?
A I'm sure you can show me a document, but --

Q I surely can. Can we put up 129 for identification, please?
A 2011.
Q All right. I'm going to go a bit further. Can you blow up the top of that for her, Mr. Starnes?
Ms. Fulkerson, do you recognize this to be an e-mail exchange with Ms. Block on the subject of the arrangements for the McDonnells to stay at Mr. Williams' Smith Mountain Lake home?
A I do.
MR. HARBACH: The government offers Government's 129.
THE COURT: It will be admitted.
BY MR. HARBACH:
Q I'd like to focus on the top e-mail from Ms. Block, Ms. Fulkerson. Let me ask you what the date and time is of that one, ma'am.
A May 24th, 2011 at 1:26 p.m.
Q All right. And she is asking you to see if SML, which you understood to be what?
A Smith Mountain.
MR. BROWNLEE: Objection.
THE COURT: Overruled. Go ahead.
BY MR. HARBACH:
Q What are the dates that Ms. Fulkerson requests use of

the house for the McDonnells for?
A July 28th through July 31st.
Q Okay. Do you recall having a discussion with Mr. Williams about this?
A Yes.
Q Did Mr. Williams agree to let them use the house?
A Yes.
Q Let's take a look at Government's 131 for identification, please. And if you could just blow up just the top there. That's good. Thank you, Mr. Starnes. Is this your response to Ms. Block, to her inquiry about the house?
A Yes.
MR. HARBACH: The government offers Government's 131.
THE COURT: It will be admitted.
BY MR. HARBACH:
Q What was the answer, Ms. Fulkerson?
A "It is available."
Q You can take that down, Mr. Starnes. Were you personally involved in making any other arrangements related to the McDonnells' stay at the Smith Mountain Lake home?
A Yes.
Q Let's take a look at 176, please. If you could just

blow up the bottom half of the page, Mr. Starnes. It is an e-mail from Ms. Fulkerson. Thank you, sir. My question first for you is, do you recognize this document?
A Yes.
Q Is this an e-mail from you to Ms. Sutherland concerning -- well, what does it concern?
A Delivery of a boat.
MR. HARBACH: The government offers Government's 176.
THE COURT: It will be admitted.
BY MR. HARBACH:
Q Okay. You write to Ms. Sutherland -- incidentally, do you recall what Ms. Sutherland's job was?
A Assistant to Ms. McDonnell.
Q Okay. Now, what you write in the e-mail is, "They would like to shoot for delivery between 10 and 11 Friday morning and will call right before they leave." Did I read that correctly?
A Yes.
Q Who is the "they" there?
A Bridgewater Marine.
Q And delivery of what?
A A boat.
Q To where?
A Mr. Williams' house at Smith Mountain Lake.

Q For what purpose?
A Use for the McDonnells.
Q All right. The last sentence of your e-mail says: "I'm still trying to find out about Rachel and the car."
A Yes.
Q First question: Who is Rachel?
A Rachel McDonnell.
Q Is this person related to Mr. and Ms. McDonnell?
A Yes.
Q How so?
A Their daughter.
Q "And the car," what does that mean?
A I believe it is the Land Rover, Range Rover. I'm not sure.
Q Whose Land Rover, Range Rover?
A Mr. Williams.
Q What was that all about, if you recall?
A To the best of my memory, it was about a car for Rachel to drive, either up there or while she was there.
Q Okay. I apologize, could we pull up the second page of 176, please? Actually, I take that back. The first page of 176, at the bottom.

MR. HARBACH: I'm sorry, Your Honor, I neglected to talk about an e-mail at the very bottom, Mr. Starnes. I just need the header at the bottom.

BY MR. HARBACH:
Q That last e-mail is from Ms. Sutherland to you; is that right?
A Yes.
Q Could we go to Page 2 for the text, please, Mr. Starnes? This is earlier in the exchange. The second sentence says: "The First Lady will be arriving at the Smith Mountain Lake house Thursday night with the twins." Do you know who "the twins" are?
A I believe it is their sons.
Q It says: "She will be on site Friday morning to accept delivery of the boat and sign for it." Then she authorized her cell phone number to be given out. Did I read that correctly?
A Yes.
Q Thank you. Sorry about taking those out of order. You mentioned a Land Rover or Range Rover a moment ago. Do you recall being involved in making any other arrangements relating to vehicles for this vacation trip?
A Yes.
Q Tell us about that.
A Mr. Williams arranged for a Ferrari to be taken to the lake house for Mr. McDonnell's use. And I arranged for the car and driver to bring back the employee that took the Ferrari up there.

Q Whose Ferrari?
A Jonnie Williams'.
Q You mentioned an employee.
A A Star Scientific employee.
Q Let's take a look at Government's 195, please. Do you recognize this document?
A Yes.
Q What is it?
A It is a Carey invoice for picking up the Star Scientific employee to bring him back from Smith Mountain Lake.
Q After delivery of the Ferrari?
A Yes.

MR. HARBACH: The government offers Government's 195.

THE COURT: It will be admitted.

BY MR. HARBACH:
Q Okay. So what kind of company is Carey International?
A A limo company.
Q Did you make these arrangements?
A I did.
Q And in the middle of the screen toward the bottom, it says, "Passenger: Hunter, Matt." Do you know who that is?

A Yes.
Q Who is that?
A An employee of Star Scientific.
Q What does it indicate the service date was there to the left? In the bottom left-hand part of the screen.
A July 29th, 2011.
Q Thank you, ma'am. Oh, I'm sorry, 195, please, just for one more minute. Blow up the middle for me, please. That pickup location, 1825 Waters Edge, it says Glen Allen, Virginia, excuse me, for the pickup location, do you know where 1825 Waters Edge is?
A Waters Edge Country Club.
Q Where is that?
A Smith Mountain Lake.
Q I'd like to direct your attention now to August of 2011. Okay? At that time, did you know anything about Ms. McDonnell requesting a Rolex for her husband or anything about a Rolex?
A No.
Q Did you know at the time that Mr. Williams actually bought one?
A No.
Q Do you recall an important event at the Mansion that was scheduled for August 30th of 2011?
A Probably.

Q Okay. Let's take a look at Government's 217, please. Do you recognize this document, ma'am?
A Yes.
Q Is this an e-mail exchange -- correction, is this another example of you forwarding an e-mail on Mr. Williams' behalf to someone else?
A Yes.
MR. HARBACH: Government offers Government's 217.
THE COURT: It will be admitted.
BY MR. HARBACH:
Q Okay, let's start at the top where it says, "From: Jonnie Williams, Sr." I think we just established that this was you sending this e-mail?
A Yes.
Q Not Mr. Williams?
A Yes.
Q Second question: The e-mail at the bottom is from someone named Caroline Birgmann.
A Yes.
Q Do you know who that is?
A She was an employee at Star Scientific.
Q Do you recall what her job was?
A She was involved in the launch and promotion of Anatabloc.

Q When you say the launch, what are you talking about?
A Bringing it out public. I don't know how to describe it. Announcing its production into the market.
Q Okay. And if we could look at, actually, at the top of this page, does this appear to be an attachment?
A Yes.
Q It says "Gov lunch invitations"?
A It does.
Q All right. Could we look briefly at Page 2 of this document? Just blow up any part of it, Mr. Starnes, just as an example.
A Yes.
Q Is this contact information for various people?
A Yes.
Q You can take that down, Mr. Starnes. Ms. Fulkerson, were you involved in planning this event at the Mansion on August 30th?
A No.
Q Did you attend the event?
A No.
Q Do you recall at some point a little bit later in 2011 being involved in helping make -- withdrawn. Were you ever involved in making arrangements for a trip to Bar Harbor, Maine?
A Yes.

Q Tell us what you recall about that.
A I made the arrangements for the Williamses and the McDonnells, there may have been other people involved, to go to Bar Harbor. I believe it was for a weekend. One of the hurricanes came in, and Virginia was a disaster area and the Governor couldn't leave, so the trip was canceled.
Q Let's take a look at Government's 211, please. Could you blow up the top half, please, Mr. Starnes? Do you recognize this document, ma'am?
A Yes.
Q Is this an e-mail concerning travel arrangements for the trip to Bar Harbor that you just described?
A It looks like it.
MR. HARBACH: The government offers Government's 211.
THE COURT: It will be admitted.
BY MR. HARBACH:
Q Okay now, the first question is, in the middle where you have e-mailed to Mary-Shea Sutherland on August 23rd, is there an attachment to this e-mail chain, ma'am?
A Yes.
Q What does it say is the attachment?
A "August 26-28 itinerary doc, Starwood Aviation Trip Sheet."
Q Let's take a look at Page 3 of Government's 211. If

you can blow that up, please. What is this we are looking at here?
A An itinerary.
Q For what?
A August 26th through 28th, 2011.
Q Concerning what trip?
A The trip to Bar Harbor, Maine.
Q And this was the trip that you described a moment ago that never happened?
A Correct.
Q And so -- oh, actually, that begs a question. You mentioned a moment ago that because of the hurricane, Mr. and Ms. McDonnell weren't able to go. And so did you say the entire trip was canceled?
A I believe so.
Q Did Mr. Williams go up there on his own anyway?
A I don't believe so.
Q New subject. During your time working for Mr. Williams, did he pay you annual bonuses?
A Yes.
Q And when he decided to pay you a bonus, what form would that bonus take?
A Either stock or cash.
Q And whose choice was it to get stock or cash?
A Usually the person he was giving the bonus to.

Q So you got to choose?

A Yes.

Q Do you recall an especially large bonus in July of 2012?

A Yes.

Q Do you recall the circumstances that resulted in you getting an unusually large bonus?

A A stock certificate was missing, a very large stock certificate, and he told me that he would pay me a large bonus if I found the stock certificate.

Q Were you able to find it?

A Yes.

Q Did it take some doing?

A Yes.

Q When you found it, did Mr. Williams pay you the bonus?

A Yes.

Q What form did the bonus take?

A He gave me stock.

Q Do you recall how much stock he gave you?

A I can't really remember the value of the stock.

Q Okay. Do you recall, what did you do with that stock after you got it?

A What he asked me to do. I cashed it and bought a vehicle.

Q Approximately how much money did you get when you cashed this stock bonus in?
A $40,000 to $45,000.
Q Did you in fact buy a car?
A I did.
Q And that was about July of 2012?
A I believe so.
Q Okay. What about in December of 2012; did you have a conversation with Mr. Williams concerning a bonus in December of 2012?
A Yes.
Q Tell us about that.
A He offered my year-end bonus or Christmas bonus and asked me which I preferred, stock or cash.
Q What was your answer?
A Stock.
Q Okay. Did he say during that conversation how much stock he planned to give you?
A 10,000 shares.
Q Ten or two?
A 10,000 shares.
Q All right. Did you in fact receive that bonus?
A Yes, but not until the next year.
Q When exactly?
A January of 2013.

Q Do you recall whether it was the beginning or the end of January?
A End.
Q Was that an in-person conversation with Mr. Williams?
A Yes.
Q Tell us what you recall about that, about the conversation where you received your bonus.
A When I finally got my bonus?
Q Yes, ma'am.
A Okay. I was told that he could no longer give me stock.
Q By him?
A By him. And that he would give me the cash equivalent of the stock.
Q So how much cash was he going to give you, did he say?
A $20,000.
Q And how did that get conveyed to you?
A He wrote me a check.
Q He wrote you a check?
A I wrote the check, he signed the check.
Q Oh, I see. So he instructed you to prepare a check for yourself?
A Yes.
Q How much did you make it out for?

A $20,000.
Q When Mr. Williams conveyed that bonus to you, did he mention anything about this investigation?
MR. BROWNLEE: Objection, hearsay.
THE COURT: She can answer that.
THE WITNESS: He just said that in light of everything that had happened, he couldn't give me stock.
BY MR. HARBACH:
Q Did he ask for your help in connection with the investigation?
A No.
Q Did he tell you to do anything or say anything in connection with the investigation?
A No.
Q Okay. Next subject. Let's take a look for identification at Government's 315, please. And Mr. Starnes, this is another one that bleeds across two pages. I'd like to start at the top. Ms. Fulkerson, do you recognize this e-mail exchange?
A Yes.
Q Is this an example, another example of you communicating for Mr. Williams' account on his behalf?
A Yes.
MR. HARBACH: The government offers Government's 315.

THE COURT: It will be admitted.

BY MR. HARBACH:

Q I'd like to start on Page 2, please, Mr. Starnes. The very last e-mail. This one is from someone named Paul Ladenson to you, and the date is February 10th of 2012. Who is Paul Ladenson, if you know?

A Dr. Paul Ladenson is affiliated with Johns Hopkins University.

Q Do you recall whether he had any connection to Star?

A He was doing Anatabloc research.

Q What about the e-mail address that's referenced in the subject line. It mentions a Dr. Frank Crantz. Do you know who that is?

A No.

Q Mr. Ladenson says, "Jonnie wanted this for Dr. Crantz's invitation to the Governor's reception on February 29th." Other than this e-mail exchange that you are involved in here, were you involved in any way with planning the February 29th event at the Governor's Mansion?

A I wasn't involved in the planning. I may have corrected e-mail addresses or provided addresses.

Q Contact information?

A Yes.

Q For invitees?

A Yes.
Q All right. And then if we could go back to Page 1 for a moment. At the bottom of the page, let's look at the header information for the e-mail that appears on the next page. This is an e-mail, it says it is from jwilliams@starscientific.com. Who is actually sending this e-mail, ma'am?
A Me.
Q Who is it to?
A Maureen McDonnell.
Q What's the date?
A February 12th, 2012.
Q Now, if we could look at the top of Page 2 for the content of that e-mail, please. Read what it says there for us.
A "Jonnie asked that I forward this to you and ask that Dr. Crantz gets on the list for the event on the 29th. Please call or e-mail me with any questions."
Q Then the same question I keep asking you: Would you have written that if Mr. Williams had not in fact asked you to do so?
A No.
Q If we could just blow up briefly Ms. McDonnell's response in the middle of the page there. It is a little tough to read because of the text. Tell me if I read this

correctly, okay? Ms. McDonnell appears to write: "Sure, we will mail an invitation to him tomorrow at the below address. I found the address on the Internet so let me know if it should be mailed anywhere different. I'll see if my staff can scan the invite so we can send it to him by e-mail, also." Did I read that right?

A Yes.

Q There is one other name on there we haven't talked about yet, Sarah Scarbrough. That's among the people that Ms. McDonnell copies this e-mail on. Do you know who she was?

A A member of the staff for the Governor.

Q You don't recall what her job was?

A No.

Q You can take down 315, please. Next document for identification is Government's 318. Is this another example of you forwarding an e-mail to Mr. Williams' private account from his public one?

A It is from one account to another. I can't tell.

Q Okay. Take a look at the bottom of the page.

A Yes.

Q Do you see the e-mail address that the original e-mail is sent to?

A Yes.

Q So is this an example of you forwarding it to

Mr. Williams' private account?
A Yes.
MR. HARBACH: The government offers Government's 318.
THE COURT: It will be admitted.
BY MR. HARBACH:
Q Who is the original e-mail from?
A Governor Robert McDonnell.
Q And what's the date of it?
A February 16th, 2012.
Q And it is addressed to Mr. Williams' public or private address?
A Public.
Q At the top, you forward it to which?
A His private. Mr. Williams' private.
Q And this is the following morning?
A Yes.
Q What time did the original e-mail from Mr. McDonnell come in?
A 11:56 p.m.
Q You can take down 318, please. Do you recall at some point in the spring of 2012 Mr. Williams instructing you to make out some additional checks on behalf of the McDonnells?
A Yes.

Q Let's take a look at Government's 350, please. Do you recognize this check, ma'am?
A Yes.
Q And is this a check that you prepared at Mr. Williams' direction?
A Yes.
MR. HARBACH: The government offers Government's 350.
THE COURT: It will be admitted.
BY MR. HARBACH:
Q Okay. Ms. Fulkerson, do you recognize the handwriting on this check?
A Yes.
Q Is that your signature on there?
A It is.
Q And the word "Void" across the center of it, who wrote that?
A I did.
Q Why did you write it?
MR. BROWNLEE: Objection, hearsay.
THE COURT: Overruled.
THE WITNESS: He asked me to take Maureen McDonnell's name out of the memo line.
BY MR. HARBACH:
Q Who asked you to do that?

A I'm sorry, Jonnie Williams did.
Q What about this voided check being made out to MoBo Realty? How did you know to put that there?
A Mr. Williams told me.
Q What about the amount of $50,000, whose decision was that?
A Jonnie asked me to write the check, Donnie okayed the amount.
Q What's the date of this voided check?
A March 6th, 2012.
Q Let's take a look at Government's 351, please. Is this another check you prepared at Mr. Williams' direction?
A Yes.
MR. HARBACH: The government offers Government's 351.
THE COURT: It will be admitted.
BY MR. HARBACH:
Q All right. This is the next check from the register, 1286; is that right?
A Yes.
Q Is your handwriting on this one?
A Yes.
Q Why did you void this one?
A Because when I made out the check, I forgot to take

off Maureen McDonnell out of the memo line.
Q You did it again?
A I did it again.
Q Okay. And is this check the same payee, same amount, same date as the one we were looking at before?
A Yes.
Q All right. Next is Government's 352 for identification. Is this another check you prepared, ma'am?
A Yes.
Q Was this also at Mr. Williams' direction?
A Yes.
MR. HARBACH: The government offers Government's 352.
THE COURT: It will be admitted.
BY MR. HARBACH:
Q Finally, we are at one that's not voided; is that right?
A Right.
Q How much is this check for?
A $50,000.
Q What's the date of it?
A March 6th.
Q Of what year?
A 2012.

Q Now, is the payee the same as before?
A Yes.
Q What about the memo line?
A It says, "Beach House."
Q How did you know to put "Beach House" there?
A Mr. Williams told me.
Q Were you involved in delivering the check that is Government's 352, were you involved in delivering that to anyone?
A I may have been. I believe I Fed Ex'd it.
Q To the address that's on the check?
A Yes.
Q For the record, if we could put up 352. Thank you for your patience, Your Honor. The address that you mailed it to is the one for MoBo Realty; is that right?
A Yes.
Q Not the one for Starwood Trust?
A Correct.
Q Okay. Later on that spring in 2012, did Mr. Williams provide you some instructions concerning a wire transfer?
A I believe so.
Q Let's take a look at Government's 386 for identification. Is this a wire transfer confirmation for the one you just described?
A Yes.

MR. HARBACH: The government offers Government's 386.

THE COURT: It will be admitted.

BY MR. HARBACH:

Q Now, Mr. Starnes, could you blow up just the space between the stars? Thank you. What does it say is the transaction date, ma'am?

A 5-22-2012.

Q In what amount?

A $20,000.

Q And the beneficiary name?

A MoBo Real Estate Partners, LLC.

Q And then underneath it it says, "Attention: Michael Uncapher." Do you know who that is?

A At the time I didn't. Now I know it is --

Q I'm just interested in what you knew at the time, ma'am.

A I didn't know who it was.

Q Could you back out, Mr. Starnes? Last question about this one. Is the handwriting at the bottom right there where it says "Gov McDonnell," whose handwriting is that?

A It is mine.

Q Why did you write that on there?

A A note for my records so I knew how to -- knew where to file it.

Q Okay. One last question: You mentioned in connection with the checks that were on the Starwood Trust account that you had to get in touch with Mr. Donnie Williams to get approval. Do you recall whether you did that in connection with the wire transfer?
A Yes.
Q Did you?
A Yes.
Q All right. Earlier in your testimony, we saw how a couple of checks that you wrote in 2011 were reflected on the ledger. Do you recall that?
A Yes.
Q Let's take a look at Government's 509, please. Is this another excerpt of the Starwood Trust general ledger from QuickBooks?
A Yes.
Q Were you involved in preparing this?
A Yes.
MR. HARBACH: The government offers Government's 509.
THE COURT: It will be admitted.
BY MR. HARBACH:
Q Can you see that okay?
A Yes.
Q Now, on the far left-hand there, it says "Rent" in

bold face. Do you see that?
A Yes.
Q We will come back to that in a second. The third entry is the third line down, it says "Bill 3-6-12." I can't even read that. "MoBo Realty."
A Yes.
Q Are you able to see what letters are highlighted there in the same column where there are a bunch of months; can you make that out?
A Reading from left to right, it says "Bill, March 6th, 2012," it is the beginning of McDonnell, "McDO," then "MoBo Realty," and then "Beach House."
Q Let's back out and see -- scroll over and see what the amount is on the third line down.
A $50,000.
Q Let's go back to the left, please, and on the sixth line down there is another entry I want to ask you about.
A Yes.
Q It says, "Check," and then "5-22-12, Wire MoBo Realty." Did I read that right?
A You did.
Q Let's go over to the other end and see how much that one was.
A $20,000.
Q Okay. Now let's back out and let me ask you the

question I mentioned a moment ago. Why did you put these items in the rent section of the ledger?
A Mr. Williams directed me.
Q You can take that down, Mr. Starnes. Could we pull up for identification, please, Government's 395.
Ms. Fulkerson, is this another example of you forwarding an e-mail to Mr. Williams' private account?
A Yes.
MR. HARBACH: The government offers Government's 395.
THE COURT: It will be admitted.
BY MR. HARBACH:
Q Let's start at the bottom. Who is the original sender of the first e-mail, Ms. Fulkerson?
A Governor Robert McDonnell.
Q On what date did he send this e-mail?
A June 26th, 2012.
Q At what time?
A 2:52 p.m.
Q What does it say in his message to Mr. Williams?
A "Congrats on the patent for Anatabine. Progress continues."
Q And then you forwarded it to Mr. Williams' private account?
A I did.

Q At what time?
A 10:07 p.m.
Q Look again.
A 2:52, June 26th -- I'm sorry, 7:10 p.m.
Q Thank you, ma'am. You can take 395 down. Next subject. As part of your duties for Mr. Williams, were you involved from time to time in helping him prepare various financial paperwork, loan applications and the like?
A Yes.
Q Can we take a look at Government's 421 for identification, please? Is this a document you have reviewed before coming into court to testify here?
A Yes.
Q Do you recognize it to be a loan application of sorts?
A Yes.
Q For whom?
A Capstar Bank for Jonnie Williams.
Q Were you involved in helping prepare this particular one?
A Yes.

MR. HARBACH: The government offers Government's 421.

THE COURT: It will be admitted.

BY MR. HARBACH:
Q Let's show the jury the first page for a moment. And now, if we could go to Page 4, the signature down there at the bottom, is this Mr. Williams' signature or is this you signing his name for him?
A I'm not really sure, but I believe this is me signing for him.
Q Okay. And what's the date?
A October 30th, 2012.
Q Whose handwriting is the date?
A Mine.
Q All right. And then if we could also look at Page 8, please.
MR. HARBACH: Can I have one second, Your Honor?
THE COURT: Sure.
(Counsel conferring with co-counsel.)
BY MR. HARBACH:
Q Page 8?
A Yes, sir.
Q Same couple of questions. The signature that's there, is that Mr. Williams' signing his own signature or is that you signing for him?
A I believe this is me signing for him at his direction.
Q Okay. And then what's the date of this signature?

A October 30th, 2012.
Q Is that also your handwriting on the date?
A Yes.
Q Okay. Before we go further with this particular document, can you tell us what your general practice was when you were preparing a document like this for Mr. Williams? How would you go about preparing it?
A The first time I prepared a personal financial statement, he went over it with me in detail. From there, I would update the financial statements from the past. We would go over them, I would go through every line with him to make sure that he knew what was on them and to ask him any questions if they were correct.
Q Now, let's look at Page 7 of Government's 421, please. In particular, I want to blow up the block at the bottom, Mr. Starnes, the one that says Schedule 9. Ms. Fulkerson, you see that this schedule is called what?
A Other Loan Payables.
Q And there is one loan listed on there.
A Yes.
Q At the time that you helped Mr. Williams fill this out, did Mr. Williams have other loans in addition to the one that is listed here that did not make their way onto this?
A Yes.

Q In particular, did Mr. Williams have some loans that were payable to someone called John McKeon?
A Yes.
Q Who is John McKeon?
A A friend and investor of Mr. Williams' -- a friend of Mr. Williams and an investor in Star Scientific.
Q Why did you not include the loans from Mr. McKeon in this section on this form?
A I didn't remember about the loans, because they weren't payable monthly. I didn't pay a monthly bill to him. They just totally slipped my mind.
Q How did you become aware that the McKeon loans were not on here?
A Mr. Williams asked me some months later if it was on there.
Q Some months later after the October 30th date we saw before?
A Yes.
Q Do you recall about when it was?
A I believe it was in January.
Q Of what year?
A 2012. I mean 2013.
Q Okay. Was the conversation you had with Mr. Williams in person or over the phone or do you remember?
A It was over the phone.

Q Okay. And prior to that call, prior to that call, had Mr. Williams ever told you to keep these loans off?
A No.
Q Prior to this call with Mr. Williams, were there any discussions with him about the loans not being on there?
A No.
Q Did Mr. Williams give you any direction in the call that you had with him?
A Yes.
Q What did he direct you to do?
A He asked me to --
MR. BROWNLEE: Objection, hearsay.
THE COURT: Overruled.
MR. BROWNLEE: Thank you.
MR. HARBACH: Can I have one second, please, Your Honor?
THE COURT: Sure.
(Counsel conferring with co-counsel.)
MR. HARBACH: The objection was overruled?
THE COURT: The objection was overruled.
MR. HARBACH: Thank you, sir.
BY MR. HARBACH:
Q The question was, what did Mr. Williams direct you to do?
A He asked me to contact Bob Pokusa, the General

Counsel for Star Scientific, to ask Mr. Pokusa should the loan have been on the personal financial statement.
Q Okay. And did you do that?
A I did.
Q Let's take a look at Government's 474, please. Is this an e-mail exchange you had with Mr. Pokusa on this subject?
A It is.
MR. HARBACH: The government offers Government's 474.
THE COURT: It will be admitted.
BY MR. HARBACH:
Q Page two, please. Just blow up the body of the e-mail, Mr. Starnes. Could you just read what you wrote to Mr. Pokusa, Ms. Fulkerson?
A "Jonnie has had with John McKeon/JMB, LLC over the last five or six years. It never crossed my mind that I need to list those on his financials. I need to list them on the financials for the jet loan. Of course I was at the big house yesterday and didn't pull them. Do you have a copy you can send to me so I don't have to turn around and go back over the weekend?"
Q Thank you, ma'am. You can take down 474. Next subject: Were you involved in helping to plan travel arrangements to Cape Cod on Labor Day weekend of 2012?

