IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

------------------------------------------

UNITED STATES OF AMERICA,

Plaintiff;

v. Criminal Action 3:14CR12

ROBERT F. McDONNELL and
MAUREEN G. McDONNELL,

Defendants.

------------------------------------------

July 31, 2014
Richmond, Virginia
9:45 a.m.

JURY TRIAL - VOLUME IV

BEFORE: HONORABLE JAMES R. SPENCER
United States District Judge

APPEARANCES: MICHAEL S. DRY, ESQ.
DAVID V. HARBACH, II, ESQ.
JESSICA D. ABER, ESQ.
RYAN S. FAULCONER, ESQ.
Counsel for Government;

JOHN L. BROWNLEE, ESQ.
HENRY W. ASBILL, ESQ.
JAMES M. BURNHAM, ESQ.
DANIEL I. SMALL, ESQ.
CHRISTOPHER M. IAQUINTO, ESQ.
Counsel for Robert F. McDonnell;

WILLIAM A. BURCK, ESQ.
HEATHER H. MARTIN, ESQ.
STEPHEN M. HAUSS, ESQ.
Counsel for Maureen G. McDonnell.

JEFFREY B. KULL
OFFICIAL COURT REPORTER

P-R-O-C-E-E-D-I-N-G-S

THE CLERK: Day four, Case Number 3:14CR12: United States of America versus Robert F. McDonnell and Maureen G. McDonnell. The United States is represented by Michael Dry, David Harbach, Jessica Aber, and Ryan Faulconer. Robert F. McDonnell is represented by John Brownlee, Daniel Small, Henry Asbill, James Burnham, and Christopher Iaquinto. Maureen G. McDonnell is represented by Heather Martin, William Burck, and Stephen Hauss. Are counsel ready to proceed?

MR. DRY: The United States is ready to proceed.

MR. ASBILL: The defense is ready.

MR. BURCK: Maureen McDonnell is ready, Your Honor.

THE COURT: All right. Thank you. Let's bring in the jury, please.

(The jury entered the courtroom.)

All right, good morning once again. Mr. Dry?

DIRECT EXAMINATION (Cont'd.)

BY MR. DRY:

Q Good morning, Mr. Williams.

A Good morning.

Q You recognize you are still under oath, correct, sir?

A Yes.

Q Mr. Williams, I think we left off talking about the

June 1st, 2011 Roskamp meeting. So I want to start with that. First of all, did Ms. McDonnell fly down for the Roskamp event?
A Yes.
Q And who went down there, did her Chief of Staff, Mary-Shea Sutherland, go down there with her?
A Yes.
Q And was their EPU there?
A Yes.
Q How did Ms. McDonnell and Ms. Sutherland and the Executive Protection Unit personnel get down to Roskamp?
A In my airplane.
Q And what was the purpose of the event from your perspective?
A This was a fundraiser, but it was also combined with investigators were coming. And doctors from Johns Hopkins and doctors from Roskamp were presenting the science to the attendees.
Q When you say investors, investors in what?
A Investors in the company, Star Scientific.
Q Okay. Was there a dinner the night before this event?
A There was.
Q And where was that dinner at?
A At the Ritz-Carlton Hotel in Sarasota, Florida.

Q Who attended that dinner?
A Ms. McDonnell, Mary-Shea Sutherland, Dr. Ladenson, my wife, Dr. Dale Wilson, several other doctors and investors.
Q And where did Ms. McDonnell and Ms. Sutherland stay overnight?
A At the Ritz-Carlton.
Q Okay. And who paid for that?
A I did.
Q Now, going to the next day, can you tell the members of the jury basically what happened at this Roskamp event, you know, who was speaking and generally what was said?
A Dr. Mullan as the Director of the Roskamp Institute, he is a well-known physician in the area of research in Alzheimer's, and he explained what had happened with this discovery and the impact and showed videos of what had happened when they give mice with Alzheimers Anatabine and showed how it improved them to normal functions. Dr. Ladenson and his colleague, Dr. Caturegli, they showed their studies on mice models where the mice are genetically engineered to develop thyroid disease, and in the presence of Anatabine in their drinking water, those mice who are genetically engineered to develop it no matter what in about 30 days, it stops the onset of the thyroid disease.

Q Okay. So these doctors are presenting this to the attendees. How many attendees approximately, if you can remember?
A 75, 80, or more.
Q Okay. And just to be clear, you were talking about studies, mice studies, but you still hadn't gotten human trials underway at this point.
A No.
Q Correct?
A That's correct.
Q Okay. Did Ms. McDonnell make any statements at the event?
A Yes.
Q And tell the jury how that came about.
A She was seated beside me, and I said to her, I said, "It is up to you, if you don't want to say anything, that's okay. But I wanted to offer if you wanted to address this group, I just wanted to, felt like I should offer," since given who she was, the First Lady of Virginia, and a guest, that I offered if she wanted to address the audience.
Q To be clear, did you want to introduce her as the First Lady regardless of whether you expected her to make comments?
A Yes.

Q Okay. And what did she say in response when you said, "Hey, if you would like to make some comments, you can"?
A She said, "Yes, I would like to."
Q And what did she say?
A She stood up and she told everyone it was an honor to be there today, it was very exciting given her background in nutritional and supplements and wellness, and given that she had had some health issues on her own when she was younger, and that she thought what our company was doing and this new discovery was very important, and she was there to lend her support to the company.
Q Did she make any comments about how she was willing to lend her support?
A She did. She said, she said at some point when she was speaking, she said, "I'm going to go with Jonnie and the State Trooper and have him drive us to every doctor in Virginia to let them know about this." And then she invited everyone in the room for the launch, to have it at the Governor's Mansion.
Q The launch of what?
A The launch of Anatabloc, which was going to happen in a few months.
Q And had you discussed that with her beforehand?
A No.

Q Were you surprised that she offered for everybody to come to the Governor's Mansion for the launch of Anatabloc?
A Yes.
Q When you introduced her, did you introduce her as Maureen McDonnell or First Lady of Virginia Maureen McDonnell?
A First Lady of Virginia Maureen McDonnell.
Q Okay. Did you think that Ms. McDonnell's comments at the launch were helpful to you?
A I did.
Q Why?
A We are a Virginia company. And the Governor's wife has taken the time to come all the way to Florida to lend the credibility to this company in Virginia, that what they are working on and what they have discovered is important. And so the credibility of Virginia came with that.
Q Now, to be clear, she didn't say that the Governor was going to pass any legislation for Star or anything like that, right?
A No.
Q Okay. After the event, did Ms. McDonnell bring up the subject of Star's stock price?
A Yes.

Q And how did that happen, where were you, kind of how did that conversation come about?

A When everyone was leaving, we walked out the front doors. And there was an SUV there to take them back to the airport to come back to Virginia. And she turned to me and said, "Jonnie, why is the stock down today with, you know, all of these good things going on?" And I said, I just turned to her and said, "Maureen, I guess there are more sellers than there are buyers today." And I said, "But in these biotech companies like this, when they are at this stage, they are going through this long development stage and testing, the stock gyrates." I said, "Why?" She said, "Because I bought stock." And I said, "What do you mean you bought stock?" She said, "Well, we missed out before and I didn't want to miss out this time when the stock was steadily going up." And so I said to her, I said, "Maureen," I said, "this is a risky investment doing things like that. I thought I loaned that money to help you with your bills." I said, "You need to sell that stock and just use that money to pay your bills."

Q Did she tell you whether she was going to sell the stock or not?

A I don't recall her saying anything.

Q Okay. I'd like to go to Government Exhibit 161

that's previously been admitted. This is the e-mail from Jerri Fulkerson to Mary-Shea Sutherland, and the jury has already seen that. It is basically just saying, "Jonnie asked that I forward the attached letter and information to you." You have seen this e-mail and this letter before, right, sir?

A I have.

Q And if we could go, first of all, did you in fact ask Ms. Fulkerson to e-mail this to Mary-Shea Sutherland?

A I did.

Q And why did you ask for this letter to be sent to Mary-Shea Sutherland?

A Because either Maureen McDonnell or Mary-Shea had contacted me and they asked me to put in writing, to put in writing what it was that I wanted.

Q And did you understand why you needed it in writing? Who was it going to?

A To the Governor.

Q Let's go to the second page. And first of all, sir, did you write this letter out yourself? You can blow up the top for me, please.

A I wrote the first sentence.

Q You wrote the first sentence. And how do you know that you wrote the first sentence?

A Because whenever it says, "The particular intent of

this letter" is something that I have carried through from the eighth grade in an English class.

Q Okay. But the rest of the letter, who wrote that?

A I went over to the Roskamp Institute and asked Dr. Crawford and Dr. Mullan to help me write this letter because the Governor wanted the -- needed this in writing.

Q Okay, sir. To be clear, you write, "The particular intent of this letter is to provide the Commonwealth of Virginia with a technology platform to lower healthcare costs."

Had you discussed this idea with the Governor personally before sending this letter?

A Yes.

Q When?

A On the flight back from California.

Q Okay. You had raised that subject matter with him on that flight?

A Yes.

Q Okay. Now, in the remaining part of that first paragraph, you describe various ongoing studies, some of which I think you referenced before. Had you previously discussed the ongoing studies with the Governor before writing this letter? I'm not talking specifics about each and every one of them, but generally.

A In general, yes. Specifically, I don't recall that,

the specific studies being discussed.
Q But you had talked to him about you guys are doing some studies.
A Yes.
Q And when did you discuss that generally?
A When?
Q Yes. When was the first time?
A The first time I recall doing that was on the Meg Whitman flight.
Q That's the flight back from --
A Sacramento, California from where he was supporting Meg Whitman in her bid for some office.
Q So the California flight back, you understood that the Governor was out there to support Meg Whitman; that's why you refer to it as the Meg Whitman flight?
A That is.
Q Okay. Going to the second paragraph, I'm just going to read this to you. "I am suggesting that you use the attached protocol to initiate the 'Virginia Study' of Anatabloc at the Medical College of Virginia and the University of Virginia School of Medicine, with an emphasis on endocrinology, cardiology, osteoarthritis, and gastroenterology."

First of all, can you tell the members of the jury what you meant by the "Virginia Study"?

A The "Virginia Study," I came to call it the "Virginia Study" from working with Dr. Ladenson over at Johns Hopkins. He thought it was, you know, he could be helpful with the medical schools in Virginia, and was just -- we started referring to it as the "Virginia Study."
Q And why did you want the medical schools in Virginia to do it? Why not just have -- when we say "do it," are we talking human trials, mice studies? What type of trials was the "Virginia Study"?
A Both. Animal and human studies.
Q Both. And why did you want Virginia research universities to do those studies instead of like Roskamp?
A Roskamp is a private research institute. I don't think they are really equipped to do this. But the goal was, with this discovery from the tobacco plant, this Anatabine, if this was what was causing people to have less auto immune diseases, then it made sense to me that the medical schools in Virginia should be interested in this and the State of Virginia should be interested in this given that the people that were researching this were very credible, well-known physicians that were helping me with this. And if Virginia, if Virginia and the Governor, the State of Virginia, and its medical schools, I felt like they needed to know this.
Q Well, to be clear, you just said that you didn't

think Roskamp was equipped to do these kind of studies. Would studies from these universities be more prestigious than from Roskamp, have more credibility?
A Yes.
Q Now, when was the first time you remember talking about the "Virginia Study" with the Governor?
A I recall specifically talking about it and laying it all out because I was on the plane with him for five or six hours.
Q That was the California flight?
A Yes.
Q Okay. Going to the last sentence of the letter, please, all the way down now, "Once you have had a chance to review this, please have someone on your staff contact me."
Did you ever get any formal response from the Governor on this, a letter back?
A I don't recall any response from this.
Q Okay. And that signature there, did you authorize Ms. Fulkerson to sign for you?
A Yes.
Q Just go up to the top really quickly, please. That was addressed to the Governor?
A Yes.
Q Okay. You can take that down, please, Ms. Taylor.

Okay, that was June 16th. Later that month, did you attend an event at the Homestead Resort?
A I did.
Q Okay. What type of event was that?
A I understood that event to be an annual rally and a meeting for the Governor where his top supporters, donors, get together for a meeting. And it was in combination with Eric Cantor was there, and then there was a panel discussion on various topics, and it was combined with that.
Q And how did you travel to the event?
A In the plane.
Q Okay. And did anyone else fly with you to the Homestead?
A I believe Bobby McDonnell and Rachel McDonnell were on the plane. Maybe Jeanine. I'm not sure. A few of the McDonnell children were on the plane.
Q Okay. So you know that there was some children of the McDonnells, but you are not sure exactly which ones?
A I'm not sure which ones.
Q But how did it come to be that you were transporting the Governor's children to this event?
A Maureen contacted me and said, "Jonnie, you need to come to this event and you will get to spend some time and play golf with the Governor. And I need you to bring my

children, a couple of my children with you when you come."
Q How did she originally -- where did she want the plane to go in the original plan?
A For me to pick up one of the children in Newport News or Virginia Beach somewhere.
Q And how about the other child?
A The other one was in Richmond.
Q Okay. So just so I'm clear, where did Ms. McDonnell want the plane to travel to?
A She wanted me to leave Richmond with one of her children and then pick up another one in Newport News or Virginia Beach, and then fly over to an airport on the mountaintop over in the western part of Virginia near the Homestead.
Q And did you agree to do that, to make that --
A I agreed to take them, but not to go to Newport News, because it is too difficult in a jet to do short hops like that.
Q Okay. But you did transport them from Richmond to the Homestead?
A I did.
Q Okay. When you arrived at the Homestead, do you see anybody in the lobby of the Homestead when you get there?
A An aide to the Governor, Adam Zubowsky, Maureen McDonnell, and Jeanine McDonnell.

Q And did you have any conversations about electronic cigarettes?
A I did, because I knew Adam smoked.
Q Okay. Just briefly, what was the conversation?
A I just told Adam, I said, "You know, Adam, I know you would rather not smoke, so I made this electronic cigarette with Anatabine in it to help you get away from smoking."
Q Now, was the Governor present for any of this conversation?
A I don't believe so.
Q During your visit, your time at the Homestead, did you and the Governor discuss the Anatabloc studies that you wanted at UVA and VCU?
A I don't specifically recall. Like I was with him playing golf for four hours or so, but I can't tell you exactly, specifically. You know, this is something that's important to me, and so I'm generally trying to move this forward every opportunity I get.
Q But you don't remember the specific conversation?
A I don't recall any specifics of that meeting.
Q At some point, do you get the idea that you want to get funding for these studies from the Virginia Tobacco Commission?
A Yes.

Q All right. Well, tell the jury what your understanding of the Virginia Tobacco Commission was.
A I was familiar with the Tobacco Commission from being in the business, and that the MSA settlement, various states had this additional money coming in that they were collecting. And some of the states were using it for revitalization of the communities that are hit the hardest by the impact of tobacco. And so as I discussed this with the Governor on the flight back from California and at different times, he thought it was a good idea that the funding be independent, away from us in Virginia, and thought the Tobacco Commission would be a good source of funding for something like this.
Q Now, to be clear, did you eventually hire Jerry Kilgore to help you with this idea?
A I did.
Q And were your conversations with the Governor about the Virginia Tobacco Commission, were those before or after you hired Mr. Kilgore?
A Before.
Q And when you are discussing this with Mr. McDonnell, he is encouraging you or discouraging you from making the application?
A No, he thinks it is a good idea.
Q Okay. But does he sit there in these conversations

and say, "I guarantee you I'll get that done," or anything like that?
A No.
Q Okay. So you hire Mr. Kilgore. Why do you hire Mr. Kilgore, first of all?
A I knew Jerry Kilgore. I have known him for a while. And after he left being Attorney General, he was at a law firm in Richmond and he was involved in lobbying activities as well. And I just thought that given his background, having been the Attorney General and been involved when the MSA and the Tobacco Commission and all of that was constructed, that he would be skilled at assisting us.
Q And did you know that he had any family relationship with the Tobacco Commission that might be helpful?
A I don't recall that.
Q Okay. Now, what's Mr. Kilgore's role in this process going to be? What's he hired to do?
A He was hired to work with our General Counsel, Bob Pokusa, to assist us in preparing applications for grants to the Commission for studies to be conducted at Virginia medical schools.
Q You said that you have known Mr. Kilgore for a while. Did you lend your plane to Mr. Kilgore for his run for Governor?

A I may have.
Q Okay. Had you ever given Mr. Kilgore any personal loans while he was running for Governor?
A No.
Q Had you ever taken any of his family members on shopping trips when he was running for Governor?
A No.
Q Had you ever bought a Rolex watch for Mr. Kilgore?
A No.
Q At the time that you are hiring Mr. Kilgore, I understand he is going to make the applications. What is Star Scientific doing regarding the UVA and VCU piece in order to get them on board?
A We are working with him.
Q What does that mean, sir?
A The medical director of our company and another person there, Dr. Ryan Lanier, are working with researchers to facilitate these studies.
Q Okay. And what are the universities going to have to do in order for the studies to get funded by the Virginia Tobacco Commission?
A Prepare grant applications and attach the study to show what it was that they were going to be doing in the use of funds.
Q So they are going to help prepare the grant or they

are going to have to agree to do the studies and then they are going to be responsible for making the applications that Mr. Kilgore is going to help.
A Yes, the administrative part of that.
Q Prepare. As this is going on and you are trying to get UVA and VCU on board, does Star Scientific have an event at Gibson Island?
A Yes.
Q That was July 23rd, 2011?
A Yes.
Q What was the purpose of that event?
A Dr. Ladenson, the chief of endocrinology at Johns Hopkins, said that they have done things like this before, and it was a good idea to get, to have all of the doctors get together and learn the science behind what was going on so they could have an open discussion and exchange ideas about how to proceed with validating Anatabine as an anti-inflammatory or for treating diseases.
Q And did you have a conversation with Ms. McDonnell before this event?
A I did.
Q And what did you ask her?
A I asked her if she could attend, because doctors from VCU's medical school and from the University of Virginia were being invited and I thought it was a good opportunity

to have her along.
Q And what did she say?
A She said she wasn't able to make that meeting. And I asked her if Mary-Shea Sutherland would be able to attend.
Q What did she say in response?
A She said, "I'll check with her and see."
Q Why did you want Ms. McDonnell or Mary-Shea Sutherland to attend this event?
A I think it was really important, that we had researchers from the medical schools in Virginia, with prestigious physicians from Johns Hopkins, to see that Virginia was supportive of this; and for VCU's doctors and for University of Virginia's doctors to see that this is important, this is being taken seriously by the State of Virginia, by the physicians at Johns Hopkins, and by researchers at University of Virginia and VCU taking the time to come to Gibson Island to spend the day addressing these issues.
Q Did Ms. Sutherland attend the event?
A She did.
Q And who else attended this event? Do you remember specific people from UVA or VCU?
A Dr. Peggy Shupnick from University of Virginia, she was a colleague of Dr. Ladenson's when they were at Harvard. Dr. John Clore, an endocrinologist from VCU that

was a colleague of Dr. Ladenson's. And maybe three or four other physicians from different departments at Johns Hopkins, from cardiology, gastroenterology. I don't recall the additional ones.

Q That's fine. Now, that event is on July 23rd. Did you let the McDonnells use your Smith Mountain Lake house from July 28th to July 31st of 2011?

A Yes.

Q Where is that home located?

A About 165 miles southwest of here in Virginia.

Q Now, did you live at this house full time?

A No.

Q What was it?

A It was a vacation house that we would use from time to time.

Q How did it come to be that the Governor and his family were vacationing at your house?

A I either offered it or they knew about it.

Q Okay. But you had let other politicians stay at your Smith Mountain Lake house occasionally, right?

A I have.

Q Okay. Before this trip, had you had any conversations with Ms. McDonnell about wanting to meet with a representative from Bill Hazel's office?

A From, say, HHS, yes.

Q Tell the members of the jury about that conversation.

A I was talking to her and I said, "I need to meet, if you could contact someone over there, I need to meet with someone so that I can, you know, things are improving and we are moving forward and I need to bring someone, if you could bring someone over so we could bring them up to speed."

Q Okay. And what was Ms. McDonnell's response?

A "Okay."

Q Before the Governor and his family stayed at your Smith Mountain Lake home, did you have any conversations with Ms. McDonnell about your Ferrari and vehicles?

A No, the only time that ever happened was, I had lunch with Mary-Shea and Maureen McDonnell one day at Kinloch to discuss Anatabloc. And my home is on the way back from there, and she said she would like to see it. So we went, stopped by my house, and we went in through the side of the house, the garage, and she commented, she was asking, you know, "What kind of cars are those? They are nice cars."

Q And did you tell her what type of cars they were?

A I told her.

Q And before the vacation, did you have a conversation with Ms. McDonnell about whether one of those cars was going to be at your Smith Mountain Lake house?

A Yes.
Q And what did she say?
A She said, she mentioned to me, "All right, do you have any of those cars over at the lake house?"
Q And what did you say?
A I said, "No."
Q What was the response?
A She said, "It would just be nice, you know, we never get to do things like that." It was, "You know, if we had that, you know, something like that over here." And I said, "I'll bring one over."
Q And in fact, did you have the Ferrari delivered?
A I did.
Q Did you have any other conversations with Ms. McDonnell about the Ferrari when she arrived at the Smith Mountain Lake house?
A I think twice she called me and asked me when was it coming, and I said he was on his way.
Q Okay.
A And then I believe when it got there, I just wanted to make sure that -- I told them a couple of things that I thought they ought to know about it.
Q Did you know who was going to be driving the Ferrari?
A I asked her not to let the children drive it.
Q Okay. Fair enough. Did you have any conversations

with Ms. McDonnell while they are at your home about what you had requested, about the representative from HHS?
A Yes. She just confirmed to me that, you know, the meeting was set for when she returned.
Q Okay. Can we pull up Government Exhibit 185? I believe this has already been -- maybe not. Sir, this is an e-mail from Ms. McDonnell to you.
A Okay, there is no text here.
Q I know. I'm sorry. The e-mail itself, it has attachments. But does it say from Ms. McDonnell to you?
A Yes.
Q And that's on July 31st, 2011?
A That's correct.
MR. DRY: The government moves to admit 185 into evidence.
THE COURT: It will be admitted.
BY MR. DRY:
Q All right, can you go to the second page of the exhibit, please? Do you remember getting this e-mail, sir?
A I do.
Q And what was the context of when you received this e-mail?
A They were returning from Smith Mountain Lake.
Q What color is the Ferrari that you had shipped up to

Smith Mountain Lake?
A It is called white with cuoio tan interior.
Q And what model is your Ferrari?
A It is a Ferrari California.
Q Is that a convertible or a hardtop?
A It is both.
Q All right. Now, going to Government Exhibit 186, please. And this has been admitted. Have you seen this document before, sir?
A Yes.
Q That's dated August 1st of 2011?
A Yes.
Q And that's the day after Ms. McDonnell e-mailed you the picture of the Governor driving the Ferrari, right?
A Yes.
Q Going down, do you see your name on this Mansion log next to 9:45?
A I do.
Q And it has a departure time of 12:14; is that correct?
A Yes.
Q And that's your name, sir?
A It is.
Q And in the Organization/Guest column, what does that say?