A Yes.
Q Let's take a look at Government's 403 for identification, please. Just blow up the small text. Just blow up the top, please, Mr. Starnes. Do you recognize this e-mail exchange, Ms. Fulkerson?
A Yes.
Q Is this an e-mail concerning the arrangements you helped make for the trip to Cape Cod that you just described?
A Yes.
MR. HARBACH: The government offers Government's 403.
THE COURT: It will be admitted.
BY MR. HARBACH:
Q First question: This is an e-mail from you to someone named Kristen Kaplan. Who is that?
A A staff member of Governor McDonnell's or Ms. McDonnell's.
Q And then the text is small so I'll read this one for you. Tell me if I read it okay. "I'm sorry for the delay in returning this e-mail. I've made reservations at Chatham Bars Inn in Cape Cod, MA for Friday, August 31st and checking out (requested a late check-out) September 3rd. I have a total of four room/suites booked and paid for per Jonnie's instructions." Did I read that right?

A I believe so.
Q Had Mr. Williams in fact instructed you to make these arrangements?
A Yes.
Q Now, what's your recollection of who went on this trip?
A Jonnie and Celeste Williams, Mr. and Ms. McDonnell, Dr. and Ms. Ladenson, and Mr. And Ms. Phil Cox and their toddler.
Q Who is Phil Cox?
A I don't know.
Q Were you involved in making flight arrangements in connection with this trip?
A On the Starwood Aviation jet, yes.
Q Let's take a look at Government's 408, please. Is this paperwork related to the flight arrangements for the trip to Cape Cod that you have just been describing?
A I believe so.
MR. HARBACH: The government offers Government's 408.
THE COURT: It will be admitted.
BY MR. HARBACH:
Q What was the date of the trip up to Cape Cod, ma'am?
A This one is dated August 31st, 2012.
Q All right. You can take the exhibit down. Apart

from the hotel accommodations that you have already talked about, do you recall being involved in helping make any other arrangements for recreation and the like on the trip?

A Yes.

Q What do you remember?

A I remember I made yacht reservations for a day of yachting, sailing; golf reservations or golf tee times; and spa times for the women.

Q Now, after the trip, did you have any --

A Oh, and dinner reservations. Sorry.

Q Okay. After the trip, were you involved at all in helping fill out paperwork at the request of the Governor's Office?

A Yes.

Q Let's take a look at Government's 410, please. This is a two-page document. I'm going to show you Page 1 and then ask Mr. Starnes to let you see Page 2.

THE COURT: Could you hold up a second?

MR. HARBACH: Yes, Your Honor.

THE COURT: Go ahead.

BY MR. HARBACH:

Q Thank you, Your Honor. Ms. Fulkerson, the documents you have just looked at that are Government's 410, do you recognize those to be the documents that you prepared in

correspondence with the Governor's Office following the trip to Cape Cod?
A Yes.
MR. HARBACH: The government offers Government's 410.
THE COURT: It will be admitted.
BY MR. HARBACH:
Q Okay. Now, the first page, let's just blow up the text there. Actually, before we do that, Mr. Starnes, do you recall where you got this form from, Ms. Fulkerson?
A The Governor's Office would have sent it to me.
Q Was this standard practice for them?
A Pretty much. If they needed it filled out they would send me the form.
Q I see. And in this particular case, the block that's filled in, Date of Contribution, is August 31st of 2012 and then the details, it says, "From Richmond, Virginia to Hyannis, Massachusetts." Is this connected with the Cape Cod trip we have been talking about?
A Yes.
Q All right. And in Contribution Information on this one, it has "Flight Checked" and there is an amount listed there?
A Yes.
Q What was the amount?

A $1,299.74.
Q And then let's look at Page 2, please. By the way, did you have an understanding of what the purpose of these forms was?
A I believe it was for reporting purposes on the Governor's staff's end.
Q Understood. This second page of Government's 410 includes some more contribution information. And is this your handwriting on both of these pages?
A Yes.
Q There's some amounts listed there, and some math calculations that were done. And I don't intend to walk you through all of those except to ask you this question: Did you make an effort to calculate some, only some portion of the expenses associated with the trip to attribute to the McDonnells?
A I did.
Q Instead of just putting the whole number on there?
A Correct.
Q You can take down 410, please. Were you involved in making additional travel arrangements for another member of the McDonnell family also on Labor Day weekend of 2012?
A I believe so.
Q Let's take a look at Government's 401, please. Ma'am, do you recognize this to be an e-mail exchange

between you and Rachel McDonnell on the subject of travel arrangements you were making for her?
A Yes.
MR. HARBACH: The government offers Government's 401.
THE COURT: It will be admitted.
BY MR. HARBACH:
Q The first place I'd like to start is on the second page, at the bottom. If you can blow that e-mail up, please. This one says, "Jonnie asked me to contact you to get details on your trip to Florida so I can make the flight reservations, et cetera." Did I read that right?
A Yes.
Q Did Mr. Williams in fact get in touch with you about this?
A Yes.
Q What do you recall about how this came about?
A Jonnie asked me to call or contact, e-mail Rachel McDonnell because she was going to Florida for the weekend with a girlfriend.
Q Okay. Now, if we could look back at Page 1, the e-mail at the bottom first, please. Now, this is from Rachel McDonnell to you.
A Yes.
Q And it says: "We are hoping to leave Wednesday,

August 29th in the early evening and come back Monday, September 3rd in the evening."

Is that the same weekend that the McDonnells, the parents McDonnell, and the Williamses were in Cape Cod?

A Yes.

Q All right. Let's back out and look at the e-mail at the top, please. This is an e-mail from you to Mr. Williams at his private account; is that right?

A Yes.

Q What do you ask him?

A "Do I get her a commercial flight," or is he going to be around to take her down, basically, in the jet.

Q Could you explain what you mean by that?

A I asked him do I get her a commercial flight or is the jet going to be in Richmond and that Rachel McDonnell could, or wherever she was, to fly on the jet.

Q Okay. Let's take a look next at Government's 404, please. Ms. Fulkerson, do you recognize this to be another e-mail in your exchange with Rachel McDonnell concerning this trip?

A Yes.

MR. HARBACH: The government offers Government's 404.

THE COURT: It will be admitted.

BY MR. HARBACH:

Q Could you read us the first couple of lines there, please?
A "I just talked to Jonnie (JW). He is going to pick you up in Tampa on Wednesday. Just need to -- what time and where and where." It should have been "where and when." "Also, you will be staying at the condo located located at --"
Q And then the address is blacked out?
A Yes.
Q When you wrote "He is going to pick you up in Tampa on Wednesday," what did you mean by that?
A He is going to pick you up by vehicle, by automobile.
Q We are not talking about the jet here.
A Correct.
Q And then the next paragraph, "And JW said you are going to drive his white Range Rover"?
A Yes.
Q Same vehicle we were talking about before with respect to Smith Mountain Lake?
A It may not have been the exact same one, but one just like it.
Q Okay. And then it says, "He will get the passes to Ritz Carlton Beach Club for you and take care of all that when you get there." Did I read that correctly?
A Yes.

Q Do you recall why you needed to cancel her flight?
A I don't remember.
Q Okay. To your recollection, did she fly down commercial or did she use Mr. Williams' jet, or do you recall?
A If he picked her up in Tampa that would have meant she flew commercial.
Q Understood. You can take down 404, please. Let's take a look at, well, let me just ask you before we show you the document. Were you involved in helping make any other arrangements for Rachel McDonnell's trip to Florida besides the flight exchange e-mails and transportation?
A Yes.
Q What were you involved in?
A Arranging for her to go out on a yacht that Jonnie had access to.
Q Okay. Let's take a look at Government's 414, please. Is this paperwork related to that arrangement for the yacht?
A Yes.
MR. HARBACH: The government offers Government's 414.
THE COURT: It will be admitted.
BY MR. HARBACH:
Q Now, you said a moment ago that this was a yacht that

Mr. Williams had access to. Did he own it?
A No.
Q What does it indicate was the, on the left-hand side, the date there?
A September 3rd, 2012. I'm sorry, the date of the trip was September 2nd, 2012.
Q Okay. Did you pay this invoice?
A I'm not sure if I paid it or Star Scientific paid it.
Q Understood. You can take down 414, please. New subject. At some point along the way, were you involved in helping to make arrangements for a high-dollar wedding gift for Jeanine McDonnell and Adam Zubowsky?
A Yes.
Q What kind of high-dollar gift are we talking about?
A A whole-house generator.
Q And whose idea was it to get that as a gift?
A Jonnie Williams'.
Q So what did you do to help look into that?
A I was asked to contact contractors in the Virginia Beach area to set up an estimate and installation.
Q Did you do that?
A I did.
Q Let's take a look at Government's 428 for identification, please. Do you recognize this e-mail exchange, ma'am? I can show you more of it if you need me

to.

A I just can't see it. Yes.

Q Is this an e-mail exchange you had with a company in your efforts to procure a generator for Jeanine McDonnell and her groom-to-be?

A Yes.

MR. HARBACH: The government offers Government's 428.

THE COURT: It will be admitted.

BY MR. HARBACH:

Q Let's start at the top. There is an attachment that says Michael & Son CCAF. Can you read that there?

A I can.

Q What's Michael & Son?

A It is the company I contacted about the generator installation.

Q All right. And did you in fact get an estimate?

A After this was completed, yes.

Q Okay. Let's take a look at Page 5 of Government's 428. This says it is a credit card authorization. Did you fill this out?

A I did.

Q Why did you need to do this?

A Michael & Son would not give the estimate without a credit card authorization.

Q Okay. Now, at the bottom of Page 5 here, there is a signature. And let me ask you, do you know, is that Mr. Williams' signature or is this another example of you signing his name for him?
A I believe this is my signature that he directed me to sign for him.
Q Okay. And what's the date of this one, 10-13 --
A 2012.
Q All right. Before we go further on the generator issue, during your time for Mr. Williams, have you also worked as a Notary Public?
A Yes.
Q And from time to time, while you were working for Mr. Williams, would you ever notarize his signature when you had in fact signed it?
A At his direction, telling me to sign it, yes.
Q Now, back to the generator for Jeanine McDonnell and Adam Zubowsky. Did Mr. Williams in fact end up getting a generator for them?
A No.
Q Why not?
A The logistics of trying to get it installed, the cost, it was more than what he thought it was going to be, and the logistics of trying to get it installed long distance was too much.

Q Did he give them a different gift instead?
A Yes.
Q What did he direct you to help prepare for them?
A A check. And he also gave them first class tickets for their honeymoon, airline tickets.
Q Airline tickets. Do you recall how much the check was?
A I believe it was $10,000.
Q Let's take a look at Government's 442, please, for identification. I can do it with paper if it suits the Court. Here we go. Ms. Fulkerson, can you see the screen there okay?
A No. It is still blank.
MR. HARBACH: Can I tender a paper copy to the witness for identification?
THE COURT: Sure.
THE WITNESS: Oh, here it is. Stop.
BY MR. HARBACH:
Q Is this an e-mail exchange between you and Mr. Adam Zubowsky related to this issue we have been talking about?
A Yes.
MR. HARBACH: The government offers Government's 442.
THE COURT: It will be admitted.
BY MR. HARBACH:

Q What's the date of this e-mail, ma'am?
A December 20th, 2012.
Q It says, "I know I have your address somewhere but for the life of me I can't lay my hands on it" and so on. Why did you need Mr. Zubowsky's address?
A In order to mail the check.
Q The gift check we have been talking about?
A I believe so, yes.
MR. HARBACH: Excuse me one second, Your Honor.
(Counsel conferring with co-counsel.)
BY MR. HARBACH:
Q My colleagues point out I haven't asked you who Adam Zubowsky is. Do you know who he is?
A I believe he is now Jeanine McDonnell's husband.
Q How is Jeanine McDonnell related to Mr. and Ms. McDonnell, if you know?
A Daughter.
Q Do you know whether Mr. Zubowsky worked for Mr. McDonnell?
A I believe so.
Q Do you know in what capacity?
A I can't remember.
Q Okay. Were you involved at all -- this is a new subject. Were you involved at all in helping to make arrangements for a trip to Savannah, Georgia for other

members of the McDonnell family in January of 2013?
A Yes.
Q Do you have a recollection of that?
A Yes.
Q Tell us what you recall.
A I remember being contacted by telephone in the evening by Ms. McDonnell telling me that Jonnie had okayed flights, commercial flights for the girls, and I can't remember which girls, their daughters, for the bachelorette party for one of them.
Q Okay. And this is for the trip that I asked you about?
A Yes, I'm sorry. Yes.
Q That's quite all right. Apart from the conversation you just related, have you ever talked to, excuse me, spoken to Ms. McDonnell yourself besides that one time?
A Not that I can remember.
Q Okay. Let's take a look at Government's 464, please.
///
///
///
///
///
///
///

Q Now, I'm going to represent to you, Ms. Fulkerson, that this is a text message. Okay?
A That's fine.
Q Do you recognize it to be one between yourself and Jonnie Williams on this subject?
A Yes.
MR. HARBACH: Your, Honor the government offers Government's 464.
THE COURT: It will be admitted.
BY MR. HARBACH:
Q All right. Could you read this one to us, please?
A Just the body of the text?
Q Yes, ma'am.
A It says, "1st lady of va called. Tried to call u. She is looking for flights round trip to Savannah for 2 of her girls. For Jeanine bachelorette party. Is it ok to book for points?"
Q What do you mean by that last question?
A "To book for points"?
Q Yes, ma'am.
A Jonnie has a lot of American Express points, and you can book flights and pay for them with his points so it doesn't cost him dollar wise.
Q I see. So we're talking about commercial flights here?

A Yes.
Q Not the private jet?
A Correct.
Q Do you know if Mr. Williams agreed to that request?
A Yes.
Q Did you, in fact, purchase tickets on points for two of the McDonnells' daughters?
A Yes.
Q Do you recall which ones?
A I'm guessing Caitlin or Rachel. Cailin or Rachel. I'm sorry.

MR. HARBACH: May I please have one second, Judge?

THE COURT: Sure.

(Counsel conferring with co-counsel.)

MR. HARBACH: For refreshment purposes only, I'd like to show the witness Government's 467, page 4. Just the bottom e-mail, please, Mr. Starnes.

BY MR. HARBACH:

Q Ms. Fulkerson, does taking a look at this help you remember which two daughters you made these arrangements for?
A Yes.
Q Okay. Which two? Can you take a look at --
A Rachel and Cailin.

Q I'm sorry?
A Rachel and Cailin McDonnell.
Q Thank you, ma'am. Okay. New subject. Do you recall Mr. Williams ever telling you that Ms. McDonnell had sent him a box with items he had purchased before -- purchased for her along with a note? Did he ever tell you that?
A No.

MR. HARBACH: May I please have a moment, Judge?

THE COURT: Yes.

(Counsel conferring with co-counsel.)

MR. HARBACH: Thank you, Your Honor. I have no further questions at this time.

THE COURT: All right. We'll take our morning break now, 15 minutes. If you all would follow the marshal.

(The jury left the courtroom.)

(Recess taken from 11:16 a.m. until 11:34 a.m.)

THE COURT: All right. Let's bring in the jury, please.

(The jury entered the courtroom.)

THE COURT: All right. Cross-examination.

MR. BROWNLEE: Thank you, Judge.

**CROSS-EXAMINATION**

BY MR. BROWNLEE:
Q Good morning, Ms. Fulkerson. How are you today?

A I'm okay.
Q Good. My name is John Brownlee and I'm an attorney for Bob McDonnell, and I'm going to ask you just a few questions this morning. Okay?
A Okay.
Q Thank you very much. Now, I believe that you testified that you've worked for Jonnie Williams for a very, very long time; is that right?
A Yes.
Q Okay. And you've been his personal assistant I believe since about 1996, '98?
A '98.
Q Okay.
A Sometime around then.
Q Okay.
A I'm very bad with years.
Q Okay. That's all right. So it's a good long while?
A Yes.
Q Okay. And is it fair to say that you respect Mr. Williams?
A Yes.
Q Okay. And you like Mr. Williams?
A Yes.
Q Okay. And fair to say that, in your opinion, you've been a loyal employee to Mr. Williams for a very, very

long time?
A Yes.
Q Okay. And he has, in your opinion, treated you well over those years?
A Yes.
Q Okay. Now, you still work for him; is that correct?
A Yes.
Q Okay. Now, it's my understanding that he no longer works for Star Scientific; is that correct?
A I believe he's still employed with Star.
Q Okay. But you work for him personally; is that correct?
A I work for Star Scientific as well.
Q Okay. So you work for the company --
A And for Mr. Williams.
Q And for Mr. Williams. Okay. So just so I understand and the jury is clear, does your paycheck come from Star Scientific or Mr. Williams or both?
A From Star Scientific.
Q Okay. So you're paid for by the company, but you still are the personal assistant to Mr. Williams?
A Yes.
Q Okay. And he has some affiliation now with the company?
A Yes.

Q Okay. And you still work for him today, as you sit here today; is that correct?
A Yes.
Q Okay. And you still work for Star Scientific today; is that correct?
A Okay.
Q So as you're sitting here today, you are an employee and being paid for by Star Scientific and Jonnie Williams?
A Correct.
Q Now, Mr. Harbach asked you a couple things about some bonuses you've received?
A Yes.
Q I think one of them was 50 or $60,000 for finding a stock certificate; is that right?
A Somewhere around that range, yes.
Q Fair to say Mr. Williams is very generous?
A Yes.
Q Okay. And then I think you testified that you also received a 20,000-dollar cash bonus in January of 2013; is that right?
A Yes.
Q Okay. Now, when you received that bonus, did you know that Mr. Williams was being investigated at that time for securities fraud?
A I didn't know what he was being investigated for, but

I knew he was being investigated.
Q Okay. And so after that, after you learned that he was being invest- -- you -- he was being investigated, he gave you $20,000 cash; is that right?
A Yes, in lieu of my bonus I was already supposed to get.
Q Okay. Is it fair to say that the $20,000 bonus was the largest cash bonus you had received to date, at that time?
A I don't remember when I got the other one.
Q Okay. So it could have been before or after?
A The year-end bonus?
Q Yes.
A Yes.
Q Okay. So the year-end bonus that you received in January of 2013 was the largest year-end bonus you had ever received?
A As cash.
Q As cash. Okay. And you received that from Mr. Williams?
A Yes.
Q After you knew he was being investigated for securities or some other type of case?
A Yes.
Q Okay. Now, you are represented by counsel here today

is that correct?
A Yes.
Q And your lawyer here is Mr. George Terwilliger; is that correct?
A Yes.
Q And you understand Mr. Terwilliger at one time was the Deputy Attorney General of the United States; is that right?
MR. HARBACH: Objection.
THE COURT: Sustained.
BY MR. BROWNLEE:
Q He also has an associate working for him; is that correct?
A Yes.
Q And that is Dallas Kaplan; is that correct?
A Yes.
Q And they have been working with you in preparation for your testimony here both yesterday and today; is that correct?
A Yes.
Q Okay. And it's fair to say those lawyers are very expensive?
A I guess.
Q You guess. Okay. Are you paying for your lawyers?
A No.

Q Okay. Star Scientific and Mr. Williams taking care of that?
A I believe Star Scientific is paying it.
Q Okay. So fair to say that the company that Mr. Williams has some affiliation with, Star, who pays your salary, is also paying for your attorneys?
THE COURT: We don't need the summary question. She's already answered all of that.
MR. BROWNLEE: Thank you, Your Honor.
BY MR. BROWNLEE:
Q Now, prior to today, we've never had a chance to meet; is that correct?
A I don't believe so.
Q Okay. So you and I have never talked before; is that right?
A To the best of my memory.
Q Okay. Fair enough. And yet prior to coming here today, you met with the good folks from the government here on at least four or five occasions; is that right? I think with maybe one or two of them were phone calls, but you've met with them on several occasions; is that right?
A Yes.
Q To go over your testimony and to prepare for being here?
A I've met with them to cooperate.

Q Okay. Now, as Mr. Williams' assistant, is it fair to say that you were responsible, from time to time, for paying for his personal bills?
A Yes.
Q Okay. And so do you also pay the bills for his adult children?
A Yes, some of them.
Q And do you pay the bills for Starwood Trust?
A With Donnie's authorization on the unusual bills, yes.
Q Okay. Let's talk a little bit about Starwood Trust so we kind of understand what that is. It's my understanding Starwood Trust is a trust that Mr. Jonnie Williams set up for the benefit of his children; is that correct?
A I believe so.
Q Okay. And that Mr. Donnie Williams is his brother who is the trustee?
A Yes.
Q Okay. So in order for you to write a check from Starwood Trust or to pay a bill from that account, you need to get Donnie Williams' approval; is that correct?
A If it's an unusual bill, yes.
Q Okay. And if it's an unusual, does that mean high, a lot?

A High or not a monthly bill.
Q Okay. And then also there's -- you pay the bills for Starwood Aviation --
A Yes.
Q -- is that right?
And Starwood Aviation, just so we understand, is the company that holds the airplane that Mr. Williams uses; is that right?
A Yes.
Q Okay. So -- now, Starwood Aviation is separate from Star Scientific; is that correct?
A Yes.
Q Okay. So if Mr. Williams were to use the aircraft for the benefit of Star Scientific, then Starwood Aviation would bill Star Scientific; isn't that right?
A Yes.
Q Okay. And who are the owners of Starwood Aviation?
A Jonnie Williams.
Q Okay. So Jonnie Williams is 100 percent owner of Starwood Aviation?
A Yes.
Q And he's the largest shareholder of Star Scientific; is that correct?
A I believe so.
Q Okay. And so when he would use the plane for the

benefit of the company, Star Scientific, Starwood Aviation, from which he's 100 percent owner, would make money; isn't that right?
A I don't really know if they made money.
Q Okay.
A The agreement was we would bill it at cost, plus maintenance.
Q I see. Now, you discussed some instances in which you signed documents for Mr. Williams; is that correct?
A Yes.
Q Okay. And I think you've testified or you've stated that you -- when you first came on board you kind of took the time to learn how to copy his signature; is that correct?
A At his direction.
Q The answer is yes?
A Yes.
Q Okay. And you did that because Mr. Williams asked you to learn how to sign his name?
A Yes.
Q Okay. And -- now, are you left-handed?
A No.
Q Okay. Mr. Williams is; is that correct?
A Yes.
Q Okay. So you kind of had to learn how to write his

signature with your right hand or your left hand?
A My right hand.
Q Okay. So you had to -- how long did that take to kind of learn how to get Mr. Williams' signature down?
A I don't remember.
Q Okay. Is it fair to say that you've looked over some documents here over the past month or so and you've had difficulty determining which one Mr. Williams signed and which one you signed?
A Yes.
Q So it's a pretty good copy of it; is that right?
A I guess.
Q Okay. All right. Now, is it fair to say that you would sign on his behalf more than just bills for companies that we talked about? Is that right?
A Yes.
Q Okay. And, in fact, I think it's fair to say you would sign whatever Mr. Williams asked you to sign?
A What he directed me to, yes.
Q Okay. Now, I think that counsel asked a little bit, you are a notary public; is that right?
A Yes.
Q Okay. And so we're all clear, a notary public is an official, designated by Virginia law, to notarize; that is, kind of confirm under oath signatures; is that

correct?
A Yes.
Q Okay. And as a notary, fair to say that you took an oath that you would faithfully perform, to the best of your ability, the duties of the office of notary public?
A Yes.
Q Okay. And essentially what you are attesting to when you are a notary is that the person is, in fact, in your presence, correct?
A Yes.
Q And that the person who is signing the document is, in fact, signing the document?
A Yes.
Q Okay. Now, you do understand that it could be a crime under the laws of Virginia to notarize a document if the signor is not in the presence of the notary at the time the document is signed?
A That's not for me to determine. I don't know.
Q Okay. Now, when you became a notary, did you -- did you take any training?
A You read a book.
Q Ma'am?
A I believe you read a book.
Q Okay. And in that book did it describe Virginia Code 47.1-15 that goes through the fact?

A I'm guessing it does.

Q Okay. And you do understand that when you are a notary and you notarize a document, you are attesting to the fact that that person is, in fact, there?

MR. HARBACH: Objection. We've been over this.

THE COURT: The objection is overruled. Go ahead. You can answer.

A I'm sorry. Could you repeat the question?

BY MR. BROWNLEE:

Q Well, let me ask it this way. Mr. Williams, most of the time, lived in Florida; is that correct?

A Over the years, it's half and half, I guess.

Q And he would ask you, from time to time, to sign documents for him and then notarize them, and you would do that; is that correct?

A Yes.

Q Okay. And so you would essentially forge his signature and then notarize that he was there when he was not?

A I don't know if you would call it forgery.

Q Okay.

A I'm just -- I did what he told me.

Q Okay. And so he asked you to -- to sign his name for him; is that correct?

A Yes.