A "See 102."
Q You knew 102 as what?
A I have no idea.
Q Two lines down, please, that's got, it says M. Huffstetler there. Do you see that, sir?
A I do.
Q A time in of 9:55. Do you recall -- and a time out, just to be clear, 11:05 for M. Huffstetler and 12:14 for you.
A I do.
Q Where did -- did you meet with a Ms. Huffstetler?
A I did.
Q And that was while you were at the Mansion?
A Yes.
Q And where did Ms. Huffstetler work?
A For Dr. Hazel in the Patrick Henry Building in the Health and Human Services Department.
Q Okay. And who was present during this meeting?
A Maureen and myself and Ms. Huffstetler.
Q It was the three of you?
A Yes.
Q Where did the meeting occur?
A In her office at the Governor's Mansion.
Q And was Ms. McDonnell present for the entire meeting?
A Yes.

Q Now, was the Governor here for this meeting?
A No.
Q Okay. What did you discuss with Ms. Huffstetler?
A The test results, and what we were planning, and at some point we hoped to reach with enough data to where we could test this at some point to lower the healthcare costs in Virginia.
Q And did you mention to Ms. Huffstetler the idea of testing Anatabloc on state employees?
A Yes.
Q What did you mean by that? What was the plan there?
A The idea was, if you take, I don't recall exactly how many thousands of state employees there are, but if you gave them this to take as part of their diet, and you started improving the attendance from cold symptoms, which are inflammatory, or it began lowering the use of prescription drugs, and you started lowering the healthcare cost on a volunteer population within the state, that would be a good model.
Q You just said "volunteer." Were the people going to know that they were taking this and have agreed to do that?
A Yes. They would be volunteers.
Q Okay. Did you mention anything to Ms. Huffstetler about your conversation with the Governor vis-a-vis

Virginia Tobacco Commission?
A That's who we were using. That's one of the places we were seeking funding from.
Q Okay. Now, on Government Exhibit 186, can we go down, please, I want to go to the 10:34. There we go. And can you highlight the 10:34 line, please, Ms. Taylor? Do you see a name next to, on the 10:34 line, who is the visitor?
A Appears that it is Dr. John Clore from MCV, or VCU.
Q Did you know who Dr. Clore was?
A Yes, I had met him through Dr. Ladenson from Baltimore. He is an endocrinology professor at VCU's medical school.
Q Was he one of the people you went to, as you mentioned a while ago, the Gibson Island event?
A Yes.
Q Did you have a meeting with Dr. Clore in the Executive Mansion?
A I did.
Q And who attended that meeting?
A Myself, Maureen McDonnell, Dr. Clore, and I'm not sure whether Ms. Huffstetler was there at that particular time with Dr. Clore or not.
Q Okay. How did Dr. Clore come to be invited to the Executive Mansion?

A I called him up from Maureen's office and asked him could he come over.
Q And did you just do that or did you have a conversation with Ms. McDonnell before you --
A I did.
Q Okay. Tell us about what your conversation with Ms. McDonnell was before you picked up her phone and invited Dr. Clore over to her house.
A I told her that, you know, Dr. Clore was important, and he could cause studies to happen at VCU's medical school as well as other doctors, and that I thought it was important to instill in him that this was important.
Q And what was her reaction?
A "Call him up."
Q At the meeting with Dr. Clore, generally, what were you telling Dr. Clore? You had already seen him at Gibson Island. So --
A Yes. I was just letting him know with Maureen McDonnell sitting there how important this was to Virginia, to the Governor. This was important.
Q Okay. Now, according to the Mansion log, Ms. Huffstetler leaves at 11:05, Dr. Clore leaves at 11:31, and you leave at 12:14. Did you have any private conversations with Ms. McDonnell during your visit to the Mansion?

A Is the question did I have any private conversations?
Q Yes. In other words, you just said that you were, first of all you were in a meeting with, I believe, Ms. Huffstetler in Ms. McDonnell's office, right?
A Yes.
Q And then Dr. Clore in Ms. McDonnell's office, yes?
A Yes.
Q You are there after they leave. Did you have any conversations with Ms. McDonnell outside the presence of Ms. Huffstetler or Dr. Clore?
A I did.
Q All right. Tell the members of the jury about that.
A Well, we summed up what was going on after meeting with those people, and then I was, as I was sitting here like this, she noticed my watch and she says, "Jonnie, what kind of watch is that?" And I said, "It is a Rolex." And she was, you know, she was interested in it. So I took it off and handed it to her so she could look at it. And she said, "I would really like to get one of these for the Governor. He just wears these old, you know, watches." And I was sitting there, and I said, "Do you want me to get you one of these watches for the Governor?" And she said, "Yes, that would be nice."
Q And did you agree to buy the Rolex for the Governor?
A I did.

Q Did you subsequently buy the Rolex?
A I did.
Q Can I get Government Exhibit 33, please? Can you bring up 33-A?
(Exhibit proffered to witness.)
Sir, is that the Rolex watch that you purchased?
A Yes.
Q When did you buy the watch? Was that after the meeting?
A Yes.
Q Where did you buy it?
A Malibu Jewelers in Malibu, California.
Q How much did the Rolex cost?
A I don't remember, six or seven thousand dollars.
Q Can we go to the second page, please? Can you look, because it is hard to see in the picture, Mr. Williams, can you look on the back of the watch?
A Yes.
Q It is part of the reason we needed the watch. What's engraved on the back?
A It says, "Robert F. McDonnell, 71st Governor of Virginia."
Q Did you have any discussions with Ms. McDonnell about the engraving?
A I did.

Q And tell the jury about that.

A When I was in the store, I was there with my daughter and my wife, and I was looking at this. And I was buying it. And my wife actually suggested to me, she says, "Well, you should have something engraved on the back of it." So I called Maureen McDonnell from the store and asked her what would she like engraved on the watch.

Q What did she say?

A She thought about it. She said, "Put 71st Governor of Virginia on it."

Q What was her reaction to you buying the watch for the Governor?

A I can't tell so much over the phone.

Q But did she ever tell you not to tell the Governor that you had bought the watch?

A No.

Q And when you gave the watch to Ms. McDonnell, what type of box was it in?

A It comes in a green Rolex box.

MR. DRY: I'd like to publish the Rolex to the jury, Your Honor.

THE COURT: Sure. Go ahead.

MR. DRY: I'd like to enter Government Exhibit 33 and 33-A into evidence, publish the Rolex to the jury, and I still have a few more questions about it.

THE COURT: They will be admitted. All right, Mr. Marshal, just take it.

BY MR. DRY:

Q Sir, you give the Rolex to Ms. McDonnell, it is in the green Rolex box. Did you want --

THE COURT: Stop asking questions while he is -- let him do this. Just pass it down the row to each juror.

(Exhibit proffered to jury.)

All right. What's the number on the watch again?

MR. DRY: 33, Your Honor. Here is the bag that it goes in. The pictures are 33-A, Your Honor.

BY MR. DRY:

Q I believe you just said that Ms. McDonnell never told you not to tell the Governor. But did you want people to know that you had bought a Rolex watch for the Governor of Virginia?

A No.

Q Why not?

A I thought it was wrong, it was a bad idea for anyone to know that.

Q Wrong how?

A I shouldn't, it was a bad -- it was a bad decision on my part to buy that watch when she asked for it.

Q But why, Mr. Williams, why was it a bad decision?
A I shouldn't have had to buy things like that to get the help that I needed. And I thought, I just thought it was a bad idea. I took a business risk, and it was a bad idea. It was a bad business decision.
Q But to be clear, sir, you didn't have to buy the watch. Nobody held a gun to your head, did they?
A No. No. I made a mistake when I bought that watch.
Q But that was your decision. You bought it.
A It was my decision, no one else's.
Q And you knew it was wrong?
A I knew it was wrong.
Q You previously mentioned that Ms. McDonnell told the Roskamp attendees that the launch of Anatabloc would happen at the Governor's Mansion, right? You talked about that a little bit yesterday.
A Yes.
Q Or very early this morning. Was there in fact an event at the Mansion for Anatabloc on August 30th, 2011?
A There was.
Q What was the purpose of the event?
A That was the day that the company launched Anatabloc for sale. And it was the physical launch of that. Associated with the launch that day was tied in with the Governor's Mansion, with a luncheon at the Governor's

Mansion.
Q And who was going to be attending this luncheon?
A Doctors from Johns Hopkins, doctors from University of Virginia, doctors from VCU, prominent doctors here in Richmond, Maureen McDonnell, the Governor, Mr. Roskamp, the philanthropist behind the Roskamp Institute, and doctors from the Roskamp Institute.
Q How was the date of the event selected?
A I believe it was selected on a day that was convenient to have the use of the Mansion and the Governor and Maureen McDonnell's schedules.
Q You mentioned the Governor twice. Did you want the Governor to attend the event?
A I did.
Q First of all, did you discuss that with Ms. McDonnell?
A I did.
Q What did you tell her?
A I said, "We need the Governor there."
Q What did she say?
A "Okay."
Q So why did you want the Governor to attend?
A Well, I had this dilemma of I'm going to pursue the prescription version of Anatabine because it needs to be in a prescription form so that doctors have the testing

and know how much to dose. And that was going to take a number of years. And I had these physicians here from the medical schools so that they would become interested in it and doing the testing on Anatabloc itself, not necessarily the drug version, because it appeared to have a food-safe profile, and to have Virginia, the seal of Virginia and have Virginia's medical schools behind it, and to have the doctors from Johns Hopkins that have been doing the basic testing to validate all of this work with the doctors in Virginia. As it is a Virginia study for Anatabloc, I thought that made good business sense. That would be very good for our company.

Q I understand you wanted to get the studies at UVA and VCU done. I think my question is, why did you want the Governor in the meeting between your company and the UVA and VCU people, doctors?

A Because it sends a signal to those medical schools that this is important. The credibility associated with it.

Q And did you discuss that with Ms. McDonnell?

A I did.

Q Was Ms. McDonnell supportive of the idea of having this event at the Mansion?

A It was her idea.

Q What do you mean it was her idea?

A At the Roskamp Institute, when she announced it.
Q All right. It might have been her idea, but who decided who to invite? Who is the one that's actually saying, "I want that doctor, that doctor, that doctor, this person, this person, this person"?
A Me.
Q On the day of the event, did you bring any samples of Anatabloc?
A I did.
Q And why did you bring samples of Anatabloc?
A I wanted to make sure everyone knew they could take the product with them. It was the day of the launch, the day of the introduction of this product. I was proud of it. I thought it was -- I actually thought it was an historical moment; that from this tobacco plant, which I brought tobacco plants from the farms out in Virginia, from a farm in Southside Virginia, to use that to explain to everyone at that meeting that hidden in this tobacco plant was Anatabine that was responsible for the health benefits from tobacco.
Q When you said that you wanted samples to be available for the attendees, were the samples actually placed at each place setting?
A They were.
Q And who did that?

A I don't know particularly who set them, who the person was that put it beside each one, but it was, I believe it was my idea to do that.
Q Okay. Walk us through what happens during this event. First of all, is the Governor there at the beginning?
A No.
Q All right. Well, walk us through generally what happens at this event.
A I was at the end of one table, Maureen McDonnell was at the end of the other. First she spoke and welcomed the doctors, and shared again with them why this was important to her, and how exciting this was to have this launch here, introduction at the Governor's Mansion, and to have physicians from the medical schools in Virginia here to get involved and study and test Anatabine.
Q And after Ms. McDonnell speaks, what happens?
A I spoke next.
Q Okay. You mentioned tobacco leaves. What are you doing with tobacco leaves during your chat?
A Well, that's where I discovered Anatabine, you know. From working with, you know, it was part of -- I've been working with it for years with organic chemists from the University of Kentucky. So I thought I would bring the tobacco plant just as a prop to be able to show the

doctors where I found this anti-inflammatory.
Q Does the Governor come in at some point?
A He did.
Q Do you remember roughly when?
A Towards the end. He sat down and was eating lunch.
Q So everybody ate lunch during this event?
A Yes.
Q Okay.
A And he began asking the doctors their questions.
Q When you say "the doctors their questions," had doctors given presentations during the lunch?
A Dr. Ladenson was talking about it, Dr. Wright was talking about it, our medical director. I don't recall much after that.
Q You said that the Governor was asking questions. Can you kind of describe what's going on at this point?
A Asking questions like, you know, "What are the end points here? What are you looking for to show efficacy with the studies? How are you going to proceed with that?"
Q And did you think the Governor's attendance was helpful?
A Yes.
Q When he is asking questions, is he expressing any support for Star, the idea of further studies?

A He was generally supportive. I mean, that was the purpose.

Q Did you give any money out to UVA and VCU?

A We handed out eight checks for $25,000 apiece to doctors at the medical institutions, including doctors from Johns Hopkins, so that they could prepare the grant applications to study this and whether it was for gastroenterology, cardiology, endocrinology, osteoarthritis, a variety of disorders.

Q So what's the plan, sir? You give the $25,000 grants to the research universities. What are they supposed to do with those? Use that money to do what?

A They are supposed to use that money because preparing a grant application is a lot of work. It is not just simple application. It requires a lot of work, a lot of back-up material, the trial, the study design of what it is that you are going to do. And so the idea was to prime the pump, to assist them in funding so they would have the incentive to have the cost of preparing, covering the cost of preparing, the time it takes to prepare the application so that it could be submitted to, hopefully, the Tobacco Commission for funding.

Q All right. Just so we are clear, they are going to do basically a study proposal.

A Yes.

Q That's going to be turned into a grant application.
A Yes.
Q And that's going to hopefully go to the Virginia Tobacco Commission. That's the plan.
A That's the plan.
Q Okay. Did you think that having the event at the Governor's Mansion was helpful to your company?
A I did.
Q Why?
A The credibility that came with that. I'm trying to have this tested in Virginia. The doctors from Johns Hopkins are helping me with the doctors in Virginia because I don't know them at the medical schools. And with an institution like Johns Hopkins, with physicians contacting their colleagues here at Virginia medical schools, I felt like I had their attention. And since it was going to be done in Virginia, to have the crown of it or the "Virginia Study" or, you know, "This is what happened in Virginia."
Q As of the date of that event, what were the things that you had already given to the McDonnells?
A Plane trips, shopping spree.
Q $50,000 loan?
A $50,000 loan, a $15,000 catering bill, golf trips -- I mean golf outings. I don't know, maybe some

other things.
Q Which of those things did you give to the McDonnells because you thought that they were your friends?
A The McDonnells were not my personal friends.
Q But why are you giving them this stuff then?
A I thought it was good for our company.
Q Do you think you would have had that event had you not given them things of value?
A No, I did not.
Q Let's go to Government Exhibit 243, please. And blow up the bottom part, please. Mr. Williams, do you recognize this as an e-mail from Ms. McDonnell to cjw01@me.com and your e-mail account?
A Yes.
MR. DRY: I move Government Exhibit 243 into evidence.
THE COURT: It will be admitted.
BY MR. DRY:
Q First of all, who is cjw01@me.com? Whose e-mail account is that?
A My wife.
Q Okay. I'm just going to read this to you and you tell me if I've read this correctly. "Jonnie and Celeste, here is the info about the Cure By Design Dinner on September 24th. I'll have an invitation mailed to you and

you'll be my guests." Go up, please. And then Ms. Fulkerson forwards this to you with an attachment, correct?
A Yes.
Q And you have reviewed this before?
A I have.
Q Let's go to the second page, please. This is a flier. At the very bottom, what is the date of the event going to be, right next to Saturday?
A September 24th, Saturday, 6 to 10, 2011.
Q Okay. And going to the next page at the very top, where is the event going to be at?
A At the Hilton Hotel in Richmond.
Q Okay. Did you have a conversation with Ms. McDonnell about this event?
A I did.
Q Tell the members of the jury about that.
A She contacted me and described the event and said she would like for Celeste and I to come, and that she was nervous about it because it was a fashion show and she was going to have to model a dress on a runway set-up that they had for the event.
Q Did she make a request of you?
A She did.
Q What did she want?

A She says, "Well, I don't know how to do this like Brad. It would be nice to have Brad here for something like this."
Q When you say "Brad," who is Brad? Is that Brad Kroenig, the model?
A Brad Kroenig is a friend of mine in New York.
Q He is a male model, I think you testified earlier?
A He is.
Q Did you and Kroenig go to the charity event?
A We did.
Q Did your wife attend?
A No.
Q Why didn't she attend?
A She wasn't interested.
Q Okay. Going to Government Exhibit 246, please. Have you had the opportunity to review -- well, just go through those briefly, please. Have you had an opportunity to review these, sir?
A I've seen these photos.
Q And are these photos of the Cure By Design event?
A They are.
MR. DRY: I would like to admit Government Exhibit 246 into evidence, Your Honor.
THE COURT: It will be admitted.
BY MR. DRY:

Q Sir, first of all, actually, can we go back to the first photo real quick? Can you just, where are you located at while this picture is being taken?
A The table in front of the gentleman speaking.
Q And whose table was that?
A Maureen McDonnell's and the Governor's.
Q Okay. So where are you seated at in relationship to them? Are you at their table?
A I'm at their table.
Q Okay. Going to the second photo. Now, obviously, for the record, that's Mr. and Ms. McDonnell holding hands on the left-hand side?
A Yes.
Q On the right-hand side, who is that gentleman?
A The far right is Brad.
Q Okay.
A And the fellow that has the microphone is the host, the director of the Cure By Design event.
Q Okay. And while this is going on, what's happening? What is the gentleman, the M.C. gentleman doing?
A Well, there was a runway fashion show of cancer survivors, and then once that was done, there was an auction to raise money.
Q An auction. And was one of the things that was auctioned off a trip to New York City?

A Yes.
Q And who was the trip going to be with?
A The Governor and his wife.
Q Okay. Walk us through -- did you bid on the trip?
A I did.
Q Walk us through why and how that all came about.
A Well, they were offering, auctioning off different items. They were auctioning off -- what seemed to gain the most attention was beach house vacations in North Carolina's Outer Banks, and people were bidding on that, multiple bids on those sorts of things. And then it came up to where the host offered his home in New York for the weekend, and included the McDonnells as a weekend in New York, as an item to be auctioned off.
Q What was the bidding like at first?
A I was the only bidder.
Q Okay. And so you bid on the event. Was that the last bid that you make?
A I bid against myself.
Q And where are Mr. and Ms. McDonnell while this is going on?
A They are standing on that stage with the host.
Q Going to the fourth photo in the series, please, did you win the trip?
A I won the trip.

Q Okay.
A I was the winning bid, if that's what you mean.
Q Yes, sir. And how much approximately did you spend at this auction?
A Well, a little girl was first, and she was auctioning off a painting. And so I bought that.
Q Can you go to the sixth page of the exhibit, please? Was that the painting that you bought from the little girl?
A It is. I gave it back to her.
Q Okay. So just to be clear, everything that you spent at the auction wasn't spent on the trip with the McDonnells, right?
A No.
Q Okay. So you bought this painting that this little girl did and you gave that back.
A I did.
Q But then you also bought the trip with the McDonnells.
A Yes. And the amount came to, I don't know, maybe it was around $15,000, $13,000, $14,000.
Q After the event, did you have dinner that night? Did you have dinner?
THE COURT: Let's stop for the morning break. We will take 15 minutes.

(Recess taken from 11:06 a.m. until 11:26 a.m.)

THE COURT: All right. Let's bring in the jury.

(The jury entered the courtroom.)

THE COURT: All right. Mr. Dry.

BY MR. DRY:

Q Mr. Williams, I believe that we left off at after the Cure By Design dinner -- that was at the Hilton, I believe you testified about, correct?

A Yes.

Q After the event, did you go to dinner that night?

A I did.

Q And who did you go to dinner with?

A The Governor, his wife, and my friend Brad.

Q And who picked up the tab for dinner?

A I did.

Q Do you remember approximately how much you spent at the restaurant?

A Twelve, $1,500 or so.

MR. DRY: I'd like to now bring up Government's Exhibit 250, please.

BY MR. DRY:

Q Actually, you know what, before we get to that. Mr. Williams, I think that we talked about Ms. McDonnell and the Ferrari at Smith Mountain Lake. Did you ever have any other conversations with Ms. McDonnell in the summer

of 2011 about automobiles for the McDonnell children?
A Yes.
Q Please tell the jury what those conversations were about.
A The first one was for her daughter Caitlin. She -- Maureen mentioned to me that she needed to get a car because her old one, you know, was in bad shape and what have you. And I just listened.
And then I received a phone call from her daughter. She said, "I found a car at this place. This is how much it is, this is who you contact, and my mother said you're going to pay for it."
Q And what did you say?
A "Your mother has been very helpful to me. I need to call her."
Q And did you have a conversation with Ms. McDonnell?
A I did.
Q And what did you tell Ms. McDonnell?
A I told her I just couldn't buy a car. I just couldn't do anything like that.
Q Any other conversations about vehicles? You said the first conversation --
A The two boys going to school, I believe they were sharing a car, and she asked me if I would sell her one of the Range Rovers at a low price for the boys.

Q What did you tell her?
A I told her the Range Rover drinks too much gas and the maintenance is high.
Q So ultimately, did you buy a vehicle or sell a vehicle to Ms. McDonnell at a discount for her children?
A I did not.
Q And why not?
A It's too visible.
Q What does that mean, "too visible," sir?
A I thought I had an understanding she was helping me, they were helping me with my company, but the thought of writing a check to a car dealership for one of the McDonnell children that I didn't even know, I just had a tough time with it.
Q And, sir, I believe you keep saying Caitlin.
A Cailin.
Q Okay.
A Yes.
Q All right. When you say Caitlin, do you mean Cailin McDonnell?
A I'm not sure of the spelling.
Q Okay.

MR. DRY: Let's go ahead and go to Government's Exhibit 250, please.

BY MR. DRY:

Q Have you seen this document before?
A I have.
Q And this is a flyer for an event for Anatabloc at the Westin Hotel; is that correct?
A It is.
MR. DRY: Government's Exhibit 250. We'd like to move that into evidence.
THE COURT: It will be admitted.
BY MR. DRY:
Q All right. Sir, first of all, just -- Rock Creek Pharmaceuticals, what is that?
A Star began as a tobacco company, and we formed Rock Creek Pharmaceuticals, and that's where the Anatabloc products and the pharmaceutical version of this was going to be housed.
Q So when that says "Rock Creek Pharmaceuticals," is that just a subsidiary of Star Scientific?
A It is.
Q Okay.
A A wholly owned subsidiary of Star Scientific.
Q Okay. And this event was going to be at the Westin Hotel; is that correct?
A That's correct.
Q And what's the -- on the -- is that October 18th on the left-hand side?