Q Okay. And he wasn't there?
A Correct.
Q Okay. And then you notarized it, you put the seal on it and attested to, pursuant to being a notary?
A Yes.
Q Okay. Now, I believe, Ms. Fulkerson, you had met with the government three times, and during those three times, this whole notary issue was never raised; is that right?
A I don't remember. We met about a lot of things.
Q Okay.
A Okay?
Q Is it fair to say that this whole notary issue came up fairly recently?
A I believe so.
Q Okay. And is it fair to say that recently you informed the government that you would not testify unless you were immunized, provided immunity from prosecution for all the things that happened with Mr. Williams unless -- and you wouldn't testify unless they granted you immunity; is that correct?
A I don't know what immunity is. My lawyers went to the government or to the judge to protect my constitutional rights.
Q Okay. So Mr. Terwilliger, who's paid for by Star,

went to the government and said you won't testify unless you got some protection. Is that fair?

MR. HARBACH: Objection.

THE COURT: Overruled.

A I -- I've always been willing to cooperate and to be truthful. I felt like I needed some protection and my constitutional rights upheld.

BY MR. BROWNLEE:

Q Okay. And that protection is because you did some things based on what Mr. Williams asked you to do?

A That's not for me to judge. I just felt like I needed my protection.

Q Okay. Well, can you tell me what you think you needed protection for?

A I just wanted my -- none of my own words to be used against me. I just wanted my constitutional rights upheld.

Q Okay. And so -- okay. Well, let me move along.

Now, it's my understanding that what you told the United States in all your interviews is that you never signed anything for Mr. Williams in an effort to help him kind of cover up something; is that correct?

A To the best of my knowledge, I've never signed anything to help him cover up anything.

Q Okay. And so -- can we -- Your Honor, can we pull

up, just for the witness and counsel, not for the jury, RM-1970? And can you show me the last page of that, please? Okay.

BY MR. BROWNLEE:

Q Ma'am, I'm going to show you what has been marked as RM-1970, and in looking at this document, is your signature on it?

A Yes.

Q Okay. And is this your certificate of notary?

A Yes.

Q Okay. And can you read the part there that begins, "On December 31st, 2007," for us?

A "On December 31st, 2007, before me, Jerri M. Fulkerson, a notary public in and for said state, personally appeared, Jonnie R. Williams, known to me, parens, or proved to me on the basis of satisfactory evidence, to be the person whose name is subscribed to the within instrument, and acknowledged to me that he or she executed the same in his or her authorized capacity and that by his or her signature on the instrument, the person, or the entity upon behalf of which the person acted, executed the instrument."

Q Okay. And then you signed that --

A Yes.

Q -- attesting to that?

MR. BROWNLEE: Okay. Can you go to the other page?

BY MR. BROWNLEE:

Q Okay. And if you look at the last part there, I believe you stated that on this document, this is actually your signature for his; is that correct?

A I believe it is.

Q Okay. And so fair to say that Mr. Williams came to you or called you and said, "I need you to sign this document for me," and you did so and then attested that he was actually there?

A I attested that he actually executed it.

Q Okay. And that he signed it?

A If that's what the whole blurb says, yes.

Q Right. Right. But you signed it?

A Yes.

MR. BROWNLEE: Can you pull it back up?

BY MR. BROWNLEE:

Q Now, if you look there, the date is 12/31/07?

A Correct.

Q Okay. And that's the date that he -- that you purportedly signed it on his behalf?

A Yes.

MR. BROWNLEE: Okay. And can you go back to the front page, please? First page.

BY MR. BROWNLEE:

Q Okay. And this is a loan document in which Mr. Williams is loaning money to a company of his called Starwood Industries, Inc.; isn't that right?

A Yes.

Q Okay. And he's loaning a company that he owns a million dollars on the last day of the year for December 31, 2007; isn't that right?

A I don't remember this document, but yes.

Q That's what it looks like?

A That's what it looks like.

Q Now, let me just ask you, Ms. Fulkerson, do you recall, in this instance, that Mr. Williams asked you to prepare this document after the end of the year; that essentially what he wanted you to do was to prepare this loan document and then backdate it? Do you remember that?

A I don't remember the document. So no, I don't remember that.

Q Okay. Let me -- let me show you -- just for her -- RM-1969.

MR. BROWNLEE: If you'll blow up the top part, please.

BY MR. BROWNLEE:

Q Now, Ms. Fulkerson, this is an e-mail sent to you, it says Jonnie Williams, but we've seen, from the prior

testimony, that you control his e-mail account. And for 14.95, you purchased this LoanBack, Incorporated document to create this loan; isn't that right?

A I purchased a LoanBack document on February 8th.

Q Right. And so you got this LoanBack document, which is just a good old standard legal document that you can get on-line to create a loan, but here you're getting it on February 8th and you see it was signed on December 31, '07, correct?

A It may not be the same one.

Q It may not be the same one.

A I've got them before.

Q Okay. So you just don't recall whether or not you got this one in February of '08 and then used it in December of -- at the end of the year '07 to backdate that loan?

A Correct.

Q Okay. And were you aware that by backdating that loan Mr. Williams was able to reap a windfall of about $300,000 on his taxes?

MR. HARBACH: Objection.

THE COURT: Sustained.

BY MR. BROWNLEE:

Q Okay. Let me show you 1966. Thank you. Now, Ms. Fulkerson, this is a -- what they call an Affidavit of

Inventorship, which -- and you've been shown this before, in which you've acknowledged that this is, again, your signature and not Mr. Williams'; is that correct?
A It may be.
Q Does it look like it may be yours?
A Possibly.
Q Okay. And it's dated December 3rd, 2010, correct?
A Yes.
Q Okay. Is that the right date or is that -- could that be a different date?
A I don't know.
Q Okay.
A I don't -- I don't remember the document. So I don't know.
Q Okay. Is it fair to say that from time to time, Mr. Williams asked you to put different dates on documents?
A No. I don't remember him ever asking me.
MR. BROWNLEE: Okay. Now come down a little bit on the document.
BY MR. BROWNLEE:
Q And, again, this is your notary signature affirming that, in fact, Mr. Williams was present when this could be your signature, right?
A Yes.

Q Okay. And you understood that -- if you go back to the top part -- that Frank O'Donnell here, mentioned in the document, was a former business partner of Mr. Williams, correct?
A Yes.
Q And at the time this document was used, Mr. O'Donnell was going through a divorce in Arizona; is that correct?
A I don't know.
MR. HARBACH: Objection.
THE COURT: If she knows. You can answer the question.
A I don't know. I don't know when his divorce was.
BY MR. BROWNLEE:
Q Okay. Do you recall being asked to send this affidavit to a court for use in a proceeding?
A I don't remember the affidavit. So no, I don't remember it.
Q Okay. All right. Thank you.
MR. BROWNLEE: Let me look up 1967. All right. And if you'll turn to page 2, please.
BY MR. BROWNLEE:
Q Again, now, Ms. Fulkerson, this is a Bank of America authorization to re-register securities form.
A Okay.
Q And here once again, you are the notary on the

document; is that correct?
A Yes.
Q And that's your signature on it, correct?
A Yes.
Q Now, I believe you've told the government that this signature here is -- is not Mr. Williams'. It's, in fact, yours; is that right?
A I believe it -- I believe that's true.
Q Okay. So that's not -- so you signed that for him?
A I believe so.
Q Okay. And that was dated January 27th, 2009; is that correct?
A Correct.
Q And then to the right there is Celeste Williams?
A Yes.
Q Okay. And you signed for her as well; is that correct?
A No. She signed.
Q She signed?
A That's her signature.
Q Okay. So was she there in Virginia when you did that?
A I believe so.
Q Okay. But Mr. Williams was not?
A That's possible.

MR. BROWNLEE: Okay. And then if you go to the -- I think the top of that page, please.

BY MR. BROWNLEE:

Q And this was sent to Bank of America; is that correct?

A I believe so.

Q Okay. And if you go to the top there -- I think if you go a little higher -- you see there's a facsimile indicator --

A Yes.

Q -- is that right?

A Yes.

Q Okay. So you sent this document, false document, by facsimile to a bank, correct?

MR. HARBACH: Objection.

THE COURT: Sustained.

BY MR. BROWNLEE:

Q Did you send this document to a bank?

A It appears I faxed this document to a bank.

Q Okay. And this document has Mr. Williams' signature on it, but, in fact, you signed it; is that right?

THE COURT: She said that.

MR. BROWNLEE: Thank you, Your Honor.

All right. Let's look up 1975. If you'll go down, please, thank you, to the next page, to the last

page. Okay.

BY MR. BROWNLEE:

Q Now, again, this is a BB&T Note Modification Agreement, and is, again, this your notary on this?

A Yes.

Q Okay. And if you go to the page before, there's a signature apparently of Mr. Williams, and, again, does that appear to be his signature or yours?

A I can't tell.

Q You can't tell. Okay.

BY MR. BROWNLEE:

Q Let me -- we can take this down. Thank you.

Let me change direction here a little bit. I think you talked about you were responsible for making payments from the Starwood Trust; is that correct?

A Yes.

Q And I think you testified Mr. Williams set this trust up for the benefit of his children?

A Yes.

Q Okay. And you understood that by law, that's what it had to be used for because it was a trust?

A Yes.

Q And his brother, Donnie Williams, was the trustee; is that correct?

A Yes.

Q Okay. And fair to say that Mr. Jonnie Williams really controlled this trust and used it however he wanted to; is that right?
A It's -- I don't know -- I -- I'm not Jonnie. I don't know.
Q Okay. Now, when Mr. Williams was low on cash, which he would be from time to time, fair to say you would then take money from the trust and give it to him; is that right? I mean, he would ask you to do this?
A Well, the trust owes Mr. Williams -- Mr. Jonnie Williams a small fortune, in my opinion.
Q Okay. So -- so just to go back to my question, then, so then on time to time, Jonnie Williams would call you and say, "Can you get some money from the trust and give it to me"?
A I would have to call Donnie and ask Donnie could the trust repay Mr. Williams.
Q Okay.
A Part of the loans --
Q And Donnie would typically approve that, right?
A Some -- I guess. If there was a question, they would talk about it.
Q All right.
MR. BROWNLEE: Can we look at 1742, please? Can we blow up the bottom part first? Thank you. Sorry about

that.

BY MR. BROWNLEE:

Q Ma'am, this appears to be an e-mail from Jamie Madry to you?

A Yes.

Q Do you know who Jamie Madry is?

A It was the accountant.

Q The accountant. Okay. And what she asked to you do was to verify apparently that Mr. Williams, in December of 2012, was going to buy a new plane; is that right?

A Yes.

Q Okay. And she's -- she says, "I believe at the meeting that Jonnie said that the trust has already loaned the money to Jonnie for purchase of the jet"; is that right?

A That's what it says.

Q All right. And this is the Starwood Trust that we're talking about, correct?

A Yes.

MR. BROWNLEE: Could we go up to the top part of it?

BY MR. BROWNLEE:

Q And this is another e-mail from you. It says, "Ok. Trust to Jonnie. $3,605,000 for new jet"; is that correct?

A Yes.
Q So Jonnie used the trust for his children to buy a 3.6 million-dollar plane for himself; is that right?
A Jonnie got repaid from the trust. It was a -- it was ultimately to Aviation, but I was told -- I'm not an accountant. I was told how it had to go. It couldn't go from trust to Aviation.
Q Okay.
A It had to go from trust to Jonnie to Aviation.
Q Right. But the trust, which appears to be the starting point for this, is a trust that was established for the benefit of his children?
A Yes.
Q And so the 3.6 million went from his trust to Jonnie to Aviation to buy a 3.6 million-dollar plane?
A Yes.
Q Okay.
MR. BROWNLEE: You can take that down. Thank you.
BY MR. BROWNLEE:
Q Let me shift gears here a little bit here. Now, you testified, I believe yesterday, that Mr. Williams donated flights to Governor McDonnell when he was both running for Governor and when he was actually Governor; is that correct?

A I believe so.
Q And I think you testified that he did that a lot for the politicians; is that correct?
A He's done it for other politicians, yes.
Q Okay. And is it fair to say that public officials, politicians request Mr. Williams, ask him to use his plane often; is that right?
A Yes.
Q Okay. And so when Mr. Jerry Kilgore was in public service, he used Mr. Williams' plane; is that correct?
A I believe so.
Q Okay. And former Attorney General Ken Cuccinelli used his plane; is that correct?
A I believe so.
Q And former presidential candidate John McCain used his plane; is that correct?
A I can't remember.
Q Okay. How about former presidential candidate Mitt Romney?
A Yes.
Q Let's change a little bit here. Now, you testified yesterday about a dinner that was held at the Governor's Mansion for Jonnie Williams in April of 2011; is that correct?
A I believe so.

Q Okay. And I believe you testified yesterday that only Mr. Williams attended that dinner; is that right?
A To the best of my knowledge, yes.
Q Okay.
MR. BROWNLEE: And if we can look at 0869.
BY MR. BROWNLEE:
Q All right. This is the follow-up e-mail to the e-mails that the government showed you yesterday. They didn't show you these. So I wanted to show you these and see if we could refresh your recollection.
THE COURT: We don't need you to editorialize. Just ask a question.
MR. BROWNLEE: Thank you, Your Honor.
BY MR. BROWNLEE:
Q On -- this is an e-mail on April 25th, and it says, "Jonnie would like to know if it's ok to change his mind and bring Celeste with him to dinner."
A Yes.
Q And then the response is, "Of course! Does she have any dietary concerns?"
So Ms. Williams attended the dinner, correct?
A Now you've refreshed my memory.
Q Okay.
A Apparently she did.
Q Okay. Great.

MR. BROWNLEE: You can take that down.
BY MR. BROWNLEE:
Q Now, we've talked about Mr. Williams' generosity. Is it fair to say that he gives lots of folks gifts?
A Yes.
Q And I think you mentioned at one time he spends a lot of money on golf clubs; is that right?
A He does.
Q Okay. And he --
A In my opinion.
Q Okay. Fair enough. And he buys them for the sales reps. Is that fair?
A He has, yes.
Q And doctors?
A Yes.
Q Okay. And he also gives away, I guess, Louis Vuitton bags to people?
A Yes.
Q Now, is it fair to say that he would, from time to time, lavish gifts on female friends of his?
A He's very generous, yes.
Q Okay. And is it true that from 2004 -- 2003 to 2004, he paid some bills for a woman living in South Carolina?
MR. HARBACH: Objection. May we please approach?

THE COURT: Sustained.

BY MR. BROWNLEE:

Q Now, you had talked before about Mr. Williams' -- I think you called it generosity. Do you think it fair to say he likes to impress people with how much money he has?

A I don't know why he does it.

Q But he does it?

A He just gives gifts. Okay?

Q And he gives a lot of gifts; is that correct?

A I don't know what people consider a lot.

Q Okay. Fair to say that he would brag to people about how much money he has?

A I -- I've never heard him brag about it that I can recall.

Q Okay. Let me shift here.

MR. BROWNLEE: All right. Can we show 896? That's the wrong one. You can put that down. Show 897.

BY MR. BROWNLEE:

Q Okay. Now, this is a -- I think you've looked at this before. I think it's in evidence, but we won't put it in evidence since we're using one of ours. I apologize. But this is a check to Mr. McDonnell for $50,000 dated May 23rd, 2011, from Starwood Trust; is that correct?

A Yes.

Q Now, you wrote this check at Mr. Jonnie Williams' direction; is that correct?
A With Mr. Don -- yes, it's correct, with Mr. Donnie Williams' approval.
Q Okay Mr. Jonnie Williams asked you to write this, and then you went and got Donnie Williams' approval?
A Yes.
Q And these funds are supposed to be for the benefit of Mr. Jonnie Williams' children, right?
A Yes.
Q Okay. Now, you testified that this loan to Ms. McDonnell, I think you said, was two years and 5 percent; is that right?
A Yes.
Q And that's what Mr. Williams told you?
A Yes.
Q Okay. But you weren't there when that loan was negotiated; is that correct?
A No.
Q Okay. And you've never seen a written agreement for that?
A No.
Q Okay. Now, Mr. Williams has, and I believe you've stated before that he has in the past made loans to people without documentation; is that correct?

A Yes.
Q Okay. Can we show -- now, the check underneath that, the one below it --
A Yes.
Q -- for $15,000, again, this is from Starwood Trust?
A Correct.
Q And this check, you were asked to prepare this check by Mr. Jonnie Williams?
A Correct.
Q Okay. And the Pay to the Order Of was left blank?
A Yes.
Q And Mr. Williams, Jonnie Williams, asked that that be left blank?
A Yes.
Q Okay. And on the bottom there in the Memo line it says "wedding gift"?
A Yes.
Q And on the ledger you booked it as a wedding gift?
A Yes.
Q Okay.

MR. BROWNLEE: All right. Take that down.

BY MR. BROWNLEE:

Q Now, you mentioned Mary-Shea Sutherland, and I believe you testified it was your understanding that she was an assistant to Ms. McDonnell; is that correct?

A Yes.
Q Okay.
A I don't know her official title.
Q Okay.
MR. BROWNLEE: Could we pull up 1160?
Your Honor, we may have to do this the old-fashioned way. May I approach and show the witness the e-mail?
THE COURT: Just give it to the marshal.
MR. BROWNLEE: Thank you, sir.
BY MR. BROWNLEE:
Q Now, Ms. Fulkerson, this is an e-mail to you on September 2nd of 2011 from a woman named Abigail Farris Rogers?
A Yes.
Q Okay. And you remember getting this e-mail?
A I don't remember getting it, but --
Q Okay. And when you got it, I think she had some trouble spelling your name, but when she eventually got it, you then forwarded it to Mr. Williams?
A Yes.
Q Okay.
A I believe I did.
Q And this e-mail references an attachment; is that correct?

A It looks like it, yes.
Q Okay. All right. And let me show you, if we can, 0004. And this is a document that was attached to that e-mail to Mr. Williams from Ms. Rogers that references a potential contract between Ms. Sutherland and Mr. Williams. Do you recall that?
A I don't remember seeing it, but it's here.
Q Okay.
A So --
Q Okay. And -- you can take that down.
And Ms. Sutherland was the person that you coordinated with with this Mansion event or this Mansion launch event that you talked about; is that correct?
A Yes.
Q And she was your point of contact for this event; is that right?
A I didn't coordinate the event, but she was the point of contact for -- if I needed something.
Q Okay. And when there was the hurricane, I guess, and there was some question as to whether or not it would be delayed, you contacted Ms. Sutherland to see if it was still on?
A Yes.
Q Okay. And is it fair to say that you learned that Ms. Sutherland was your contact from Mr. Jonnie Williams?

A I believe so.
Q Okay. And just so I'm clear here, when you were told about the point of contact, the point of contact was not a gentleman by the name of Martin Kent?
A No.
Q Or Jason Eige?
A Not that I remember.
Q Okay. It was Mary-Shea. Okay.
A I believe so.
Q Thank you.

MR. BROWNLEE: Can you pull up 1426?

BY MR. BROWNLEE:
Q I believe the government showed you this check, and these were the checks made out to MoBo Realty from Starwood Trust; is that correct, ma'am?
A Correct.
Q And I believe that there were three of them prepared, two had to be voided and then one actually was sent?
A Correct.
Q Okay. But on the first one, it's made out to MoBo Realty, Attention Maureen Uncapher; is that correct?
A Yes.
Q And the second one was still made out to MoBo Realty, correct?
A Yes.

Q And the third one was as well?
A Yes.
MR. BROWNLEE: You can take that down.
BY MR. BROWNLEE:
Q All right. Let me show you 1958. Ma'am, this is a text message from you to Mr. Williams in April of 2013.
Do you know who Talhia is?
A I believe her last name is Tuck. She is -- she was the communications person for Star Scientific.
Q So she dealt with the press; is that correct?
A Yes.
Q And you are here telling Mr. Williams that "Talhia sent draft 3 of press release. What do you want me to do?" Do you remember what you were sending him and what you were doing here, what this related to?
A It relates to the third draft of a press release.
Q Okay.
A What did he want -- what did he want me to do.
Q Okay. And did this press release have to do with the company's response to the federal investigation?
A I have -- I have no memory.
Q You can't --
A I don't know.
Q Okay. Thank you. Now -- Court's indulgence for one second, Your Honor.

(Counsel conferring with co-counsel.)
BY MR. BROWNLEE:
Q Let me show you, ma'am, 725.
MR. BROWNLEE: If you'll go down to the bottom.
BY MR. BROWNLEE:
Q This is an e-mail, it says Jonnie Williams, but I believe it's from you, to Janet Neal, who worked for Attorney General Cuccinelli. And can you tell us what you were doing here in this e-mail, ma'am?
A It says, "Jonnie is in New York today and" --
MR. HARBACH: Object to the witness reading from a document not in evidence.
THE COURT: Sustained.
BY MR. BROWNLEE:
Q Can you just tell us what you were trying to convey here? Please don't read it. I apologize.
A He would like to get an appointment with Attorney General Cuccinelli.
Q Okay. And do you recall, were you able to do that?
A I don't remember.
Q Okay. Fair to say, though, Mr. Williams met with a lot of different public officials from time to time?
A Yes.
Q Okay.
MR. BROWNLEE: Let's see 1179, please. If

you'll go down to the bottom.

BY MR. BROWNLEE:

Q This is an e-mail from Attorney General Cuccinelli to you requesting permission to use the aircraft to go from Manassas to Louisville, Kentucky. Do you remember that?

A Not particularly, but I see the e-mail.

Q Okay. And if you scroll up, your response there is, "The jet is all yours." So, again, he's requesting to use the aircraft personally, and you authorized it?

A I don't know if it's personal or business wise, but Mr. Williams --

Q No, no. I apologize. It wasn't for personal, but it was he personally requested. This e-mail actually came from the Attorney General himself, correct?

A Yes.

Q Okay. Excuse me. And you would not have authorized that unless Mr. Jonnie Williams gave you permission; is that correct?

A Correct.

Q Okay.

MR. BROWNLEE: Let me see 1988. I'm sorry, 19 -- yeah. 1988. All right. And if you'll just highlight the bottom portion there.

BY MR. BROWNLEE:

Q All right. Now, this is an hand e-mail from Teiro

Cuccinelli --

MR. HARBACH: I'm sorry, Your Honor. I have to object to counsel reading from a document not in evidence.

THE COURT: Just ask the questions you want. If you want it admitted, then we can deal with it completely, but the way you're doing it. Ask her a question about it.

MR. BROWNLEE: All right. Yes, sir.

BY THE COURT:

Q Is this an e-mail from Ms. Cuccinelli?

A It appears to be.

Q And it's dated in June of 2012; is that correct?

A Yes.

Q Okay. And she is thanking you for allowing she and her family to use the lake house at Smith Mountain Lake; is that correct?

A Yes.

Q Okay. Fair to say that Attorney General Cuccinelli and his family used the lake house on occasion?

A Yes.

Q Okay. More than once?

A I believe so.

Q Okay. And this is her just thanking you for that?

A It appears to be.

Q Okay. All right.

MR. BROWNLEE: Can I show 1989?

BY MR. BROWNLEE:
Q Let me show you the bottom portion of this, and this is an e-mail from you to Elaine Thompson. Do you know who Elaine Thompson is?
A A receptionist/secretary at Star Scientific.
Q Okay. And this is an e-mail reflecting that you are sending Attorney General Cuccinelli's mother-in-law more Anatabloc?
A Yes.
Q And you did that from time to time?
A Yes.
Q And did you send a lot of it to her.
A I can't remember.
Q Okay. More than once?
A It says "more," so I would think so.
Q Okay. Thank you. This is Government's Exhibit 410, and I believe Mr. Harbach showed it to you and it is in evidence. So I believe that it can be -- subject to the Court's approval, it can be seen.
THE COURT: It's been admitted already.
MR. BROWNLEE: Thank you, Your Honor.
BY MR. BROWNLEE:
Q This is a -- just so I understand, this is a document that when a politician or a public servant were to accept a gift or travel from your company, Star Scientific, they

would send this to you, and then you would fill it out and figure out an amount, and then that way the politician can take that amount and put it on a public disclosure form. Is that your understanding?
A I'm not sure what the government's or the politician's office does with it. If they asked me to fill it out, I filled it out.
Q And if you look at the -- next page, sir. Thank you.
Down in the middle part of it, you've come up with an estimate of whatever the value the company believes is appropriate and that's what you submitted?
A I believe so.
Q Okay. Now, is it fair to say that -- so in this case it's $6083; is that right?
A Yes.
Q Okay. Is it fair to say that if you don't get this sent to you, then you can't fill it out? Is that -- that makes sense, but is that fair to say?
A Yes.
Q Okay. And in this case someone from Mr. McDonnell's staff apparently sent this to you in an e-mail; is that right?
A I would think so, yes.
Q I mean, the Governor didn't personally send this to you. Somebody who worked for him did?

A I'm guessing.
Q Okay. All right. And then they filled it out as best you could, and you sent it back so they could do whatever they needed to do with it?
A That's correct.
Q Okay. Now, you had talked about -- thank you very much.
You had talked about some -- a trip that Rachel McDonnell took down to Florida, I think with a girlfriend of hers, and stayed at one of Mr. Williams' condominiums; is that correct?
A It's his brother's condominium, but yes.
Q And Rachel is Mr. McDonnell's daughter?
A Correct.
Q Okay. Now, did you get one of these forms that we just discussed here, did they send you one of those to fill out?
A I don't remember.
Q Okay. All right. All right. And you also talked about that the Governor's daughter and her friend used a dock or a boat while they were down there; is that correct?
A Yes.
Q And you said that that wasn't Mr. Williams' -- it was not Mr. Williams' boat; is that right?

A No.

Q Okay. Do you know, is that John McKeon's boat?

A I believe it is.

Q Okay. Did you receive one of these forms to fill out for Rachel McDonnell using Mr. McKeon's boat?