A Yes.
Q Okay. And what was the purpose of having this event at the Westin?
A This particular event was the beginning or part of these meetings that we were going to conduct around the United States to showcase this discovery and to present the data that had been conducted so far to the medical community.
MR. DRY: Can you go -- scroll down on the -- there you go. Right there.
BY MR. DRY:
Q And those are three doctors that are going to be speaking; is that right? Mr. Mullan, Dr. Ladenson, and Dr. Caturegli; is that correct?
A Yes. It's pronounced Dr. Mullan.
Q Mullan. I'm sorry.
Now, the featured guest, who's listed as the featured guest?
A The First Lady of Virginia, Ms. McDonnell.
Q And how did Ms. McDonnell come to be the featured guest for this event?
A I called and asked could the Governor attend.
Q And what did she say?
A He wasn't able to, but she was.
Q And why did you want the Governor or the First Lady

to attend the event?
A These were local doctors. They were doctors from VCU, and I thought it was important that these physicians realize this was important in Virginia.
Q Did Ms. McDonnell attend the event?
A She did.
Q Did she give brief remarks in support of the company?
A She did.
Q Okay.
MR. DRY: Let's go to Government's Exhibit 254, 254. There you go.
And, Judge, just to -- I don't think there's going to be an objection. The government moves -- would request moving 254 into evidence.
THE COURT: It will be admitted.
BY MR. DRY:
Q And, sir, this is another flyer, correct?
A Yes.
Q And is this a second event?
A Yes.
Q Where is it going to be at?
A In Michigan at the Warwick Hills Country Club.
Q And what's the date of the event?
A Saturday, October the 22nd.
MR. DRY: Going down on the flyer.

BY MR. DRY:
Q Who's going to be the featured guest, sir?
A The First Lady of Virginia, Maureen McDonnell.
Q Did you have a conversation with Mr. McDonnell about his wife attending this event before she flew to Michigan?
A I did.
Q Tell the members of the jury about that.
A On Friday, before the event, I asked him was it okay, and he said yes, he was going to sleep in late in the morning, just have her back by so-and-so -- such and such time.
Q And why did you call Mr. McDonnell to ask this?
A I wanted to make sure it was okay.
Q Why did you want the First Lady to attend the event?
A Because of the credibility that came.
Q And did she give any remarks at this event?
A She did.
MR. DRY: Your Honor, we have a videotape that's Government Exhibit 253.
BY MR. DRY:
Q Mr. Williams, have you reviewed the videotape of the Michigan event?
A I've seen the tape before.
Q And did it accurately depict what happened on that date in Michigan?

A It does.

MR. DRY: I'd like to move Government's Exhibit 253 into evidence, and we're going to play excerpts of that, Your Honor.

THE COURT: It will be admitted.

MR. DRY: All right. Could we play the first excerpt from 251, please?

BY MR. DRY:

Q And just -- these are going to be the First Lady's remarks.

(Video Played.)

(Video Ended.)

BY MR. DRY:

Q Sir, just for clarity, who is the gentleman that introduced Ms. McDonnell there?

A That's Dr. Dale Wilson. He's a professor of OB-GYN at Michigan State, and he is a practicing physician in Flint, Michigan.

MR. DRY: Okay. Can you go ahead and start the tape?

(Video Played.)

(Video Ended.)

BY MR. DRY:

Q Did Ms. McDonnell know she was going to speak at the event?

A Yes.

Q And were you happy that Ms. McDonnell flew to the event and made the remarks for Star?

A I was.

Q How did you travel there?

A In the airplane.

Q Okay.

MR. DRY: Can we go ahead and play the second excerpt?

BY MR. DRY:

Q This is going to be your remarks, sir, at 30 minutes, 30 seconds and 34 minutes, zero seconds.

(Video Played.)

(Video Ended.)

BY MR. DRY:

Q Sir, how important was it for your company to get the human trials of Anatabloc done at this time?

A It's what physicians are used to. Physicians are used to seeing clinical data, double-blind studies.

You know, it's anecdotal with my wife. It's important because it's never happened before, and it links up with the studies that have been done at Johns Hopkins that show that women that smoke have 73 percent less thyroid disease even at low levels. So it matches up.

But for a physician to treat a patient, they

need that data. The data is -- the data is just so necessary.

MR. DRY: Can you play the third excerpt?

BY MR. DRY:

Q This is going to be your remarks at hour and 53 minutes of the presentation.

THE COURT: I didn't hear you.

MR. DRY: These are going to be Mr. Williams' remarks at hour 53 of the presentation, 1 hour and 53 minutes.

(Video Played.)

(Video Ended.)

BY MR. DRY:

Q Sir, you keep talking about UVA and VCU studies. Were those -- what are you talking about there? Were you talking about the studies that you had given planning grants for?

A Yes.

Q And at the time did you think that VCU and UVA were going to agree to do the studies?

A I did.

Q And was it important to you?

A It was.

Q Why?

A Those studies would give -- make the physicians

comfortable with recommending it to their patients.
Q Show you what's Government's Exhibit 258, please. This is another flyer for a separate event at Pelican Hill in Newport Coast, California.
MR. DRY: The government would request to move for Government 258 to be put into evidence.
THE COURT: It will be admitted.
BY MR. DRY:
Q And, sir, we're not going to go through all of this again, but was there an event at The Resort at Pelican Hill?
A Yes.
Q And was this similar to the other events?
A It was.
Q And did Ms. McDonnell attend this event?
A She did.
Q Why did Ms. -- why did you want Ms. McDonnell to come to this event? For the same reason as the last event?
A Yes.
Q Did she give any remarks?
A She did.
Q Was this event videotaped?
A I believe so.
Q Have you previously reviewed a videotape of it?
A Not the entire tape, but I've seen clips of it.

Q Okay.

MR. DRY: Well, let's -- I'd like to move Government's Exhibit 257 in, and we'll play the clips, Your Honor.

THE COURT: It will be admitted.

BY MR. DRY:

Q All right. This is going to be you introducing Ms. McDonnell at the California event at Pelican Hill.

MR. DRY: Can you play the first excerpt, please?

(Video Played.)

(Video Ended.)

BY MR. DRY:

Q Who is that gentleman, sir?

A That's Dr. Kiet Doan. He's a general surgeon.

Q Where at? Do you know?

A In Flint, Michigan.

MR. DRY: Can you go ahead and continue playing the tape, please?

(Video Played.)

(Video Ended.)

BY MR. DRY:

Q Would you have had Ms. McDonnell speak at your event had she not been the First Lady of Virginia?

A No.

Q Ms. McDonnell makes a comment in that excerpt about you being a long-time friend of the Governor. How many times had you and the Governor actually met by October of 2011?
A Maybe six times.
Q Did you talk frequently on the phone with the Governor?
A No.
Q Were your interactions with the Governor business or personal?
A They were business.
Q Did you consider the Governor a long-time friend in October of 2011?
A No.
Q Were you happy that Ms. McDonnell made that comment, though?
A I wasn't going to correct her.
THE COURT: I didn't hear you.
THE WITNESS: I said I wasn't going to correct her, Your Honor.
BY MR. DRY:
Q All right. The next excerpt is short. This is your remarks about the studies. It's -- can we play the second excerpt?
(Video Played.)

(Video Ended.)

BY MR. DRY:

Q Sir, is this just another example of the importance of UVA and VCU studies to you?

A It is.

Q Now, let's talk about that a little bit. This is in October of 2011. What is Star Scientific doing to get those studies done at UVA and VCU?

A Well, we've already passed out grants to facilitate the preparation of the applications. And Dr. Curtis Wright, as I mentioned, is the medical director of our company that was a former chief of anesthetic and addictive substances for the Food & Drug Administration. So he was very capable of working with the institutions to conduct clinical studies.

And assisting him was Dr. Ryan Lanier. So they were trying to assist the physicians that were going to be studying Anatabloc and preparing the applications with whatever they needed.

Q But by December of 2011, are things imminently going to happen or what's going on?

A I would say we're caught in the bureaucracy of large institutions.

Q What do you mean by that?

A Anytime it's a large institution, it's very slow to

move projects through.
Q Okay. And did you think that you were -- what -- which institutions were you trapped in the bureaucracy of?
A VCU and UVA.
Q Okay.
A And UVA in particular.
Q Well, let's go to January of 2011 -- I'm sorry, '12. January of 2012. Does the subject of the McDonnells' beach properties come back up?
A Yes.
Q And tell the jury about how that occurs. Initially, in January of 2011, who were you having conversations with about the beach properties?
A Maureen McDonnell.
Q Okay. And what is Ms. McDonnell telling you?
A She said the rent is not covering the payments.
Q And what does she want you to do about it?
A She wants me to loan them some more money.
Q And do you have conversations with a man named Michael Uncapher about that as well?
A I did.
Q And tell the jury about who's on the phone, what's the conversation.
A I recall having a conversation with him to where Maureen put him on the telephone and -- because I didn't

think -- I didn't think Maureen -- Maureen knew there was a problem, but she didn't have a grasp of the financial details of the problem specifically.

And her -- I believe this was her brother-in-law, and he was sort of a manager of the -- the real estate venture at Virginia Beach, the houses in Sandbrige, Virginia. And I asked him particular questions. I was trying to get a handle on, okay, they need to borrow some money. You know, how much money are we going to end up -- how deep is this hole here.

Q And was there any discussion about you buying the beach properties?

A There was.

Q And tell the members of the jury about that.

A That didn't go far. I had no interest in buying real estate in Sandbrige, Virginia.

Q And who brought that up to you?

A Maureen McDonnell.

Q So you don't agree to buy the beach properties, but what do you agree to?

A I agreed to help them with money.

Q And when you say "them," who are you talking about?

A The Governor and his wife.

Q And specifically, why are you agreeing to help them?

A Because they are helping me.

Q How?
A With these meetings, with introductions, the launch at the Governor's Mansion, the credibility that they are lending to what I'm doing.
Q At the same time that you're having conversations about lending more money, does the subject of the studies at UVA and VCU come up?
A Yes.
Q How?
A The Governor called me.
Q Tell the jury --
A That was later.
What happened was is Maureen McDonnell asked me, "How are the studies going over at UVA?"
Q Okay.
A And I said, "They're slow."
She said the Governor wanted to know how the studies were going at UVA.
Q Did she call you back after that conversation?
A She did.
Q And what did she say?
A She said he was furious when I told her that it was bogged down in the administration.
Q So in the initial conversation, you tell her it's bogged down?

A Yes.
Q And then subsequently, she calls you back?
A She calls me back and she says, "The Governor wants the contact information of the people that your company is dealing with at University of Virginia."
Q Were you happy with this news?
A I was. I was pleased that they were -- someone was going to follow through with it.
Q What did you do as a result of this conversation with Ms. McDonnell?
A I contacted Dr. Wright. Dr. Wright had Ryan Lanier get the contact information, forward it to my son, and I asked my son to send it to Maureen.

MR. DRY: Can we bring up Government's Exhibit 298, please?

BY MR. DRY:
Q And, sir, this is an e-mail from Dr. Wright to you, correct?
A Yes.

MR. DRY: I'd like to move Government's Exhibit 298 into evidence.

THE COURT: It will be admitted.

BY MR. DRY:
Q And, sir -- just scroll down, please. Thank you. A little bit higher up, the second e-mail. Thank you.

And this is the e-mail that you just talked about from Mr. Lanier to Dr. Wright?
A That's correct.
Q And the subject line is "UVA people," correct?
A That's correct.
Q And then if you go up, Mr. Wright forwards that information to you. And why had you requested this contact information?
A Because Maureen McDonnell said that the Governor wanted it.
Q And how -- this is on February 3rd of 2012. How much -- how long did -- before this e-mail did Ms. McDonnell ask you for the contact information?
A Within a few days.
Q Okay. And then at the same time -- can you take that down, please.

At the same time this is going on, you are having conversations with Ms. McDonnell about something called a Healthcare Industry Leaders Reception?
A Yes.

MR. DRY: And I'd like to show -- well, let me go back.

BY MR. DRY:
Q When you ask Dr. Wright to send this information, had you written a check yet to help out with the beach

properties?
A No.
Q Okay.
MR. DRY: Let's go to Government's Exhibit 301, please.
BY MR. DRY:
Q Sir, this is an e-mail from Maureen McDonnell to Caroline Birgmann, and you are cc'd, courtesy copied, on this, correct?
A Yes.
MR. DRY: I'd like to move Government's Exhibit 301 into evidence, please.
THE COURT: It will be admitted.
BY MR. DRY:
Q All right. Let's go to the bottom e-mail. And who is Ms. Carolyn Birgmann, sir?
A She's a sales representative in Virginia.
Q Okay. I'm going to read what Ms. Birgmann wrote to Ms. McDonnell. Subject line, "MD e-mail addresses." I'm going just going to read the first sentence, and you let me know if I'm reading it correctly. "Hi, Maureen. I hope you are doing well! Jonnie Williams, Sr. has asked me to compile a list of MDs in the area for you to include on your invitation list for the event coming up the end of February."

Had you asked Ms. Birgmann to give this list to Ms. McDonnell?
A Yes.
Q Why?
A Because the Healthcare Leaders Reception was an annual event held at the Governor's Mansion to recognize healthcare leaders, and I was given the opportunity to invite people, doctors, to the reception.
Q What do you mean you were given the opportunity?
A Maureen McDonnell called me and said, you know, invite all the doctors that you want to invite to the Healthcare Leaders, to the meeting.
Q And who did you want to invite?
A Besides local physicians?
Q Yes.
A Dr. Ladenson and a colleague of his, Dr. Crantz.
Q And how about Star folks?
A Yes, employees from Star as well.
Q And did you want to go?
A I did.
Q Okay. And can we go -- well, hold on before that.
When you said that you wanted to invite local doctors, why did you want to invite local doctors?
A Because they would be there and see that our company was there, and we would get the opportunity, at the

Governor's Mansion at the reception, to talk to various doctors.

Q And what were you hoping these doctors would do?

A I was hoping they would do the same thing that we were traveling around the country for is to share with them what we had discovered and to learn about Anatabloc.

Q But did you want them to do something with their patients after they learned about all this?

A I did. I wanted them to use the product because it would be good for the company.

Q Okay. And let's go to the top portion of the e-mail. This is Ms. McDonnell response, and you're cc'd on this. All right. I'm going to read this. Just let me know if it's incorrect.

"P.S. By the way, the docs we are identifying for the reception are healthcare industry leaders in Virginia.

Thanks, Carolyn! We appreciate the list of docs that you sent, but wanted you to know that you didn't have to limit them to this area. It's a reception for healthcare leaders from all over the state of Virginia, so please expand on your list. I checked our number of invites, and if Jonnie has any more than these 39 docs, send them along because we have room to invite more. We may already have some of these docs on our invite list.

So if you can put them in alphabetical order, we can run your list against ours and remove the duplicates. We're actually sending out invitations this week, and I was wondering if you also have the physical addresses of the docs you're referring? If so, and if it's not too much trouble, could you send them over to us? Thanks so much for your help."

Did you think it was a benefit to your company that you'd be able to invite who you wanted to the Healthcare Leaders Reception?

A I did.

Q Why was that --

A Well --

Q -- just briefly?

A Anytime in front of the showcase of the Governor's Mansion, the credibility that comes with presenting your product to someone, it automatically takes on an importance from the credibility.

Q Okay.

MR. DRY: I'd like to bring up Government's Exhibit 312. And, Your Honor, Mr. Williams isn't on this e-mail, but I believe it's been stipulated to authenticity, and we'd like to admit Government's Exhibit 312 into evidence at this time.

THE COURT: It will be admitted.

MR. DRY: Okay. Let's go to the bottom e-mail first -- or the middle e-mail. No, no. That's -- there we go. Thank you, Ms. Taylor.

BY MR. DRY:

Q Okay. This e-mail here says from Jonnie Williams, Jr. Who is that?

A My son.

Q And it's to Maureen McDonnell, and it says, "FD: Anatabine clinical studies - UVA, VCU, JHU. Please let me know if this helps. I have not heard from my father on that" -- "on this yet."

Why is your son e-mailing Ms. McDonnell this information?

A I'm not sure I understand this. Is -- is --

MR. DRY: We can go down. Go down a little bit so he can see.

BY MR. DRY:

Q And, in fact, I've got a paper copy of this if you want to just take a minute to look at it, sir. I know that you're not on this e-mail.

THE WITNESS: Thank you.

BY MR. DRY:

Q Let's just do it this way. Is this Mr. Lanier e-mailing your son and then your son forwarding the information to Ms. McDonnell about who the contact

information is at --
A Yes.
Q -- UVA?
A I understand what it is now. It just --
Q It's okay.
A It just didn't make sense the way it was -- to me.
Q On the screen.
A I didn't understand it.
Q Okay.
MR. DRY: And then can we go to the top e-mail, please?
BY MR. DRY:
Q And, sir, that e-mail is from Ms. McDonnell. Do you know who rfmva09@gmail.com is?
A The Governor of Virginia.
Q And then it's got a separate e-mail, Bob McDonnell.
Do you know who Jasen Eige is?
A He's a lawyer for the Governor for the state of Virginia.
Q Okay. And can you read that to me?
A Which part?
Q What she wrote.
A "Here's the info from Jonnie. He has calls in to VCU and UVA and no one will return his calls."
Q Did you have a conversation with Ms. McDonnell in

which she talked to you about what she did with the information that she had requested from you, the contact information that your son had sent?

A She said she forwarded it to her husband.

Q At the time of this e-mail, had you actually written another check for any additional loans to the beach properties?

A No.

Q Okay.

MR. DRY: I'd now like to show Government's Exhibits 318, please. And let's go to the bottom e-mail first, please.

BY MR. DRY:

Q This is an e-mail from the Governor to you; is that correct, sir?

A It is.

MR. DRY: I'd like to admit Government's Exhibit 318 into evidence.

THE COURT: It will be admitted.

BY MR. DRY:

Q And, sir, Ms. McDonnell is not on this e-mail; is that correct?

A That's correct.

Q And the date of the e-mail is February 16th, 2012?

A Yes.

Q It says, "Johnnie. Know u have been slammed. Do u want me to call your lawyer on the certificates and the documents. Thanks for all your help. Gov."

First of all, is that the correct spelling of your name?

A No.

Q When the Governor references "know u have been slammed," what is he talking about? Generally, what is going on with this e-mail?

A Well, we had had a conversation where I discussed with him that I had been really busy, and we had conversations -- where it refers to "certificates and the documents" -- was possibly loaning his stock certificates so that he could borrow money against them.

Q Let's talk about that a little bit. What -- when you say loan him stock certificates, first of all, stock certificates in what?

A In Star Scientific.

Q And whose stock certificates were those?

A They were mine.

Q And your conversation with the Governor, what was the plan or the discussions about loaning stock certificates?

A We had a conversation where I wasn't exactly sure, from talking to his brother-in-law, just how deep this hole was at Sandbrige and how much money it was going to

take. So I thought a way to keep him out of my cash would be that I would just loan him -- take some certificates and split them into individual certificates, maybe take them out of the airplane account, since there were shares over there, and let the Governor either sell those or borrow money against those as he needed them once they determined what the amounts were that they needed monthly for the cash deficiencies at Sandbrige.

Q All right. Well, let's a step back. Stock certificates. Are these literally pieces of paper that is shares of Star Scientific stock?

A Yes.

Q And whose name are those in, if they're yours?

A They're in my name, or if they're in the airplane account, they're in Starwood Aviation.

Q Fair enough. And you're talking about physically delivering stock certificates to who?

A To the Governor's broker, stockbroker.

Q Okay. And were the -- in the initial discussions, were the shares going to be transferred out of your name?

A No. They would have a stock power signature guaranteed from me, attached to the certificate so that he could borrow against it. But the idea was is that okay, the lending institution has the ability to take that once I've signed it.

Q Okay.
A But it would stay in my name for purposes of, you know I wanted to keep the stock certificates in my name.
Q Well, why did you want to keep the stock certificates in your name?
A I didn't want anyone to know what I was doing.
Q What does that mean?
A I didn't want to see stock certificate shares being transferred to the Governor of Virginia.
Q All right. If you physically -- or if you actually transferred the shares into the Governor's name, what's the process that that would require?
A It would be sent to the transfer agent with that stock power, as I just described, and the stock -- the stock transfer agency, which is usually a bank that administers and keeps the accounting of the shares of a company, of who owns what, they would then transfer those as per the instructions with the stock power being signature guaranteed and signed.
Q Okay. So the stock power basically allows whoever -- if you don't do it that way and you just put a stock power with the certificate --
A Yes.
Q -- and the Governor would borrow against that --
A Yes.

Q -- is that right?
A That's correct.
Q And if for some reason the Governor didn't pay back the loan --
A Right.
Q -- then what could the lender do, based on that stock power?
A They would take the stock and sell it to cover the loan.
Q Okay. But the benefit of this, in your mind, this approach, was what?
A It was two-fold. It was, one, to keep them out of my cash, since I had the certificates and had no intentions of selling them, and that would facilitate whatever these cash needs were going to be down here in Virginia Beach. And the second one was I didn't want anyone to know.
Q Why don't you want people to know that you're loaning the Governor money?
A I think it's a problem.
Q What does that mean, sir?
A I think it's a problem -- I think a problem with why I'm loaning the money.
Q All right. Well, why are you loaning the money?
A I'm loaning him money to help me.
Q Help you do what, sir?

Let's stop beating around the bush. Why are you not wanting people to know that you're loaning the Governor money?

A It may be wrong. I think it's wrong. It could be wrong, and it could be -- it could be violating laws. I don't know that, but it could be.

Q You knew it was wrong, and you were hiding it?

A I knew it was wrong. I was uncomfortable. I didn't think I should have to be doing this.

Q I understand you keep saying --

A Yeah.

Q -- you shouldn't have to be doing this.

A Yeah.

Q But it was your choice, right?

A I made a bad decision. I knew it was wrong. I thought the ends justified the means for what I was trying to accomplish here in Virginia, and I made a mistake. It was a bad mistake. I should have never written the checks.

Q When you're talking about stock certificates with the Governor, did the subject of whether you were going to document this -- this new loan come up?

A Yes.

Q Tell the members of the jury about that.

A I met with the Governor and discussed it.

Q And what?
A I told him I would just as soon keep it between us with a handshake.
Q And what did he say?
A He had his own disclosure issues.
Q Did he say he had his own disclosure issues?
A He did.
Q In your conversations with the Governor about this stock plan, did the two of you discuss whether you would have to report the transaction to the SEC?
A I told him that I believe I was required to report it, and his position was is he didn't understand why because you wouldn't have to list the person that it was transferred to. And I told him I needed to check into that because I wasn't sure of that under Sarbanes-Oxley laws, under the disclosure. I wasn't sure about that, whether it could be done without it showing who they would be transferred to.
Q Well, hold on. Let's talk about that a little bit. First of all, the SEC is the Securities and Exchange Commission?
A That's correct.
Q And when you transfer -- if you had transferred shares using the transfer agent so that the shares were actually in the Governor's name, the transfer agent would

know about that, right?
A That's correct.
Q And would lawyers at Star know about that?
A That's correct.
Q And the lawyers at Star would have required you to do what, if they had known you had done it?
A They would have stopped it. But I would have been required to file a Form 4 with the Securities and Exchange Commission within, I believe, 48 hours.
Q Okay. Well, let's talk about that. What's a Form 4?
A A Form 4 is a disclosure form from the Securities Exchange that anytime you have any changes to your beneficial ownership, you're required to file that document.
Q So is it fair to say there was no way for you to get the stock certificates into the Governor's name without other people knowing?
A That's what I had learned.
Q You mentioned Sarbanes-Oxley. What's Sarbanes-Oxley?
A Sarbanes-Oxley is law that was passed to strengthen the disclosure of companies in transactions, financial transactions to the shareholders.
Q And financial transactions of whom?
A It's complicated. There --
Q Well, let's put it this way. Does Sarbanes-Oxley

apply to you as the CEO of a publicly traded company?
A Yes, I believe so.
Q And that requires -- that puts restrictions on and disclosure requirements on you as CEO, right?
A That's correct. That's my understanding.
Q And is Sarbanes-Oxley often referred to as Sarbox?
A It is.
Q During your conversations with the Governor about you providing this additional money to him, is Maureen McDonnell present?
A No.
Q Is anybody else present?
A No.
Q During these conversations, does the subject of UVA and VCU come up, the studies at UVA and VCU?
A In a phone call.
Q Okay. Let's --
A Let me back up. I'm not sure if you are referring to the -- the conversation in person or in phone calls. I need to make sure I understand what your questions are.
Q My question --
A Your question is.
Q -- is during your conversation with the Governor about you providing him money, was anything mentioned about UVA and VCU studies?