A I don't remember.

Q All right. Now, you had talked about Adam Zubowsky, who married Mr. McDonnell's oldest daughter. There was this effort for Mr. Williams to give them a generator?

A Correct.

Q And were you aware that that was what Mr. Williams was trying to give them as some sort of engagement gift?

A I believe it was a wedding gift.

Q Wedding gift. Okay. And he didn't give the generator. He ended up giving a 10,000-dollar wedding gift?

A Correct.

Q Do you remember if anyone sent you one of these forms to fill out?

A I don't remember.

Q Okay. All right. And I'll ask you as well, you had talked about some flights that Mr. Williams used -- he had some points. And so he gave some points to fly some of the children to some event; is that right?

A Yes.

Q To Savannah, Georgia, I think you said?
A Yeah. I believe it's Savannah.
Q Savannah. Okay. And you don't remember getting one of these forms to fill out, do you?
A No.
Q Now, let me ask you this. You had testified that on one occasion you actually spoke to Ms. McDonnell; is that correct?
A Yes.
Q And is that the only time you remember talking to her?
A The only time I can remember.
Q Okay. But you were aware that -- that Mr. Williams, Jonnie Williams, was very close with Ms. McDonnell; is that correct?
A I don't know how close they were.
Q Okay.
A I know they talked.
Q Okay. Well, let me ask you, then. Were you aware that in about 15-month period, beginning in April of 2011, that they had over 1,200 either cell phone calls or text message transfers?
A No.
Q Were you aware that they traveled to Michigan together?

A Yes.

THE COURT: She says she doesn't know how close they were. You can ask ten of these "were you aware" questions. She doesn't know. She doesn't know. Ask a question that she can respond to.

MR. BROWNLEE: I think she said she did know, sir.

A The Michigan trip was for business.

MR. BROWNLEE: Okay. So I -- I think --

BY MR. BROWNLEE:

Q Did you know they went to California?

A Give me some more detail here.

Q Okay. They went to a nutraceutical event in both Salt Lake City and then also a trip to California?

A With other people.

Q So the answer is yes?

A Yes.

Q Okay. Now, what was your understanding of Mr. Williams' relationship with Mary-Shea Sutherland?

A I -- professional, I guess. I don't really know.

Q Okay. So were you aware that Ms. Sutherland wrote Mr. Williams a letter in January of 2012 indicating that Mr. Williams had informed her that at that time -- this is January 2012 -- that Mr. Williams was planning to replace you?

A No.

MR. HARBACH: Objection.

THE COURT: Sustained.

MR. BROWNLEE: Court's indulgence for one moment.

(Counsel conferring with co-counsel.)

MR. BROWNLEE: Thank you very much, Your Honor.

Thank you, Ms. Fulkerson.

THE COURT: All right. Counsel for Ms. McDonnell.

MR. BURCK: Your Honor, I'll try to finish up before lunch.

**CROSS-EXAMINATION**

BY MR. BURCK:

Q Good morning.

A Good morning.

Q My name is Bill Burck. I represent Maureen McDonnell. I just wanted to start by going over some of the exhibits the government showed you earlier.

A Okay.

MR. BURCK: And I'd ask that we put up Government Exhibit Number 146, and could you blow up the text, please? Thanks.

BY MR. BURCK:

Q I believe you testified about this document earlier.

Do you remember this document?
A I do.
Q And this reflects a trip that Mr. Williams took with Ms. McDonnell and others down to the Roskamp Institute in Florida; is that right?
A The text on this indicates that it was Jonnie Williams, Jr. on the flight --
Q Right. Mr. Williams --
A -- with Ms. McDonnell and Mary-Shea Sutherland.
Q And Mary-Shea Sutherland was on that flight; is that right?
A It appears she was.
Q Thank you.
MR. BURCK: And could you take that down, please? Thank you.
Government Exhibit 151, please, and blow up the text.
BY MR. BURCK:
Q And I believe you testified about this document as well. Do you remember this document?
A Yes.
Q And does it say that Mary-Shea Sutherland was on that trip as well?
A It does.
MR. BURCK: You can take that down.

Government Exhibit 182. Would you mind blowing up the text as much as you can? Actually, if you -- under 6/30/2011, there's a 7/6. Can you blow that up, please?

BY MR. BURCK:

Q Now, Ms. Fulkerson, do you remember testifying about this document?

A Yes.

Q What is this document?

A It's an expense report from Jonnie Williams to Star Scientific.

Q And do you see underneath the Kinloch highlighted, the second Kinloch highlighted. Do you see an entry there?

A Yes.

Q And it says July -- 7/6/2011, July 6, 2011, AMEX - Berkley Hotel. Breakfast with Ms. McDonnell - Anatabloc meeting?

A Yes.

Q Did the government ask you about that meeting?

A I don't remember. We talked about a lot of things.

Q And how would you get the information that you put on these expense -- or the ledger?

A Mr. Williams would tell me.

Q So he would have told you that there was a Ms. McDonnell about Anatabloc on July 6, 2011; is that

right?
A Yes.
Q But you have no idea if Ms. McDonnell was actually present for a breakfast with him on that day, do you?
A No.
MR. BURCK: Thank you. You can take that down.
Now on my side, I would ask that we put up RM -- just for the witness, of course -- RM-0523. RM-0523. We can do this the old-fashioned way, Your Honor. RM-0523. Your Honor, may I approach?
BY MR. BURCK:
Q Now, Ms. Fulkerson, do you recognize this document?
A It's an expense report.
Q And do you --
A I'm sorry.
Q Sorry.
A It's an American Express report.
Q American Express report. For whom?
A Jonnie Williams.
Q Jonnie Williams, Sr.?
A Yes.
Q And do you see -- the second to bottom entry there, do you see that?
A Yes.
Q And that's an entry on July 26, 2011; is that right?

A Yes.
Q It says "Martinair, Inc."; is that right?
A Yes.
Q And would you mind reading the entry that's -- that's next to it as to what the expense is?
MR. HARBACH: I object, Your Honor. Document is not in evidence.
THE COURT: Sustained.
MR. BURCK: That's fine, Your Honor.
BY MR. BURCK:
Q Ms. Fulkerson, does the entry reflect a flight between the First Lady and doctors?
MR. HARBACH: It's the same objection, Judge.
THE COURT: Overruled. Let's get through this.
A It indicates it's a charter flight for doctors and the First -- First Lady McDonnell.
BY MR. BURCK:
Q Okay. And it says from Richmond to Baltimore?
A Yes.
Q For Anatabloc John Hopkins Symposium?
A Correct.
Q How much does it say?
A $8,001.44.
Q And on this big thick stack, can you turn to -- I think it will be the third to last page in your document.

A Yes.
Q It's 64 on the bottom, RM-05230064?
A Yes.
Q Do you recognize that document?
A Yes.
Q What is that?
A It's a -- an invoice Martinair sent.
Q And do you see a date for that invoice?
A July 23rd.
Q Okay.
A 2011. The trip date.
Q Trip date. Fine.
A Okay.
Q There's an invoice date as well?
A July 25th, 2011.
Q Okay. And does it say the passengers?
A It does.
Q And who does it say the passengers were?
A John Clore, Mary-Shea Sutherland, Margaret Shupnik.
Q Do you know who John Clore or Margaret Shupnik are?
A No.
Q You know who Mary-Shea Sutherland. You've testified about her?
A Yes.
Q Does this reflect that Ms. McDonnell was on that

flight?
A No.
Q And the information that you received on the first page -- I'm sorry to have to flip back to the first page -- the first page, that's information that you would have entered?
A Yes.
Q And Jonnie Williams would have told you what to say?
A Yes.
Q And that says First Lady McDonnell?
A Yes.
Q Does it say Mary-Shea Sutherland?
A No.
MR. BURCK: We can move on to -- briefly, just on -- I'll have to ask -- I don't think -- it's not working. RM-1990. No? Okay. I'm sorry, Your Honor.
BY MR. BURCK:
Q Ms. Fulkerson, would you turn to the second page? It's RM-1990-0002. Do you see that?
A Yes.
Q You see there's an e-mail from Mary-Shea Sutherland to yourself dated August 24, 2011?
A Yes.
Q Do you remember this e-mail?
A No.

Q Have you had a chance to look at it?
A Just now.
Q It refers to something called the Gibson event?
A Yes.
Q Do you recall what that was?
A No.
Q Do you -- have you ever heard of a place called Gibson Island?
A Yes.
Q Where is that?
A Maryland.
Q Is it near Baltimore?
A I believe so.
Q Thank you.

MR. BURCK: It's on, Your Honor. I can do it a little more quickly. Could you -- could you blow that -- is that RM -- that's not going to work. Your Honor, I'm going to have to use the paper document.

THE COURT: Okay.

MR. BURCK: It's like old school, Your Honor. Sorry.

THE COURT: What's the number on this one?

MR. BURCK: This one is RM-0618, and I'm going to be turning to the 23rd page, Your Honor.

BY MR. BURCK:

Q Ms. Fulkerson, will you please turn to -- are you on that 23rd page?
A Yeah.
Q Thank you. I know it's hard to read. It's easier to read, though, on paper than it is on the screen. Do you recognize this document in all its fuzziness?
A I believe it's an expense report from Mr. Williams.
Q And would you have filled out the information in that report?
A Yes.
Q Okay. And I want to direct you to the third entry. I believe it says July 25th, 2011. Do you see that?
A Yes.
Q And I think beside that it refers to The Jefferson Hotel?
A Yes.
Q And there's some text that -- again, I think you testified earlier that you would have entered this information for Mr. Williams?
A Yes.
Q And does it refer to a lunch with somebody?
A Yes.
Q And who is that person?
A It looks like, if I can read it correctly, Mary-Shea Sutherland, assistant to First Lady, concerning Anatabloc.

Q Okay. And that's on July 25th, 2011?
A It looks like it.
Q And then there's one right below it. And is that basically the same -- it says July 26th, 2011?
A It looks like it.
Q And it says -- it's at The Jefferson Hotel again?
A Yes.
Q And what does it -- does it say lunch? I'm sorry. If you could describe it or read it, however you --
A It looks like the exact same entry.
Q Okay. And can you look at the prices, to the best you can, if you can see, the far right. For the 7/25/2011, what's the price?
A 7,716.
Q And then the price for the 7/26/2011?
A 4,441.
Q Those aren't the same prices?
A No.
Q Okay. And then further down on that list you'll see I think third from the bottom, August 17, 2011?
A Yes.
Q Do you see The Jefferson Hotel there?
A Yes.
Q And, again, can you describe what the entry that you wrote says, or you can read it?

A It looks like, "Lunch with Mary-Shea Sutherland, slash, assistant to First Lady, concerning Anatabloc."
Q And do any of those entries refer to Ms. McDonnell being present?
A I'm sorry. I didn't hear you.
Q I'm sorry. Do any of those entries refer to Ms. McDonnell being present?
A No.
Q Thank you. You can put that aside. Thank you.
Now, I think you testified briefly about a document that Mr. Brownlee showed you. It was an e-mail that -- that Abby Farris sent to you. Do you recall that?
A Yes.
MR. BURCK: Can I have RM-1991, please?
A I've got nothing.
BY MR. BURCK:
Q Here. I'll give you --
A Oh, here it is.
Q Great. Thank you. Could you take a moment to just read that?
A Okay.
Q Do you remember this document?
A No.
Q Did you -- it's an e-mail from Mary-Shea Sutherland to yourself; is that right?

A Yes.
Q And it's dated September 2nd, 2011?
A Yes.
Q And do you recall you testified about an event that happened at the Mansion in August of 2011?
A Yes.
Q So this is a little bit after that event?
A Yes.
Q And can you describe, without reading from the document, what this e-mail is?
A She's suggesting ways to -- a film maker to do something for Anatabloc. Either -- there was two suggestions on it.
Q And I'm sorry. The "she" is Mary-Shea Sutherland?
A Oh, I'm sorry. Yes, Mary-Shea Sutherland.
Q And you said that she's describing two different ways to do a --
A A documentary or --
Q -- documentary.
A -- or a film.
Q Okay. And is there anybody else on this e-mail other than yourself and Mary-Shea Sutherland?
A She asked me to print it and send it to Jonnie.
Q Okay. Thank you. Back in 2011, the summer of 2011, around this time we just talked about, September and

August, were you planning to stay working for Mr. Williams?
A Yes.
Q Did you ever have -- excuse me. Had you ever had any intention at that time to leave his employment?
A No.
Q You've been working for him for 20 years or so?
A Approximately.
Q And you've never said to him you want to leave your job?
A No.
Q To this day, you are still working for him?
A I am still working for him.
Q Did he ever tell you that he had offered Ms. Sutherland a job?
MR. HARBACH: Objection.
THE COURT: Sustained.
BY MR. BURCK:
Q Ms. Fulkerson, you were asked some questions about personal e-mails and public e-mails for Jonnie Williams. Do you recall that?
A Yes.
Q And you were shown from e-mails from -- I think it was from my client and maybe also from the Governor to his public address. Do you recall that?

A I believe so.
Q All right. Did Jonnie Williams have a cell phone?
A Yes.
Q Did he use his cell phone?
A Yes.
Q Did he text people?
A Yes.
Q Did you monitor his texts?
A No.
Q Did he use a cell phone to call people?
A Yes.
Q Did you record his calls?
A No.
MR. BURCK: Would you mind showing Government Exhibit 161?
BY MR. BURCK:
Q Ms. Fulkerson, do you remember this document?
A Yes.
Q And I think there's an attachment to it as well that's a -- it's a document that -- if you wouldn't mind showing the last page.
This is the letter that you testified Jonnie Williams had dictated at least in part to you?
A It was prepared and sent to me.
Q Prepared and sent to you. Okay.

MR. BURCK: And can you turn to the e-mail on the first page? Thanks.
BY MR. BURCK:
Q And this is an e-mail from you to Mary-Shea Sutherland, and you say, "Jonnie asked that I forward the attached letter and information to you."
A Yes.
Q Do you recall if Jonnie Williams had Maureen McDonnell's e-mail address at this point?
A I don't know. I can't -- I don't remember.
Q You don't remember. Do you recall if -- if he had the Governor's e-mail at this point?
A Again, I'm really bad with years. So --
Q Sure. No, of course. Fair enough.
A -- I don't remember.
Q I understand. And did you have their e-mail addresses? Do you remember if you had their e-mail address at that time?
A I may have. I don't remember when I got them.
Q Okay. Is there any particular reason that you knew why Jonnie asked that you send this to Mary-Shea Sutherland and not directly to Maureen McDonnell or the Governor?
A No.
Q So he didn't discuss that with you?

A No.

MR. BURCK: Thank you. You can take that down.

Could you put up Government 163, please, and could you please turn to -- I believe it is the second page. Could you blow up the bottom e-mail?

BY MR. BURCK:

Q Ms. Fulkerson, do you remember testifying about this document with the government?

A Not about --

Q Not about this part, I'm sorry, but about the document itself. Do you remember that?

A Yes.

Q Okay. And this is an e-mail that's part of that document that you testified about?

A I believe so.

Q And it's an e-mail from Mary-Shea Sutherland to you?

A Yes.

Q On June 21st, 2011?

A Yes.

Q And it says, "Hi, Jerri. I was on the phone with Jonnie, but he got off before I could ask him the following question"?

A Yes.

Q So did you understand that e-mail to say that Mary-Shea Sutherland had been on the phone with Jonnie

Williams?
A Yes.
Q It's Jonnie Williams, Sr.?
A Yes.
Q So did you have an understanding that Mary-Shea Sutherland spoke to Jonnie Williams on her own, directly to Jonnie?
A Yes.
Q And was that something that happened frequently, in your view, or you don't know?
A I don't know.
MR. BURCK: You can take that down. Thank you.
BY MR. BURCK:
Q I'm almost done. I promised before lunch, and I'm going to be done before lunch.
You testified -- or I think Mr. Brownlee asked you about whether or not -- well, let me back up.
Mr. Williams, you said, was -- he's a generous person, right?
A Yes.
Q I think you testified that he likes to give gifts?
A Yes.
Q And I think you testified, I think Mr. Brownlee asked you whether or not he bragged about that?
A I don't know if he bragged about it to other

individuals.
Q I understand. Do you recall being interviewed by the -- the FBI and the prosecutors last year?
A Yes.
Q You had an interview with them at some --
A Yes.
Q It was roughly June or so? You don't know. But you did have an interview with them?
A I did have an interview.
Q Do you recall telling the FBI and the prosecutors that you've known Mr. Williams for about 20 years?
A Approximately, yes.
Q Do you recall telling them that Mr. Williams brags about everything?
A I may have.
Q Okay. And do you recall telling them that Mr. Williams would brag to anybody if he was trying to impress somebody?
A I may have.
Q And I'm almost done. This is it. I think last month, maybe early last month, you had another interview with the FBI?
A Okay.
Q I'm asking you. Don't take my word for it. Did you meet with the FBI?

A With the prosecutors?
Q I'm sorry. The prosecutors and FBI agents.
A Yes.
Q Excuse me. I think of them all the same.
A Okay.
Q And that was about early last month?
A I've met with them several times. So --
Q Okay.
A Yes.
Q And I think you testified today that Mr. -- you testified about the stock bonus that you got?
A Yes.
Q The $20,000 in early 2013 from Mr. Williams?
A Yes.
Q And that was the largest cash -- I'm sorry. I said stock bonus. It was cash bonus, right?
A I got cash in lieu of stock.
Q Cash in lieu of stock?
A Yes.
Q And that was the largest cash bonus you had ever received from Mr. Williams or from Star Scientific?
A Besides the car, yes.
Q Besides the car, right. But it started with the stock and then it became a car?
A And this bonus was supposed to be stock.

Q Right, it was supposed to be stock. And I think you testified that Mr. Williams said something along the lines of he wanted to give you cash instead of stock because of everything that's happened?
A Because of the invest- -- he said -- I believe he said he cannot give stock that year.
Q I think you were about to say because of the invest- --
A Yeah, he may have said because of the investigation. But I know he said he can't give stock.
Q Okay. It was your understanding that he was not giving you stock because of an investigation?
A I can't remember exactly what he said --
Q No. I understand.
A -- but yes.
Q That was your impression?
A Yes.
MR. BURCK: Okay. Your Honor, that's it. Thank you.
THE COURT: All right. Redirect?
MR. HARBACH: Your Honor, Mr. Dry suggests that I inform you this might take a little while. Would you like me to go ahead?
THE COURT: No. I want you to go ahead and see if you can't exhaust this.

MR. HARBACH: Very good. Your Honor.

**REDIRECT EXAMINATION**

BY MR. HARBACH:

Q Okay, Ms. Fulkerson. I think I'd like to start, kind of maybe go backwards.

MR. HARBACH: If we could pull up Government's 163.

BY MR. HARBACH:

Q Mr. Burck asked you about this document. This is a document you testified about on direct. Does this have to do with the trip to The Homestead?

A I believe so.

Q Okay. And if we could go to page 2, please. I guess down at the bottom, the portion that Mr. Burck highlighted for you?

A Right.

Q Where it says -- it's an e-mail from Mary-Shea and it says she was on the phone with Jonnie. Do you recall having any conversations with Mr. Williams about his reaction to Ms. Sutherland calling him directly?

A I don't remember.

Q You were asked several questions on cross-examination about other politicians, for example, for whom Mr. Williams has provided the plane?

A Yes.

Q Do you recall being asked by Mr. Brownlee about former Attorney General Kilgore?
A Yes.
Q Former Attorney General Cuccinelli?
A Yes.
Q Former presidential candidate John McCain?
A Yes.
Q And former presidential candidate Mitt Romney?
A Yes.
Q To your knowledge, ma'am, did Mr. Williams ever provide five-figure loans to any of Mr. Kilgore, Mr. Cuccinelli, Mr. McCain or Mr. Romney?
MR. BROWNLEE: Objection, Your Honor.
THE COURT: Sustained.
BY MR. HARBACH:
Q Ms. Fulkerson, to your recollection, did Mr. Williams -- in your experience working for him booking his plane, to your recollection, did Mr. Williams ever allow any of those men to use the plane to transport their children?
A To the best of my knowledge, no.
Q To your recollection, did any of those politicians or any members of their staff ever ask Mr. Williams to transport their children on his plane?
A To the best of my memory, no.

Q You mentioned on cross-examination a couple of times Mr. Williams' generosity and the fact that he gives gifts to lots of people?
A Yes.
Q Does he give gifts to both men and women?
A Yes.
Q You were asked a few questions about -- in which you provided an answer about your constitutional rights. Do you recall that series of questions Mr. Brownlee asked you?
A Yes.
Q I think I only have one question on that on you, and that is: As you sit here today, do you have any agreement with the government whatsoever governing your testimony at trial today?
A I don't believe so.
Q You talked at some length about your practice of signing Mr. Williams' name for him from time to time?
A Yes.
Q And you were asked a series of questions by Mr. Brownlee about your notarizing them sometimes?
A Yes.
Q Why did you do that? Why did you sign Mr. Williams' name for him from time to time?
MR. BROWNLEE: Objection, Your Honor. I think

we've been through this.

THE COURT: She can answer the question.

BY MR. HARBACH:

Q Why did you do that? Why did you sign his name for him sometimes? Why did you notarize it sometimes?

A He directed me to.

Q You -- at the beginning of your testimony, you talked about your contact with Mr. -- your testimony on direct -- this was a while ago -- you talked about your frequency of contact with Mr. Williams, and you mentioned that he was in town sometimes and he was out of town sometimes. Do you recall that?

A Yes.

Q When he was out of town, where was he most often?

A Usually in Florida.

Q Okay. And were there times when you were filling out paperwork for Mr. Williams or signing his name when you were in Virginia and he was in Florida?

A Yes.

Q You testified on cross-examination, in response to questions from Mr. Brownlee, about Starwood Trust. You were asked some questions about that. Do you remember those?

A Yes.

Q At one point you said that the trust owes

Mr. Williams a small fortunate, in your opinion?
A Yes.
Q Do you recall that testimony?
A Yes.
Q Could you explain that, please?
A Mr. Williams has funded the trust with different things. He's paid for houses. He's paid for cars, paid for a lot of different things that the trust should have paid for, and it's -- and I've been informed or told that I should book it as a loan from Mr. Williams to the trust.
Q Thank you. When you -- when you originally met with the government, did you agree to meet voluntarily?
A Yes.
Q Now, you were also asked some questions about your bonus, and with the Court's indulgence, I'm afraid I only have one copy of this. Can I tender it to counsel for a moment before I show the witness?
THE COURT: Go ahead.
BY MR. HARBACH:
Q Tendering to the witness, for the record, what's been marked for identification as Government's 616. Ms. Fulkerson, I'm going to represent to you that those are some bank records from Wells Fargo. Okay?
A Okay.
Q Now, could you take a look at page 3 of that

document?
A Okay.
Q Do you see your name anywhere on that page, ma'am?
A Yes.
Q Okay. Do you -- does this page appear to document any transactions between yourself and Mr. Williams or Star?
A I've never seen these before. On first glance, it looks like the dates and the certificate numbers where he's gifted me stock.
Q Thank you, ma'am.
MR. HARBACH: Your Honor, the government offers Government's 616?
THE COURT: It will be admitted.
MR. HARBACH: Now, may I please use the Elmo to publish it for the jury or is that --
THE COURT: All right. It's not in your electronic documents?
MR. HARBACH: No, sir, it's not. I'm sorry.
THE COURT: All right. Well, go ahead and use the Elmo.
MR. HARBACH: Publishing page 3 of Government's 616 for the jury.
BY MR. HARBACH:
Q And, Ms. Fulkerson, can you see it on your screen

there, ma'am?
A Yes.
Q Now, this is your name up here in the account name block; is that right?
A Yes.
Q Now, a little bit further down there's an entry for -- in the "Current Certificate Value" column it has 10,000. Do you see that there?
A I do.
Q And there's a date associated -- I'm sorry, a date associated with that of July 17th of '12?
A Yes.
Q Do you recall testifying on direct examination about a bonus you received from Mr. Williams in July of '12 with which you purchased a vehicle?
A Yes.
Q Would that be these 10,000 shares?
A It appears to be.
Q Okay. And then on January 18th of' 12, in the "Issued" column --
A Uh-huh.
Q -- there's a -- a transaction involving how many shares?
A 10,000.
Q On January 7th of 2011, in the "Issued" column,

there's a transaction involving how many shares?
A 10,000.
Q On November 11th of 2010, there's a transaction involving how many shares?
A 10,000.
Q And on December 23rd of 2009, there's a transaction involving how many shares?
A 20,000.
Q Now, how many shares did you say on direct examination was the bonus, the -- cash bonus that you received in January of '13 was the cash equivalent of how many shares?
A 10,000 shares.
MR. HARBACH: Could we look at Government -- back to the regular display, please, Kathy. Could we look at Government's 352, please?
BY MR. HARBACH:
Q These are the checks we've talked about several times. I want to ask you about the entry there for MoBo Realty. At the time you prepared these checks, did you know what MoBo Realty was?
A Mr. Williams explained to me it was a real estate agency.
Q Okay. And then underneath that, it says "Attention Maureen Uncapher." Now, at the time you prepared these

checks, did you know who Maureen Uncapher was?
A No.
Q Okay.
MR. HARBACH: You can take that down, please.
Can I have one moment, please, Judge?
THE COURT: Sure.
(Counsel conferring with co-counsel.)
BY MR. HARBACH:
Q Ms. Fulkerson, do you recall -- at the time that you completed the checks that we were just talking about, you prepared those, you said that Mr. Williams told you that MoBo was a real estate agency?
A Yes.
Q Do you recall whether you learned whether it was affiliated with anyone or owned by anyone or do you know?
A I believe he told me it was affiliated with the McDonnells.
Q Finally, based on your personal observations of Mr. Williams and your conversations with Mr. Williams, just speaking for yourself now, did you ever suspect that there was anything to Mr. Williams' relationship with Ms. McDonnell other than a business relationship?
MR. BURCK: Objection, Your Honor.
THE COURT: Sustained.
MR. HARBACH: I have nothing further, Your

Honor. Thank you.