A During this dialogue over a period of time?
Q Yes.
A Yes.
Q What?
A He said -- he called me and he said, "I'm following up with the situation over at UVA," and then it shifted to that he needed some more money for Sandbrige.
Q Do you remember the exact date of that conversation?
A I think it was the day of the Healthcare Leaders meeting.
Q Well, let's talk about the Healthcare Leaders meeting.
MR. DRY: I'd like to show Government's Exhibit 341, please. This has been stipulated to, and the government would move to admit 341 into evidence.
THE COURT: It will be admitted.
BY MR. DRY:
Q Going down to the bottom, please, can you blow up the -- or actually, on the top right-hand corner, what's the date there, sir?
A February the 29th, 2012.
Q And it says "Building: 706 - Patrick Henry Building," correct?
A That's correct.
MR. DRY: If we can scroll down, I think it's

fourth from the bottom.

BY MR. DRY:

Q Do you see your name there, "Jonnie Williams"?

A I do.

Q And in the "Agency Name" it says "Gov," correct?

A Yes.

Q And that's a "3r" and "Room Destination" of 1:25, correct?

A Yes.

Q Now, is this the same day as the Healthcare Leaders Reception event?

A Yes.

Q And did you have a private meeting with the Governor that day?

A Yes.

Q How did that meeting come about?

A In a conversation with -- I'm not sure exactly the time and how it was arranged, whether it was with the Governor or Maureen McDonnell.

Q All right. So either a conversation with either the Governor or Ms. McDonnell --

A -- about the setting up of the meeting.

Q About the setting up of the meeting. And where was this meeting held at?

A In a conference room at the Patrick Henry Building.

Q Okay. Who else was present for the meeting?
A No one. The Governor and I.
MR. DRY: All right. I'd like to -- this has not been stipulated to, but I'd like to pull up Government's Exhibit 2, but only the third page. And I'd like to move this page into evidence.
THE COURT: It will be admitted.
MR. ASBILL: No objection.
BY MR. DRY:
Q Okay, sir. Do you recognize those notes?
A I do.
Q And, sir, in the middle of that page, whose notes are those or whose handwriting is that?
A That's mine.
Q Okay. And the top of the page, is that your handwriting?
A No.
Q And the bottom of the page, is that your handwriting?
A No.
Q Do you recall, at this February 29th, 2012, meeting scribbling down these notes?
A I do.
Q When it talks about 50,000 -- and this meeting is with the Governor?
A Yes.

Q Is the top portion of your part of it, "50,000 SHS M," what does that refer to?
A This was -- that, in particular, refers to loaning them 50,000 shares at that point. It's one of the options that we discussed was loaning them 50,000 shares so that they could borrow against it.
Q Well, let's talk about that for a second. You've previously talked about, I believe, the stock power of attorney idea where the shares won't leave your name --
A Right.
Q -- but they'll -- they'll borrow money against that, right?
A Right.
Q Were there discussions about rent?
A There were.
Q Tell the jury about that.
A Well, it was considered that I could rent the house down at Virginia Beach and help them with it that way and just write the checks as rent.
Q Did you have any intention of renting those beach houses?
A No.
Q Okay. Now, you said that this was about loaning the shares. How many shares was being discussed?
A 50,000 shares.

Q And there's a notation to the left, it looks like "$.10."

A Yes.

Q What does that mean?

A That means -- what was going on right here is let's suppose that I loaned him 50,000 shares. He borrows the money against the 50,000 shares. The stock price goes up or the shares are called in or sold and the stock price goes up. He would be on the hook and have an obligation to purchase those shares back at a higher price to return those.

Q Okay.

A And one of the ways to address that was I had options, a security to purchase shares in the future at a price that were below the market. So I suggested to the Governor maybe you could buy 50,000 of these at $.10 and that would cover -- if the stock ran up, that would cover it.

Q All right. Well, let's break that down a little bit. All right. First of all --

A That would cover your exposure for the difference between what you're borrowing and what the increased appreciation could be. That would cover that exposure.

Q Okay. First of all, let's -- let's unwind that a little bit.

A Okay.
Q So you have stock in Star Scientific, right?
A Yes.
Q And you have what's called options?
A I own options also. It's securities. It's part of my ownership.
Q Okay. And an option is basically a right to purchase the stock at a certain price?
A At a certain price and at a certain time.
Q At a certain price, at a certain time. Okay. Now, you're discussing a way that you could protect the Governor from the danger of giving him shares, him selling them and then him being on the hook to give you back those shares at a higher price; is that right?
A That's correct.
Q Okay. Now, you're offering to sell him those options at $.10, right?
A Yes.
Q How much were those options worth at this point?
A Probably a dollar.
Q Okay. So if you sold him 50,000 options at $.10 a piece --
A Right.
Q -- how much would he owe you?
A $5,000.

Q And how much were those options worth at that time?
A 50,000.
Q Okay. And what would happen if -- what was the benefit to him?
A Well, if he owned the options -- if he bought the options and he just borrowed the money, it could repay the money. But if the stock appreciated, the options would cover the entire loan, if the -- if the appreciation was enough.
Q What was Mr. McDonnell's reaction to this discussion?
A These were just options we were sitting there discussing.
Q Okay. Does the subject of reportability come up in this meeting?
A Yes.
Q In what context?
A He says -- he said, "I have disclosure. I have reporting requirements," and I said, "So do I."
Q And was he saying "I want to report this" or "I don't want to report this"? And when I say "this," I'm talking --
A I said that I'd just as soon keep this between us and no one know this.
Q And what was --
A And he said that was fine with him. And that's why

no lawyers were contacted after that.
Q Did you do the $.10 option plan?
A I did not.
Q Why not?
A Because I later found out I would have to disclose that also.
Q So in order to transfer the shares, the options to Governor McDonnell, what would have had to happen?
A I would have had to file Form 4s with the Securities and Exchange Commission and disclose who they were transferred to.
Q Okay. And would lawyers have known if you had transferred -- was there a way for you to transfer those options to the Governor without lawyers knowing about it?
A No.
Q Was there a way for you to transfer those options to the Governor without the transfer agent knowing about it?
A No.
Q Okay. Why didn't you want to do the option plan because it would be reported?
A I didn't want anyone to know about it, once I found out it was the same situation with restrictions of transferring the shares.
Q And why didn't you want anybody to know about it?
A I didn't want anyone to know that I was helping the

Governor financially with his problems while he was helping our company.
Q After your meeting with the Governor, did you attend the Healthcare Leaders Reception?
A Yes.
Q And that was the event that Ms. McDonnell told you that you could invite people to?
A Yes.
Q I'm just curious, at this point was Mary-Shea Sutherland, had she left Ms. McDonnell's employment?
A Yes.
Q Okay. And she left back in September of '11, right?
A I don't recall the specific month, but I -- she had left.
Q Did all of the people that you invited actually attend the event?
A Not all of them.
Q Okay. But did you have Star Scientific folks there?
A I did.
Q Your son attended?
A David Dean.
Q David Dean. Who is who?
A Head of sales.
Q And did anybody -- Dr. Ladenson?
A Dr. Ladenson, at this point, we had retained as a

consultant to the company.
Q Okay.
A And --
Q And did he bring somebody?
A Dr. Crantz, a colleague of his, an endocrinologist from McLean, Virginia.
Q Okay. Let's go -- and there were several doctors that you were trying to get to sell -- or convince that Anatabloc was good for the local area, right?
A Yes.
MR. DRY: Let's go to Government's Exhibit 334, please?
BY MR. DRY:
Q Do you recognize this picture, sir?
A I do. I'm standing beside Dr. Crantz.
Q All right. That's a picture of you at the Healthcare Leaders Summit, correct?
A It is.
Q Or Healthcare Leaders Reception.
MR. DRY: Government moves to admit Government's Exhibit 334 into evidence.
THE COURT: It will be admitted.
BY MR. DRY:
Q Okay. Sir, that's you in the middle with your arms crossed?

A Yes.
Q And I think you've already said this, but I just want to clarify. To your right with the white hair, who's that gentleman?
A That's Dr. Crantz, Dr. Ladenson's friend.
Q And Dr. Ladenson was the Johns Hopkins researcher, right?
A He's the chief of endocrinology at Johns Hopkins School of Medicine.
Q And I think you said Star had retained his services, right?
A Yes.
Q Did the Governor announce Dr. Ladenson's attendance at the event?
A He did.
Q How did that come about?
A While the Governor was speaking, I asked Maureen to go over and have the Governor recognize Dr. Ladenson as a special guest that evening.
Q And what did she say?
A Okay.
Q And did she go up to the Governor?
A She did.
MR. DRY: Can we bring up Government's Exhibit 338 into evidence? Government would move Government's

Exhibit 338 into evidence.

THE COURT: It will be admitted.

BY MR. DRY:

Q That's a picture of the Governor and Ms. McDonnell at the event?

A Yes.

MR. DRY: Then let's bring up Government's Exhibit 336 into evidence. Government would move Government's Exhibit 336 into evidence as another picture from the Healthcare Leaders Reception.

THE COURT: It will be admitted.

BY MR. DRY:

Q And this is while the Governor is making remarks, sir?

A Yes.

MR. DRY: I'd like to move -- come up -- Government's Exhibit 337 into evidence, please.

THE COURT: It will be admitted.

BY MR. DRY:

Q Sir, you're on the left by the pillar?

A I am.

Q And to the left of you is who?

A Dr. Crantz.

Q And to the left of him in the back with the white hair next to Dr. Crantz, who is that?

A That's Dr. Ladenson.
Q Were you happy about the Governor recognizing Dr. Ladenson at this event?
A I was.
Q Why?
A It drew the attention in the place that Dr. Ladenson was important.
Q And if Dr. Ladenson is important, who is he representing at that event?
A Star Scientific.
MR. DRY: Can we bring that down, please?
BY MR. DRY:
Q After the reception, did you go out to dinner that evening?
A I did.
Q Who did you go with?
A The Governor and Ms. McDonnell, Dr. Ladenson, Dr. Crantz, David Dean, and myself.
Q And where did you go?
A A couple of blocks from the Governor's Mansion, a restaurant called La Grotta.
Q Okay. And what was discussed at the dinner?
A Anatabloc.
Q Okay. And were there often occasions where you were with the Governor that you didn't discuss Anatabloc?

A I don't recall -- I don't recall any.

Q All right. Well, let's bring up Government's Exhibit 346 into evidence. This is an American Express bills for Mr. Williams. Government would move Government's Exhibit 346 into evidence.

THE COURT: It will be admitted.

BY MR. DRY:

Q And the top of this bill, the closing date is March 29th, 2012, Mr. Williams.

MR. DRY: Can we go down?

BY MR. DRY:

Q Do you see an entry for La Grotta?

A Yes.

Q And the date not of the charge, that's February 29th of 2012?

A Yes.

Q And what was the cost of the dinner?

A $1,423.19.

Q Did you pay the entire bill?

A I did.

Q And just so we're clear, is this your personal credit card or is this your corporate card?

A It's the company one.

Q Okay. So included in this bill is whenever you travel on company business, things like that?

A When I'm working.
Q Okay.
MR. DRY: Can we bring that down, please?
BY MR. DRY:
Q Did anybody offer to pay other than you?
A No.
Q Okay. Mr. Williams, we've talked a lot about your cars and your homes a little bit, but just -- let's be clear. You've traveled around in a private jet for a long time, haven't you?
A Over 20 years, 25 years.
Q And what are some of the kind of cars that you own or have owned?
A All sorts, Ferraris, Aston Martins, Range Rovers.
Q Rolls-Royce?
A One time. I didn't care for it.
Q Okay. And you own a lot of homes?
A A few homes.
Q And you've -- your homes are nice homes. They're typically more than a million dollars a piece, aren't they?
A They are.
Q And many of your expenses, Star Scientific would reimburse you, didn't they?
A Yes.

Q What kind of expenses did Star Scientific reimburse you for?
A Mostly travel and entertaining people, dinner, New York, California, meeting with investors, travel-related expenses.
Q And when you travel, you travel in style, generally, nice rooms, nice hotels, right?
A Generally.
Q Okay. Did anyone at Star Scientific review your -- the expenses that you charged to the company?
A The chief financial officer.
Q But where is he in the food chain at the company? Is he above you or below you?
A Below.
Q Did you expense to Star Scientific things that you bought for the Governor and his wife and his family members?
A Such as?
Q Dinners, golf clubs.
A Yes.
Q Okay. Kinloch golf outings?
A Yes.
Q But did you expense -- I think you referred to it as this, the shopping spree for Ms. McDonnell, did you expense that to Star?

A No.
Q Why not?
A It was out of line. It wasn't normal for me to do anything like that.
Q Well, and isn't it true that the CFO would have seen that, right?
A Yes, he would see that.
Q And that would -- that might be questioned, wouldn't it?
A I would hope so.
Q Did you expense the Rolex that you bought for the Governor?
A No.
Q Why not?
A I didn't want anyone to know about it.
Q Did you inform the other executives at Star Scientific that you were loaning money to the Governor?
A No, I did not.
Q Other than Ms. Fulkerson, did anybody know at Star Scientific?
A No one.
Q Why not?
A I didn't want anyone to know what I was doing.

MR. DRY: Let's -- let's bring up Government's Exhibit 348, please.

BY MR. DRY:
Q Mr. Williams, this is an e-mail from John Piscitelli to you, correct?
A It is.
MR. DRY: Government would move Government's Exhibit 348 into evidence.
THE COURT: It will be admitted.
BY MR. DRY:
Q And, sir, the subject of this is "Transfer instructions"?
A Yes.
Q And this is March 2nd of 2012?
A Yes.
Q Who is John Piscitelli?
A He's a stockbroker at Davenport & Company for the Governor.
Q Did you know that Mr. Piscitelli was going to be e-mailing you with transfer instructions?
A Yes.
Q But -- and you talked to the Governor about that?
A I did.
Q Now, in the fourth line down, it says "For Further Credit." Who is that to?
A It's for further credit to the McDonnells' account 7502-4806.

Q Now, it talks about "Incoming Fed Wire Instructions." Is there a distinction between transferring shares this way, according to these wire instructions, and the way we talked about earlier with the stock certificates --
A Yes.
Q -- and the power of attorney?
A There is.
Q And what is that?
A The DTC system is set up for brokerage firms to transfer shares electronically from one brokerage firm to another.
Q Okay. And were you excited about the idea of electronically sending shares over to Davenport?
A This was in a time frame of when it was being considered whether it had to be disclosed with filings at this point.
Q If you had transferred the shares -- could you transfer shares, first of all, in stock certificate form or would they have to be held --
A No. It would be electronically. The shares would follow at some point.
Q Okay. So you would have to have shares in a brokerage account?
A Yes.
Q And then you would have to transfer those shares into

the McDonnell brokerage account?
A That's correct. Electronically they would show up, and the paperwork would follow.
Q Okay. Did you want to transfer the shares electronically?
A I couldn't do that.
Q Why?
A Because I found out that it would have to be disclosed.
Q Did you have any discussions with a man named John McKeon about the idea of transferring shares to the Governor?
A I did.
Q What were those discussions?
MR. ASBILL: Hearsay. Objection.
THE COURT: You need to stand up when you address.
MR. ASBILL: I'm sorry, Your Honor. I object.
MR. DRY: They're not for the truth of the matter asserted, Your Honor.
THE COURT: The objection is sustained.
BY MR. DRY:
Q Did you ask Mr. McKeon to do anything regarding the transfer of the shares to the Governor?
A I did.

Q What did you ask him?

A I asked him if he would loan the shares to the Governor because the Governor was in financial trouble.

Q And did you explain to him why you wanted him to do it?

A I told him that, you know, I was too close to it.

Q And did he agree to transfer the shares?

MR. ASBILL: Objection.

THE COURT: Sustained.

A He said he would sleep on it.

THE COURT: Sustained.

BY MR. DRY:

Q Stop.

THE WITNESS: Sorry. Sorry.

BY MR. DRY:

Q Ultimately, did Mr. McKeon transfer any shares?

A No.

Q Okay. After the e-mail from Mr. Piscitelli March 2nd -- can we pull that down, please? -- did you have a discussion with the Governor in which you told him that you couldn't transfer the shares?

A Yes.

Q And what did you tell him?

A I told him it was unavoidable and that I needed to just loan him the money and write a check.

Q What was unavoidable?
A The disclosure.
Q And what was his reaction to this?
A Okay.
Q And, sir, I'm sorry. Let me just back up for one second. Mr. McKeon, is -- what's your relationship with Mr. McKeon?
A He's a friend of mine.
Q Is he also a shareholder?
A Yes, he is.
Q Okay.

MR. DRY: I'd like to now go to Government's Exhibit 347, please.

BY MR. DRY:

Q Sir, this is a questionnaire that attorneys from Star Scientific ask you to fill out, correct, a disclosure requirement?
A It's an internal one at the company.

MR. DRY: Okay. Would move Government's Exhibit 347 into evidence.

THE COURT: It will be admitted.

BY MR. DRY:

Q What's the purpose of this internal questionnaire?
A It's a questionnaire sent to the officers and the directors of the company so they can obtain the materials

that they need in order to accurately prepare the company's security exchange filings.
Q So is this information used by the company's lawyers to complete like the annual report?
A That's correct.
Q And who does the annual report go to?
A The shareholders.
Q And what was your understanding of your legal obligations to be truthful to shareholders?
A My understanding was to be truthful to the shareholders.
Q All right. Well, let's -- let's talk about that a little bit. Going to -- and you knew that you had disclosure requirements to shareholders, right?
A I did.
Q And you knew generally that it was prohibited for you to give things of value to government officials in return for stuff, right?
A I did.
Q And you knew that if you were going to do that, that would be something that you'd have to report. You knew that, right?
A Yes.
Q Well, let's go to -- let's go to the sixth page of the exhibit.

A I knew that in general. Not from in writing and documents, but I just -- my general understanding.
Q You knew it?
A I knew it.
Q All right. Well, let's go to the question 11. I'm going to read this and you make sure that I've read this correctly. "I have knowledge, or a reason to believe, that the company, at any time since January 1, 2011, has or may have engaged, directly or indirectly, in: Any bribes or kickbacks to government officials (both domestic and foreign) or their relatives, or any other payments to such persons, whether or not legal, to obtain or retain business or to receive favorable treatment with regard to business."
Did I read that correctly?
A Yes.
Q And that's marked false, right?
A Yes.
Q What box should have been checked?
A It should have been true.
Q Why?
A It should have been true because I was making payments.
Q And you were making payments in exchange for what?
A To help our company.

Q And at this point you had already loaned the McDonnells $50,000, right?
A Yes.
Q And you had already given a 15,000-dollar check for the wedding reception?
A Yes.
Q You had already had the shopping spree, the Rolex, the vacation, right, all of that?
A Yes.
Q The dinners, golf clubs, all of that?
A That's correct.
MR. DRY: Let's go to the eleventh page of the exhibit. I'm sorry. It should be 681 on the bottom. I think the next page. The top of that, please.
BY MR. DRY:
Q This is the Signatures and Certifications block, right?
A Yes.
Q I'm just going to read to you the second paragraph in the first block. "I understand that the information that I am furnishing to you herein will be used by the company in the preparation of the annual report. The answers to the questions set forth above are accurate and complete to the best of my knowledge."
Did you sign that?

A It's not my signature, but I authorized it to be signed.
Q Okay. That's Jerri Fulkerson's signature?
A It is.
Q And you told her to sign it?
A I did.
Q And the date was March 12 -- 2nd of 2012, right?
A Yes.
Q Did you even bother to review this document before telling her to sign it?
A I did not read it.
Q But you knew generally, you knew that you had to keep what you were doing with the Governor secret, didn't you?
A I did.
Q If you had read it, would you have checked that box any differently?
A No.
Q You would have still lied, right?
A I didn't want anyone to know.

THE COURT: All right. We are going to stop here for lunch. It's 1:00. If you all could come back, let's make it five after 2, we'll get started with the afternoon session.

(The jury left the courtroom.)

THE COURT: All right.

(Luncheon recess taken from 1:05 p.m. to 2:05 p.m.)

THE COURT: All right, bring in the jury, please.

(The jury entered the courtroom.)

All right, Mr. Dry?

BY MR. DRY:

Q Mr. Williams, I think where we finished up was the March 2nd of 2012 disclosure, the Internal Disclosure Form. I'd like to now bring up what's previously been admitted as Government Exhibit 352. Can we blow up the top portion, please? Sir, this is a check written to MoBo Realty in the amount of $50,000 off of Starwood Trust. What is Starwood Trust?

A It is a trust that my children are the beneficiaries of.

Q Okay, sir. And who is the trustee of this trust at this time?

A My brother, Donnie Williams.

Q Okay. And Donnie was the trustee, but were you making decisions regarding what happened in the trust?

A Yes.

Q And if the trust was writing checks, typically you would authorize those and Ms. Fulkerson would check with your brother; is that right?

A Yes. In this case I called my brother, also.

Q You called your brother and explained to him you were going to do this $50,000 check?
A Yes.
Q Okay. Did you instruct Ms. Fulkerson to write the check after speaking with your brother?
A I did.
Q Why is the check written to MoBo Realty, sir?
A That's who I was asked to have the check made out to.
Q Asked by whom?
A I believe Maureen or the Governor, one or the other.
Q One or the other?
A Yes.
Q Did you know what MoBo Realty was?
A Somewhere through here, I had learned what it was from the brother-in-law, I believe, earlier on talking about it.
Q Okay. And what was your understanding when you wrote this check of what MoBo Realty -- instructed Ms. Fulkerson to write the check, what MoBo was?
A MoBo Realty was, I don't know the legal entity of it, but it was a partnership owned by the Governor and his wife, and the Governor's sister and her husband.
Q Okay. And the Governor's sister was Maureen Uncapher at this time?
A I believe so.