THE COURT: All right. Thank you, ma'am. You may stand down.

(Witness stood aside.)

THE COURT: All right. We're going to stop here for lunch.

MR. HARBACH: Your Honor, may Ms. Fulkerson be excused?

THE COURT: Absolutely.

MR. HARBACH: Thank you.

THE COURT: All right. If you all would come back at 2:15, we'll get started with the afternoon session. Just follow the marshal.

(The jury left the courtroom.)

///
///
///
///
///
///
///
///
///
///
///

(Luncheon recess taken from 1:15 p.m. to 2:15 p.m.)

All right, let's bring in the jury, please.

(The jury entered the courtroom.)

All right, government, call your next witness, please.

MR. FAULCONER: Thank you, Your Honor. The United States calls Phil Owenby.

PHIL OWENBY,

called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. FAULCONER:

Q Could you please state your name and spell your last for the court reporter?
A Phil Owenby. O-W-E-N-B-Y.
Q What city do you currently live in?
A Richmond.
Q Where do you currently work?
A Kinloch Golf Club.
Q Spell Kinloch.
A K-I-N-L-O-C-H.
Q Where is that located?
A It is in Goochland County.
Q How long have you worked there?

A Approximately 14 years.
Q Have you been there since it opened?
A Yes.
Q What's your current title at Kinloch Golf Club?
A General Manager.
Q In addition to being General Manager, are you also a certified PGA Professional?
A I am.
Q What exactly is a PGA Professional?
A It is a person that is professional in the game of golf and the business of golf.
Q Now, before working at Kinloch Golf Club, how many other golf courses have you worked at?
A Four.
Q And is Kinloch the nicest or how does it compare to the other ones?
A It is the nicest.
Q How many golf courses have you played at in your life, would you say?
A Approximately a thousand.
Q How does Kinloch compare to the other courses you have played?
A Top 50.
Q As General Manager of Kinloch, where were you in the food chain in terms of the employees you have there?

A I lead the operation. I answer directly to the Board of Directors.
Q About how many employees do you have?
A Approximately 75.
Q We have been saying Kinloch Golf Club. Is Kinloch a public or private course?
A It is a private club.
Q How many members does it have?
A About 475.
Q Is there actually a cap on the membership?
A Yes, cap is 500.
Q Now, of your 475 members, about how many are in the Richmond area?
A The resident members, about 260.
Q How much does it cost for someone to become a member in the Richmond area of Kinloch?
A Approximately $50,000.
Q On top of that $50,000, does it cost any money on a yearly basis?
A Yes. The annual dues are $11,000.
Q Compared to the other courses that you have worked or played at, does Kinloch have more or fewer people playing there every day than most other golf courses?
A Fewer.
Q How about compared to a public course, just a little

fewer or a lot fewer?
A I would say a lot fewer.
Q Now, can members of your club bring guests to your club?
A Yes.
Q Can they also have guests come without the member actually being present?
A Yes.
Q If you arrive and you are not a member or with a member, what's the first thing that you do when you get to the property?
A You would go to a gate, which we have a dial pad at the front gate. They would call the club, call the inside of the clubhouse.
MR. FAULCONER: Your Honor, with the assistance of the Court Security Officer, I'd like to offer up to the witness Exhibits 137 through 144, a series of photographs.
THE COURT: All right.
(Documents proffered to witness.)
BY MR. FAULCONER:
Q Mr. Owenby, if you could flip through these real quick and let us know when you've gotten a chance to look through each one of them.
A Yes, sir.
Q Are these photographs of the Kinloch Golf Club

property?
A Yes, sir.
MR. FAULCONER: We would offer Exhibits 137 through 144 into evidence.
THE COURT: They will be admitted.
BY MR. FAULCONER:
Q I'd like to walk through some of these photos to make sure we understand what each one is of. If we could pull up Exhibit 137. What is this a photograph of, Mr. Owenby?
A This is a photograph of the front gate of Kinloch Golf Club.
Q If we could zoom in on the little hedge there to the left, the part where the little box is, is that the little call box that you were talking about there, Mr. Owenby?
A Yes.
Q When a non-member comes up to the club and dials into this call box, what do they say to be able to get access?
A They would hit the call button. It would be answered by one of our staff members, and they would say that they were there as a guest of the member's name.
Q Got it. If we could pull up Exhibit 138. Mr. Owenby, what is this a picture of?
A It is a photograph of the practice area and also the main clubhouse.
Q About how many square feet is that clubhouse?

A About 26,000.
Q Now, what happens once a person drives in? Where do they bring their car?
A They would come up to the front of the clubhouse and be greeted by one of our staff people.
Q And where on this picture would they actually be greeted?
A It is on the far right-hand side where the vehicle is.
Q When somebody comes up to the club, do you actually try to make an effort to be out there to greet them yourself?
A As often as I can, yes.
Q I'd like to show you just a couple quick photographs of the course. If we could pull up Exhibit 139. Is this a photograph of one of the holes out at Kinloch Golf Club, Mr. Owenby?
A Yes.
Q I see there that it is very tiny, but there are some people out in the picture there. Is there typically staff members with people when they are playing out at Kinloch?
A When they are playing the golf course there will be caddies with the players, yes.
Q For anybody who is not a golfer, what is a caddy?
A A caddy is a staff member that would be carrying the

golf bags and also giving advice during the course of the round.
Q How much does a caddy cost at Kinloch?
A The base fee is $55 plus gratuity per bag.
Q Do the caddies at Kinloch, is it T-shirt and jeans or how are they dressed?
A No, they have khaki shorts or pants, white shirt, a Kinloch khaki cap, and then a blue overbib or overall.
Q Kind of like they wear on the pro tours?
A That's correct.
Q Are there actually caddies, can you tell whether those are caddies in the picture there with the individuals?
A Yes, sir, there is one on the right and one on the left.
Q If we could pull up briefly Exhibit 140. Is this another hole at Kinloch?
A Yes, sir.
Q That building to the right in this picture, what is that building?
A That's the clubhouse.
Q Buildings to the left, are those part of the Kinloch club facilities?
A No. Those are private homes.
Q If we could pull up Exhibit 141. This is the last

one of the course, Mr. Owenby. What hole is this at Kinloch Golf Club?
A This is the 18th hole.
Q If we could zoom in on it a little, there looks like a metal object there in the lower left-hand corner. Could you tell us what that logo is there?
A That's the Kinloch logo.
Q In addition to the golf course itself, are there actually places to eat when you are on the property?
A Yes.
Q If we could pull up Exhibit 142. What is this, Mr. Owenby?
A This is our Halfway House Snack Bar.
Q If we could pull up Exhibit 143. Could you tell us what's shown in this picture, Mr. Owenby?
A Yes, that's the men's club room, men's locker room, club room, dining area.
Q And do you actually have another separate dining room within the building?
A Yes.
Q So where is this particular dining room located?
A This is located in the men's locker room, which is in the central part of the clubhouse.
Q Got it. All right, now, just so everybody understands, if somebody just wants to walk in off the

street and have dinner in this locker room, are they able to do that?
A No, sir.
Q Who is allowed into this locker room?
A Members and accompanying guests.
Q We can take that one down. Now, I'd like to direct your attention to this case here in particular. Is a man named Jonnie Williams a member of Kinloch Golf Club?
A Yes.
Q Starting in around May of 2011, do you recall Mr. McDonnell playing at your club on Mr. Williams' account?
A Yes.
Q Before that time, do you recall Mr. McDonnell ever being at your club?
A No.
Q On this particular or the first occasion, do you recall how you first learned that Mr. McDonnell would be coming?
A Yes.
Q How was that?
A Mr. Williams called.
Q Do you actually recall Mr. McDonnell arriving?
A Yes.
Q When he arrived, did you greet him?

A Yes.
Q And do you recall what you said to him when you greeted him?
A Introduced myself and welcomed him to the club.
Q Did you say anything about Mr. Williams when you greeted him?
A You know, other than "Nice to have you with us and I know you are with Mr. Williams or a guest of Mr. Williams."
Q Now, is it typical for you when you do greet somebody to mention the member's name of who they are playing on, whose account they are playing on?
A Yes.
Q Do you remember who was with Mr. McDonnell the first time he came to your club?
A He had his sons.
Q Did he also have a security detail with him?
A Yes. He had two security detail.
Q Just to be clear for everyone, the first time he came to your club, was Mr. Williams with him?
A No.
Q Did Mr. McDonnell and those who were with him go out on the course that day?
A Yes.
Q All right. I'd like to talk about what exactly they

did at the course that day. Do you keep receipts of people's visits to your course?
A Yes.
Q Are those typically made and kept in the regular course of business at Kinloch?
A Yes.
Q And are they generally made around the time that the purchases are made?
A Yes.
Q I'd like to show you Exhibit 135. Can you tell us what the first page of this document is?
A This is the member statement for May of 2011 for Jonnie Williams.
Q If we could turn to the second page, could you tell us what's shown there? We will zoom in a little bit, but generally speaking.
A Those are the individual tickets for the month for that statement.
MR. FAULCONER: We would offer Exhibit 135 into evidence.
THE COURT: It will be admitted.
BY MR. FAULCONER:
Q I'd like to zoom in on these and make sure we understand exactly what these expenses were for. I'd like to start with the second one in the farthest left-hand

column. Zoom in on that little square. Can you tell us what this particular receipt is for?
A This is for four guest fees for unaccompanied guests.
Q And what's the first name listed there under "Players"?
A Governor Bob McDonnell.
Q And what's the total cost of this particular receipt?
A $1,200.
Q If we could scroll down to the next one. Could you tell us what this receipt is for?
A This is for merchandise in our golf shop.
Q That's $410?
A That's correct.
Q Now, if we scroll down to the next one, what is that receipt for?
A That's for the caddy fees.
Q Does that caddy fee there include the tip?
A Yes.
Q Now, if we could zoom out and look at some of the other columns briefly. Focusing on the middle column, that one right there where it says "Area Food and Beverage", is that expense for food and beverages at your course?
A That's correct.
Q From looking at this, can you actually tell which are

in the dining room and which are at the snack bar?
A Yes.
Q When it says "Food and Beverage," what does that mean?
A That would be the dining room.
Q This is a receipt for it looks like 3:14 p.m.
A I'm sorry, the question?
Q Was this a receipt that looks like 3:14 p.m.?
A Yes.
Q Are those a couple more receipts about 8:59 and 8:20 p.m.?
A Yes.
Q All right, now last one real quick if we could zoom back out and go to the top receipt on the right. Can you tell where that purchase was made that day on May 29th?
A That was in the snack bar.
Q All the receipts that we just went over, can you tell us whose account they were charged to?
A Jonnie Williams'.
Q We can take that one down. Was May of 2011 the last time that Mr. McDonnell or one of his sons played at your club?
A No.
Q Do you recall his sons actually coming out with Mr. Williams in late July of 2011?

A Yes.
Q I'd like to show you Exhibit 177. Is the first page of this the July, 2011 statement for Mr. Williams?
A Yes.
Q Turning quickly to the second page, are these the receipts associated with that month for Mr. Williams' account?
A Yes.
MR. FAULCONER: We would offer 177 into evidence.
THE COURT: It will be admitted.
BY MR. FAULCONER:
Q If I could start with the top receipt -- sorry, the receipt in the lowest left-hand corner there. What does that show there in that particular receipt?
A It shows two guest fees.
Q And is one of the names there Sean McDonnell?
A Yes.
Q Now, the guest fee there is $125. What was the guest fee on the receipts we just looked at a little bit ago?
A $300.
Q What's the reason for the difference between those?
A This particular receipt is for $125, which is the accompanied guest fee, means the guests were playing with the member. The previous was $300, which was an

unaccompanied fee. There was not a member in the group.
Q There is also a name there, David Dean. Do you recognize that name?
A Yes.
Q Was he also a previous member of your course?
A Yes.
Q And do you recall any relationship that he had to Mr. Williams?
A Yes, I think he worked for Mr. Williams.
Q Now, if we could zoom back out and if we could focus on the top receipt in the middle there. Could you tell us, are those more caddy fees for about $400 that day?
A Yes.
Q Again, do those caddy fees include the tip?
A Yes.
Q If we could scroll down to the next receipt real quick. Is that a purchase of apparel at your club for about $648?
A Yes.
Q And then go to the next one down. That's another expense at your snack bar, right?
A That's correct.
Q All right. We can zoom back out on that. Now, again, all the charges for July 26th that are shown on this receipt, whose account were they charged to?

A Jonnie Williams'.
Q Now, do you recall Mr. McDonnell's sons again coming to the course in August of 2011?
A Yes.
Q I'd like to show you Exhibit 200. Is the first page of this exhibit the August, 2011 statement for Mr. Williams?
A Yes.
Q Turning to Page 3 of this exhibit. Then also to Page 4. Are Pages 3 and 4 receipts for particular visits in August of 2011?
A Yes.
MR. FAULCONER: We would offer Exhibit 200 into evidence.
THE COURT: It will be admitted.
BY MR. FAULCONER:
Q Starting with Page 3, looking at the first receipt in the upper left-hand corner, could you tell us what that particular receipt is for?
A That is for merchandise in our golf shop.
Q Does that include -- what's a Ping Voyage bag?
A That's a golf bag.
Q Now, if we could scroll down real quick, on that next one there, does that show -- what does that show in that receipt?

A It shows unaccompanied fees for two guests for nine holes.
Q If we could scroll down. What does that one show there?
A That's the caddy fee.
Q If we could zoom back out. Now, if we could zoom in -- the date of the prior ones was August 5th; is that right?
A That's correct.
Q If we could zoom in on the top one in the middle. Does this show another visit on August 11th of 2011, six days later?
A Yes.
Q Do you remember Mr. McDonnell's sons coming out with a friend on or around that time?
A Yes.
Q What's the total cost of their visit on that occasion?
A $900.
Q And scrolling down again, does that show caddy fees for about $300 there?
A Yes.
Q Again, does that include the tip on that charge?
A Yes.
Q Then below that, I guess there's two receipts for

beverages, right?
A Yes.
Q And then zooming back out and going to the upper right, is that a charge at the snack bar for that visit?
A Yes.
Q Looking at the next receipt down, what's the date on that receipt?
A That is August 13th.
Q Do you recall Mr. McDonnell coming out with his son, Sean, on that date, two days after the prior visit?
A Yes.
Q And on, I guess this would have been the second time Mr. McDonnell came there, did you actually greet him yourself the second time as well?
A Yes.
Q Would the greeting have been similar with the first greeting you had with him?
A Yes.
Q The next receipt down from that one, just scrolling down, what does that mean there, for Titleist Pro V1x?
A Those are golf balls purchased in the golf shop.
Q Below that, are those more caddy fees there?
A Yes.
Q Those caddy fee charges, based on what you can tell, the prices include the tip?

A Yes.
Q Turning to Page 4 of this exhibit briefly. Are there some more charges for food in the upper left-hand corner there?
A Yes.
Q And all of these charges that we have looked at from August of 2011, whose account did those charges go on?
A Jonnie Williams'.
Q And this last visit in August of 2011 when Mr. McDonnell again came, was Mr. Williams present on that occasion?
A No.
Q All right. Now, zooming forward just a little bit to the winter of 2011, winter of 2012, do you recall a later visit by Mr. McDonnell and his two sons in or around January of 2012?
A Yes.
Q I'd like to show you Exhibit 285. Is this the first page of Mr. Williams' statement for January of 2012?
A Yes.
Q Turning to the second page, are those the specific charges from that month?
A Yes.
MR. FAULCONER: We would offer 285 into evidence.

THE COURT: It will be admitted.

BY MR. FAULCONER:

Q Zooming in on the second receipt down on the left, does that show again the golf charges for that particular occasion?

A Yes.

Q On this occasion in January of 2012, did you again personally greet the Governor, former Governor, when he showed up?

A Yes.

Q Was the greeting similar to the first one that you had had with him?

A Yes.

Q I see here that there is both the guest fee of $300 and then the $90 cart fee. Are you allowed to take a cart at Kinloch?

A Yes.

Q If you do, does the caddy still come with you or no?

A Caddy still comes with you, yes.

Q So scrolling down to the next one, is that the caddy fee there on top of the cart fee for that day?

A Yes.

Q Again, does that caddy fee there include the tip being charged to this account?

A Yes.

Q Now, based on these receipts or your recollection, was Mr. Williams present in January of 2012 when Mr. McDonnell and his sons played there?
A No.
Q But whose account did all of these charges go on?
A Jonnie Williams'.
Q All right. Now, do you recall after that January, 2012 visit, a fourth visit by Mr. McDonnell to your property?
A Yes.
Q I'd like to show you Exhibit 433. Is this the first page of David Dean's bill for November of 2012?
A Yes.
Q That's the member that we referenced earlier, the former member that worked for Mr. Williams.
A Yes.
Q Turning to the second page of this document, are these some of the charges from that month?
A Yes.
Q Turning to the third page, are those more charges from that month?
A Yes.
MR. FAULCONER: We offer Exhibit 433 into evidence.
THE COURT: It will be admitted.

BY MR. FAULCONER:
Q Just zooming in on the top left corner of that page, can you tell us what individuals are listed there under that particular receipt?
A David Dean, Jonnie Williams, Governor Bob McDonnell, Sean McDonnell, and Bobby McDonnell.
Q Do you recall those individuals playing at your course in about November of 2012?
A Yes.
Q What was the total charge for that golf on that day?
A $187.50.
Q Now, to be clear, was this the first time that you had seen Mr. McDonnell and Mr. Williams together?
A Playing golf together, yes.
Q Now, I'd like to show you Exhibit 434. Is this Mr. Williams' receipt from that same month, November of 2012?
A Yes.
Q Turning to Page 2, are there some charges for November 23rd, 2012 on that receipt?
A Yes.
MR. FAULCONER: We would offer Exhibit 434 into evidence.
THE COURT: It will be admitted.
BY MR. FAULCONER:

Q The second receipt down on this page, could you tell us what that shows?
A Caddy fees.
Q Again, like the others, does this one include the tip?
A Yes.
Q Now, I'd like to zoom out real quick, and then just looking at those other receipts as best you can tell, do those show additional charges for food and beverages while they were there on that occasion?
A Yes.
Q Like the other ones we have talked about, whose account did these charges go on?
A Jonnie Williams'.
Q Mr. Owenby, since that visit in November of 2012, have you ever seen Mr. McDonnell at Kinloch again?
A No.
Q What about his sons?
A No.
Q All right. Now, we have seen some receipts for items that were purchased like clothing or things like that. Do you sell clothing at the course?
A Yes.
Q Does some of that clothing include that logo that we saw earlier in that one picture where we zoomed in?

A Yes.
Q Clothing that has the Kinloch logo on it, can you get it other places or where can you actually get a piece of clothing like that?
A Only at Kinloch.
MR. FAULCONER: I'd like to offer up to the witness Exhibits 9-A, 10-A, 11-A, 12-A, 14-A, and 19-A with the assistance of the security officer.
(Documents proffered to witness.)
BY MR. FAULCONER:
Q Mr. Owenby, if you could take a second to look through these photos and let us know when you have had a chance.
A Yes, sir.
Q Mr. Owenby, are these items with the Kinloch logo on them?
A Yes, sir.
MR. FAULCONER: We would offer Exhibits 9-A, 10-A, 11-A, 12-A, 14-A, and 19-A into evidence.
THE COURT: They will be admitted.
BY MR. FAULCONER:
Q We will try to flip through these pretty quickly. Looking at 9-A first. Is this a shirt purchased at Kinloch Golf Club?
A Yes.

Q Where is the logo on this one that lets you know that?
A On the left sleeve.
Q If we could look at 10-A briefly. Is this another shirt purchased at Kinloch?
A Yes.
Q 11-A? Is this also a shirt purchased at Kinloch?
A Yes.
Q 12-A, if we could. Would the same be true for this one?
A Yes.
Q And then finally, 14-A. Is the same true for this one?
A Yes.
Q If we could look at 19-A. Could you tell us what this is?
A This is a golf bag.
Q Can you tell what brand of golf bag this is from looking at it?
A It is a Ping.
Q And is that the Kinloch logo on it?
A Yes.
Q Now, all the items we just looked at, where would you buy them at Kinloch?
A In the golf shop.

Q If I could show you Exhibit 144, which we haven't looked at but was previously admitted. Could you tell us what that's a photograph of, Mr. Owenby?
A That's the golf shop at Kinloch Golf Club.
Q Is that where you would purchase the items we just looked at?
A Yes.
Q If we could zoom in to the right of the keyboard there, in the left of this picture, what is that item there?
A That's a credit card machine.
Q Now, at Kinloch, do the items you sell in the pro shop, do they have price tags on them?
A Yes.
Q If somebody who comes in as a guest of a member wants to pay for something, can they offer to give you their credit card and pay for the item at the pro shop?
A Yes.
Q Do you accept credit cards generally at Kinloch for other expenses as well?
A Yes.
Q Now, in the four times that Mr. McDonnell was at your property, did he ever ask you about how he should pay for anything?
A No.

Q Do you have any record of Mr. McDonnell paying for anything at Kinloch Golf Club?
A No.
MR. FAULCONER: One moment, Your Honor. No further questions for this witness, Your Honor.
THE COURT: All right. Cross?
CROSS-EXAMINATION
BY MR. BROWNLEE:
Q Good afternoon, sir.
A Good afternoon.
Q My name is John Brownlee, and I represent Bob McDonnell. I just have a couple questions for you. I believe you testified that in May, August, 2011 and then in January of 2012, Mr. McDonnell came out to your course and golfed; is that right?
A Yes.
Q On each of these three occasions you met him at the entryway and welcomed him to your club; is that correct?
A Yes.
Q Okay. And he was unaccompanied in those three instances? Mr. Williams did not golf with him; is that correct?
A Correct.
Q And on those occasions, I think he had some combination of his sons with him and then he always had

his protective detail with him; is that correct?
A Correct.
Q And I believe you testified that when you greeted him, you informed him that you had been notified by Mr. Williams that he was coming and you were expecting him.
A Correct.
Q Okay. And so you were fully aware at that time that Mr. Williams would be paying for the golf that day; is that correct?
A Correct.
Q And many of the receipts that Mr. Faulconer showed you today actually had Mr. McDonnell's name on it or his sons' name on it; is that correct?
A Yes.
Q So people knew that he was actually out there playing that day.
A Yes.
Q And if you recall, when he was at your club, was he open and interacting with people and playing openly out in the club?
A Yes.
Q He appeared to be comfortable at the club? I don't know how good a golfer he is, but he seemed to be comfortable?

A Yes.
Q He was outgoing, friendly with people?
A Yes.

THE COURT: Mr. Brownlee, I need to stop. One of my jurors needs to go out. So we've got to deal with this. If you all would leave and let the juror take care of himself.

(The jury left the courtroom.)

All right, we will take a break. A juror was feeling ill, so I don't know how long this is going to be. So we will get back as soon as we can.

(Recess taken from 2:53 p.m. to 3:14 p.m.)

THE COURT: All right. Bring the jury in, please.

(The jury entered the courtroom.)

All right, proceed.

BY MR. BROWNLEE:
Q Mr. Owenby, I just want to go back. We were talking about the times that Mr. McDonnell came out and played at the course. I just was asking you was he -- did he appear to be comfortable there, friendly to people, and kind of acting very normally when he was at your course?
A Yes.
Q Okay. And let me talk on the one instance in November of 2012 when Mr. McDonnell was there and

Mr. Williams was there. Was Mr. McDonnell's security detail with him on that trip as well, if you recall?
A I don't recall.
Q Is it fair to say on the other times there, though, his detail was always with him?
A I think so, yes, sir.
Q On all the times that Mr. McDonnell was at your course, did you ever see him do anything in an effort to try to conceal his appearance there or hide that he was there?
A No.
Q And is Mr. Williams still a member of your course?
A Yes.
Q Okay.

MR. BROWNLEE: Nothing further.

THE COURT: Any questions?

MR. HAUSS: No questions, Your Honor. Thank you.

THE COURT: All right. Thank you, sir. You may stand down.

(Witness stood aside.)

Government, call your next witness, please.

MR. FAULCONER: Your Honor, the United States calls Robert Ryan McDonnell.

ROBERT R. McDONNELL,

called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. FAULCONER:

Q Could you please state your name and spell your last name for the court reporter?

A Robert Ryan McDonnell, M-C-D-O-N-N-E-L-L.

Q What's your relationship to the defendants, Robert F. McDonnell and Ms. Maureen G. McDonnell?

A I am the son.

Q Do you recall meeting a man named Jonnie Williams, Sr. sometime around the summer of 2011?

A Yes, late spring to summer, 2011.

Q And 2011, was that before or after your dad took office as Governor?

A This was after my dad took office.

Q Before your dad ran for Governor, did you know who Jonnie Williams was?

A No, sir.

Q Had you ever seen him around family events before your dad ran for Governor?

A No, sir.