Q Now, were you aware that there were checks that were voided out?
A I've learned that.
Q Okay. But at the time you didn't --
A I didn't pay any attention to it.
Q And did you instruct Jerri Fulkerson not to have Maureen McDonnell's name on the checks?
A All I can tell you is that I just had the check made out to who I was told by the Governor or his wife who to ultimately make it out to.
Q So you don't remember a specific conversation with Jerri Fulkerson about that?
A As I sit here, I don't.
Q Now, what was this $50,000 for? What was it?
A It was additional money to help them out with the beach property.
Q Okay. And so I think you previously testified you didn't do the stock transaction, right?
A That's correct.
Q And so was this basically a way to get more money to the Governor and his family?
A It was.
Q Did you ever have any loan paperwork associated with this new $50,000 loan?
A No.

Q And at the time that you wrote this check, what did you expect to get in return from the Governor?
A I expected what had already happened, that he would continue to help me move this product forward in Virginia.
Q And how, sir?
A Whether it was assisting with the universities, with the testing, or help with government employees, or publicly supporting the product.
Q Now, after this $50,000, did you give another $20,000 to the McDonnells?
A I did.
Q Let's bring up Government Exhibit 374, please. The top e-mail is from Jerri Fulkerson on behalf of you to Mr. McDonnell, correct?
A Yes.

MR. DRY: I'd like to move for the admission of Government Exhibit 374.

THE COURT: It will be admitted.

BY MR. DRY:
Q Now, going to the bottom e-mail, sir, that's from Mr. McDonnell to your e-mail account, correct?
A Yes.
Q And that says, "Can you talk tomorrow for a few minutes on Sandbridge. Hope all is well. How is your golf game. Best to Celeste." And Celeste was who?

A My wife.
Q And Sandbridge, what did you understand him to be talking about as far as a few minutes on Sandbridge?
A That they needed some more money.
Q Okay. And the date? When you say "they," who?
A The Governor and his wife.
Q And the date of that e-mail is May 14th, 2012?
A Yes.
Q And on the top of it, Ms. Fulkerson responds and says: "Jonnie asked me to send you an e-mail asking you to call him at your convenience. He is available all day." There is a number listed. Is that your cell phone number?
A It is.
Q Is Ms. McDonnell on this e-mail? Either one of them?
A I don't see it.
Q Okay. Let's go to Government Exhibit 375. That is very small. So let's go to the second, I think it is blown up. This is a text message from you to the Governor on May 14th, 2012 at 1:20 p.m. Correct?
A Yes.
MR. DRY: Government would move Government Exhibit 375 into evidence.
THE COURT: It will be admitted.
BY MR. DRY:

Q Sir, that basically just says, "Got e-mail, call any time. Jonnie." Correct?
A Yes.
Q These text messages were just between you and the Governor, correct?
A That's correct.
Q Government Exhibit 379, please. This is an e-mail from the Governor to you on May 18th, 2012 at 5:26 p.m., correct?
A Yes.
MR. DRY: The government moves for admission of Government Exhibit 379 into evidence.
THE COURT: It will be admitted.
BY MR. DRY:
Q The date of that text message is May 18th. That's four days later, right?
A Correct.
Q And Mr. McDonnell writes: "Johnnie. Per voicemail, would like to see if you could extend another 20k loan for this year. Call if possible and I'll ask Mike to send instructions. Thx. Bob." Did you receive this text message, sir?
A I did.
Q First of all, is that the correct spelling of your name?

A No.
Q Government's Exhibit 380, please. Now, this is a text message from you to the Governor at 5:38 p.m., correct?
A Yes.
Q That's basically 12 minutes after that other text message was sent to you, right?
A Right.
Q And in this one, you write: "Done. Tell me who to make it out to and address. Will FedEx. Jonnie." Why are you asking him who to make it out to?
MR. DRY: I'd like to admit Exhibit 380 into evidence, Your Honor.
THE COURT: It will be admitted.
BY MR. DRY:
Q Why are you asking the Governor who to make the check out to?
A I have no idea who to make the check -- who he wants the check written to.
Q Now, you say yes within 12 minutes. Did you have a conversation with the Governor about what the terms of this new $20,000 loan was going to be?
A I don't recall having that conversation.
Q So did you think it was going to be -- what did you think the terms were going to be?

A Whatever the ones were before.
Q Okay. And was there a written loan agreement for this one?
A No.
Q Let's go to Government Exhibit 389, please. This is a text message from you to the Governor, 5/25 2012 at 12:02 a.m.; is that correct?
A Yes.
MR. DRY: Government moves Government Exhibit 389 into evidence.
THE COURT: It will be admitted.
BY MR. DRY:
Q There, you say, "MoBo was done Tuesday. Golf game improving. Hope to play with you and Phil Homestead. Star doing great. Jonnie." You say MoBo was done Tuesday. Is that because you had sent the money, the $20,000?
A Yes.
Q And these text messages that we have just gone over, those were just between you and the Governor, correct?
A Yes.
Q Let's go to Government Exhibit 390, please. Now, this is a text message from the Governor to you, correct?
A Yes.
MR. DRY: The government would move Government

390 into evidence.

THE COURT: What's the number again?

MR. DRY: 390, Your Honor.

THE COURT: It will be admitted.

BY MR. DRY:

Q And this one, the Governor writes: "Thanks so much for the help. See you in a few weeks." You in fact loaned the Governor another $20,000, right?

A I did.

Q Now, this one, was it a check or a wire transfer? Do you remember?

A I don't recall. I don't know.

Q Okay. At the time that you loaned the money to the Governor, did you think he was your personal friend?

A No.

Q Why were you loaning him money, the next $20,000?

A I was loaning him money so that he would help our company.

Q Were there various times in 2012 that you and the Governor communicated about Star Scientific stock?

A Yes.

Q And let's do some examples. Government Exhibit 370, please. This is a text message from the Governor to you, correct? That's your phone number there?

A Yes.

MR. DRY: The government would request the admission of Government Exhibit 370 into evidence.

THE COURT: It will be admitted.

BY MR. DRY:

Q The date of this text message is April 28th of 2012.

A Yes.

Q So this is before the $20,000 that we just talked about, right?

A Right.

Q And it is sent at 1:59 a.m. Can you read what the Governor wrote to you there?

A "Stock going great. Alzheimers study announcement really helped. Thanks for coming to Romney event and helping him. Gov."

Q And you have had an opportunity to review these text messages before today, correct?

A I have.

Q And that makes it easier for you to read them?

A It does.

Q Can we go to Government Exhibit 392, please. Do you recognize this as an e-mail from Mr. McDonnell to you on June 13th, 2012?

A Yes.

MR. DRY: The government moves Government Exhibit 392 into evidence, Your Honor.

THE COURT: It will be admitted.

BY MR. DRY:

Q This is on June 13th, 2012. What does the Governor write to you there?

A "Stock looking good. Well done. Gov."

Q All right. Let's go to Government Exhibit 395, please. I believe this is already admitted. Now, the bottom e-mail is from the Governor to you. What does he say there, sir?

A It says, "Congrats on the patent for Anatabine. Progress continues."

Q Okay. And then Ms. Fulkerson forwards you that e-mail, right?

A Yes.

Q Do you see Ms. McDonnell on that e-mail at all?

A No.

Q Okay. Let's go to Government Exhibit 396, please. This is another text message from the Governor to you, correct?

A Yes.

MR. DRY: Government moves for the admission of Government Exhibit 396, Your Honor.

THE COURT: It will be admitted.

BY MR. DRY:

Q That's dated July 3rd of 2012, right?

A Yes.
Q Can you read what the Governor wrote to you there?
A "Good announcements lately. Stock looks good. Hope all is well. You and Celeste enjoy the 4th of July. Gov."
Q Was it unusual for you to get text messages from people about how Star Scientific's stock price was doing?
A No.
Q Why not?
A They generally comment when it is good and they generally comment when it is bad.
Q When you say "they" --
A Shareholders.
Q Did you and the Governor ever discuss the ownership of Star stock?
A He said he was a shareholder. I didn't know how many shares he owned, though.
Q What was the context of those conversations?
A Make a comment like, you know, "I'm a shareholder and I'm rooting for you."
Q Okay. And was that generally when you were discussing how things were going with Star?
A I can't say in particular.
Q Okay. But you know that you had those kinds of conversations.

A Yes.
Q Let's go to Government Exhibit 397, please. This is another text message from you to the Governor. This is July 3rd of 2012. Do you recognize this document, sir?
A I do.
MR. DRY: Government moves for admission of Government Exhibit 397 into evidence.
THE COURT: It will be admitted.
BY MR. DRY:
Q Now, sir, this is dated July 3rd of 2012, right?
A Yes.
Q I'm going to read this to you. "Johns Hopkins human clinical trials report on August 8th. If you need cash let me know. Let's go golfing and sailing Chatham Bars Inn, Chatham, MA, Labor Day weekend if you can. Business about to break out strong. Jonnie."
Did you in fact go on vacation with Mr. and Ms. McDonnell to Chatham Bars Inn?
A Yes.
Q Okay. And that was in September of -- from August 31st to September 31st of 2012?
A Yes.
Q But before that, in July of 2012, do you remember any discussions with Ms. McDonnell about a National Governors' Association meeting in Williamsburg that was going to be

held on July 12th?
A Yes.
Q Tell the jury about those discussions.
A She called and said she was in Williamsburg and that they were having the Republican Governors' Meeting there, and she said it would be a good opportunity to have Anatabloc there, but it was kind of late. And I said, "Well, I'll have someone run it down so that they can place it in the rooms for the governors."
Q And when you say "run it down," what does that mean?
A Deliver it.
Q And you are delivering samples of Anatabloc?
A Samples of Anatabloc, I believe to the Williamsburg Inn or wherever it was that they were staying.
Q Were you happy about this?
A Any time I have an opportunity to put Anatabloc in front of somebody, I feel good about it.
Q And was it good that these were governors?
A That was very good.
Q Okay. Now, let's go to the Chatham Bars Inn trip. What is the Chatham Bars Inn? What is that?
A It is a resort in Chatham, Massachusetts on the ocean, on the Cape.
Q And you went on vacation with Mr. and Ms. McDonnell to this resort, right?

A Yes.
Q Who was -- well, let's actually bring up Government Exhibit 412, please. Have you had an opportunity to review this picture before?
A I know that photo.
Q Okay. And can you just actually go through briefly, these are all pictures of Chatham Bars Inn?
A Yes.
MR. DRY: The government moves Government Exhibit 412 into evidence, please.
THE COURT: It will be admitted.
BY MR. DRY:
Q All right. Is this the front entrance, the front of the resort?
A It is not the entrance that you arrive at. It is actually that it is positioned that way overlooking the ocean. Guests normally aren't arriving and leaving from that entrance. That goes down to the ocean.
Q Okay. And who all accompanied you on this trip?
A My wife, Dr. Ladenson, his wife, the Governor, his wife, Phil Cox, his wife, and their young newborn child.
Q Was Phil Cox a friend of yours?
A No.
Q Who is Phil Cox?
A Phil Cox is, I believe he is the director of the

fundraiser for the Republican Governors' Association.
Q And how was Phil Cox invited? Did you invite him?
A No.
Q Who invited him?
A The Governor.
Q Okay. Why did Dr. Ladenson go on this trip?
A Dr. Ladenson is my friend, but he is also a consultant to the company. And so I asked him if he would come along with me to help educate the Governor more about Anatabloc.
Q Okay. And where did everyone stay during this trip?
A They have -- you are looking at the main hotel. And they have cottages along the ocean. So people were in different cottages.
Q Okay. And who made the arrangements for the cottages?
A My secretary, Jerri.
Q And you told her to do that?
A I did.
Q During this vacation, well, first of all, how did people get to Chatham Bars Inn?
A They flew in to Hyannis.
Q On what?
A My plane.
Q Okay. Who paid for the cottages?

A I did.
Q Was there a sailing trip during this vacation?
A There was.
Q And was it a public charter?
A A private charter.
Q And who arranged for that?
A My secretary.
Q And she did that at whose direction?
A At mine.
Q And who paid for the sailing?
A I did.
Q Was there a golf trip? Was there golfing during the trip?
A Yes.
Q Who played golf?
A Phil Cox and the Governor and I.
Q And where did you play?
A A place, at a private country club called Eastward Ho.
Q Eastward Ho?
A Eastward Ho. It is on the ocean.
Q And was this a public or private course?
A Private.
Q How did you get on then?
A I called Kinloch and asked them if they would arrange

for it.
Q And did they?
A They did.
Q And who paid for the golf?
A I did.
Q Was there a clambake? Can we go to the second picture? I think it is 62. Was there a clambake during this vacation?
A Yes.
Q Tell the jury about the clambake.
A The clambake was in this building with a buffet set up, and also outside there was a fire pit right there in front of the building on the right.
Q Can you just go ahead and point to the building on the screen? If you just touch the screen, I think. Right there, that building?
A Yes.
Q During the clambake, first of all, was there expensive, I don't know if it is Cognac or Louis XIII?
A Yes.
Q What is that?
A It is a Cognac.
Q Okay. What kind of Cognac?
A It is expensive Cognac.
Q Okay. Ball park me on how much. If I went to a

store, how much would this cost me?
A If you bought it at the ABC store, it would probably cost 3,000 a bottle. In a restaurant it would probably be 5,000 or so.
Q And did you drink this Louis XIII Cognac during the clambake?
A Yes.
Q Who was drinking that?
A Everyone except the wives.
Q So the men were drinking the Cognac?
A Yes.
Q Who paid --
A I don't recall anyone's wives drinking it. My wife wasn't drinking. She doesn't drink.
Q Who paid for the clambake?
A I did.
Q Now, you had previously talked about this charity auction that was back in September of 2011. This Cure By Design and the auction for a trip. Right?
A Yes.
Q Was that trip that you won or that you purchased --
A I bought.
Q That you bought, was that to Chatham Bars Inn or was that something else?
A That was a trip in New York.

Q Okay. So were these trips related in any way?
A Not in my mind.
Q Did you expense this trip to Star Scientific?
A I did.
Q And why did you do that?
A Because I was working the entire weekend.
Q What do you mean by that, sir?
A I was working. I was there with Dr. Ladenson to try to help get the Governor more involved.
Q And at this time, did you think that the Governor was still going to assist you with your company?
A I did.
Q Let's go to -- let's take that down, please. I want to change topics. I want to go to Government Exhibit 431. Now, this is a series of text messages, sir. And these are between you and the Governor; is that correct?
A Let me look at it just a moment and make sure, unless you know it is.
Q No, I want you to make sure.
A Yes.
Q Okay. In fact, let's go down all the way to the bottom. These text messages were produced by you from your cell phone, right?
A Yes.
Q Okay. So let's go to the top and let's take these in

order. These are November 22nd, this is from you to the Governor. Can you just read what you wrote to the Governor on November 22nd?
A "Happy Thanksgiving from the Williams kitchen."
MR. DRY: I'm sorry. I'd like to admit Government Exhibit 431 into evidence.
THE COURT: It will be admitted.
BY MR. DRY:
Q Sorry to interrupt you, sir. Go ahead.
A "Happy Thanksgiving from the Williams kitchen."
Q And then let's scroll down. And this was from the Governor back to you. What did he write there?
A What do I write or what does he write?
Q What did he write.
A "Jonnie. Thanks for all you do for me and my family. Governor."
Q Is that the correct spelling of your name?
A I didn't see it. Yes, it is.
Q Okay. Now, going down, this is your response to him. What do you write there?
A "Your family is very special."
Q And then I think on the second page you continue. Keep going down. You send another text message right after that. Go down to the content. You write, "You too." Correct?

A Yes.

Q Okay. Now, the first, can we go back to the first page, because it is a little bit -- the very top one, the text message. That was sent at 6:56 p.m. on November 22nd, right?

A Yes.

Q Okay. And let's go to Exhibit 432, please. This is a text message photo that you send to the Governor.

MR. DRY: The United States would ask to admit Government Exhibit 432 into evidence, Your Honor.

THE COURT: It will be admitted.

BY MR. DRY:

Q And this was right after you sent that first text message, you sent a photo, right?

A Yes.

Q Can we go to the second page to blow up the -- yeah. In fact, let's just go to the third page, because that's even bigger. There we go. What is this photo of?

A That's the kitchen at my house out in Goochland.

Q Okay. And who are those people?

A The left is Chef Leo and his wife.

Q Chef Leo.

A Yes.

Q Who is Chef Leo?

A Chef Leo is someone I met a few years ago that when

we are home in the house out in Goochland on Thanksgiving and Christmas, he comes over and prepares dinner.

Q And in fact, was this Thanksgiving?

A It was.

Q And what was Chef Leo's relationship with the McDonnells at this time?

A He was their chef, too.

Q At the Mansion?

A Yes.

Q And how did that come about?

A They had lost their chef or had a problem with their chef, and she called me.

Q When you say "she," who?

A Ms. McDonnell. And said, "Jonnie, do you know a chef?" And I said, "I do. And I'll give you his name and number. But if you hire him, you can't have him on Thanksgiving and Christmas."

Q Why not?

A Because I need him.

Q Okay. Fair enough. So why are you sending this e-mail or text message to the Governor?

A I was poking at the Governor a little right here. Sort of, I knew that Leo had told me that they -- he had prepared their dinner and it was being heated up.

Q I got you.

A And I was probably being silly a little bit right here.
Q Okay. Well, this wasn't the only photo of the chef that you sent to the Governor, was it?
A No.
Q Let's go to Government Exhibit 445. This is a text message you sent on December 24th of 2012 to the Governor, correct?
A Yes.
MR. DRY: Government seeks to admit Government Exhibit 445 into evidence.
THE COURT: It will be admitted.
BY MR. DRY:
Q Okay. You sent that at what time, sir?
A 7:46 in the evening on Christmas Eve.
Q On Christmas Eve. Let's go to the second page. That's the photo. Then let's go to the third page, which is the actual digital portion of this. Who is that on the left-hand side?
A Chef Leo.
Q Who is on the right-hand side?
A That's my wife, Celeste.
Q And this was Christmas Eve of 2012; is that right?
A Yes. In the living room.
Q And why are you sending him this photo of the chef?

A Because Chef Leo told me that they were -- he had prepared dinner and they were heating it up.
Q Okay. Well, did you get a text message response from these photos?
A I did.
Q Let's go to Government Exhibit 444, please. This is an image that was on your cell phone; is that right?
A Yes.
MR. DRY: The government seeks to admit Government Exhibit 444 into evidence.
THE COURT: It will be admitted.
BY MR. DRY:
Q Let's go to the larger one. Sir, did you receive that soon after you sent that text message on December 24th?
A Yes.
Q And this is a picture of what?
A Picture of the Governor showing off a watch.
Q And the watch there, what does that look like?
A Your question was?
Q Do you recognize the watch?
A It looks like the Rolex that I purchased in Malibu.
Q Before you received this picture, had you ever had any discussions with the Governor about the Rolex?
A No.

Q Okay. So did you know whether he knew who it was from or anything like that before you received this photo?
A No.
Q Okay.
A I had no direct communication with him about it.
Q Okay. Now, at some point, does your brother start helping out the McDonnells in some way?
A He does.
Q And how does that come about?
A The McDonnells were going to, I believe, a football game that they wanted to go to one Sunday and Maureen called me and said, "I have to go over to Wyndham." It may have been on a Saturday, was telling me what the problem was. They wanted to go to a football game, but they had to go paint the deck and clean up the house over at Wyndham, the yard work, landscaping. And so she was complaining about it. And so I told her I would help her with it.
Q She is complaining about doing the yard work?
A She is complaining about doing the yard work and painting the deck.
Q And did she ask you how you got that stuff done for your house?
A She knew that.
Q She knew what?

A She knew from when she was over at my house out in Goochland that there are people that work there.
Q Okay. And you agreed to help her out. What did that mean?
A Whether to do the minimal amount of landscaping or deck painting or whatever it was that she needed so she could go to the football game on Sunday.
Q And so what did you do?
A My younger brother is a retired police officer, and I called him and asked him if he would help me out with it and deal with it.
Q And what did he do?
A I think he got, arranged for another person or two to help him and went over there and dealt with it.
Q Okay. And was there -- how much work did he do there?
A I'm not sure. I didn't learn until two or three weeks later that he was still doing work there. I hadn't talked to him. And he said he was still there.
Q Okay. Was the Governor aware that your brother was doing yard work and home improvement projects at his house?
A Yes.
Q How do you know that?
A I talked to the Governor about it.

Q And what did he say?
A He said, "Donnie is a good guy. He is a nice fellow. Thank you for helping us out."
Q Okay. Now, Mr. Williams, you were interviewed by law enforcement agents on January 23rd, 2013? Do you remember that?
A I remember it very well, sir.
Q Okay. And you were interviewed by Special Agent, FBI Special Agent Kennedy and Virginia State Police Special Agent Charlie Halen; do you remember that?
A That's correct.
Q Now, when they came to interview you, were you completely honest with them?
A No.
Q In fact, what did you tell them about, first of all, who is Paul Perito?
A Paul Perito is a very good friend of mine, a very close friend of mine, and he also happens to be the Chairman and the President of Star Scientific. He is a lawyer.
Q He is a lawyer?
A Former federal prosecutor.
Q Okay. What did you tell the agents about whether Paul Perito knew about all your business dealings?
A I told them that everything that I do goes through

Paul Perito.

Q Was that true?

A Not in this case it wasn't.

Q In fact, did Mr. Perito know about the loans to the McDonnells?

A He didn't. No one did except for my secretary and myself.

Q What did you tell the law enforcement agents when they asked you whether you ever got anything in exchange for the loans to the McDonnells?

A I don't recall what I said to that.

Q Okay.

(Document proffered to witness.)

A I see it. There are a lot of highlighted areas.

Q Okay. I want you to put that to the side now. So the question before you is, what did you tell the law enforcement agents when they asked you whether you ever got anything in exchange for the loans to the McDonnells?

MR. ASBILL: Objection.

THE COURT: Does that refresh your recollection?

THE WITNESS: Does it refresh my recollection? Yes. Seeing this document and saying that, yes.

MR. BURCK: I just ask that Mr. Dry identify the document that he has put in front of the witness.

THE COURT: Go ahead and identify the document

for me.

MR. DRY: It is your Report of Interview from that interview, correct?

THE WINTESS: Okay, yes.

BY MR. DRY:

Q And you hadn't seen that report before today?

A I've never seen this document.

Q The question is, what did you tell the law enforcement agents when they asked you whether you ever got anything in return for the loans to the McDonnells?

A I was not truthful and I told them that I didn't receive anything.

Q All right. What did you tell the law enforcement agents about whether you ever asked for anything in return from the Governor?

A I don't recall telling them I asked for anything.

Q But had you in fact been asking for things?

A I had.

Q And can I see that back?

(Document proffered to Mr. Dry.)

THE COURT: Holdup, Mr. Dry. We have a juror having a little coughing spasm. So we will just wait. I'll tell you what, let's take ten minutes.

(The jury left the courtroom.)

(Recess taken from 2:58 p.m. to 3:11 p.m.)

THE COURT: All right, let's bring in the jury.

(The jury entered the courtroom.)

All right.

(Document proffered to witness.)

BY MR. DRY:

Q Mr. Williams, I believe that the question I asked was, what did you tell the law enforcement agents about whether you asked for anything from the Governor? And you said that you did not specifically recall. Right?

A Yes.

Q I'd like you to review that document. That's a separate portion. That's the same report. It is a different page of that. I'd like you to review that, the underlined portion. I'd like you to put it aside. Does that refresh your recollection?