Q Now, before 2011, the year that you met Mr. Williams, had you ever played golf at a place called Kinloch Golf

Club?
A No, sir.
Q After you met Mr. Williams, did you play out at Kinloch Golf Club?
A Yes, sir.
Q Is that a private course?
A I believe it is a private course, yes.
Q Is anyone in your family a member of Kinloch?
A No, sir.
Q When you played there, who was the member who was sponsoring you?
A Jonnie was the member at Kinloch.
Q The first time you played at Kinloch, do you remember when that was approximately?
A The first time we played was, I believe, late May, 2011.
Q Do you remember who was with you the first time you played?
A Yes. It was myself, my twin brother, my soon-to-be brother-in-law, and my father.
Q And who did you understand to be paying for your day when you were at Kinloch on that particular occasion?
A I believe Jonnie was the member, so I believed he was paying.
Q Now, later, after that first round of golf at

Kinloch, can you tell the jury whether you actually received some golf apparel from Mr. Williams?
A After Kinloch?
Q Yes, after the first visit to Kinloch.
A I don't remember if I received any after the first visit.
Q Do you remember receiving a golf bag from Mr. Williams?
A I do.
Q Could we show Exhibit 20-A for identification? Do you recognize this item that's shown in this picture?
A Yes. That's a Virginia golf bag and a set of clubs.
MR. FAULCONER: We would offer Exhibit 20-A into evidence.
THE COURT: The number again?
MR. FAULCONER: 20-A.
THE COURT: It will be admitted.
BY MR. FAULCONER:
Q Mr. McDonnell, is this a golf bag that you received from Mr. Williams?
A Yes. I received this golf bag about a week after an event at the Homestead. Jonnie sent the clubs to me.
Q Now, if we could bring up Exhibit 21-A. Do you recognize what's shown in this photograph?
A Yes, sir. These are the particular clubs in the bag,

Callaway.

MR. FAULCONER: We would offer Exhibit 21-A into evidence.

THE COURT: It will be admitted.

MR. SMALL: No objection.

BY MR. FAULCONER:

Q Now, are these the golf clubs that you received from Mr. Williams?

A Yes, sir.

Q Now, backing up for just a moment, you had mentioned earlier that these clubs came off an event at the Homestead. Do you remember Mr. Williams being at the Homestead as well?

A Yes, sir, Mr. Williams was at the Homestead.

Q And when you were at the Homestead, did you play golf with Mr. Williams when you were there?

A Yes, sir.

Q When you played golf with Mr. Williams while you were there, was your father present?

A No, sir, he was not. My father was busy at meetings, and Jonnie asked if I wanted to just go play with him, and we just played about nine holes until the sun went down together.

Q Do you recall if Mr. Williams played with your father apart from being with you on that particular visit to the

Homestead?
A No, he did not play with my father.
Q Now, going back to the golf -- moving on from the golf clubs, if we could show you Exhibit 17-A. Do you recognize what's shown in this photograph?
A Yes, sir.
Q What's shown in this photograph?
A Two pairs of golf shoes.
MR. FAULCONER: We would offer Exhibit 17-A into evidence.
THE COURT: It will be admitted.
BY MR. FAULCONER:
Q Are these golf shoes that you received from Mr. Williams around the same time as that bag and clubs?
A Yes, sir. These shoes showed up along with the clubs and bag.
Q When you received the clubs and the bag and the shoes, did you discuss the fact that you had received them with your father?
A Yes. So I remember the week or so after the Homestead, I got a call from Jonnie saying, "Hey, there is a present for you waiting at your house." And I get home and there is a bag and clubs just sitting there along with these shoes. So I told my father -- well, first I called and thanked Jonnie. I don't know where the gesture came

from. But I told my father that he had sent me these shoes and clubs.
Q What was your father's reaction to that?
A My father's reaction was that I should send them back to Jonnie.
Q Do you remember him saying something about it being a little excessive?
A Yes, sir.
Q Now, did you actually end up returning the clubs and the shoes and the bag to Mr. Williams?
A No. I believed the gift to be -- obviously I was excited, so I believed it to be a gift to me. Jonnie and I had developed a relationship by that point, so I thought it was just an independent present to me and I didn't think that we -- that I should return them.
Q So did you keep them?
A I did keep them.
Q Did you use them in your father's presence?
A I believe so, yes.
Q You played golf with your father after that time?
A Later possibly, yes.
Q Now I'd like to show you Exhibit 18-A. Do you recognize the item shown in this photograph?
A Yes, sir, I do.
Q And what is it?

A It's a Notre Dame golf bag.
Q Do you know who this bag previously belonged to?
A I believe my father.
MR. FAULCONER: We would offer Exhibit 18-A into evidence.
THE COURT: It will be admitted.
BY MR. FAULCONER:
Q Do you know where this bag came from before it got to your father?
A I believe this came from Jonnie.
Q Now, this was around June or July of 2011 that you received these items; is that right?
A Yes. This was late June, I believe.
Q Now, later in August of 2011, do you remember playing at Kinloch Golf Club again?
A I would like to see the date or like a calendar. Like a specific day.
Q Let me put it this way: Do you remember playing out at Kinloch Golf Club again later that summer without your father present?
A Yes, sir.
Q Do you remember playing there with your brother and a friend of yours?
A Yes. I believe it was Brandon DeGraff.
Q And after, when you played that time, was

Mr. Williams with you?
A No., He was not.
Q And do you recall ever discussing with your father that you had played at Kinloch without Mr. Williams present?
A I don't remember a particular discussion about going out there, about that specific outing.
Q Do you ever recall whether you talked to him in general about the fact of going out to Kinloch without him or Mr. Williams present?
A Yes, there was probably a discussion that I went and played golf at Kinloch that day or along those lines.
Q And do you remember what your father's reaction was to that?
A I don't remember his particular reaction. But I just told him I went and played golf that day.
Q I guess after -- do you remember him saying anything about it being excessive like about the bag and the shoes?
A No, not particularly.
Q Now, I'd like to show you briefly something that's previously been admitted, which is Exhibit 177. Sorry, Exhibit 200. If we could turn to the third page of this document. If we could zoom in on the top receipt in the middle. Does that show that outing that we were talking about earlier with Mr. DeGraff?

A Yes, sir.
Q Does that seem like about the right time frame, August 11th of 2011?
A Yes, sir.
Q All right. We can go and take that down. One moment, Your Honor, I apologize.
Now I'd like to direct your attention to December of 2011. And specifically, around Christmastime. Were you at home for Christmas that year with your family?
A Yes, sir.
Q And do you recall any expensive gifts that your father received?
A December, 2011?
Q Yes.
A Not particularly.
Q Do you recall him receiving a watch that Christmas?
A Oh, December. Okay. Yes, sir, a watch.
Q And could you describe that for the members of the jury?
A I believe it was a Rolex watch.
Q And do you remember who he received it from at Christmas?
A Yes, he received it from my mother.
Q And do you recall that Rolex watch being engraved?
A Yes, I believe it had my dad's name on it.

Q Do you recall his reaction when he received that particular item?
A Yeah, I do. He was surprised. It was a nice watch. But really, his first reaction was like, to my mother, "Another watch?" He had a Seiko watch of 10 to 15 years that she gave him before. He didn't know he needed another watch, was really his first reaction.
Q I guess before that, before the Rolex watch, what would you say was the next nicest gift you had seen your mother give your father?
A Probably that Seiko watch before.
Q Well, Christmastime of 2011, that would have been obviously around December 25th, right?
A Yes.
Q Do you recall actually playing out at Kinloch with your father a few weeks after that?
A A few weeks after -- possibly.
Q If we could show Exhibit 285, which has been admitted. If we could turn to the second page of that document. If we could zoom in on the second receipt down on the left. Looking at that document, Mr. McDonnell, does that look like about the date, January 7th, 2012, of another time that you went out to Kinloch?
A Yes. That seems right, January 7th.
Q And do you recall going out to Kinloch in January of

2012 with your father and your brother?

A Yes. I believe it was an unusually nice day for January to be able to play golf. So I do remember that.

Q And like the prior occasions, who did you understand to be paying for your dad at Kinloch that day?

A Jonnie was a member there, so I assumed it to be Jonnie.

Q Now, I'd like to briefly direct your attention to another Christmas, and that's the Christmas of 2012. Do you recall receiving shares of stock in Star Scientific around Christmas of 2012?

A Yes, sir.

Q And do you actually recall a conversation about that around the time of Christmas dinner?

A Yes. I think it was later in the evening, as dinner was wrapping up.

Q Was your father present for that conversation?

A Yes, sir.

Q Now, I'd like to show you what's been marked for identification as Exhibit 448. Looking at the first page of this document, do you recognize this as a Davenport & Company form that you filled out?

A So that is not my handwriting.

Q Do you recognize this as a Davenport form that you reviewed and then later signed?

A Can I see my signature?
Q Sure. If we could go to the third-to-last page. There we go. If we could zoom in on the bottom there. Is that your name and signature?
A Yes, sir.
MR. FAULCONER: We would offer Exhibit 448 into evidence.
THE COURT: It will be admitted.
BY MR. FAULCONER:
Q Could you tell us what the date is there by your signature?
A December 26th, 2012.
Q If we could zoom back out and then go to the first page. So is this a form that you filled out to receive those shares of stock in Star Scientific?
A Again, I did not. That is not my --
Q I apologize. Was this a form that you signed in order to receive the shares of Star Scientific stock?
A Yes, sir, I signed the form.
Q When you were discussing receiving this stock, can you tell us whether your parents said anything about how they had bought it?
A So my understanding was that my grandfather, who had passed away, had left each kid a thousand dollars, and that was invested into the Star Scientific stock.

Q Was there any discussion about having gifted shares of that stock to your sister, Cailin, the prior year?
A I don't remember that.
Q Was there any discussion of having purchased and sold the stock at various points in 2011 with your parents?
A I don't remember that conversation.
MR. FAULCONER: One moment, Your Honor.
THE COURT: Sure.
(Counsel conferring with co-counsel.)
BY MR. FAULCONER:
Q With respect to what you said earlier about the money for the stock having come from your grandfather's estate, who was it that said that?
A My mother.
Q And that was in the same conversation that we were talking about?
A The dinner table conversation?
Q Yes.
A Yes, sir.
Q Was there any conversation at that dinner about taxes or tax consequences as it related to that stock?
A Not that I remember.
MR. FAULCONER: Your Honor, I think now I have no further questions.
THE COURT: All right.

CROSS-EXAMINATION

BY MR. SMALL:

Q You testified you met Jonnie Williams in the spring of 2011, correct?

A Yes.

Q And who did you meet him through?

A So the first time I met Jonnie, he was with my mother and she introduced me to him.

Q Okay. And you understood him to be a friend of your mother, correct?

A Yes, sir.

Q Now, you said you developed a friendship with Jonnie. Tell us what that means to you.

A So after I met Jonnie, we exchanged text messages and phone calls. I was really interested, I grew up interested in nutraceuticals and I was health conscious through my mother, but I also had a passion for business and I understood Jonnie to be a successful businessman. So I think that developed into this mentor/mentee relationship. He kind of took me under his wing and taught me about business.

Q Okay. And he also, I take it, invited you to play golf, correct?

A Yes.

Q And who called who? Did he call you or did you call

him?
A So the first initial times, Jonnie called me to play golf in the summer of 2011. I was busy with my internship and also preparing to play soccer at UVA, so I declined the offer for the first few times. But eventually, we did connect and play golf.
Q You were on summer vacation from college, right, at the time?
A Yes.
Q And Jonnie Williams called you and invites you to play golf, right?
A Yes, sir.
Q And you said no. You couldn't do it.
A No, I was busy.
Q And he called you again and invited you to play golf, right?
A Yes, sir.
Q You said no again.
A Yes.
Q That happened a couple times.
A The first couple times, yes.
Q But then you were asked questions about the Homestead event. The Homestead event was basically some kind of a political gathering or convention, am I right?
A Yes. It was some sort of RGA or PAC convention out

at the Homestead.
Q And you had been to, I assume, you had been to a few political events before, right?
A Yes, I've grown up around politics, so I've been to quite a few.
Q Fair to say that if you are not directly involved, the evenings are interesting but the afternoons are not?
A Yes.
Q Okay. So in the afternoon, you met up with Jonnie Williams at the hotel; is that right?
A Yes, sir. At the hotel.
Q Tell us what happened.
A So as all the political, politically-involved individuals at the Homestead, they had their meetings during the afternoon, and Jonnie approached me and he asked if I wanted to salvage the last few hours of daylight. So just him and I went off and played about nine, ten holes of golf until the sun went down, really.
Q So you are a college kid?
A Yes.
Q He is a successful businessman. Did that feel strange to you, that he was inviting you to play golf?
A No. Again, because I've grown up around politics, I am used to communicating and interacting with people two to three times my age. So it really didn't strike me as

strange. And furthermore, I was really interested in business, so I wanted to talk to him and learn from him.
Q So the two of you went out and played nine holes of golf.
A Yes.
Q What did you talk about?
A Really just current events, small talk, casual talk. We would talk about golf in general. Just very social.
Q All right. And over time, I take it you continued to develop a relationship with Jonnie; is that right?
A Yes, sir.
Q Friendship with Jonnie.
A Yes. A friendship.
Q And did you consider that separate from your mom or your dad's friendship with Jonnie?
A Yes, I really did. As time went on and we communicated through phone calls and texts, I considered it a legitimate friendship outside of whoever my father was, and I viewed him as a mentor.
Q You said that you both were interested in nutraceuticals, correct?
A Yes, sir.
Q You talked about those issues?
A Yes. Just generally. It was just more of a background of being health conscious. My mom has always

been interested in nutraceuticals and health, so that was a shared common interest.
Q You were also both interested in business, right?
A Yes, sir.
Q Talked about those issues?
A Yes. So during the summer of 2011, I was getting ready to apply for business school at UVA, so we would talk about how that was going, what classes, courses I was taking, just general business.
Q And you are in business school now; is that correct?
A Yes, sir, I'm at Duke University School of Business.
Q Over time, did you continue to have conversations with Jonnie Williams?
A Yes, sir.
Q Did Jonnie Williams ever tell you that his father was helping him with his company?
A Jonnie Williams' father?
Q No, that your father was helping him -- let me rephrase it. Forgive me. You are right, I'm wrong. Did Jonnie Williams ever tell you that your father was helping him with his company?
A No, sir, never.
Q Did he ever say that he had an agreement with your father to promote his company?
A No, sir, never.

MR. FAULCONER: Objection.

THE COURT: Overruled.

BY MR. SMALL:

Q Did he ever ask you to talk to your parents, either of them, about his company?

A No, sir, never.

Q Did Jonnie Williams ever ask you for anything other than to play golf with him?

A No. Nothing other than golf.

Q I take it Jonnie Williams offered you a number of different things, right?

A Can you explain "things"?

Q Sure. Well, we saw some shirts and some rounds of golf, right?

A Yes.

Q You understood he was a wealthy businessman?

A Yes, sir.

Q And did he ever say anything about "Gee, you ought to pay for some of this"?

A No, sir.

Q And when you went golfing, you knew that Jonnie was going to pay, right?

A Yes, sir.

Q Did you ever ask Jonnie Williams to pay for your golf?

A No, sir.

Q Did you ever ask Jonnie Williams to pay for a shirt or something?

A No, sir.

Q He offered to do those things, right?

A Yes, sir.

Q So you said that the golf clubs showed up. You used that word. Where did they show up, the golf clubs that Jonnie Williams gave you?

A Yes. So again, I remember the phone call. I was driving in the car and he said, "There is a present waiting for you at home." Home at that point was the Governor's Mansion. So when I got home, the clubs were in the bag, were just there.

Q Let me back up a little bit. This was shortly after you and Jonnie played at Homestead?

A Yes, sir. This was about five to seven days after the Homestead event.

Q So at Homestead, you had your own set of golf clubs, right?

A Yes. I was playing with my original set of Ram golf clubs that my father had gotten me seven years prior.

Q Wait a minute. How old were you at the time, when you were playing at Homestead?

A 2011, I would have been 19.

Q So your dad bought you a set of golf clubs when you were 12 or 13?
A Yes, 12 or 13.
Q And at Homestead, with Jonnie, the wealthy businessman, you were still playing with those golf clubs, right?
A Yes, the same clubs.
Q Fair to say, I don't know much about golf clubs, they are pretty old and beat up by that point?
A Yes, they were used, and used a lot.
Q Did Jonnie notice that or say anything about it?
A I believe he noticed the clubs I was playing with.
Q But did you ever ask Jonnie Williams to buy you a new set of clubs?
A No, sir.
Q Did you have any expectation at all that he would do that?
A No, sir.
Q And so when you got home and the surprise was there, what did you do?
A I immediately called Jonnie and thanked him many times.
Q What did he say?
A He said, "Don't worry about it, you are welcome. I can't wait to see you playing with them."

Q And you were asked about whether your father thought the gift was a little excessive. And you said that yes, he said something about that, right?

A Yes, my father believed it was excessive.

Q Fair to say there was a bit of an argument within the family about those golf clubs?

A Yes. So I was clearly excited about the clubs and I thought it was a gift directly to me, and so there was a disagreement between myself and my father. And my mother even weighed in on the situation and she sided with me, that I should be able to keep the clubs because it was a gift to me.

Q So your mom and you thought you should keep them and your dad thought you ought to give them back.

A Yes.

Q Who won that argument?

A I won the argument, because I ended up keeping the clubs.

Q Okay. And Jonnie Williams made some other offers to you as well, did he not?

A Can you be specific?

Q I don't want to get into details, but just quickly, you have sort of a recurring bronchitis, right? Fair enough?

A Yes, I have had recurring upper respiratory

infections for many years.
Q And when you were out playing golf with Jonnie, did that come up?
A Yes. We would talk about my bronchitis and he would mention his product, Anatabloc, and how it decreases inflammation and he thought it would be helpful for me to take because it would help calm the inflammation that causes bronchitis.
Q And did he offer to provide you with this product, Anatabloc?
A Yes, I believe he just gave me a few capsules.
Q Okay. And said you could get more? He would get you more?
A I don't remember that specific part, but --
Q Okay. Did you in fact start taking Anatabloc?
A Yes, I did start taking Anatabloc.
Q And he also offered, am I right, to arrange for you to see a specialist, right?
A Yes. In the fall of 2011, after taking Anatabloc, I had another serious case of bronchitis, so he thought that I should go visit a specialist that he knew at Johns Hopkins.
Q Okay. Did you?
A I did not. By that point I was back at UVA and I was too busy and told him that I didn't think it would work

out. I was seeing a doctor at UVA, so I did not go see a specialist.
Q He also offered to give you an internship; is that right?
A Yes.
Q All right. Tell us about that.
A So during the summer of 2011, I was interning at a law firm, at Eckert Seamans, and again, Jonnie and I, as we would talk, we would talk about my business interest. So he thought it would be a good idea for me the following summer, 2012, to be his apprentice or do an internship with him to some degree. So that was the conversation.
Q Okay. And what happened?
A So I thought it was a good idea because I'm applying to business school. I thought it would look good, be a learning experience for me. I went back and told my father. And he said, "Absolutely not," that I had a good internship at Eckert Seamans and he told me if I worked hard it could materialize into an internship the next summer and he didn't think interning or traveling around with Jonnie was a legitimate internship.
Q So what did you do?
A That was the end of the conversation. I told Jonnie I didn't think this would materialize, it was not going to work.

Q That was another thing Jonnie offered you where you said no, right?
A Yes, sir.
Q Just briefly, a couple other things. You recall your family going for a weekend to Smith Mountain Lake?
A Yes. I remember Smith Mountain Lake.
Q And that was Jonnie's house at Smith Mountain Lake?
A Yes.
Q Okay. And when you arrived at Smith Mountain Lake, was there a car in the driveway?
A Yes, there was a Ferrari parked in the driveway.
Q And tell the ladies and gentlemen of the jury what happened with that car.
A So my understanding was that the car had to be brought back to Richmond for some reason. And we all, all the kids, thought it would be really funny if my dad drove it back, so we pushed him to drive it. I personally was scared. He hadn't driven himself in two or three years. So it was kind of amusing to see.
Q So when you say he hadn't driven himself, every Governor has a protective service, right?
A Yes, sir. He had the protective service and then campaigning the last year as Attorney General he wasn't driving, either.
Q And the protective service, their job is to take him

everywhere he goes, right?
A Yes.
Q And in fact, you are aware that they get a little upset if he kind of sneaks off and goes to the ice cream store himself or something.
A Yes. They don't like that.
Q He had a ride back from Smith Mountain Lake, right?
A Yes, he had the EPU.
Q Who encouraged him to get in the Ferrari and drive it?
A It was the kids.
Q You said previously, I think, that it was kind of a family joke. What did you mean by that?
A Yes. So again, none of us had seen my dad drive a car in forever, and to be driving a Ferrari, it was amusing to us and we knew it would be fun for him. So it was really quite fun.
Q You were asked some questions about this watch that was a Christmas present. Who is it your understanding that the watch came from?
A From my mother.
Q Okay. And the watch, you said it was -- it said "Rolex" on it; is that right?
A Yes, it was a Rolex.
Q But did it come in a Rolex box? It didn't come in a

Rolex box, did it?
A I don't remember the particular box, but I don't think it was Rolex.
Q And it didn't have a Rolex certification, did it?
A No.
Q What did you think about the watch?
A So originally, I thought the watch was a fake.
Q A fake meaning sort of a knock-off?
A A knock-off. Exactly. I looked at the watch, and I've seen a Rolex once or twice before, and the second hand on this particular watch ticked instead of rolled, so I thought it was a fake at first. That was my first intuition.
Q Is the roll your understanding of why it is called a Rolex?
A That's my understanding.
Q And also, do you have -- I gather your parents had been, both parents had quite recently been on some job development, business development trips to the Far East?
A Yes. They were in Asia at some places on a job expansion tour.
Q Did that contribute to your view that the watch was probably a knock-off?
A Yes. It played a part. I know the black market, or of the black market over there. So I believed, I thought

it was just purchased through that.
Q You were asked some questions about Christmas of 2012 and the Star Scientific stock. Do you recall there being any particular rush to sign the forms?
A No real rush to sign the forms.
Q And the prosecutor asked you if your parents explained what was going on. Who actually explained what was going on?
A My mother told us that we had been given a thousand dollars from my grandfather, her dad, and that it was invested in Star Scientific.
Q Did your father, do you recall your father saying anything about this?
A No. He was just present, but never talked.
Q So you testified that you thought that Jonnie Williams was a friend and a mentor, correct?
A Yes, I believed him to be a mentor.
Q And because of that, because you thought he was a genuine friend and mentor, you thought it was okay to accept gifts from a wealthy friend. Is that fair to say?
A Yeah. I thought it was a personal gift to me from a friend and a mentor.
Q In hindsight, can you tell the jury, has your view of that changed?
A Yes.

MR. FAULCONER: Objection, Your Honor.

THE COURT: The objection is sustained.

BY MR. SMALL:

Q How old were you when your father started in public service?

A I was a month and ten days old.

Q So throughout your life, he has been in public service?

A Yes. He has been 22 years or 21, 22 years in public service.

Q And has that put some demands and strain on your family?

A Yes.

Q I take it despite that, your family supported him in his work; is that right?

A Yes. We supported him.

Q Why is that?

A We know that my dad loves Virginia and he loves to serve. I always remember, one of his favorite Bible verses is "The greatest among us is the servant of all."

MR. FAULCONER: Objection.

THE COURT: Sustained.

MR. SMALL: Thank you, Bobby. Nothing further.

THE COURT: Anything from Ms. McDonnell?

CROSS-EXAMINATION

BY MR. HAUSS:
Q Good afternoon.
A Good afternoon.
Q How are you today?
A I'm doing well, yourself?
Q Good, thank you. So you just testified that you understood that Mr. Williams was your mother's friend; is that correct?
A My mother's friend.
Q And he was also at some point your friend.
A Yes, sir.
Q Did you ever, did Mr. Williams ever tell you he was hanging out with you to try to get closer to your father?
A No, sir.
Q He made you feel like he wanted to hang out with you; is that right?
A Yes.
Q Like he valued spending time with you; is that right?
A Yes, sir.
Q And you testified that Mr. Williams never told you that your dad was trying to help his company, correct?
A No, sir.
Q Did Jonnie Williams ever say to you that your mom was trying to get your dad to help Star Scientific?
A No, sir.

Q Now, you also mentioned that a shared interest that you and Mr. Williams had was nutraceuticals, right?
A Yes, sir.
Q That's not something you recently got into. That's something you have been interested in your whole life; is that right?
A Yes, sir.
Q That's because that's something that your mom has been really interested in your whole life.
A Yes, sir.
Q In fact, would you say that your mom is very passionate about nutraceuticals?
A She is very health conscious.
Q Now, when you would spend time with Mr. Williams, when you would golf with him, did he ever talk to you about his product, Anatabloc?
A Yes, we would casually talk about Anatabloc.
Q And would you say he was enthusiastic about Anatabloc?
A Yes. He was enthusiastic.
Q Fair to say that Mr. Williams was a bit of a salesman?
A Yes, he is a businessman and a salesman.
Q And would he ever tell you about the launch of Anatabloc and how great that was going to be?

A There were conversations about the launch.
Q You also mentioned the strains and demands that your dad's public service has put on your family.
A Yes, sir.
Q Fair to say that your dad, throughout your life, has been very, very busy?
A Very busy, very hard-working.
Q And did that become worse after he became Governor, even busier?
A Yes, even busier.
Q Then you mentioned the Rolex that your dad got being a gift from your mom; is that right?
A Yes, sir.
Q Did you ever hear your mom say that watch was from Jonnie Williams?
A Not at that time.
Q And with respect to the shares of stock that you got in Christmas, 2012, your mom didn't say anything about disclosure requirements, did she?
A No.

MR. HAUSS: One minute, Your Honor. Nothing further, Your Honor. Thank you.

THE COURT: All right. Any redirect?