A Yes.

Q What did you tell the law enforcement agents about whether you ever asked for anything from the Governor or expected anything?

A I didn't ask for anything and I didn't expect anything.

Q And was that true?

A No, it wasn't.

Q And why were you lying to the law enforcement agents?

A The questions that they were asking me caused me to

believe that the Governor was in trouble or may be in trouble, and if he was in trouble, I could be, also.

Q Okay. And if the Governor was in trouble, what were you and the Governor going to be in trouble for?

A The Governor was in financial trouble. And I needed his help. And I think the trouble would be, what was wrong was, I went to the Governor with this big discovery that I had, and I just made a mistake because I thought the Governor could help bring this product to marketplace and it was the right thing to do. But the reasons that I was loaning him money and helping his family, I needed his help, but it was wrong to do that.

Q Well, to be clear, you knew it was wrong at the time; that's why you were hiding it.

A I did. I knew it. I knew it was wrong. I thought the ends justified the means. And I was wrong. I should have just, you know, I should have just tried to figure out how to do it a different way, but I didn't.

Q All right.

MR. DRY: I want to make sure he is not looking at anything.

(Document retrieved from witness.)

BY MR. DRY:

Q Now, after you were interviewed by law enforcement, did you have any conversations with Mr. and Ms. McDonnell

to tell them that law enforcement agents had interviewed you about their relationship with you?
A No.
Q Let's bring up Government Exhibit 470. This is a text message produced from your phone from Ms. McDonnell; is that correct?
A It is.
MR. DRY: Government seeks to admit Government Exhibit 470 into evidence.
THE COURT: It will be admitted.
BY MR. DRY:
Q Blow that up. And that's sent on January 24th. That's a week after your interview with law enforcement, correct?
A Yes.
Q And I'll just go ahead and read this. "Jonnie. Would you like to stay at our beach house in Sandbridge for some of the time you are in Virginia? Pick the best days and take the time with your family on the ocean. Or you can have a Star Scientific retreat there and have your team come down and join you for a meeting. If one of the weekends works out with his legislative schedule, I'll bring Bob down and then you would have some private time to talk somewhere he is comfortable. Let me know what you think. MM."

Did you follow up on this?

A No.

Q Let's go to Government Exhibit 484, please. This is an e-mail between you and Ms. McDonnell, actually, between your wife, you, and Ms. McDonnell; is that correct?

A To my wife, me, from Ms. McDonnell.

MR. DRY: Government seeks to admit Government Exhibit 484 into evidence.

THE COURT: It will be admitted.

BY MR. DRY:

Q Okay, sir, the date of this is February 11th, 2013, correct?

A Yes.

Q Had you had any conversations with Mr. McDonnell or Ms. McDonnell informing them that you had been interviewed by law enforcement regarding your relationship with them?

A No.

Q Okay. The bottom e-mail is from the Governor. It is e-mailing his children and cc.-ing his wife. I'm going to read this to you, sir. Make sure I get it correct. "Kids. Asking for help. Need to rent the beach houses at Sandbridge more. Willing to give your friends a discount for the times its tougher to rent. Will you help us and e-mail your friends list and tell them your family has a few beach houses for rent. Do not mention me. And will

give a friend discount 10 percent off from now until May 15 and 20 percent off October 15 through March 30, 2014. They can go to www.sandbridge.com to see Sunseeker or east coast palace. Thanks kids. Also plan to use it some yourselves this year. Love Dad."

Ms. McDonnell forwards that to you and your wife, correct?

A Yes.

Q And what did you think was the purpose of that e-mail?

A It is wintertime, and I don't think many people are attracted to Sandbridge in the wintertime.

Q And so why is she e-mailing that to you or forwarding the e-mail to you?

MR. BURCK: Objection, Your Honor.

THE COURT: Sustained.

BY MR. DRY:

Q All right. Let's go to Government Exhibit 3, please. Do you recognize that document?

A I do.

Q And this is a handwritten letter that you received from Ms. McDonnell?

A It is.

MR. DRY: The government moves Government Exhibit 3 into evidence, Your Honor.

THE COURT: It will be admitted.
BY MR. DRY:
Q All right, before we read the document, sir, let's take a step back. How did you receive this letter?
A It was in a box that was delivered to my house in Goochland on the kitchen counter.
Q And do you remember approximately when it showed up?
A Sometime in February.
Q February or March?
A Or March. I don't know the date. I don't know the date --
Q Okay.
A -- that it was there.
Q But you said it was in a box.
A It was.
Q Is it the only thing that's in the box?
A No. It was a large box on the kitchen counter when I came in the house, and I actually thought it had been shipped there from my wife or daughter from somewhere.
Q All right. What happens? There is a big box in your house in Goochland. What happens? Do you open the box?
A I'm curious, so I open the box.
Q And what do you find in the box?
A Looked like most of the things from the shopping spree in New York. And this letter.

Q When you say the shopping spree, is this the stuff that you had purchased for Ms. McDonnell in New York?
A It is.
Q And you said the letter was in there. What was your reaction when you opened up the box?
A It was a sinking feeling. It was like, "Oh, no."
Q And why?
A I sat down in a chair in the den and read this letter over and over, and this letter, this letter was a fabrication.
Q Let's talk about, first of all, you are not sure of the exact date, but this was March of 2013?
A Yes.
Q I'm going to read the letter to you.
A Okay.
Q "Dear Celeste and Jonnie. I can't begin to thank you how special you made me feel on Cailin's wedding day and on our 35th wedding anniversary day all dressed up in the beautiful outfits you adorned me in on both momentous occasions. I'm so happy we have been able to share so many significant milestones in our lives with you both. I Truly hope your daughter will now be able to enjoy these lovely outfits and show them off on many grand occasions. If not, I'm sure there are many exemplary charitable organizations like we talked about who would welcome the

opportunity to auction them for a wonderful cause, having been worn only once by the First Lady of Virginia to her daughter's wedding at the Executive Mansion and celebrating her 35th wedding anniversary with the Governor. Actually, if that happens, I think I'll be there to bid on them myself. Please know that we cherish our friendship with you and look forward to many more wonderful memories together ahead. XOXO, Maureen McDonnell."

Let's take a step back. This 35th wedding anniversary, what's she referring to there?
A When we went to New York, it was for an anniversary dress, and also for one of the parts of the wedding, maybe the reception or what have you.
Q And did you attend a 35th wedding anniversary party?
A I did.
Q And where was that at?
A In Barboursville, just outside of Charlottesville.
Q And whose anniversary was this?
A The Governor and his wife.
Q And who did you bring with you?
A My wife.
Q Okay. Now, in the letter, it talks about your daughter enjoying the outfits. Had you ever discussed with Ms. McDonnell the idea of her returning the outfits

to you before this box showed up?
A No.
Q And had she ever discussed returning the outfits so that your daughter could enjoy them?
A No.
Q Had she ever discussed the idea of returning the outfits so that they could be auctioned off for charity?
A No.
Q What was your reaction when you read the letter?
A I was -- I felt sorry for her.
Q Were you worried for yourself?
A I was worried for myself, but at that moment when I read this letter and I sat down, I felt sorry for her.
Q Well, what's the first thing you did after you got this letter and box? After you read the letter, what did you do?
A I called Jerry Kilgore at McGuireWoods.
Q That's a law firm?
A A law firm here in Richmond.
Q He is a lawyer as well, right?
A I called him right after I read it.
Q What happened next? After you called him, what happened?
A He sent someone to come pick the box up.
Q With the letter?

A With the letter.
Q All right. At some point, the investigation, there starts to be news accounts of your relationship with Mr. and Ms. McDonnell, right?
A Yes.
Q And that was around Easter of 2013?
A Yes.
Q By that point, you had hired your own personal attorneys?
A Yes.
Q And let's go to 506, please. This is, the bottom is an e-mail from you to Ms. McDonnell; is that right?
A Yes.
Q I'm sorry, a text message.
A A text message.
MR. DRY: The government seeks to move Government Exhibit 506 into evidence, Your Honor.
THE COURT: It will be admitted.
BY MR. DRY:
Q Now in this, sir, you write to Ms. McDonnell: "Celeste and I are proud to be your friends. We both admire how hard you and Gov work for Virginia. We will do anything for you. Jonnie." This is after you have been interviewed, right?
A Yes.

Q And you knew that Ms. McDonnell had been interviewed?
A Yes.
Q By law enforcement?
A Yes.
Q Why are you sending this text message?
A I felt sorry for her.
Q Why do you feel sorry for her, sir?
A I don't want anyone in trouble, and she was in financial -- they were in financial stress and hardship.
Q Let's be clear, though. How did you know that Ms. McDonnell had been interviewed by law enforcement?
A My brother. No, I don't recall.
Q Did you have a conversation with your brother when the box comes back?
A I did.
Q And does he relay a conversation he had with Ms. McDonnell?
A He did.
Q As a result of that, did you understand that Ms. McDonnell had been interviewed by law enforcement?
A I did.
Q And this is going to go into the press; the press now is getting a hold of this, right?
A Yes.
Q When you say you felt sorry for Ms. McDonnell, had

your brother communicated anything that Ms. McDonnell wanted told to you through your brother?
A Yes.
Q What was that?
A That's why I felt sorry.
Q What was that?
A He said that she was crying --
MR. BURCK: Objection, Your Honor.
THE COURT: Sustained.
BY MR. DRY:
Q All right. Did you have a romantic relationship with Ms. McDonnell?
A No.
Q Did she ever say anything to you indicating that she believed you had some romantic relationship?
A No.
Q What type of relationship did you have with the McDonnells?
A I thought I had a business relationship with both of them.
Q But you called them your friends in some text messages?
A Business friends. I liked them both. But it was a business relationship.
Q Now, after you are interviewed by law enforcement,

you knew that you were under investigation for things unrelated to your relationship with the McDonnells, right?
A Yes.
Q And you understood that you might be under investigation for that, too, right?
A Yes.
Q The other stuff, what was your understanding of what you were being investigated for that was not related to the McDonnells?
A Securities filings, a bank loan -- bank loans, and the Starwood Trust investments.
Q And when you say the Starwood Trust investments, that was your control of Starwood Trust?
A Yes.
Q And your relationship with Mr. McKeon?
A Yes.
Q And some transactions that you two had entered into, right?
A That's correct.
Q Now, ultimately, you agreed to cooperate with federal authorities in their public corruption investigation of the McDonnells.
A I did.
Q Why did you agree to cooperate in that investigation?
A It was the right thing to do.

Q Were you worried about yourself?
A I was worried about myself, too.
Q Let's talk about what you got in return for your cooperation. Let's start with -- you agreed to be interviewed by law enforcement on July 1st of 2013, right?
A Yes.
Q And between your first interview with law enforcement on January 23rd of 2013 and July 1st of 2013, had you talked to any law enforcement agents?
A No.
Q Had you been interviewed?
A No.
Q And you had lawyers at that point, right?
A I had lawyers.
Q Okay. Now, let's bring up Government Exhibit 524. And sir, this is a proffer agreement. Have you seen this document before?
A I have. I have seen it.
Q And under the terms of that, this agreement, what were you required to do?
A To answer all the questions truthfully.
Q And could anything that you say during this interview be used against you if you were charged?
A Not as long as I told the truth.
Q Okay. Going to the third page of the exhibit, did

you sign this?
A I did sign this agreement.
Q And that was with your attorneys, right?
A That's correct.
Q Now, after you are interviewed --
MR. DRY: Government Exhibit 524 into evidence, Your Honor?
THE COURT: It will be admitted.
BY MR. DRY:
Q When you are interviewed, do you want immunity from prosecution for your relationship with the McDonnells, right?
A Yes.
Q Let's go to Government Exhibit 523. And this is an actual immunity agreement that was entered into after your interview; is that right?
A Yes.
MR. DRY: Government seeks to admit Government Exhibit 523 into evidence, Your Honor.
THE COURT: It will be admitted.
BY MR. DRY:
Q Now, what was your understanding of what you were required to do under the terms of this agreement?
A The first one.
Q The first one.

A To answer all the questions truthfully.
Q I'm sorry, there is a proffer agreement and this immunity agreement. So this one.
A Yes.
Q What is your understanding of what you have to do under this agreement?
A To cooperate with the government in its investigation and answer questions.
Q And what are you getting in return?
A That I won't be charged for any corruption.
Q Any corruption involving anybody?
A Involving the Governor during this period.
Q Okay. Well, on that first paragraph, it says, "would receive transactional immunity in exchange for his complete and truthful cooperation regarding potential violations of criminal law related to his agreement to provide, and his provision of, things of value to Virginia Governor Robert F. McDonnell, First Lady of Virginia Maureen P. McDonnell, and their family members."
A Yes.
Q Does this say anything about securities fraud, sir?
A No.
Q Does it say anything about your relationship with Starwood Trust?
A No.

Q Does it say anything about your relationship with Mr. McKeon?
A No.
Q What was your understanding of whether you could be prosecuted for any of those other things after this agreement?
A I could.
Q And why did you want immunity from prosecution related to your relationship with the McDonnells?
A Because when I answered those questions truthfully, the answers to those questions exposed me to trouble.
Q Trouble?
A Trouble, possible criminal charges.
Q Okay. Now, let's go to the second page of this. That's your signature at the bottom?
A Yes.
Q Going to the third page, that's your attorneys' signatures?
A Yes.
Q Okay. Now, that was July 1st of 2013. From that time until June 5th of this year, did you have any other agreements with the government?
A No.
Q During that period of time, did you continue to be interviewed by the government?

A I did.
Q Were you interviewed on September 12th, 2013?
A I want to answer the question, but unless I know that particular date, I just don't like saying that I did that.
Q You were interviewed in between the time you got the first immunity agreement and the time that you got the second one?
A Yes.
Q And you were interviewed about your relationship with the McDonnells, right?
A Yes.
Q Did you tell the truth during those interviews?
A I did.
Q But subsequently, you entered into another immunity agreement with the government, right?
A I did.
Q Please bring up Government Exhibit 530. Now, before you entered into this second agreement, what was your understanding of whether you could have been charged with your relationship with Mr. McKeon, the Starwood Trust, or anything else unrelated to the McDonnells?
A I could, but I wasn't concerned about that.
Q Okay. Did you ask for a second immunity agreement?
A I did not. I did not ask or demand an agreement.
Q Let's talk about this second agreement. In the

second paragraph, I'll read it --

MR. DRY: Admit Government Exhibit 530 into evidence, Your Honor.

THE COURT: It will be admitted.

BY MR. DRY:

Q In the second paragraph, it says the conduct for which you would receive immunity "is limited to conduct involving his agreement to provide and his provision of things of value to former Virginia Governor Robert F. McDonnell, former First Lady of Virginia Maureen P. McDonnell, and their family members; conduct related to loans Williams received from 2009 to 2012 in exchange for his pledge of Star Scientific stock; and conduct related to Williams' gifts of Star Scientific stock to certain trusts from 2009 to 2012. No other conduct or potential violations of federal criminal law are covered by this agreement."

So you understood -- what did you understand you to be getting immunity for?

A For what it just says here.

Q Were you getting immunity for anything else?

A No.

Q Now, what was your understanding of what you were required to do under the terms of this agreement?

A To cooperate with the government and tell the truth.

Q And what was your understanding of whether this agreement provided you any protection from civil lawsuits or civil government investigations or anything like that?
A It doesn't.
Q As long as you provide truthful testimony here today, sir, what is your understanding of the risk of you going to jail?
A I don't have any risk of going to jail if I'm truthful.
Q But if you lie under oath, what's your understanding of the risk of you going to jail?
A There is a possibility.
MR. DRY: Just one moment, Your Honor.
THE COURT: Sure.
(Counsel conferring with co-counsel.)
BY MR. DRY:
Q One last thing, sir. On this agreement that we just spoke about, is this the agreement that you have been testifying under today, this last one?
A I don't have it on my screen. The last one --
Q 530.
A -- that was just here?
Q Yes, 530. In fact, I should have done this. Let's go to the third page of that. That's your signature there, sir, at the top?

A Yes, it is. That's the agreement.

MR. DRY: The government will tender the witness, Your Honor.

THE COURT: All right. Cross? Mr. Burck, just so you will know, we are going to stop for the afternoon break at 4:15.

MR. BURCK: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. BURCK:

Q Good afternoon, Mr. Williams.

A Good afternoon.

Q My name is Bill Burck and I represent Maureen McDonnell. Have we ever met before?

A I don't think so.

Q And you have never met with me preparing for this trial, did you?

A No.

Q And you have met with the government, though, to prepare for your testimony today?

A I have.

Q How many times roughly?

A Maybe seven or eight times.

Q Is that in addition to the meetings that you discussed, some of which you discussed with Mr. Dry over the last year-and-a-half? He mentioned a meeting in

September of last year, a meeting in July of last year, some other meetings.
A I would say seven or eight times.
Q Total?
A I just don't recall having that many meetings with them.
Q Okay. Thank you. You told us yesterday, and it was a while ago now, but yesterday you told us a little bit about yourself.
A Yes.
Q And Star Scientific and building up this business. Do you remember that?
A Yes.
Q And you mentioned, I think, that -- how long have you been at Star Scientific, or when did you start the company?
A About 1990.
Q 1990. And before that, had you been in other businesses?
A Yes.
Q Can you tell us a little bit about those businesses? Tell us where you come from.
A From the beginning?
Q From the beginning.
A I grew up in Fredericksburg, Virginia, and went to

Stafford High School. My family has been from that area for many, many generations. And then I went to a small college in Providence, Rhode Island, Johnson and Wales. And then I got married. I met my wife up there.
Q That's Celeste?
A Celeste. And then I came back to Virginia. During the summers, I had worked at a car dealership in Fredericksburg at home. I came back and went to work there for a short period of time. Then I went to work for a real estate developer in Fredericksburg. His name was Carl D. Silver. Then I invested into an optical business in one of the shopping centers that Carl --
Q An optical business?
A An optical business for eyeglasses. And I invested money into that and was part owner of it. The partner had a drug problem and left. And so I was, I came in from in the real estate business, where I was successful, and tried to operate that business. And it had a lot of debt and I couldn't make it work. When I was maybe 21 years old. And it ultimately failed. And during that process, I had met a friend of mine that's one of my best friends today. He is an opthalmologist from Johns Hopkins. His name is Frank O'Donnell. And Frank O'Donnell was a real bright fellow. And he would come down on weekends from Johns Hopkins and see patients in the optical and a

physician practice and refer people to the optical shop. And him and I developed a great friendship. And then Dr. O'Donnell was very bright, he graduated from Johns Hopkins. He was chief resident his last year and was first in his class for plastics and ophthalmology. And he left, and he was the Chairman of the Department of Ophthalmology at St. Louis University School of Medicine, was his first job out of Johns Hopkins.

Q Can you just orient us in time right now?

A Maybe 1980.

Q Thank you. Please go ahead.

A Okay. And then Dr. O'Donnell moved to St. Louis, back to his home, where he was the Chairman of the Ophthalmology Department and him and I kept in touch. The optical business didn't work out. I don't want to drag you through this if there is --

Q I'm interested. Please.

A Okay. I just want to make sure I'm answering the question is all. And then when the optical business didn't work out, my wife was from Massachusetts, and so we moved to Massachusetts to Hingham, Massachusetts, and I went to work when I was maybe 22 at a Mercedes Benz dealership called Prestige Imports in Hingham, Massachusetts. And Dr. O'Donnell contacted me from St. Louis, said, "Jonnie, I want to come visit you, I have

an idea on something."

So Dr. O'Donnell and I started a company called CME-SAT. And then, so Dr. O'Donnell had this idea about providing continuing medical education via satellite, so the doctors that are required to have their continuing medical education credit wouldn't have to travel and be inconvenienced. And at this time, satellite receivers were starting to come into play. And so we formed this company. And at the Mercedes Benz dealership, one of my customers was Tom Burns of the large law firm in Boston, Burns & Levinson. And one day I was in Boston going to, looking for Mr. Prifty's office.

Q Who is Mr. Prifty?

A A corporate lawyer. And I ran into Tom Burns walking down the street. And Tom said, "Jonnie, where are you going?" And I said, "I'm looking for Mr. Prifty, because my friend, Dr. O'Donnell and I, are forming a company to broadcast continuing medical education via satellite." And he said, "Well, you don't need Mr. Prifty, just come on with me." And I went inside Milk Street in Boston, and he introduced me to his partner, Larry Levinson. And they said, "Listen, Jonnie, we know you are doing very well over at the Mercedes Benz dealership but we want you to move into our law firm. We are going to incubate you as a client for the law firm."

Q This is for the satellite business?
A Yes.
Q So you are running two businesses at this point?
A No, I was starting it up. I was just getting ready to start it up. So then I quit my job. And a person I got to be friends with and I'm still friends with, one of my customers was Doug Hajjar. Doug Hajjar was a very bright fellow, Chief Financial Officer of M/A-Com. You see their satellite dishes around. So I called Doug, and Doug agreed to help me. And so M/A-Com came into the deal with us. And I went to New York and I arranged for the financing for us to start that company. And we later sold out of that company and a group out of Canada took it over.
Q Roughly how much money did you make off of that?
A I was 25 years old at the time. I think I made $500,000 off of that.
Q Then tell us, where did you go from there, because obviously you built Star Scientific, a big company.
A Okay. And then from there, Frank O'Donnell, Dr. O'Donnell, the opthalmologist, he read a story in Time Magazine about a gentleman named Dr. Werner Baumgartner at the hospital in Long Beach, California, where he had discovered a technology called radioimmunoassay of hair analysis to use for drug testing. And so I contacted the

doctor and went out and met with him. And at this point he just had an idea. And so I brought in management, I raised the capital, put the company together, and that's a very successful company today. It is actually used in the federal court system and major corporations for drug testing. It is a profitable New York Stock Exchange company called Psychemedics. And --

Q What's the market cap on that?

A I don't know right now, maybe it is 70 or $80 million. I haven't paid any attention to it. It may be higher. But it has been profitable, 69 quarters or so in a row.

Q What's your percentage ownership of it?

A I don't own it now. I sold it earlier.

Q How much did you make off of that?

A I don't remember.

Q Was it more than $500,000?

A Yes.

Q Millions?

A Maybe.

Q Please continue. I just want to understand how you got to where you are.

A Yes. And then at the time, also at the time I was doing Psychemedics, I had invested in a company called Spectrum Pharmaceuticals at the request of my friend, Dr.

O'Donnell. His friend was starting this company. And I invested money in it, but I wasn't involved in the organization or putting the company together. And I made maybe $700,000 or a million dollars or more off of that, maybe two or so.