REDIRECT EXAMINATION

BY MR. FAULCONER:

Q Now, Mr. McDonnell, before your testimony here today, did you meet with the defense lawyers in this case, your parents' lawyers?
A Yes, sir.
Q About how many times did you meet with them?
A One to two times. Three times.
Q And did you decline to meet with us before your testimony here today?
A Yes, my counsel advised me to decline.
Q Now, you talked a little bit about your communications with your father. About how often would you say that you spoke to him on the phone?
A My father?
Q Yes.
A Around that time?
Q Around the time of about 2010 to 2012.
A So I was at UVA and we probably talked once or twice a week by phone.
Q Now, you talked also about your interactions with Mr. Williams. When you interacted with Mr. Williams, was it mostly in person or by phone?
A Most of it was -- well, I mean, there was texts and then personal contact. So it was varied.
Q When you interacted with him, though, how many times did you meet him in person?

A Possibly around ten.
Q How many times do you remember playing golf with him?
A Five, four or five.
Q I just want to make sure we are crystal clear on this. The first time you spoke to Jonnie Williams on the phone, who called whom?
A The first time I spoke to Jonnie?
Q Yes.
A I don't remember who called who.
Q Okay. Now, you also talked a little bit, I think Mr. Hauss asked you about this, when you were interacting with Jonnie Williams, did he mention his product, Anatabloc?
A Yes, sir.
Q Did he specifically mention the launch of the product Anatabloc?
A He vaguely would talk about like when he was -- he was excited for it to hit the markets.
Q Now, you also were asked about the trip to Smith Mountain Lake that you took. In addition to driving the Ferrari home, do you recall whether your father drove the Ferrari anywhere else while you were at Smith Mountain Lake?
A I don't believe it was driven anywhere except from the house back to Richmond.

Q And you also talked about the Rolex a little bit on cross-examination. And you talked about your opinions of the Rolex. To be clear, your father never said anything about thinking the Rolex was fake in your presence, did he?

A Not in my presence.

MR. FAULCONER: One moment, Your Honor. No further questions, Your Honor.

THE COURT: All right. Thank you. You may stand down.

(Witness stood aside.)

All right, we will go ahead and take our normal afternoon break. Another 15 minutes. We will make sure everybody can have something to drink or use the bathroom.

(The jury left the courtroom.)

(Recess taken from 4:02 p.m. to 4:18 p.m.)

///

///

///

///

///

///

///

///

///

THE COURT: All right. Let's bring in the jury, please.

(The jury entered the courtroom.)

THE COURT: All right. Government, call your next witness.

MR. DRY: The government calls Mark Sykes to the stand.

**MARK SYKES,**

called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

**DIRECT EXAMINATION**

BY MR. DRY:

Q Good afternoon, Major Sykes.
A Good afternoon, sir.
Q Can you please state your full name for the record?
A Yes. Mark Jeffrey Sykes. S-Y-K-E-S.
Q And where do you work, sir?
A Division of Capitol Police.
Q And how long have you worked for the Capitol Police?
A Two years.
Q And your rank is major?
A Correct.
Q And what's your title?
A Assistant Chief of Police.

Q And how many people do you supervise, sir?
A We have 73 sworn officers, 14 -- 31 wage and 14 civilian, for a total of about 118 people.
Q And can you briefly describe what the Capitol Police does?
A Capitol Police provides law enforcement and -- police law enforcement security services for the Capitol complex and area, state buildings, parking facilities. We also, our jurisdiction, extends out to the Science Museum of Virginia, which is a state property, also as well as the War Memorial.
Q And does that jurisdiction go over the Patrick Henry Building?
A It does, sir.
Q And can you briefly describe what the Patrick Henry Building is?
A The Patrick Henry Building is one of the government facilities. It houses the office of the Governor and most of the individuals who are on the Governor's staff, cabinet officials, folks of that nature.
Q And does the jurisdiction of the Capitol Police also include the Executive Mansion?
A It does.
MR. DRY: I'd like to bring up Government's Exhibit 551 for identification, please.

BY MR. DRY:
Q Have you had an opportunity to review this document before?
A I have.
Q And what is it, sir?
A This is the site plan, area plan for the Capitol area.
MR. DRY: I'd like to move Government's Exhibit 551 into evidence.
THE COURT: It will be admitted.
BY MR. DRY:
Q Sir, zooming in on the Capitol Square portion -- right there, Mr. Starnes, thank you -- can you point out on the screen where the Executive Mansion is?
A Yes, sir. It would be here.
Q Okay. And how many entrances are there for the Executive Mansion?
A There are three primary entrances, a main gate, a north gate and a south gate to that facility.
Q And do you see a building, the Patrick Henry Building you were talking about before?
A Yes, sir, I do.
Q Can you point on the screen where that building is?
A Okay.
Q And is that commonly referred to as the PHB?

A Correct.
Q And how far away, approximately, are those two buildings?
A Approximately 100 yards.
Q And is there a private way to get from the Patrick Henry Building to the Executive Mansion?
A There is.
Q And what is that?
A A set of tunnels.
Q And who's allowed to use those?
A Executive Protection, the Governor, and his staff.
Q Okay. And as part of your duties, do you oversee the officers who provide security to both the Patrick Henry Building and the Executive Mansion?
A Yes, sir.
Q I'd like to -- you can take that down, Mr. Starnes.
Bring up Government's Exhibit 531, please.
And do you recognize this photo, sir?
A I do.
Q What is it?
A That's a photograph of the Executive Mansion, also referred to commonly as the Governor's Mansion.
MR. DRY: I'd like to move Government's Exhibit 531 into evidence.
THE COURT: It will be admitted.

BY MR. DRY:

Q Sir, what are we looking at here? You described three entrances. What are we looking at here?

A Yes, sir. This would be the entrance I described as the main gate. That's the main entrance off North Drive, leading into the front entrance of the Mansion. To the left of this photo, which would be in the northerly direction, you'd have the north gate, and that gate is essentially between the Patrick Henry Building -- the exterior of the Governor's Mansion Complex and the Patrick Henry Building. To the south or to the right of this photo as you move down, there's a slight grade on the hill. There's a carriage house or a cottage, Mansion cottage, and there's a south gate that allows you access into and out of the facility from that point as well.

Q And where -- which gate do most visitors come through?

A Most visitors would come through the main gate, the gate that's depicted here.

Q Okay. And are there records kept of when visitors come to the Executive Mansion?

A There are.

Q And I'd like to now hand the witness Government's Exhibit 110, 125, 186, 287, and 290.

Have you had an opportunity to review these

records before your testimony here today, sir?
A Yes, sir, I did.
Q And what are those records?
A These are daily guest logs for the Executive Mansion.
Q And are these visitors' logs kept in the course of the regularly conducted activity of the Capitol Police?
A Yes, sir, they are.
Q And who actually fills out the information on the logs?
A The officer on duty.
MR. DRY: At this time the government would like to admit Government's Exhibit 110, 125, 186, 287, and 290.
THE COURT: They'll be admitted.
BY MR. DRY:
Q Now, the Capitol Police were served with a federal grand jury subpoena for these records, sir?
A Yes, they were.
Q And were you personally involved in trying to respond to that grand jury subpoena?
A Yes, I was.
Q And can you tell the members of the jury what the process was that was involved?
A I have a records coordinator that I went to and asked her to collect and assemble all the records and documents we had to comply with the federal grand jury subpoena for

the time in question, time period in question.
Q And were you able to find each and every daily log for the visitors' logs to the Mansion that were requested in the grand jury subpoena?
A No, sir, we were not, but we found quite a few of those.
Q Okay. And can you just briefly give an overview of the ones that you weren't able to find, as far as date wise?
A I can. In 2010, I think there were eight months that we could not locate. And I want to say the -- my recollection was the latter two months of the -- that year were what we did have.
There were also a segment of those records I think from 2011, January, I believe March and April, that were missing from 2011. And I think there may have been one month or portion of a month from 2012. But we had everything else.
Q Now, is it fair to say you guys went through the records multiple times trying to find these?
A Yes, sir. I can assure you we did.
Q Okay. But the five logs that I've admitted into evidence there, those were among the records that you did find?
A Yes, sir. That's correct.

MR. DRY: Let's bring up Government's Exhibit 110 as an example.

BY MR. DRY:

Q What is the date of this particular Mansion log?

A This is May 2nd, 2011.

Q And in the left-hand corner, it says "Shift #1 OIC: Sergeant Bassett." What does that mean?

A That would be the shift, the particular shift sergeant, our officer in command of that particular shift. So that sergeant is in charge of that particular shift.

Q And then to the right of that it's got Officer Brackett and Robinson, what does that mean?

A Those were the two officers who would have been on duty that day.

Q For that shift?

A For that shift, correct.

Q And tell the members of the jury which shift -- what does Shift #1 mean?

A Shift #1, we have a midnight shift. And that's why you see two officers' names there. Midnight shift runs from 12 midnight until 8 a.m. And at that point we have one officer positioned at the Mansion gate and a second officer inside the Mansion in the Executive Protection Office.

Q And then Shift #2?

A Shift #2 is day shift. That essentially runs from 8 a.m. until 4 p.m. We have one officer at that point because the Virginia State Police Executive Protection are on duty during day shift. So we have one officer. That officer is positioned at -- outside at the Mansion gate.
Q And then Shift #3?
A Shift #3 is from 4 until midnight. And once again, that would be one officer positioned at the Mansion gate.
Q And so just so we're clear, during the day, EPU officers assist and protect in the Mansion. Is that fair?
A Correct.
Q How many days off does Capitol Police take from protecting the Mansion?
A We are not off. It's a 365-day-a-year operation, 7 days a week.
Q On this particular log, do you see an entry in the "Time In" column for 7:50, since we're up there?
A Yes, sir.
Q And whose -- whose name is next to that?
A Mary-Shea.
Q And in the "Organization/Guest" column, what does it say there?
A Mansion staff.
Q Can you -- can you tell the members of the jury, who's required or who's supposed to sign in on the visitor

logs?

A Anyone other than VSP, Executive Protection Unit, First Family, Capitol Police, and visitors who would come for major events. Tax Tribute would be an example of one such event.

The other folks are an approved personnel list, to include Mansion staff and so forth. But everyone else, with the exception of those three primary groups, are to be signed in or to be logged in.

Q Now, if you're on this approved list, are you still supposed to sign in?

A Yes, sir, you do.

Q Do you see, on this particular log, going down at 9:24, do you see a name listed there under the "Time In" column or -- or the "Name" column for 9:24?

A Yes, sir.

Q And who is that?

A John Williams.

Q Okay. And in the "Organization/Guest" of, what's listed there?

A 102.

Q And who does 102 refer to?

A 102 is the call sign we use for the First Lady.

Q Okay. And does anyone else have a numerical identifier?

A They do. Each member of the family would have a distinct call sign.
Q And for the Governor, what's his call sign?
A 101.
Q Going back now to Government's Exhibit 531. You've previously testified that most visitors come through the front gate right here, right?
A Yes, sir.
Q Is it possible for someone to get into the Executive Mansion without signing in to the visitors' log?
A Yes, sir.
Q Can you describe when that would typically happen?
A There could be an occasion where a member of the First Family or someone on staff would say we're coming in through the north gate. That person or family member may have someone else in the car. We would not necessarily go over and look in the car to see who else would be in there, sir.
Q Fair enough.
Thank you very much, sir.
A Yes, sir.
THE COURT: Any questions, Mr. McDonnell?
MR. BROWNLEE: Nothing, Your Honor. Thank you.
THE COURT: Anything?
MR. BURCK: No, Your Honor.

THE COURT: All right. Thank you, Major. You may stand down.

THE WITNESS: Thank you, Your Honor.

(Witness stood aside.)

THE COURT: Call your next witness, please.

MR. DRY: The United States calls Jonnie Williams to the stand.

**JONNIE RAY WILLIAMS, SR.,**

called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

**DIRECT EXAMINATION**

BY MR. DRY:

Q Mr. Williams, can you please state your full name for the court reporter?

A My name is Jonnie Ray Williams.

Q And, sir, how do you spell your name?

A It's spelled -- first name is spelled Jonnie, J-O-N-N-I-E, R-A-Y, Williams.

Q And are you senior or junior?

A I'm senior.

Q Okay. Were you one of the founders of a company named Star Scientific?

A I was.

Q And when you founded Star Scientific, what type of business were you founding?
A What type of business was it?
Q Yes. What type of --
A It was a tobacco business.
Q And specifically, what type of tobacco business? What were you doing?
A I had the -- I bought the old Brown & Williamson cigarette facility in Petersburg, Virginia, and we manufactured cigarettes and we manufactured cigars for Swisher Sweets.
Q And at some point did your tobacco company have -- kind of transition of trying to find healthier ways of curing tobacco?
A Yes.
Q Can you briefly describe that?
A I came from health care, and I ended up with the cigarette factory. And the first thing was to get it into the black, making money, and I did that and the company was doing very well.
And then I set out believing that -- you know, understanding that the cigarettes are a problem, and I set out to see if I could make them less toxic, make them no more harmful than they had to be.
Q And eventually, did you patent a way of doing that?

A I did that. I did do that.
Q But at some point did Star Scientific's focus change from tobacco to what's been called a nutraceutical?
A Yes.
Q And kind of describe how that happened.
A Well, as we left the cigarette business, I discovered a way to remove the -- prevent the tobacco-specific nitrosamines -- which is the strongest, most abundant carcinogens in tobacco -- from forming.

One of the major tobacco companies came in, British American Tobacco, as a partner, and -- through their Brown & Williamson subsidiary. And so that was moving along, and then one of the other companies in the industry started to copy what Brown & Williamson was doing; R.J. Reynolds. And we litigated the case against R.J. Reynolds, and we lost the case on infringement. All the patents were upheld, but we lost on the infringement side, and then we ultimately settled the case.

But once that had happened, I had taken the company from a very profitable cigarette business into this area of trying to make it less harmful tobacco. And then my partner, Brown & Williamson, was purchased by R.J. Reynolds Tobacco Company that I was litigating with. So it made it a little difficult.

But through the process of discovering and

figuring out how to block the nitrosamines from forming, what I was looking for was why can't people just quit smoking, why can't they -- you can go down to the drugstore and buy all the nicotine you want, and the quitting rate is 4 or 5 percent at the end of the year. There must be something else in there. And that led me to identifying the compound in tobacco that I believe is not only responsible for people smoking, but I believe it's responsible for -- is the explanation was the key for why people that smoke aren't developing these autoimmune diseases like thyroid disease, Parkinson's disease that have been studied in hundreds of thousands of patients.
Q So is it fair to say that when you were working on this product, you identified something called Anatabine?
A I did.
Q And you believed that that would reduce inflammation diseases in the human body. Is that true?
A I did. I tested it for that, and that's -- that was the result.
Q Well, let's go back. What -- Star Scientific, in 2009, what was your title with Star Scientific?
A CEO, chair -- CEO of the company.
Q And how much were you paid in salary as CEO?
A Base salary was a million dollars a year.
Q And in 2009 was Star Scientific a profitable company?

A No, not at that point. I had taken it into a biotech area.

Q And what were your duties as the CEO of Star Scientific?

A Well, when you're -- when you're in a biotech area, you're trying to develop a technology that's going to change things. The number one rule in business is to stay in business. So what I did was I covered Wall Street and the investment community from several prior deals that I had, companies that I was a founder or co-founder of that were very successful. So my access to capital was very good.

And so I would routinely meet with investors, meet with the investment community to keep a base of support underneath of what I was doing to support this going forward. Because when you start doing this, when you -- when you're not funding it from operating cash flow and you're relying on investment capital, new investment capital to come into the company while you complete whatever it is until you reach the point of commercialization, your access to capital is very important.

Q Were you the owner of a company named Starwood Aviation?

A Yes.

Q And what's Starwood Aviation?
A Starwood Aviation is a company that just houses the airplane.
Q And when you say "the airplane," what type of airplane?
A Learjet.
Q And ultimately, whose jet is that?
A Mine.
Q Okay. And what type of things did you use the jet for?
A Raising capital, product development. I move around a lot. It's a small infrastructure in the company, and I'm busy and I move around from place to place a lot.
Q And when you're using the jet for company business, do those flights come out of your pocket or who pays for them ultimately?
A No. The company reimburses me for the business trips.
Q And if they are just personal trips, who pays for them?
A I pay for them.
Q Did you occasionally lend your -- your jet to Virginia politicians to use?
A I did.
Q And why would you let Virginia politicians use your

jet?
A I think it's become common practice here in Virginia and know other people that have jets here in Virginia, and you allow the politicians to use the airplanes because if you're a Virginia company, you want to make sure that you have access to these people, and the airplane -- the airplane accomplishes that.
Q Well, and to be clear, what type of politicians are you loaning your jet out? Are they Republican, Democrat, a mix?
A I'd say mine is on the Republican side.
Q And beginning in March of 2009, did you start lending your jet to Mr. McDonnell during his campaign for Governor?
A The first time Governor McDonnell used my airplane, I was coming into Richmond, and someone had contacted my secretary and said they need to use the jet to go to Roanoke, Virginia, I believe. And I said okay, I'm coming in at this -- this time and they can take it and go to Roanoke with it. And I met the Governor on the tarmac as I was walking into the FBO.
Q Now, in March of 2009, was he the Governor?
A No.
Q Okay. So had you ever met Mr. McDonnell before this March of 2009?

A I don't recall ever meeting him.
Q During Mr. McDonnell's campaign for Governor, do you know how many times you -- you met him?
A Three times, two times.
Q Okay. And how would you -- how would you characterize your relationship with the Governor prior to him becoming Governor, Mr. McDonnell?
A He's -- he's -- he's a politician and I'm a businessman.
Q Okay. Now, after the election in November of 2009, after he's actually elected but before he goes into office, did you ask to meet with him?
A Yes.
Q And where was this meeting going to occur?
A At the Four Seasons Hotel in New York.
Q Okay. Why did you want to meet the Governor?
A To develop a relationship with him.
Q A personal relationship?
A No. A business relationship.
Q And did the meeting actually occur at the Four Seasons?
A It did.
Q And that was in New York?
A Yes.
Q Who was present during this meeting?

A The Governor's wife; several of the aids; one of the aids, Adam Zubowsky; another gentleman by the name of Phil Cox; and a friend of mine by the name of Brad Kroenig.
Q And -- now, Kroenig was your personal friend, right?
A I invited him to come to dinner.
Q Okay. And who is he?
A Brad lives in New York.
Q And what's his occupation?
A Brad is a model, a professional model.
Q Now, had you ever met Ms. McDonnell before this meeting?
A I don't think so.
Q Okay. Now, during -- kind of place this. Where does this meeting occur in the Four Seasons?
A Physically?
Q Yeah. I mean, just kind of set the stage for where this meeting is at.
A In the lobby of the Four Seasons on 57th Street, when you walk in, it's a grand lobby. And off to the right is not a formal restaurant, but a -- a restaurant that's available, you know, to have light lunch -- to have lunch, to have breakfast and dinner, light dinners.
Q And how long do you think you spoke to the Governor and Ms. McDonnell at this? Was it a three-hour thing or --

A No, no. They were going to -- they were going to a Christmas show in New York, a Broadway Christmas show. So I'm going to say I was there with the Governor and his wife for, at the most, an hour.

Q Okay. And generally, what was the topics of discussion? Are you pitching anything or what are you --

A No. In that environment, I don't have -- it's not an environment to be trying to sell the Governor anything or pitch anything to him. I'm just trying to -- I'm just trying to establish a relationship with him and it happens to be in a nice environment.

Q And during this -- this conversation, did the subject of Ms. McDonnell's inauguration dress come up?

A It did, yes.

Q And just walk me through what happened.

A When I introduced my friend, Brad Kroenig, he is -- as a male model, he's in the fashion industry. She was very interested in that. And she said, you know, "I have a problem with" -- "I've got to come up with a dress to wear for the inauguration." And so she mentioned to Brad, you know, "Do you know anyone in" -- "with you being in the fashion industry, that could help me, you know, with a dress?"

And Brad turned it to me and said, "One of Jonnie's good friends, his daughter is the goddaughter of

Oscar de la Renta." And so that sort of put it back with me.

Q And then what happened?

A I told her that I would help her -- I'd help her get a dress for the inauguration.

Q And what kind of dress were you offering to help get her?

A I didn't know at that point what the dress needed to be like, but a nice dress for the inauguration.

Q And when you said offered to help her, were you offering to pay or offered to find or how did that work?

A Well, at that point I was hoping that -- through my friend that, you know, maybe from one of these shows or whatever, maybe Oscar de la Renta, as close as my friend is with him, that they would let her borrow one for the inauguration.

Q But did you learn whether that was going to be possible or not?

A I found out that that wasn't an option.

Q Now, when you were having this conversation with Ms. McDonnell, is Mr. McDonnell present?

A To her left, seated to her left.

Q Seated to her left. And does she say anything to Mr. McDonnell about the dress?

A She did.

Q What did she say?
A She said, "This is great. Jonnie is going to help me get a dress for the inauguration."
Q Now, did you subsequently -- you said that you found out that you couldn't get a loaner dress and you were going to have to buy it?
A Right.
Q Did -- did you have conversations with Ms. McDonnell about that?
A I did.
Q Describe those.
A I told her I needed to get a date when she could come to New York as soon as possible so that we could go to Oscar de la Renta so that she could be fitted for the dress to have it in time for the inauguration.
Q Did you ultimately buy Ms. McDonnell's inauguration dress?
A I did not.
Q Why not?
A When I received a phone call from a lawyer at the Governor's office saying that, you know, "I understand that you're getting ready to purchase Ms. McDonnell a dress for the inauguration. I'm calling to let you know that you can't do that."
And I said, "Thank you very much."

Q Okay. And do you remember, was that lawyer's name Jason Eige?
A Yes.
Q Did you have a subsequent conversation with Ms. McDonnell about not purchasing her the dress?
A I did.
Q And what was discussed then?
A She wasn't happy about it. She was disappointed, and she indicated that she had been told that the dress for the -- an inauguration dress -- it was actually two things. It was, one, a fancy dress like this would look bad in this economy to be wearing at the inauguration. And secondly, the dress would have to be given away, the inauguration dress, if I purchased the dress, and she said she would just take a rain check.
Q Did she use those words?
A Yes.
Q Now, in October of 2010, did you fly back from California with Mr. McDonnell on your private jet?
A Yes.
Q How did that come about?
A Someone on his staff contacted my assistant and said that they -- they really needed to use the airplane to go to California.
Q So did you agree to that request?

A I agreed to that request and allowed them to use the airplane.
Q And did you fly out there with the airplane or how did you get on board?
A I took a commercial flight.
Q Okay. So you took a commercial flight to where?
A To San Francisco. And then I had the plane come pick me up from Sacramento to San Francisco to pick me up so that I could spend time with the Governor to explain to him what I was -- you know, what our business -- what I was trying to accomplish.
Q All right. Just so I'm clear, so your jet flies from Richmond to California, and where do you fly from commercial to Sacramento?
A I don't remember whether I left out of Richmond or Florida or where I left out of, but I took a commercial flight to intercept that trip.
Q Okay. And why -- why did you want to be on board your aircraft for the flight back from California to Richmond with the Governor?
A I figured that would give me five or six hours with the Governor to explain to him what I had discovered here in Virginia and to explain to him that I needed his help and -- in moving this forward.
Q And during this five or six hours with the Governor,

what did you tell him?
A Well, what I did was I explained to him how I discovered it. I gave him a basic education on the -- on smoking, the diseases that don't happen with smokers and just tried to make sure he understood, you know, what I had discovered in this tobacco plant and that I was going to -- what I needed from him was that I needed testing and I wanted to have this done in Virginia. And I did ask him -- I told -- I asked him, "Would you connect me with the person in Virginia in your administration so that I can move this forward" --
Q And --
A -- after I finished explaining, you know, how Anatabine works and the properties of it.
Q So you said that you mentioned testing. Did you talk about -- and the testing that you wanted was where?
A In Virginia. He thought -- we both agreed, he agreed, that the independent testing in Virginia was a good idea.
Q But he -- he didn't agree in any way to -- he didn't guarantee you, yeah, I'm going to get you the testing or anything else like that. What did he actually agree to do for you in that flight?
A He agreed to help me find -- he agreed to introduce me to the person that I needed to talk to.

Q And did he tell you who that was?
A Dr. Hazel.
Q And who is Dr. Hazel?
A Dr. Hazel is an orthopaedic surgeon that's in charge of Virginia's equivalent of HHS, health and human services.
Q Now, we talked about the trip to New York City in November of 2009, and then we just went over this flight in October of 2010. Both of those are interactions with the Governor. In between then, how often did you meet the Governor?
A I don't recall meeting -- I don't recall, unless there's a paper or some sort of record that says that I met with him. I don't recall.
Q Let's do it this way. During that time frame, how would you describe your relationship with the Governor?
A He was busy doing his business. I was busy doing mine.
Q Okay. Did you actually get a meeting with Dr. Hazel in November of 2010?
A I did.
Q Where did you meet Dr. Hazel?
A At the Patrick Henry Building.
Q And what was the purpose of the meeting with Dr. Hazel?

A To explain to Dr. Hazel what I had discovered. And I explained to him that I was early with this and I was trying to set it up to where ultimately this compound that I discovered, which was an anti-inflammatory, that was very potent, that appeared to have -- look like a vitamin from a safety profile, and I was doing the work and working with medical researchers and physicians at Johns Hopkins to try to demonstrate -- try to develop this into a product that could be ultimately shown to lower the health care cost in Virginia.

Q And did you mention to Dr. Hazel anything about your wife Celeste's experience with Anatabine at the meeting?

A I did.

Q And briefly, what was that about?

A I shared with him the experience of what happened with my wife when she developed Hashimoto's thyroiditis.

Q And your wife had this condition?

A She did. She developed thyroid disease, and it accelerated to the point where the nodules became atypical. And when the endocrinology -- endocrinologist at VCU Medical School said that she needed surgery, then I contacted the chief of endocrinology at Johns Hopkins. And I took her there, Dr. Paul Ladenson. Dr. Paul Ladenson did -- conducted a full examination of my wife. He's a thyroid expert, and he agreed that her thyroid was

going into cancer. It was too high of a risk with the mortality associated with that and her thyroid needed to be removed.