And then right there at the same time, a fellow named Charles Munnerlyn had left CooperVision, a company that makes intraocular lenses in Sunnyvale, California -- I skipped one in there, a company called Eye Technology that makes intraocular lenses, and I did well with that. With VISX, VISX was a company, an idea of Charles Munnerlyn. This is when, this is why you have lasik now, is because of VISX. And I learned about it through Dr. O'Donnell. And I flew out Sunnyvale, California and met with Charles Munnerlyn. He had just one office. He had left CooperVision in a small rented place and had this idea that he could reshape the cornea to correct people's vision. And on the spot, I called Dr. O'Donnell while I was there in Sunnyvale, and I said, "Frank, this looks good, you know, rush, we are like in Star Wars right here with this laser for putting a prescription on someone. And, you know, they haven't even made it to animals. This is a concept." And he said, "Well, it makes sense." And so I wrote them a check for $600,000, and I was the second largest shareholder of VISX. And then I probably ended up

raising them another $50 million back then.
Q When is this?
A This is back in maybe 1990, 1989 or 1990 somewhere.
Q Right before Star Scientific?
A Through there. And with VISX, by that time, this was maybe 24 years or so ago, by that time I was, off of VISX, I was making millions of dollars off of VISX.
Q Per year?
A At that point, I didn't come under -- until I started going into this healthcare area with the tobacco part, I was up in the millions of dollars a year. Up until that point, even 25 years ago. 24 years ago. My tax returns would show that.
Q And did you use that money, the money you made off of that company, to start Star Scientific?
A I did.
Q Tell us about that. How did Star Scientific --
A Star Scientific came about because I had loaned some money to a company in Petersburg, Virginia that had the old Brown & Williamson Tobacco Company.
Q You mentioned that yesterday. Go ahead.
A So it was there, empty, and so I went in and bought it.
Q How much did it cost?
A I put up at the time, the first check I wrote there,

I paid off a bank for the equipment and then bought the building and maybe I spent a million-and-a-half dollars or so back then, 20 years or so ago. And so at that point, I went to the President of Swisher International. That's the largest cigar company in the world. They are in Jacksonville, Florida. And I persuaded the CEO of that company, Tim Mann, since they didn't manufacture their own little cigars, to let me manufacture them in Petersburg, and that if that business grew large enough, I would help him move it out of there into Jacksonville at their manufacturing facility.

Q Let me stop you there. Swisher was the largest cigarette manufacturer in the world?

A Cigar.

Q Excuse me. You went to them and persuaded them to do what?

A To allow me to contract manufacture their small cigars at the Brown & Williamson factory in Petersburg.

Q Had they been doing that in Petersburg before that?

A No.

Q So you are the one who convinced them to do it?

A I did.

Q How did you do that?

A I went and met with Tim Mann, and I took with me a gentleman from Petersburg that's a friend of mine today,

for many years, Paul Lamb. And he was in charge of Brown & Williamson's operations when they were functional in Petersburg. He was a tobacco engineer. And I took Paul with me and convinced them that we could manufacture them in Petersburg.
Q That was a big step forward for Star Scientific as a new company?
A Yes. Within about -- I had the company profitable in maybe 120 days or so.
Q And when you, let me make sure I understand, did you start it from scratch?
A I did.
Q And you grew profitable in 120 days?
A I did. I started it from scratch.
Q How many successful companies is this for you?
A Psychemedics -- up until that point? Or up until now?
Q We will get to now. But let's start with up until that point.
A Up until that point, Eye Technology, Opthalmic Imaging Systems, a company called CA Blockers that didn't work, but the successful companies were VISX -- I don't know if I'm missing anything. But four or five through there. And then once I got the tobacco factory going in Petersburg, then I took that one into making millions of

dollars fairly quickly, and then took the sales up to about 150 million.

Q When did that happen, the 150 million?

A The 150 million was maybe fifteen years or so ago.

Q Roughly late 1990's?

A I don't remember. I don't recall exactly when it was. But at the time, what I was doing is I had the company very profitable, and I had no debt. And so at that point, Wrigley's Chewing Gum had just won the Advertising Age Award of the Year, marketing it to smokers. And so I had an idea if you could put tobacco into -- small amounts of tobacco into the chewing gum, it may compete well with that. So I went to Wrigley's, to the chewing gum company in Chicago, and they were afraid of it being tobacco. So I found a company in, a large company in Mexico that was willing to make it.

And then before I did that, I contacted the Food and Drug Administration at the Food Division, Bob Lake, and I went and met with him to explain to the FDA what it was; that I was in the cigarette business, contract cigarette business, and that I was manufacturing little cigars, but what I really wanted to do was try to move away from that and market products that would be safer alternatives for smokers.

Q That must have been tough. You are a cigar company

and you are going to the FDA, Food and Drug Administration, to explain to them how you are now going to move into healthcare or health improvement products. That can't be an easy conversation.

A I don't think it was difficult. They were very interested at this period in history with tobacco. So I met with them, and they said, "You need to have experts." It is called under the Grass Certification, generally recognized as safe three experts. And so I found the experts that worked in this area, and I went back to the Food and Drug Administration with that. And when I went back, the room was full of people, and they had the FDA out of Rockville piped in from the Drug Division, other people, Legal. And Bob Lake said, "Jonnie, you have to go to the -- go over to the Drug Division with this."

So I went to the Drug Division. And at the time, I had met Dr. Jaffe, who was a former U.S. Drug Czar, and probably the most well-known addiction expert in the world, but he was anti-tobacco. And I had him coming down to Virginia, to Richmond, on the weekends helping me so I could understand this. When I went to the Drug Division, they said, "Jonnie, the problem," or actually, I was still back at the Food Division, they said, "The problem with what you have are the nitrosamines." And I asked one of the experts, "What are nitrosamines? Is this

like hot dogs or what is this?" He said, "They are tobacco-specific nitrosamines that are formed during the curing of tobacco." So I said to them, I said, "What about if I can remove the nitrosamines?" They said, "Good luck. No one has been able to do that."

Q Is this the origins of Anatabloc, the Anatabine?

A It is.

Q Continue.

A If you want me to stop, just say so.

Q No, I don't. Please continue.

A And then at this point, I thought, well, I called Virginia Tech because it is an agricultural school. And I tried to find an organic chemist that was familiar with that tobacco and they said, "You have to go to the University of Kentucky." So I called the University of Kentucky, and a nice fellow answered the phone, Dr. Harold Burton. He was a nitrosamine expert. And I asked him to give me a 101 to a 404 fast on tobacco-specific nitrosamines.

Q What does that mean?

A In school, where you started your classes, 101 to 404.

Q Okay.

A So what happened was, I asked him, I said, "Dr. Burton, are there nitrosamines in tobacco when it is

green?" He said no. I said, "What about when it is yellow and it is ripe like a banana and the starches have gone to the sugar and the chlorophyll is left, like seventh grade science?" He said, "No, they haven't formed yet." "So when do they form, at the end of yellowing?" He said, "Yes, that's when they begin to form." I said, "So if I can put the brakes on the nitrosamines from forming, if I can put the brakes on at the end of yellowing, I should be able to prevent the nitrosamines from forming." And again, just real fast, the Indians had to learn this, the settlers had to learn this when they first came to Virginia in rotating the crops -- tobacco plants are large, leafy plants -- when you see that they are pulling a lot of nitrogen out of the soil. that nitrogen gets converted into nitrate and in the presence of alkaloids or salts, like nicotine, anatabine, nornicotine, anabasine, in the presence of those salts, the microbial reduction of the nitrate to nitrate present, you form carcinogens. In tobacco itself they are the carcinogens. In tobacco smoke, 23 percent transfers the strongest and most abundant carcinogens even in cigarette smoke. For my purposes I'm in smokeless and I'm trying to prevent this from forming at this point. Now, once I did that, here is how I did it. I thought, "Well, it must be a microbial situation. This has to be bacteria during

this, if it is at the end of yellowing." Now, I'm not a scientist, I'm not a doctor, but I'm rationalizing, but I've been exposed to technology companies from lasers to radioimmunoassays to drugs.

Q You had technology companies, you came from technology.

A Yes. So I understood, I had a basic understanding of that. So what I did was, I thought, well, maybe the microbials on the surface. I'll send it out to Dr. O'Donnell and have him take an excimer laser and hit it and see if that -- whatever microbial activity that is, that will work. But while I was waiting for that, I was sitting in my office at the cigarette factory in Petersburg and I thought, and that wavelength, microwave, removes moisture, and fast. And it should also kill any microbial activity. So I took the tobacco and put it in a microwave, a kitchen microwave at the end of yellowing. And I stood there for 60 seconds, two minutes, three minutes, and I sent it off to the University of Kentucky to Dr. Burton to be tested for nitrosamines. And he received it and called me up and he said, "What did you do to the tobacco?" I said, "I'm not going to tell you. Are the nitrosamines in the tobacco?" And he said, "No, how did you do this?" I said, "I'll tell you later. I need you to come over here and visit with me." So when I

received the tobacco back from the laser, the microbial part of it, I realized that the microbes were down in the plant. The UV laser for, you know, ablating tissue was surface and that wasn't going to work. So I focused on the microwave. I flew out to Amana Corporation in Iowa and met with the CEO and had him build me --

Q You said Humana?

A Amana Corporation that builds microwaves in Iowa. And I built some microwaves, the length of this room.

Q Big microwave.

A Well, what I did, once I had it working in a kitchen microwave, I sent someone that worked for me in the office down to Wal-Mart and bought 200 microwaves so I could see if I could cure enough tobacco by hand to make some cigarettes to show that this was commercially -- that I had to figure out how to apply it commercially at some point. And during that period, there was a meeting in Richmond. I'm trying to think of the name of it. I haven't been around it for a while. I think it was called like the TRC or something like this, it was Tobacco Research in Chemistry. And all of the leading tobacco researchers and chemists came here in Richmond to the old Hyatt Hotel. And I went there and met with R.J. Reynolds, Philip Morris, British American Tobacco, the leading tobacco companies.

Q All the big companies.
A All the big companies I met with. And they were all, I would say, I just took the lead out of the gasoline.
Q How did you do that?
A By curing the tobacco. These were the strongest and most abundant carcinogens in cigarette smoke, and I figured out how to stop it. At that point, I was using giant microwaves. And it was cumbersome, because I had to remove so much moisture when it would come in off the farm, so I had a 50, 60-square foot building down in Chase City. The farmers would bring in the tobacco, and I would run it through the microwave. Even at that point, with the microwave, Brown & Williamson Tobacco came in with me. But once I had removed the nitrosamines, Warner-Lambert, Schering-Plough, SmithKline, three of the largest drug companies in the world, they came to my house out in Goochland.
Q They came to you.
A The CEO's of those companies came there. Because keep in mind, I'm back over at the Drug Division, and I've just taken the nitrosamines out. So maybe this is a good drug for them to attack the tobacco industry. So I had a deal with Schering-Plough for a couple hundred million dollars. And it went to the Board.
Q The Board of Star Scientific?

A No. Yes, back early on Star Scientific. When it was private. And so I had a deal with Schering-Plough for like first payments, like $200 million or so going on. And then the, what happened was, the Board voted it down because the drug company was afraid of tobacco. And at that point, I went back to -- Brown & Williamson had contacted me, the CEO, Nick Brooks. That's the largest operating division of British American Tobacco, the second largest tobacco company in the world.

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

A And he called me and said, "Listen, Jonnie. I need what you have. I won't try to take it from you. I won't try to steal it from you. I need what you have." He said, "So let's get together and work out a deal," and I did.

And while I was doing that, they had agreed to buy the tobacco from the microwave. They didn't care how I was doing it --

Q Right.

A -- as long as the nitrosamines were out of it.

And while I was doing that, one of the engineers from Brown & Williamson one day made a comment. Because I had a group of their engineers that they assigned now down in Chase City with me, and he said, "We'll never be able to convert all the tobacco over using these microwaves, Jonnie, not as big as our business is." And so then I realized it would be a specialty situation.

So then I went back to the drawing board while we were doing the microwaves, and I believed that what was causing this microbial situation I could solve with oxygen. So I took a -- a Maytag clothes dryer, the -- I had -- I bought it from a used appliance store because the old dryers would get hot enough to where you could heat it up enough to kill the microbial activity, which was maybe around 170 degrees or so.

And so I took a -- a Maytag clothes dryer and I took a magazine rack and bolted it inside the spinning dryer, and I had a fellow that used to work for me at the cigarette factory, Tommy. I said, "Tommy, we don't have time to hot-wire this. I need to you stay here all night and every hour, or whatever it is with the clothes dryer, just reset this thing for me."

And so I came back the next morning. I took the tobacco that looked like normal tobacco, where the microwave made it flat because it removed the moisture so fast, and I sent that to the University of Kentucky. And they said, "We can't find the nitrosamines in here."

So what I did then is I got in my car -- and I don't know if I got in a car or got in a plane. I went to Bennettsville, South Carolina, to the largest company that makes curing barns, and within a week from my Maytag clothes dryer, I had designed a unit for curing tobacco, and I ordered $30 million worth of them.

And I went to Brown & Williamson and I said, "I need you guys to bankroll this thing for me because this is how you're going to take the lead out the gas with the tobacco." And I had a very good relationship with Brown & Williamson. Their general counsel and their executive vice president, Mick McGraw, was a nonsmoker and he was very interested in what I was doing.

So Brown & Williamson bankrolled it, and I started going to Macon, Georgia, every few weeks or so and was basically leading them that way. And in the British American Tobacco's annual report the following year, British American Tobacco, the parent company, said that they were using my company to make their tobacco products less harmful.

Q Mr. Williams, can we just stop there for a moment?

A Yeah.

MR. BURCK: I think it's 4:15, Your Honor. I didn't know if you wanted to continue or --

THE COURT: Let's stop. We'll take 15 minutes.

(The jury left the courtroom.)

(Recess taken from 4:13 p.m. until 4:21 p.m.)

MR. BURCK: Your Honor, I understand that the witness is in the bathroom.

THE COURT: All right. Just hold on a second.

(The jury entered the courtroom.)

THE COURT: All right. Mr. Burck.

MR. BURCK: Thank you, Your Honor.

BY MR. BURCK:

Q Mr. Williams, just before we continue, I was just wondering, did you speak to your attorneys in the last 15 minutes during the break?

A I did.

Q Did you talk to them about your testimony?
A I did. About my testimony?
Q About your testimony.
A Yes.
MR. BURCK: Would you mind, the court reporter, I would ask that you read the last two sentences or so of Mr. Williams' testimony before we went on break.
(Record read.)
MR. BURCK: Thank you.
BY MR. BURCK:
Q I just wanted to have it read back so that you could reorient where we were in your testimony.
A Okay.
Q So please, if you could continue.
A Yes. So at that point, things were going very well with our partner, Brown & Williamson. And -- and I had worked with -- I brought in some other people to help, scientists from the University of Kentucky, neurologists, different people, to come in and fill in background on things that I was trying to do.
And where I was trying to go with Brown & Williamson was to convince them that, okay, we block the nitrosamines from forming. They're the strongest, most abundant carcinogens in tobacco, but where you really need to go with this is you need to go with smokeless in a form of a

Tic Tac, and that way we can eliminate the carcinogens and have your products much safer.

And so I did that.

Q When you say "Tic Tacs," the form of a Tic Tac, actually?

A Compressed -- I would take the tobacco and pulverize it in like Pillsbury flour and then put some binders in it to make it into the form of -- a Tic Tac form of a dissolvable mint. And they had embraced that, and they were test marketing that around the United States.

They were also test marketing a safer cigarette, or a cigarette with less toxins with this new tobacco in it, they were testing that around the United States.

And so the rest of the industry saw what Brown & Williamson was doing. And they basically had no choice, once the nitrosamines were coming out of the tobacco, and they started to copy. Not as well, but they were copying what I was doing.

Q You mean copying patents?

A Yes, copying -- copying the technology of lowering the nitrosamines through using airflow and controlling the temperature and the humidity inside of a curing chamber to prevent the microbial activity from reducing nitrite to nitrite with those alkaloids for the nitrosamines. So the other companies started to do this.

Q Right.
A And then I -- I --
Q I'm not sure what they were doing, but it sounded very --
A Okay.
Q And so the patents themselves, you owned the patents or did the company own the patents?
A They're in my name --
Q They're in your name.
A -- and I signed them to the company.
Q Okay.
A And then Reynolds, we -- we sued R.J. Reynolds Tobacco Company for patent infringement, and that was quite a challenge when you sue a tobacco company and you're a small company. It's quite a challenge when you do that because the lawyers pile in on that.
Q Right.
A And so the problem was not so much that I would litigate Reynolds, but my partner was Brown & Williamson. I had carved them out, and we decided that, okay, if Brown & Williamson takes the lead out the gas here, the other ones won't have any choice. And that's what we were working on.
And so what happened was that Mick McGraw called me up one morning, the general counsel and the executive vice

president of B&W, and said, "Jonnie, I hate to tell you this, but Reynolds is buying our company." And that's the company that I'm litigating with.

Q Right.

A And so that was a -- that was a surprise. And so at that point I decided I didn't want to stay making cigarettes. I wanted nothing to do with it. So I sold out of the cigarette part of it.

Q Right.

A Now I found myself in straight litigation here on a very large lawsuit with a very large tobacco company, which is very high risk.

And so while I -- while I was doing that, while I was doing that, I asked Dr. Jaffe one day, "Dr. Jaffe, why are people smoking?" Dr. DeLorenzo says the nicotine has such a weak half-life, it doesn't last very long. It's addictive, but it's really not why people are smoking, in his view.

I said, "You're a psychiatrist and you're an addiction expert. Why are they smoking?"

And he said, "I think they're mildly depressed."

And so --

Q Mildly depressed?

A Mildly depressed. And so then I brought in some neurologists and I asked them, "What are you writing

prescriptions for for people that are depressed?" And they explained to me Pargyline, different drugs, MAO inhibitors like Wellbutrin like you'll hear on TV advertised sometimes.

And so once I heard that and I understood that maybe there's another alkaloid in tobacco. Just because nicotine is the most abundant one and it's addictive, maybe there's another one in tobacco. That's maybe the reason that they're smoking. And so what I did was I had some tests performed at the tobacco company, brought in chemists from the University of Kentucky and put it into the form of an extract, like a vanilla extract, Marlboro cigarettes I put into an extract. Then I took Nicorette Gum with the nicotine, put it into an extract.

And then what happened was we took all the alkaloids in tobacco. And now I'm trying to match them up to an MAO inhibitor, and nicotine was zero as an MAO inhibitor. And then I --

Q What does that mean?

A It -- in your brain you produce monoamine oxidase. Monoamine oxidase regulate your dopamine levels. And so that's why a class of drugs were developed called MAO inhibitors to try to inhibit the monoamine oxidase, and then you have more dopamine available. And studies had shown that smokers had lower MAO levels, just testing in

general.

And so the challenge I had was to isolate the alkaloid or the compound in tobacco that was responsible -- that would match up to a Marlboro on an MAO assay as an antidepressant. And when we conducted that MAO assay on nicotine, it was no MAO activity on nicotine, and this is a drug that's used for antidepressant activity.

Q Right.

A So I thought, well, maybe there's another mechanism or something, but nicotine is zero. I've ruled that one out because, you know, nicotine is available everywhere so why can't you just go to the drugstore and purchase it in any form and quit, and it doesn't work very well.

So then I tested a Marlboro cigarette in extract form, and when the neurologists and the chemists did that assay, a Marlboro cigarette inhibits this monoamine oxidase activity. It's 60 percent. And so the drugs -- the reason they have a problem with the drugs for MAO inhibitors, it's very difficult to regulate. They'll go to 80, 90 percent, and they have black box warnings and you'll have a stroke.

But on the MAO activity of a Marlboro, it went to 60 percent, and no matter how hard you dosed it, it stayed -- it stayed at 60 percent. Okay. And so now the

challenge was is is there an alkaloid in tobacco that matches up with that.

And so when I got to Anatabine, I knew that nornicotine was very addictive and it was -- you know, it showed that activity but too high. Anabasine was -- had aspects to it from prior tests, from livestock in Russia eating it and having the animals deformed. And then when I tested it with Anatabine, when I held the chart up at the light, it was 100 percent dead match on a Marlboro cigarette, the Anatabine was, for MAO. It was a hundred percent statistically dead match on a Marlboro cigarette.

So at that point I thought, well, if I take it and make it a drug, it's -- you know, I'm looking at ten, who knows how many years this is going to take. And so I had done the work on it and I left it alone, and then when we went into the R.J. Reynolds trial, it didn't work out. All the patents were upheld at the appellate office. Every claim in the patents was upheld, but they were infringing just a little bit below our levels and we ran into trouble with that, and we settled the case for less than we wanted with R.J. Reynolds. And once that happened, I was in a situation, we were in a situation where, okay, what do I do now with this.

And so I went back to the Anatabine. And the medical director of our company, as I had mentioned earlier in

this trial, is a former chief of anesthetics and addictive substances, which covers nicotine, at the FDA. So he ended up coming on board as the medical director of the company. So that gave me a tremendous resource in in-house for that.

And so then what I set out to do is -- with Dr. Wright was can you organize the tox -- the toxicology work to show that Anatabine is food safe, and since it's found in potatoes and tomatoes and the night shade plants, let's sell it as a vitamin. And Dr. Wright organized the toxicology studies up at Harvard. And we went through that for about two years, and then that takes us up to about 2009 or so where you heard me talking about the CigRx product.

Q Right. Right.

A And so at that point I had isolated, we had synthesized Anatabine chemically. We had figured out how to make it. And so now the challenge was to go to market and see if there was a market and see if this was going to work with the smokers.

Q Right. You told us a little bit about the experience your wife had with --

A Yes.

Q -- the product?

A Yes.

Q Can you tell us a little bit more about that?
A Okay. My wife had developed --
MR. DRY: Judge, relevancy. We've been here for --
THE COURT: I think he's been very thorough about that issue. I don't know that we need to hear any more about it.
MR. BURCK: That's fine, Your Honor.
A Okay.
BY MR. BURCK:
Q Mr. Williams, it's fair to say that you are -- you're a very successful businessman; is that right?
A I feel that way.
Q And you told us that you've built five -- at least five different companies up from nothing?
A Yes.
Q All right. And I understand that you come from very humble beginnings; is that right?
A Rural Virginia.
Q And you were not wealthy when you were a child, were you?
A No.
Q What is your net worth in this period of time, last five years, roughly?
A I don't care to answer that, unless I have to under

the law.
Q You don't have to answer it specifically. Can you give me a range?
A I really don't care to do that --
Q Okay.
A -- in public, unless it's required of me by this court.
Q It could be, but I will not press you on it.
A Okay.
Q But you're well -- you're worth well over a million dollars, right?
A Yes.
Q Now, this whole experience, this investigation, everything that's gone on has been difficult for you, has it not?
A It's been very difficult.
Q And your reputation has taken a beating, hasn't it?
A It has.
Q And people think you've done something wrong, right?
A I don't know if they do or not. Some may. Some may not.
Q Well, you testified earlier that you did to Mr. Dry's questions. Do you remember that?
A Yes. I was concerned about it.
Q Has this hurt your -- has this whole experience, this

investigation, has it hurt your financial situation?
A Other than the impact maybe on -- since I left Star Scientific and brought two physicians in, I felt some impact in it from there. But as far as my ability to operate and move forward in business, I don't believe it has.
Q That's good to hear.
And you are no longer the CEO of Star Scientific, but you're still employed by Star Scientific, right?
A I'm a low-level employee.
Q Right.
A A dollar a month.
Q What's your current -- what's your current position there?
A I don't think I have a position, other than they pay me a dollar a month, and I try -- I'm available when they need me to help them with anything.
Q And what's your -- what percentage of the company do you own at this point, roughly?
A I don't know percentage wise. Maybe a little over 10 percent or so.
Q And what's the market cap in the company, generally?
A It's dropped quite a bit with all this.
Q Yeah, yeah.
A It's probably -- maybe $80 million or so.