And while I was there with Dr. Ladenson and my wife in his office, I asked Dr. Ladenson, I said, "Have you ever conducted any studies with smokers and Hashimoto's thyroiditis?"

And he said, "Why would you ask that?"

And I said, "I'm curious."

He said, "The only study that I know of that's ever been done was done here, and smokers generally don't get thyroid disease."

So I asked him, I said, "Before you do the surgery, can you give me" -- "can you give me 60 days so I can try something to stop it?"

And --

Q And that was Anatabine that you were going to try?

A I took Anatabine. I took it at a level of what smokeless tobacco people using chewing tobacco and various varieties of that. That was the only guideline I had for the level of Anatabine.

And I made them into a form of a Tic Tac for my wife, and I asked her to take these right up until the time that we showed up for surgery at Johns Hopkins and before the surgeons.

Before she was going into surgery, I insisted that they do a sonogram or a test once more to check the thyroid disease. And they came back in maybe an hour with her, and this thoracic surgeon contacted Dr. Ladenson over at endocrinology and said, "Ms. Williams is no longer a candidate for surgery."

Q Is it fair to say that this -- your wife's experience made you enthusiastic about this idea?

A Very enthusiastic.

Q But, sir, first of all, you're not a scientist, you're not a doctor, right?

A I am not a scientist. I am not a doctor.

Q Okay. And when you first say this to Dr. Ladenson about, "Hey, can you give me 60 days," what's his kind of reaction to your idea?

A "Jonnie, I get a lot of" -- "I get a lot of quirky relatives that suggest things" --

Q Okay. But --

A -- "but I'll give you" -- "I'll give you like 60 days to try this."

Q All right. But when you're telling Dr. Hazel about your wife's experience and about the product and your beliefs, what's his reaction?

A It's interesting.

Q But did you feel like he was as enthusiastic as you

were?
A No.
Q Okay. And at this point did you have any human studies, human trials that you could point to to say, yes, this is effective for X, Y and Z?
A No. I was there to start the dialogue and let him know what it was that I had discovered and what it -- what I hoped the testing would demonstrate.
Q As you left there, did you get any commitments from Dr. Hazel regarding what he was going to do to help you?
A No. I invited Dr. Hazel to come to the Roskamp Institute, which was conducting testing.
Q Let's talk about that. Just briefly describe what the Roskamp Institute is.
A It's a private research institute, funded by a philanthropist, Bob Roskamp, that -- in Sarasota, Florida. And he brought in a group of maybe 100 researchers on his own privately to try to address Alzheimer's.
Q And did Star Scientific and the Roskamp Institute, did they have any financial relationship?
A I don't believe with the institute itself, but with an arm of the institute that is engaged in commercial activity.
Q Okay. So that's a financial relationship that benefits Roskamp?

A It does.
Q Okay. Did Dr. Hazel agree to go to the Roskamp Institute?
A I believe he did. I'm confident that he agreed. I just don't remember exactly how that went to the next step.
Q Okay.
A He said he was -- he was interested in going.
Q And why did you invite Dr. Hazel to the Roskamp Institute?
A Well, Dr. Hazel is a physician. He's a key person -- he is the key person that I know at this point in the administration. And with him being a physician, I felt like if he sees the test results and he sees the work that's going on, maybe he would understand better than someone like me, that's not a doctor or a scientist, trying to explain this discovery that I had.
Q Did you ultimately schedule a flight for him -- for Dr. Hazel to go down to the Roskamp Institute?
A I did.
Q And did he actually go?
A No.
Q What happened?
A Somewhere through that period, he said that he wouldn't be able to attend.

Q And what was your reaction to him not going down?
A Disappointed.
Q Now, I want to move to February of 2011. Did Star Scientific have an event in February of 2011 for a product called CigRx?
A Yes.
Q And what was the purpose of that event?
A CigRx used this Anatabine, and unlike using it as an anti-inflammatory to try to help people with a particular problem, I believed that the anti-inflammatory contributed to why people were smoking. And so we developed a product called CigRx as a dietary supplement, hoping that smokers would find that Anatabine that they're used to that makes them feel good in tobacco in this product.

And so what we had done is I had engaged a -- a national health group with a test market in Richmond where we had a field sales force to contact physicians and health care professionals in the Richmond area and bring them together at The Jefferson Hotel so I could bring in our medical director, who's a former chief of anesthetics and addictive substances at the FDA.

And so I wanted him to be able to explain to the Richmond health care community what we had discovered in this new product that we were making available in the stores and the drug stores and to them to assist smokers.

Q And just for clarity sake, the compound you're talking about is Anatabine; is that correct?
A It is. It's Anatabine.
Q And then you have a product that you're promoting in February of 2011 called CigRx?
A CigRx.
Q And Anatabine is in CigRx?
A Yes.
Q And then later on you have a product with Anatabloc?
A With an increased level of Anatabine for a different purpose.
Q Okay. And the cigarette's purpose is the smoking cessation?
A It's an alternative to smoking. We would like to think -- smoking cessation is actually a drug claim at the FDA.
Q Okay.
A So we --
Q An alternative --
A -- wanted to avoid any problems with that, but we believe that this is the active ingredient in tobacco, aside from nicotine, and that this could be helpful to smokers as an alternative not to use cigarettes.
Q Okay. And Anatabloc, that has a higher dosage, but that is for anti-inflammatory?

A It's an anti-inflammatory. Chronic -- autoimmune diseases -- the underlying cause of an autoimmune disease is chronic inflammation that eventually --
Q Okay. I want to stop you there.
All right. So going back to the CigRx event at The Jefferson Hotel, I just want to make sure I understand. You've got this doctor that's going to talk to other doctors and trying to explain CigRx, correct?
A Correct.
Q And the goal of doing that is to get these other doctors to do what?
A To recommend the product to their patients.
Q Okay. And did Mr. and Ms. McDonnell attend the CigRx event?
A At the end of it, that evening.
Q Okay. And how did that come about?
A From having met the aid to the Governor, Adam Zubowsky, I contacted Adam and asked him could they stop by.
Q Okay.
A And he text me back and he said, "Let me know when you need" -- "what time you're going to be finished so we can come by towards the end."
Q And when did you contact -- did you know that Adam Zubowsky is the body man for the Governor, the aid?

A The aid, yes.
Q The traveling aid?
A Yes.
Q When did you contact him in reference to when the Governor showed up, how far in advance? Just ballpark me.
A Well, I think I contacted him that afternoon and alerted him to the event.
Q Okay.
A And then I -- my recollection is that he responded to me and said, "Let me know what time and then" -- maybe 30 minutes, 30, 40 minutes.
Q And why did you want the Governor and First Lady to stop by your event?
A Well, I had Richmond physicians and health care professionals in the room, and I thought the credibility of the Governor towards letting them know that our company was important, this discovery was important would be very helpful to our company.
Q And did Mr. McDonnell make any remarks at this event?
A Yes.
Q And briefly, just -- were they really long remarks or just brief remarks?
A Those remarks were related to, I think it's important that we have companies in Virginia with this entrepreneurial in pursuing ventures like this. This is

sort of the backbone of Virginia, or companies that are pursuing technology like this, and, you know, we're proud to be supportive of this company.

Q As of this event, had you socialized with the Governor or Ms. McDonnell in February of 2011 when they showed up at this or is this more the donor relationship?

A I have had no -- I have not socialized with them.

Q Okay. Now, did you see Mr. and Ms. McDonnell again in April of 2011 in New York?

A Yes.

Q And, in fact, did Ms. McDonnell contact you about going up to New York?

A That's correct.

Q Tell the -- tell the jury about that.

A She contacted me and said, "We can go to New York now. Can you come up for this event at the Union League Club and I'll have you seated with the Governor and we can go shopping now."

And I said, "Are you sure that's okay?"

She goes, "It's okay. It's okay now."

Q And what type of event was this Union League Club event?

A It was a typical political rally. The people in that audience were investment banking groups in New York that were interested in the Republican agenda, and the Governor

represented that.

Q Now, did you agree to take Ms. McDonnell shopping in New York City?

A I did.

Q And who was present during this shopping trip?

A Ms. McDonnell, her Chief of Staff Mary-Shea, and myself.

Q Were there EPU officers nearby?

A One from New York. One from Virginia.

Q And where were they at?

A They drove the car.

Q Okay. And what stores did you go to in New York City?

A We had lunch at Bergdorf Goodman, a department store on Central Park. And after lunch, I had made an appointment with -- I don't know how you would describe it -- a designer or a fitter at Oscar de la Renta, through my friend, to show her some dresses. And so that's the first place we went to.

Q And where did you go after that?

A Louis Vuitton on 5th Avenue.

Q Okay. And then where did you go after that?

A She wanted to go back to Bergdorf Goodman.

Q And kind of walk us through what's happening in each of these stores. I mean, when you went there, was it to

purchase one dress or what was going on?
A She needed two dresses. She needed one for the anniversary, and she needed one for the upcoming wedding with her daughter --
Q Okay.
A -- or wedding reception. I'm not sure.
Q Okay. When you say "anniversary," whose anniversary?
A Hers and the Governor's.
Q Okay. So you go there for two dresses, correct? And --
A I'm not sure if it was two -- you know, this went on for hours. I'm not sure if there were two dresses at Oscar de la Renta or what -- two dresses at Bergdorf Goodman. I'm not -- I don't know the number of dresses from what stores.
Q All right. But ultimately, were only two dresses purchased through the whole shopping trip or were more --
A No. There were more things.
Q Okay. Kind of describe what was bought.
A At Oscar de la Renta, there was at least one dress, maybe two, a white leather coat, a full-length white leather coat. At Louis Vuitton, shoes, a purse, a raincoat. And at Bergdorf Goodman, at least one dress. And that dress was tailored and it didn't work. So I called back to the store and purchased another one and had

it sent to the Governor's Mansion.
Q Okay. And what was Ms. McDonnell's demeanor during the shopping?
A I'd say she was happy.
Q Okay. Is Mary-Shea there, I think you said?
A She is.
Q And did you buy anything for Mary-Shea Sutherland?
A I did.
Q And tell the jury how that came about.
A Well, after Oscar de la Renta and Louis Vuitton, we went back to Bergdorf Goodman a few hours later. And I'm sitting in the designer dress department at Bergdorf Goodman and I'm sitting on an ottoman while Ms. McDonnell is trying on dresses. Mary-Shea is sitting there. And we're sitting there for a while, and I said, "Mary-Shea, you may as well try" -- "try a dress on."
Q Okay. And did she ultimately get a dress?
A She did.
Q Total how much, approximately, did you spend on Ms. McDonnell during the shopping trip?
A $20,000 or so.
Q And Mary-Shea Sutherland got how many items?
A One.
Q And that was one dress?
A Yes.

Q That was approximately $1,600?
A I don't recall exactly how much it was.
Q Okay. Did you go to the Union League Club event later that night?
A I did.
Q And who did you sit next to at the event?
A I sat with the Governor and his wife.
Q Okay. Now, I want to fast-forward to the end of that month. Did you go to dinner at the Governor's Mansion on April 29th of 2011?
A I did.
Q And how did that come about?
A Maureen McDonnell invited my wife and I to attend dinner with her and her husband at the Governor's Mansion upstairs in the private residence.
Q And did you buy Ms. McDonnell anything as a hostess gift for the dinner?
A I did.
Q And tell the members of the jury how that came about.
A Well, I didn't know what to get. I told my wife about what had happened in New York.
Q What do you mean "what had happened in New York"?
A That, you know, I had purchased these things for her in New York.
Q That you had purchased what?

A In particular, a purse in New York. And she said, "Well, let's go over to Stony Point, if you can remember what it looked like, and get a wallet to go with the purse."
Q What store in Stony Point?
A Louis Vuitton.
Q Okay. Just so I'm clear, so your wife suggests that you go to Louis Vuitton to pick out a matching wallet?
A Yes.
Q Okay. Did you do that?
A I did.
Q And you show up at the Governor's Mansion. Who are you having dinner with at the Governor's Mansion?
A The Governor and his wife.
Q Okay. And did you meet any of the Governor's children during this dinner?
A I did.
Q Who?
A Rachel, his daughter that was going to school, came by, and Cailin, his other daughter that was getting married.
Q And how long were these interactions with the kids?
A The Governor talked to Rachel for a couple minutes, standing there. She was standing there. And Cailin, maybe a couple minutes or -- I just don't -- it was brief.

Q It was brief. But you don't know specifically? You couldn't tell us 5 minutes, 10 minutes, 15 minutes, right?
A I can't tell you that. I can tell you that it wasn't over five minutes.
Q Okay. What did you discuss during dinner with Mr. and Ms. McDonnell?
A Anatabloc that contains Anatabine.
Q Okay. And was your wife discussing it as well?
A Yes.
Q And what was she saying about --
A She was -- she heard me pitching this, or selling this to the Governor, and I think she decided on her own just to explain to the Governor what had happened with her experience. And he listened very well. He listened closely to what she had to say.
Q And during this, are you bringing up the studies again?
A I am.
Q Before -- before your meeting with Cailin McDonnell and Rachel McDonnell, had you ever met them before?
A I don't recall ever meeting them.
Q Okay.

MR. DRY: Can we bring up Government's Exhibit 110? I believe that's been introduced into evidence already.

BY MR. DRY:

Q You've seen this document before, sir?

A I have.

MR. DRY: And can we blow up where his name is? Yeah, right at the 9:24 part.

BY MR. DRY:

Q That's your name on the Mansion log?

A Yes, it is.

Q And that reflects that you came to the Mansion at 9:24 and left at 11:25, right?

A This is on the date of the dinner?

Q No, no, no, sir.

A This is a different one?

Q I'm sorry. Let's go up.

A Okay.

Q Upper right-hand corner.

A Yes.

Q Do you see the date of May 2nd, 2011?

A I do.

Q And you see where you arrive at 9:24 and 11:25?

A I do.

Q Did you actually meet with Ms. McDonnell on that date --

A I did.

Q -- at the Mansion?

A I did.
Q How did that come about?
A She contacted me and asked me if I would come see her.
Q And who was present during this meeting?
A Her and myself.
Q Did you know what the purpose of the meeting was going into the meeting?
A She wanted to talk about Anatabloc.
Q Okay. And then while you're at the meeting, what happens?
A Maureen McDonnell was explaining to me hers and the Governor's financial situation, that they were -- that they were in financial trouble.
Q And did she describe how much financial trouble she was -- they were in?
A She said her and her husband were discussing filing bankruptcy, but he thought it was a bad idea. And she told me that they had a loan with a physician in Virginia Beach that was a high interest loan, short term, and she explained to me that the real estate at Virginia Beach, with the economy, was not renting and covering the payments and that they were basically in trouble.
Q And did she mention who the high interest rate loan was from?

A A doctor in -- she may have said the name. I don't -- I don't think she said the name, but some doctor in the Virginia Beach area that they knew.

Q Did the subject of credit card debt come up?

A Yes.

Q What was said about that?

A She said their credit cards are -- were basically tapped out and they were high, and -- and she -- she became very emotional at this point.

Q And what did she -- what was your response? Was she asking for anything or what is she doing, just commiserating with you?

A I sat there and listened. And then she said to me, "I have a background in nutritional supplements and I can be helpful to you with this project, with your company. The Governor says it's okay for me to help you and" -- "but I need you to help me. I need you to help me with this financial situation."

Q And specifically, what did she ask you to do?

A She said that they had a wedding -- their daughter Caitlin was about to be married and they had a balance on the reception bill of approximately $15,000 or so. And she said she needed to borrow $50,000. And she said she would help me, and I said, "Okay, I'll do it."

Q Well, to be clear, she's saying that she's going to

help you, but she's not promising you that the Governor is going to help you, right?
A No.
Q And she never tells you at this meeting, "I'll get Bob to do X, Y or Z if you give us the money"?
A No.
Q Okay. So you agree to the $50,000. Does the subject of Cailin's wedding expenses, Cailin McDonnell's wedding expenses, does that lead to a request as well?
A Yes. And I agreed to do that as well.
Q And what was that?
A $15,000.
Q Did she tell you why she needed the $15,000?
A She was short on the -- she didn't know how she was going to cover the expenses of the wedding reception.
Q And did she tell you how much the reception was going to cost and how much was left over?
A I don't recall exactly the numbers. I think the reception cost was maybe 25 or $30,000.
Q And that was according to Ms. McDonnell?
A Yes.
Q Now, you tell Ms. McDonnell you're going to help her. Is there anything that you want to do before you write the checks?
A No. The only thing I cared to do before I gave her

$65,000 in two checks is I needed to make sure her husband knew about it.
Q Why?
A He's the breadwinner in the house, and I'm not writing his wife any checks. I'm not writing his wife checks without him knowing about it.
Q Did you have a conversation with Mr. McDonnell before you loaned the 50,000 and gave the 15,000?
A I did.
Q Do you remember the exact date of that conversation?
A I don't. I recall that it was on the day that I came there or somewhere -- I just don't recall whether it was in person or whether I talked to him on the phone.
Q Well, tell the members of the jury what you remember about the conversation with Mr. McDonnell.
A I called him and said that, you know, "I met with Maureen. I understand the financial problems and I'm willing to help. I just wanted to make sure that you knew about this."
Q And what does he say?
A "Thank you."
Q Does he dispute that they are having financial problems?
A He just mentioned that the real estate in Virginia Beach was the problem.

Q Is there any discussion about -- you knew he was a lawyer, right?
A I did.
Q Did you agree on terms for the loan?
A I don't recall what the terms were at that time.
Q Okay. Did you draft up any loan paperwork?
A No.
Q Okay. Why did you agree to loan $50,000 and give $15,000 to the Governor?
A I needed -- I needed his help.
Q Help personally?
A Not personally. I needed the -- I needed the help of -- what I was trying to do was I discovered this compound in the tobacco plant that I believed that would lower the health care costs. I know that he controls the medical schools here in Virginia. And so I needed his help with the testing of this to help me implement this into the system, and I needed the credibility that comes with that office and with the state of Virginia for letting people know about the benefits of Anatabine.
Q When you agreed to give the 50,000 and 15,000, were you doing it because you thought that Mr. McDonnell and Ms. McDonnell were your personal friends?
A No.
Q What were they?

A This was a business relationship.
Q At some point in May of 2011, did you invite the Governor himself to go down to the Roskamp Institute?
A I did.
Q And what event did you want him to come to?
A There was a fundraiser being held at the Roskamp Institute, and it was also investors from New York and different places that were attending that meeting. But also doctors from Johns Hopkins were attending to discuss with the physicians from Roskamp the science.
Q And this meeting was going to be on June 1st, 2011?
A I think so.
Q And that was down in Florida?
A In Sarasota, Florida, at the Roskamp Institute.
Q Did Governor McDonnell tell you that he would go, decline? What did he tell you?
A He wasn't able to go, but his wife was.
Q Okay. At some point did you think he might go?
A I did.
Q Okay. And you said that his wife went. Did you have a conversation with Ms. McDonnell about that?
A I did.
Q And what was that conversation?
A I talked to her and I told her what was going to happen, and she was willing to come down and as long as

she could get back the next afternoon because the wedding was coming up.

MR. DRY: Okay. I'd like to show Government's Exhibit 125, which I believe has already been introduced into evidence.

BY MR. DRY:

Q On the top right-hand corner, do you see the date on that, sir?

A May the 23rd, 2011.

MR. DRY: And can you go -- scroll down to the noontime and then highlight both the noon blocks.

BY MR. DRY:

Q And, sir, that says 12:00, right?

A Yes.

Q And that's your name, Jonnie Williams?

A It is.

Q And it says "To see 102," correct?

A Yes.

Q And below that says "Alia Williams," right?

A It does.

Q With the same time in and time out?

A Yes.

Q Do you know who Alia Williams is?

A No. But I know who Celeste Williams is. I think they -- they just misspelled my wife's name.

Q Okay. Did you actually go with your wife to the Executive Mansion that day?
A I did.
Q And was that a significant date for you?
A It's our anniversary.
Q Your wife and yours anniversary?
A Yes. We were going to The Jefferson to have lunch, but I told her I had to stop by the Governor's Mansion first.
Q And why were you stopping by the Governor's Mansion that day?
A To deliver these checks.
Q What were the amounts on the checks?
A One was for 15,000. One was for 50,000.
Q And did you instruct your assistant, Jerri Fulkerson, to write those checks?
A I did.
Q One of the checks was made out to Maureen McDonnell. Why was it to Maureen McDonnell?
A That's who I was told to make the check out to.
Q By whom?
A Maureen.
Q On the 15,000-dollar check, that was made out in blank. Why was that made out in blank?
A It was going to the catering company, I thought.

Q Okay. Before Ms. McDonnell asked you for the 15,000, had you been invited to attend the wedding? Before she asked you for the money, not before you delivered it.
A I don't recall.
Q Had you planned on going to the wedding?
A No.
Q What was Ms. McDonnell's demeanor when you gave her the 50,000 and 15,000-dollar checks?
A She was pleased.
Q And, in fact, can you walk the jury through what happened as you're delivering the checks? Does your wife come into the Mansion as well? You were there for an hour and 15 minutes.
A I left her in the car for a little bit. I had trouble getting out, and Maureen McDonnell eventually came out and asked my wife to come in.
Q And what are you and your wife doing with Ms. McDonnell for an hour and 15 minutes?
A We went upstairs and had a salad --
Q Okay.
A -- with Maureen McDonnell, I believe.
MR. DRY: Can you please bring up Government's Exhibit 134, please?
BY MR. DRY:
Q Sir, this is an e-mail from Mr. McDonnell to you,

correct?
A Yes.
MR. DRY: I would like to move Government's Exhibit 134 into evidence, Your Honor.
THE COURT: It will be admitted.
BY MR. DRY:
Q Sir, do you have difficulty reading?
A On two fronts. When I don't have my glasses on --
Q Okay.
A -- and just reading in general is difficult.
Q And have you always had difficulty reading?
A Yes.
Q Okay. I'm going to read this aloud and you tell me if I'm -- if I'm messing up. Okay?
A Okay.
Q The date of this is May 28th, 2011. "Johnnie. Thanks so much for all your help with my family. Your very generous gift to Cailin was most appreciated as well as the golf round tomorrow for the boys. Maureen is excited about the trip to Florida to learn more about the products and to see Celeste. Have a restful weekend with your family. Thanks."
Is that the correct spelling of your name, sir?
A No.
Q Okay. And I read that accurately?

A I think so.

Q Okay. What's the Governor referring to when he mentions "the golf round tomorrow for the boys"?

A Ms. McDonnell had contacted me and said that they would like to go to the Kinloch Golf Course with the boys as they prepared for the wedding of their daughter.

THE COURT: Did you say Mr. or Ms.?

BY MR. DRY:

Q Who -- who called to make the request?

A I believe Ms. McDonnell called me. I'm sorry.

Q No. That's okay. Just make sure that if you're going to look over, you've got to pull the mic over so that --

A Okay.

Q There we go.

A All right.

Q So I believe you said Ms. McDonnell called you. To be clear, had you previously mentioned, hey, I've got this private golf course in Kinloch and made a general invitation at this point?

A Yes.

Q Okay. And Ms. McDonnell calls you to take you up on it --

A Yes.

Q -- is that accurate?

All right. Now, were you invited to play on that day with the McDonnells or was it just the family?
A Just the family.
Q Okay. Did the Governor call you after they played?
A That evening.
Q That evening. And what did he say? Was it a voice mail or did you actually talk to him?
A I think it was a voice mail.
Q Okay. And do you remember what he said?
A That, Jonnie, thank you for all you do for my family. Thank you for this wonderful day that we had at Kinloch.
Q Okay. So it was a general thank you call?
A Yes.
Q Okay. Now, going on, it says, "Your very generous gift to Cailin was most appreciated." Had Cailin and you ever talked about -- had she made the request for the money, for the $15,000 to you or had Ms. McDonnell?
A Ms. McDonnell.
Q Okay. The Governor writes, "Maureen is excited about the trip to Florida." What's he referring to?
A The Roskamp Institute meeting that's coming up.
MR. DRY: Judge.
THE COURT: All right. We'll stop for the evening. We will get back together tomorrow morning. Let's make it 9:30 again. I have a sentencing, and

hopefully that won't take more than a half an hour. But you all get here at 9:30, and we'll -- we'll get started with tomorrow's session.

Again, please don't discuss the case with anyone, allow anyone to discuss it with you, and if that happens, come and tell me, please. You all have a good and safe evening and be healthy. All right. We'll see you tomorrow.

(The jury left the courtroom.)

THE COURT: All right. We'll be back at 9:30 in the case and 9:00 generally.

(The trial adjourned at 5:37 p.m.)

# I N D E X

## WITNESSES


| Examination By: | | Page |
|---|---|---|
| **JERRI FULKERSON** | | |
| Direct Cont'd | - MR. HARBACH | 428 |
| Cross | - MR. BROWNLEE | 493 |
| Cross | - MR. BURCK | 540 |
| Redirect | - MR. HARBACH | 560 |
| **PHIL OWENBY** | | |
| Direct | - MR. FAULCONER | 570 |
| Cross | - MR. BROWNLEE | 596 |
| **ROBERT R. McDONNELL** | | |
| Direct | - MR. FAULCONER | 600 |
| Cross | - MR. SMALL | 613 |
| Cross | - MR. HAUSS | 628 |
| Redirect | - MR. FAULCONER | 631 |
| **MARK SYKES** | | |
| Direct | - MR. DRY | 635 |
| **JONNIE RAY WILLIAMS, SR.** | | |
| Direct | - MR. DRY | 646 |