Q So roughly your -- your percentage ownership is about $8 million right now?
A Maybe in Star.
Q But it hasn't -- but that has not -- even though there's been a dramatic decline in the stock price, that has not overall affected your ability to do business?
A It's not -- it doesn't impact my ability to do business.
Q Okay. Did you tell the government at any point that you are a -- you are just a vitamin salesman?
A I don't recall ever saying that I was a vitamin salesman.
Q Do you think you are a vitamin salesman? Is that what you would think you'd sum up your career?
A Well, I'm a salesman for whatever product our company is developing. And Anatabloc is a dietary supplement, and I've been working with people at the company trying to sell it.
So if --
Q And --
A Some days I would say I'm doing that, yes.
Q So some days you're a vitamin salesman, but --
A Probably.
Q -- is that how you'd sum up your career?
A It's not.

Q How would you sum up your career, just briefly?
A I try to develop technologies that are going to change, have a change in the marketplace or change and try to improve products for people. I try to -- that's what I'm focused on would be disruptive technologies that have the capability to improve people's lives.
Q And Anatabloc, CigRx, those are disruptive technologies in your view, right?
A Yes, they are.
Q Tell us about CigRx and Anatabine and what they mean to you.
A What Anatabine means to me?
Q What it means to you.
A Let me try it this way, and if it doesn't work for you, I'll try it a different way --
Q However -- whatever way you want to try it.
A Since you're just letting this go here, I'll try.
Let me tell you what Dr. Ladenson thinks of it.
Q Okay.
A Is that okay?
Q Absolutely.
A All right. Dr. Ladenson thinks that the Anatabine discovery is one of the most significant discoveries in modern medicine, right there with antibiotics.
Q Antibiotics? Is that what you --

A Antibiotics. That's what he thinks.
Q And we've heard testimony about Mr -- Dr. Ladenson, right?
A Yes.
Q Do you agree with him?
A I do. I've had firsthand experience of it working.
Q And this is -- this is the story about your wife that you spoke about briefly yesterday?
A Yes.
Q Okay. So is it fair to say that you truly believe in Anatabloc, CigRx and your products, right?
A I do.
Q Now, what you've been telling us today, has this been just a pitch to you or do you really believe what you've been saying?
A What I've been telling you --
Q Today.
A -- all day or just about this --
Q No, no. Just in the last -- in the last half hour.
A I've been trying to respond to your question about where I started and where I've arrived.
Q Right. Absolutely. And so it's -- it's genuinely what you believe; isn't that right?
A It is.
Q I just want to take you back to some testimony you

had yesterday or maybe it was earlier today. Mr. Dry described a period of time October 2010. Do you remember that?
A Yes.
Q And I believe you were on your private jet with then Governor McDonnell. Do you remember that?
A I do.
Q And do you remember your testimony about that?
A I recall discussing it.
Q And you -- I think you testified that you spoke to the Governor for five or -- the whole trip about Anatabloc, right?
A Only the period that he fell asleep for a while. Other than that, I was talking about Anatabloc.
Q He fell asleep while you were speaking?
A Somewhere during the trip, I think I put him to sleep.
Q How -- how long do you think you were able to speak to him during that period?
A All the time he was awake. It was hours.
Q Hours. Okay. Okay. Did he engage with you or did he just sort of stare at you?
A He had to listen to me.
Q It was a confined area, right? So he had to --
A I had his attention.

Q Okay. And did he respond as you were speaking or did he just let you talk?
A He asked questions, and the Governor is a bright fella and he listened politely.
Q And he actually got you a meeting with Dr. Hazel after that, right?
A He did.
Q And how long after the flight was the meeting with Dr. Hazel?
A It seemed like maybe a week.
Q And Dr. Hazel was the Secretary of Health for the state of -- or the Commonwealth of Virginia?
A Yes.
Q In that meeting did you explain to Dr. Hazel or try to explain what your products could do for the state of Virginia?
A I did.
Q But I think you testified that Dr. Hazel didn't share your enthusiasm, right?
A Well, I didn't expect him to share my enthusiasm. He's an orthopaedic surgeon and he's a doctor. And I didn't have the clinical data. So that didn't surprise me.
Q I want to ask you a question, and stepping back to some testimony you gave yesterday about a conversation you

had with my client in May of 2011, on May 2nd, 2011.
A Yes.
Q And that was the meeting that you described --
A Yes.
Q -- and you testified that she told you about the couples' financial difficulties?
A Yes.
Q Is that what you said?
A Yes.
Q And I believe that you testified about what she said to you in the course of that meeting about what she would do for you and what you would do for her. Do you remember that?
A Yes, I do.
Q And do you recall your testimony?
A In general.
Q In general? And did she tell you that -- did Maureen McDonnell tell you that she was going to get the Governor to do anything for you?
A No.
Q Did she say that she was going to do --
A She said, "I'll help you all I can."
Q "I'll help you all I can." Okay.
A She said the Governor said it was okay for her to help me.

Q Right. The Governor was saying it was okay for her to help you?
A Yes.
Q But he never said that he was going to help you?
A No, not that day.
Q I just want to ask you a question just so I understand the testimony --
A Yeah.
Q -- because it was a long day.
A Yeah.
Q Just sitting here today, are you 100 percent sure that Bob McDonnell agreed to help your company, Star Scientific, because of the loans and gifts that you gave him and his family? Are you 100 percent sure of that?
A I am 100 percent sure of that. I believe that.
Q And -- and so you believe that but for the gifts and the loans, you would not have gotten the launch, as you called -- or as it was referred to at the Mansion, right?
A Yes.
Q And you would not have gotten the second meeting with Dr. Hazel, right?
Do you remember there were two meetings?
A I'm listening. You're listing --
Q I'm asking. I'm asking --

A Well, I didn't know if it was -- I was to respond to each one separately.
Q I'm sorry. I thought you responded to the launch saying that -- would you have --
A No, I didn't say anything.
Q No. That's fine.
A I'm sorry. I was listening.
Q My apologies. The launch, would you have gotten the launch but for the gifts and the loans?
A No.
Q Would you have gotten the second meeting with Dr. Hazel but for the gifts and the loans?
A I don't know that.
Q You don't know that?
A I don't know the second meeting because -- I don't know the second meeting because -- I just don't know about the -- I don't know of -- when you ask me that because I loaned the money and I got the meetings. So I didn't -- I just don't know that.

MR. DRY: Objection, Your Honor. I don't think that the witness testified about a second meeting with Dr. Hazel. I think he --

THE COURT: Well, he's asked the question sufficiently. Ask another one, please.

BY MR. BURCK:

Q And the healthcare event in early 2012 --
A Yes.
Q -- do you think that -- you were able to invite a number of doctors --
A Yes.
Q -- from very prestigious universities and hospitals; Johns Hopkins, one of the top schools in the country, right?
A Yes.
Q And do you think that you got that, the invitations, only because you gave these loans and these gifts?
A I think the -- the whole evening, sir, from the -- from the invitations to the private dinner with Dr. Ladenson and Dr. Crantz, and then when they surprised me and invited him to spend the night -- the two of them to spend the night at the Governor's Mansion after dinner, I don't believe that I would have -- that would have happened.
Q Okay. So that was because of the loans and the gifts?
A I think so, yes. I believe that.
Q The -- the second one I talked about, that's the only one you're not sure about?
A The second one?
Q The second one I talked about the --

A With Huffstetler?
Q Huffstetler, the -- with his staff.
A Well, they had arranged for the meeting with Dr. Hazel --
Q Right.
A -- but I just don't -- you know, I just --
Q You're not sure about that one?
A I'm not sure about that one.
Q That's fine. That's fair.
Now, let's talk a bit about my client, Ms. McDonnell, and discussions you had with her about Anatabloc, and I think you testified that you spoke to -- every time you met with the Governor, you spoke about Anatabloc?
A Every time I had the opportunity.
Q Every time you had the opportunity. Okay. And Ms. McDonnell, did you talk to her a lot about Anatabloc as well?
A I did.
Q And when you -- you knew that -- or she told you that she was -- she had a history with nutraceuticals, right?
A She did.
Q And when did you first learn that? Do you remember? Was it the first time you met her or was it sometime thereafter?
A I don't recall when I first learned that.

Q Okay. But it was something you understood; that was something that she was really interested in?
A Yes.
Q And you told her about the experience your wife had, right, with Anatabloc?
A Yes.
Q And you mentioned Dr. Hazel really didn't share the enthusiasm with this product?
A I didn't have the data to show him.
Q You didn't have the data, right. Ms. McDonnell did share your enthusiasm; isn't that fair to say?
A Yes, she did.
Q And you genuinely believe that she did?
A I believe she thought it was -- I believed that she believed in the product.
Q Okay. And that was from the very beginning of when she learned about Anatabloc?
A I believe it was early on, yes.
Q And you know that she started taking it herself, right?
A Yes.
Q And you know she gave it to her children?
A I didn't know she gave it to her children.
Q Now, you testified yesterday, in response to a question from Mr. Dry, that you are a businessman and

Governor McDonnell is a politician, right?
A I did say that.
Q And that was the foundation of the relationship that you were trying to build with Governor McDonnell, right?
A It was a business friendship and I needed -- I needed him to help me as the head of Virginia.
Q So from the very get-go, you saw Governor McDonnell as a potential business -- call it target?
A I wouldn't call it a target.
Q What would you call it?
A I would call it -- in the beginning, I thought it was -- when I first met him, I just wanted to form the relationship just like with other people that have used the airplane over the years.
Q So it was no different than other politicians at the -- at the early point?
A Not at the early point.
Q Okay. And would it be fair to say that you had -- let's call it an agenda with Governor McDonnell?
A Yes.
Q And the agenda was to promote your business?
A To promote the company and try to have him help with the testing of the product, yes.
Q You testified earlier about a social gathering with Governor McDonnell and Ms. McDonnell in December of '09 in

New York City. Do you remember that?
A Yes.
Q And that was in the lobby of the Four Seasons Hotel?
A Not in the lobby, but off the lobby in a small -- in a restaurant area.
Q And just so I understand the sequence of what happened at that -- that -- that meeting that you testified about, you had a friend with you, Brad Kroenig?
A Brad Kroenig.
Q Kroenig. Who was a male model. You testified about him.
A Yes.
Q And you met with the Governor and the First Lady in the lobby? No?
A No. We had drinks.
Q You had drinks.
A And they were going to a show.
Q Okay. And they went to the show, right?
A Yes.
Q Now, when they went to the show, they left behind members of staff?
A They did.
Q And that was Phil Cox?
A Phil Cox, Adam Zubowsky, and I can't recall the names of the other people.

Q Okay. And when you were -- you were at a bar area?
A No. Sitting in the restaurant.
Q Sitting in the restaurant. Did you order any drinks while you were --
A Yes.
Q And I think you testified about some Cognac --
A I did.
Q -- earlier at a different event, a couple years later, right?
This was at -- I think at the vacation --
A Yes, at the Chatham Bars Inn.
Q Yeah.
A Yes.
Q So in the Four Seasons I think you ordered the same Cognac, right?
A I did.
Q And that was the Louis XIV -- XIII? Excuse me.
A Louis XIII.
Q XIII. XIV would probably be $10,000.
A I don't know if they make one.
Q How much was the Louis XIV that you bought, that bottle?
A It may have been $5,000.
Q $5,000. Did anybody ask you to buy it?
A No.

Q You wanted to buy it?
A I was entertaining the folks, those people.
Q You were entertaining the people who were there?
A Yes. And Brad Kroenig was there.
Q Okay.
A And so that's commonplace for Brad in his world. And I had invited Brad to come along because I thought people would find Brad interesting and it would make it --
Q Right.
A -- soften the -- the meeting.
Q Soften --
A Make it interesting --
Q Right.
A -- to them.
Q And that's because Brad is a male model, he's -- he's famous in the fashion industry?
A He's very famous in the fashion industry.
Q Phil Cox and Adam Zubowsky, how long had you know them -- known them? Excuse me.
A I don't know if that may have been the first time I met Phil Cox. I'm not sure. Adam Zubowsky I had met maybe once before that or so.
Q So you bought -- but you did buy the Cognac?
A Yes.
Q And you shared it with them?

A Yeah, I shared it with them.
Q Is it fair to say that when you're around, nobody else has to reach for their wallet?
A I would say -- I would say when I'm around, I try to make things a little easier for people.
Q Right. And you don't -- no one is -- you're a generous person, right?
A I am. I think I am.
Q And you've done extremely well in your life?
A I think I've done well.
Q No one is forcing you to provide 5,000-dollar bottles of Cognac, right?
A No one is forcing me to do that.
Q You enjoy it?
A I actually don't care for that, but other people seem to. I'd rather have a milk shake from Carl's.
Q I'm sorry. I'm not talking about the taste of the Cognac. I'm saying you enjoy --
A Oh.
Q -- giving people things that make them happy, gifts?
A I generally like to -- I try to help people.
Q Okay. Now, going back to the -- excuse me.
When the Governor and the First Lady -- or actually, excuse me.
They were not -- he was not the Governor at the time,

right? He was the Governor-elect?
A That's correct.
Q And Maureen McDonnell, when they returned from the show, they joined you?
A No. I don't recall seeing them after the show.
Q Okay. So you saw them before?
A It was maybe 45 minutes or so before the show.
Q Got it. And that's where you had the conversation with them about -- or with Ms. McDonnell about the Oscar de la Renta dress?
A That's correct.
Q Do you remember -- you know Oscar de la Renta personally, right?
A No, I don't.
Q You don't?
A No.
Q You didn't show, on the phone, people where Oscar -- that you had Oscar de la Renta on the phone?
A I have no idea -- if Oscar de la Renta walked in the room, I wouldn't know him.
Q Okay. And you testified that Brad Kroenig had been talking to Maureen McDonnell about a dress?
A Yes. And Brad reminded me that a very good -- close friend of mine that I spend time with every week, his -- his daughter, Oscar de la Renta is the godfather of his

daughter.
Q I see.
A And that's where that came from.
Q I understand. I understand. Ms. McDonnell didn't ask you to buy a dress at that -- at the Four Seasons, right?
A She asked me to get her -- if I could get her -- she turned -- told her husband I was going to get her a dress. But at that point I was hoping I could borrow one.
Q Well, let's just back just up a little bit.
A Yeah.
Q Because I think you testified earlier that Brad Kroenig had said -- turned to you --
A Yeah.
Q -- after he was talking to Maureen McDonnell --
A Yeah.
Q -- and said to you, "Don't you know Oscar de la Renta's" --
A Yes.
Q -- right?
A Yes.
Q And then you said -- and he said -- and Brad Kroenig said to you, "Can you help her get a dress"?
A No. Brad Kroenig said can I help her get a dress?
Q Is that what you testified?

A I don't believe so. Brad Kroenig turned to -- he turned to me and pushed it back to me.
Q Right. I mean -- what does that mean? What does it mean pushed it back to you?
A He shifted it back to me because Brad realized that he didn't know anyone -- see, in my mind, I thought -- my daughter was a model with Ford and --
Q That's Rachel, right?
A -- and I met Brad from -- at one of the runway shows. And they have all these clothes at the runway shows. So I thought that, you know, when we're talking to Brad, maybe he could -- there's a place to borrow one of these dresses for the inauguration.
Q Right.
A And then Brad reminded me of my friend that was real close to Oscar de la Renta. So then I said, "I'll get you" -- "I'll help you get a dress."
Q Okay. So you said that "I'll help you get a dress" to --
A "I'll get" -- "I'll help you get a dress," yes.
Q You said it to Maureen McDonnell?
A Yes, I did.
Q And she was happy about it, right?
A She was very happy.
Q And she turned to her husband and told him?

A "Jonnie is going to help me get a dress for the inauguration."
Q But you didn't end getting a dress for -- for Maureen McDonnell, right? You didn't actually get one for her at that time?
A No, not at that time.
Q You testified that was because you were informed that it would be inappropriate?
A The lawyer called me --
Q The lawyer --
A -- and told me.
Q -- Jasen Eige?
A Yes.
Q All right. And you testified that you had a conversation with Maureen McDonnell around that same time?
A Yes.
Q And you recall, I think, that she said to you that it would be too expensive, given the economy at the time, in sum and substance?
A I did.
Q And you testified that she said that she would take a rain check on that?
A Yes.
Q And I --
A On a shopping trip to --

Q On a shopping trip.
A On a shopping trip. Not on another inauguration dress.
Q No. I think only one for Virginia, right?
A Yes.
Q Do you recall telling Mr. Eige that -- that you -- that you wanted to convey to Maureen that after the Governor-elect's term is up, you want to fly her up to get a dress?
A No.
MR. BURCK: Your Honor, may I approach just to refresh recollection?
THE COURT: Sure.
MR. BURCK: This is RM-0676.
THE COURT: Could raise your voice a little bit?
MR. BURCK: I'm sorry, Your Honor. RM-0676.
THE COURT: All right.
BY MR. BURCK:
Q And without reading from it, just -- out loud, just start from the bottom and read it up and then I'll -- then put it aside, please.
A This is from Jasen --
Q Wait. Mr. Williams, don't -- please don't read from the document. Just read it to yourself.
A Okay.

Q Before I ask you any questions, this is -- you're not on this e-mail, right?
A That's correct.
Q This is an e-mail dated December 18, 2009?
A Yes.
Q And it's between Jasen Eige and someone named Crystal Cameron?
A Yes.
Q Do you know who Crystal Cameron is?
A I have no idea.
Q And after reading that document, do you remember my question: Did you tell Jasen Eige that after the Governor-elect's term is up, you want to fly her up to get a dress?
A I don't recall that at all.
Q Thanks.
Now, I just want to shift gears just a little bit.
Actually, before I go on, did you meet with the prosecutors in this case about three weeks ago or so?
A Yes.
Q Did you tell the prosecutors that you did not recall -- excuse me -- that after meeting with FLOVA -- do you know who FLOVA is?
A It's a nickname for Ms. --
Q First Lady of Virginia?

A Yes.
Q -- that after meeting with FLOVA in December of 2009, after meeting with her, that you don't recall any other interactions with her until October 2010? Do you remember telling them that?
A I may have said that. I don't recall. As I sit here, I don't recall that.
Q And you did testify to a conversation, a phone call you had with her --
A Yes.
Q -- after the meeting?
A Yes.
Q So when you said -- or you may have said to the prosecutors that after meeting with FLOVA in December of 2009, you do not recall any other interactions with her until October 2010?
A Not in person. On the phone call when she talked to -- called me about the dress.
Q Okay. Now, shifting gears just a bit. You talked to Mr. Dry about an interview that happened in January of 2013 with the Virginia State Police --
A Yes.
Q -- and the FBI. Do you remember that?
A Yes.
Q And the agent, the FBI agent and the Virginia State

police officer, or detective, he -- they showed up at your home --
A They did.
Q -- in Florida?
A They did.
Q Did they call you to tell you that they were coming?
A No.
Q So it was a surprise?
A It was a surprise.
Q And they knocked on the door and there they were?
A Yes.
Q And you spoke to them voluntarily, right?
A I did.
Q And you didn't have any lawyers present?
A No.
Q Now, one of the topics I think they wanted to talk to you about was the McDonnells, right?
A Yes.
Q And the other topic -- or there were two other topics, at least. One was about Mr. McKeon, right?
A Yes.
Q And you touched briefly on who Mr. McKeon is.
A Yes.
Q Can you tell us a little bit more about who Mr. McKeon is?

A John McKeon is a friend of mine. He's become a friend of mine, and I met him in Richmond maybe six -- six years or so ago, six or seven years ago.
Q And what does Mr. McKeon do?
A He's a private investor. He used to be a fund -- a money manager in New York.
Q And is he a wealthy man?
A I think so.
Q I think in that interview with the Virginia State Police and the FBI in January, you told them that you had gotten a 2 million-dollar loan for Mr. McKeon in June of 2009?
A Do you have something that --
Q Yes, I can --
A Help me with that.
Q I'll help you out. Absolutely.
A I just don't want to guess at that.
MR. BURCK: Your Honor, we're just going to pull it up. We're going to pull it up.
THE COURT: All right.
BY MR. BURCK:
Q Now, Mr. Williams, can you see that okay?
A I can.
Q And Mr. Dry actually showed you this document earlier, right?

A He showed me this document earlier today?
Q I'm asking you the question. If you don't recall, I can take you to the sections that he showed to you.
A No. I -- as I sit here, I don't recall this document.
Q Mr. Williams, what I'll do is I'll take you down -- can you move the pages down to, say, the third page. Further down, please. And further -- oh, actually, right there is perfect. Thank you.
Now, without reading out loud from the document -- could you blow up the bottom paragraph of that page?
Now, without reading that out loud, can you just read it to yourself?
A Okay.
Q Do you recognize that paragraph?
A Okay. Give me just a moment.
Q Sure.
A Okay.
Q Do you remember this document now?
A I don't remember the document itself, but I've just read this one.
Q Okay. Well, we're actually going to go up to page 2, the fifth paragraph.
Could you blow that up? I think that's the wrong paragraph. Can you move it up just a little bit? There

we go.
Can you read that paragraph to yourself?
A Yes.
Q And remember, my question to you is whether or not you told the investigators that you received a 2 million-dollar loan from John McKeon?
A Okay.
Q Do you remember telling the -- does this help refresh your recollection as to whether or not you told these investigators that you received a 2 million-dollar loan from John McKeon?
A I don't recall specifically if I did or not.
Q Okay. Let me ask you this. Did you receive a 2 million-dollar loan from John McKeon?
A I would like to see -- I would be --
THE COURT: Well, this question calls for independent memory. If you recall whether you got --
A I don't recall specifically.
THE COURT: All right.
BY MR. BURCK:
Q You don't recall receiving --
A I recall --
Q Go ahead.
A I recall loans with John McKeon, a credit line, but I can't recall that specifically as I sit here.

Q Okay. That's fine. Let me ask you --
A Okay.
Q -- do you recall telling the investigators in the January 2013 interview that you had not repaid the loan as of that date --
A Yes.
Q -- the loan you talked about just now --
A Yes.
Q You remember telling them?
A I remember saying that.

THE COURT: All right. We're going to stop here primarily because I can't take another second. I've had all I can stand for the day, and I'm sure you feel the same. We will get back. It's been a long day, and I'm -- I'm starting to lose focus so let's stop here.

We will start tomorrow at 9:30. And, again, please don't discuss the case with anyone, allow anybody to discuss it with you and take care. We'll see you tomorrow. Hang tough. We'll get through it. All right. We'll see you tomorrow.

(The jury left the courtroom.)

THE COURT: 9:30 tomorrow.

(The trial adjourned at 5:24 p.m.)

I N D E X

WITNESSES


| Examination By: | | Page |
|---|---|---|
| | JONNIE RAY WILLIAMS, SR. | |
| Direct Cont'd | - MR. DRY | 694 |
| Cross | - MR. BURCK | 851 |