IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 3:14cr12 |
| ROBERT F. MCDONNELL, | ) | |
| Defendant. | ) | |

**S<small>ENTENCING</small> P<small>OSITION OF THE</small> U<small>NITED</small> S<small>TATES</small>**

The Governor of the Commonwealth of Virginia wields enormous power.  He oversees 110,000 state employees, 132 state agencies, and a $96 billion budget.  Tr. 4351–52.  The defendant abused that power and violated his duty to the citizens of Virginia to provide his honest services.  The defendant is fond of pointing out that under Virginia law, no limits on gifts to elected officials existed, and he thus claims that he was merely a "part of the culture of unlimited gifts that has permeated Virginia politics."  Presentence Report ("PSR") ¶ 128.  But he was not convicted of accepting gifts; he was convicted of accepting bribes.  And bribery has always been a violation of state (as well as federal) law.  *See* Va. Code § 18.2-439.  The defendant violated the law when he sold the power and influence of his office in exchange for more than $175,000 in payments, golf, vacations, and luxury goods.

After a six-week jury trial, the defendant stands convicted of eleven counts of honest services wire fraud, extortion, and conspiracy.  The PSR calculates his Sentencing Guidelines range for imprisonment as 121–151 months, and the United States asks this Court to adopt the PSR's factual findings and Guidelines calculations.  Based on the factors set forth in 18 U.S.C. § 3553(a), a Guideline sentence is sufficient, but not greater than necessary, to account for the seriousness of the offense, promote respect for the law, promote general deterrence, and account

for the history and characteristics of the defendant.  More specifically, after serving as a prosecutor and Attorney General, this defendant corrupted an office that few bribery defendants achieve, and then falsely testified and shifted blame for his actions before the jury that convicted him.  Thus, a Guideline sentence appropriately balances the defendant's prior good deeds with the gravity of his criminal conduct.

## I.      Guidelines Calculation

As this Court is aware, "in imposing a sentence after *Booker*, the district court must engage in a multi-step process.  First, the court must correctly determine, after making appropriate findings of fact, the applicable guideline range."  *United States v. Moreland*, 437 F.3d 424, 432 (4th Cir. 2006).  In doing so, the Court must make factual findings, supported by a preponderance of the evidence, to support any pertinent Guidelines enhancements.  *See United States v. Grubbs*, 585 F.3d 793, 803 (4th Cir. 2009); *United States v. Harvey*, 532 F.3d 326, 337 (4th Cir. 2008); *United States v. Quinn*, 359 F.3d 666, 680 (4th Cir. 2004).  "Next, the court must 'determine whether a sentence within that range serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors.'"  *Id.* (*quoting United States v. Green*, 436 F.3d 449, 455 (4th Cir. 2006)).

The United States has no additions, corrections, or objections to the PSR.  The United States asks the Court to adopt the PSR's findings and overrule the defendant's objections to its application of enhancements for (i) an offense involving more than one bribe, (ii) an offense involving a bribe or official action worth more than $120,000, and (iii) the defendant's obstruction of justice during his trial testimony.

**A.    The PSR appropriately applied a two-level enhancement pursuant to § 2C1.1(b)(1) because the offense involved more than one bribe.**

First, the PSR properly applied a two-level enhancement because the offenses involved more than one bribe or extortion.  *See* U.S.S.G. § 2C1.1(b)(1).  Here, the jury convicted the defendant of six separate counts of extorting six different things of value from Jonnie Williams.  Moreover, the evidence at trial established by a preponderance of the evidence that the defendant and his family members received numerous other bribes and extorted other items of property as part of the charged conspiracy.  None of those items was extorted or accepted by the defendant or his family members as part of one lump sum financial transaction.  To the contrary, over the duration of the charged conspiracy, the defendant went back time and again to extort or solicit new, previously undiscussed bribes from Mr. Williams—each time committing a new and separate offense.  As a result, § 2C1.1(b)(1) plainly applies.

Moreover, the Second Circuit has identified a three-factor test for determining whether more than one bribe occurred under § 2C1.1(b)(1).  *United States v. Arshad*, 239 F.3d 276 (2d Cir. 2001); *see also United States v. Roussel*, 705 F.3d 184 (5th Cir. 2013) (applying *Arshad* factors); *United States v. Weaver*, 175 F. App'x 506 (3d Cir. 2006) (same).  The first *Arshad* factor is whether "the payments were made to influence 'a single action.'"  *Id.* at 280 (citation omitted).  Here, Mr. Williams made discrete payments to obtain several official actions, not simply one.  This Court has already found that the defendant performed each of these separate actions and they were, in fact, "official" under the law.  *See* Mem. Op. Denying Mr. McDonnell's Rule 29 Motion at 4 (Doc. No. 571) (identifying five discrete official acts: "(1) the August 1, 2011 meeting between Williams and Molly Huffstetler, an official from the Health and Human Resources Department; (2) the August 30, 2011 Mansion event; (3) the February 17,

2012 email to Jason Eige; (4) the February 29, 2012 Healthcare Leaders Reception; and (5)

McDonnell's March 21, 2012 meeting with Lisa-Hicks Thomas and Sarah Wilson.").

The second factor is "whether the pattern and amount of payments bear the hallmarks of

installment payments, such as a regular schedule of payments over a finite period of time toward

a fixed final sum, rather than a series of intermittent and varied bribes." *Arshad*, 239 F.3d at

281. Though the defendant solicited multiple payments from Mr. Williams during the course of

the scheme, they never came at regular intervals or in regular amounts. *See* Exh. 609 (outlining

bribes, including $15,000 payment in May 2011, $50,000 in March 2012, and $20,000 in May

2012). The totality of Mr. Williams's largesse was not a single bribe broken into pieces.

Indeed, at the time of the first one, the remaining payments were not even contemplated. *See,*

*e.g.*, Exh. 379 (May 2012 text message from the defendant asking, "Johnnie [sic]. Per voicemail

would like to see if you could extend another 20k loan for this year.").

Third and finally, the defendant did not receive his bribes "in the same form and in the

same means," *Arshad*, 239 F.3d at 282, as he and his wife solicited cash, golf, vacations, and

luxury goods, Exh. 609. Thus, the PSR correctly applied § 2C1.1(b)(1).

> **B.** **The PSR appropriately applied a 10-level enhancement pursuant to**
> **§§ 2C1.1(b)(2) and 2B1.1(b)(1)(F) because the greater of the value of the**
> **things obtained by the defendant and those acting with him or the official**
> **action to be received in return for those things of value exceeded $120,000.**

Section 2C1.1(b)(2) provides that in an honest-services bribery or Hobbs Act extortion

case, a defendant's base offense level must be enhanced commensurate with "whichever is

greatest" of four amounts: (i) "the value of the payment"; (ii) "the benefit received or to be

received in return for the payment"; (iii) "the value of anything obtained or to be obtained by a

public official or others acting with a public official"; or (iv) "the loss to the government from

the offense." The first and third amounts reflect the value of the agreed upon bribes or extorted

property, or *quid*, and the second amount reflects the value of the official action sought, or *quo*. The fourth amount reflects any loss to the government caused by the offense.  If the greater of the four amounts exceeds $5,000, the base offense level is enhanced by the number of levels set forth in U.S.S.G. § 2B1.1(b)(1)'s table for calculating loss and gain for fraud offenses.

The commentary to § 2C1.1, in turn, provides further guidance for application of § 2C1.1(b)(2). It defines "payment" as "anything of value" and provides that payments "need not be monetary." § 2C1.1 cmt. n. 1.  The background commentary explains that because "[t]he object and nature of a bribe may vary widely from case to case," § 2C1.1 is "designed to cover diverse situations." *Id*. cmt. background.  Moreover, the commentary recognizes that "[o]ffenses involving attempted bribery are frequently not completed because the offense is reported to authorities"; thus, "[f]ailure to complete the offense does not lessen the defendant's culpability in attempting to use public position for personal gain." *Id.*  As a result, "[s]olicitations and attempts are treated as equivalent to the underlying offense." *Id.*  And with respect to § 2C1.1(b)(2), the background commentary explains that "[i]n a case in which the value of the bribe exceeds the value of the benefit, or in which the value of the benefit cannot be determined, the value of the bribe is used because it is likely that the payer of such a bribe expected something in return that would be worth more than the value of the bribe." *Id*.

Importantly, like all Chapter 2 and 3 enhancements, application of § 2C1.1(b)(2) must be determined on the basis of all "relevant conduct" as defined by U.S.S.G. § 1B1.3.  Thus, "in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy)," relevant conduct includes "all reasonably foreseeable acts and omission of others in furtherance or the jointly undertaken criminal activity."  § 1B1.3(a)(1)(B).  In other words, as applied to

5

§ 2C1.1(b)(2), the United States need not prove that a defendant was subjectively aware of the precise value (or even existence) of the bribes or official action, and those values are not limited to charged conduct or what the defendant received directly.  Rather, the United States may rely on any bribe or official action that was reasonably foreseeable to the defendant.

Similarly, as with calculation of loss under § 2B1.1, calculation of the applicable and comparative values in § 2C1.1(b)(2) need only be "a reasonable estimate . . . , given the available information," and a "district court's estimation . . . need not be determined with precision." *Quinn*, 359 F.3d at 680 (internal quotation omitted).  Indeed, it is not necessary to make a specific estimate at all; all that the Guidelines require is that the district court determine the applicable range from § 2B1.1(b)(1)'s table.  *See, e.g.*, *United States v. Kant*, 946 F.2d 267, 269 n. 1 (4th Cir. 1991).

In sum, the question for the Court is simple: did the PSR correctly conclude that the trial evidence showed it is more likely than not that the greater of the value of the bribes or official action reasonably foreseeable to the defendant in this case exceeded $120,000?  As explained below, the answer is yes, and the defendant's arguments to the contrary are unavailing.

        1.     The Value of the Bribes

The PSR applied a 10-level enhancement based on the value of the bribes and extorted property exceeding $120,000.  And as a threshold matter, the bare minimum enhancement in this case is the total *value* of the extorted property set forth in the Hobbs Act counts—the $50,000 payment in May 2011 (Count 6), the $15,000 wedding check in May 2011 (Count 7), the $2,380.24 in golf in May 2011 (Count 8), the $1,368.91 in golf in January 2012 (Count 9), the $50,000 payment in March 2012 (Count 10), and the $20,000 payment in May 2012 (Count 11).

The parties disagree on two factual issues.  First, the defendant claims that the value of the bribes and extorted property is limited to the charged property listed above and should exclude any other things of value the McDonnells took from Mr. Williams.  Second, the defendant claims that the value of the $120,000 in payments given in 2011 and 2012—despite being given as undocumented loans with no required payments until 2015 and a 2% interest rate—was essentially zero.  Both of the defendant's arguments are wrong, and the Court should overrule his objection.

### a.  The Uncharged Bribes

First, in addition to the charged property in Counts 6–11, the PSR included $37,994.91 from six additional things of value the defendant and his family accepted from Mr. Williams during the course of the charged conspiracies: (i) $19,289.28 for the April 2011 shopping spree; (ii) $2,268 for a boat rental during the July 2011 vacation at Mr. Williams's Smith Mountain Lake home; (iii) $6,500 for the Rolex; (iv) $868.99 for an additional golf outing at Mr. Williams's club in August 2011; (v) $7,383.14 for the vacation to Chatham Bars Inn in September 2012; and (vi) $1,685.50 for work performed by Donnie Williams at the McDonnells' home.

Importantly, all six additional things of value directly benefited the defendant or his wife, and all of them were received during the time periods of the charged conspiracies of which the defendants were convicted.  Moreover, all of them fall within the purpose of the charged conspiracies as they were described by the Court in its jury instructions, namely "for the defendants to secretly use Robert McDonnell's official position as Governor of Virginia to enrich the defendants and their family members by soliciting and accepting payments, loans, gifts, and other things of value from Jonnie Williams, Sr. and Star Scientific in exchange for"

7

official action.  Tr. 6089.  Moreover, the value of all six was reasonably foreseeable to—if not conclusively known by—the defendant.  For example, the defendant personally signed disclosure statements listing the value of the Smith Mountain Lake boat rental and the Chatham Bars vacation.  *See* Exh. 609; Tr. 3430–32, 3485, 4594, 4707, 4770–71, 4782, 5063.  Similarly, he was present for the August 2011 golf outing, and its cost was reasonably foreseeable based on the golf outings that preceded and followed it, as well as his 40 years of golf experience and the trial testimony about the exclusive nature of the golf club at issue.  *See, e.g.*, Tr. 571–78, 4570, 5042, 5072, 5104; Exhs. 137–44.  And the trial evidence established that the defendant knew about the work Donnie Williams performed at the McDonnells' home—work that included the purchase of a hot tub cover, hardwood flooring, deck staining, and other work.  Tr. 827–28, 3013–19, 3421; Exhs. 496, 607.  And Donnie Williams testified that the invoice the McDonnells ultimately paid after they became aware of the investigation substantially understated the value of the actual work performed.  Tr. 3021–22; Exh. 496.

In reality, the defendant cannot reasonably dispute that he knew about the source and value of the August 2011 golf, Smith Mountain Lake boat rental, Chatham Bars vacation, or work by Donnie Williams. He maintains, however, as he did at trial, that he was completely in the dark about the source and value of both the April 2011 shopping spree and the Rolex.  But his denials did not withstand the scrutiny of common sense at trial, and they fall woefully short in light of the reduced standard at sentencing.[1]

---

[1] Indeed, the PSR's estimate is conservative because it does not include various other things of value from Mr. Williams that were reasonably foreseeable to the defendant as part of the bribe scheme, including three golf outings for the defendant or his sons; the golf shoes, bags, and clubs given to the defendant and his sons; the cost of expensive dinners following the Cure by Design and Healthcare Leaders events; the true value of the Smith Mountain Lake and Chatham Bars vacations; the cost of delivering the Ferrari to the Smith Mountain Lake home; the $10,000 check from Williams to the defendant's eldest daughter's wedding;  the expenses for

b.    *The Value of the Undocumented Balloon Payment Loans*

Next, the PSR appropriately estimated the value of the three undocumented loans from Mr. Williams to the defendant as $120,000, or the face value of the checks written at Mr. Williams's direction and deposited by the defendants.  As a result, the PSR concluded that when combined with the $18,749.15 charged in Counts 7–9 and the $37,994.91 in "uncharged" bribes (which together total $56,744.06 before the loans are considered), the loans brought the total value of the bribes to approximately $176,744.06—and in any event, above $120,000.

The PSR's conclusion is correct because the trial record establishes by a preponderance of the evidence that the value of the loans to the defendant easily exceeded the $63,255.94 necessary to bring the total value of the bribes above $120,000.  First, although the parties agree that Mr. Williams and the defendants considered the transactions to be loans, the purported terms of the loans were so staggeringly bare that they barely constituted loans at all.  None of the three loans were collateralized.  None were documented.  Tr. 5260.  The May 2011 loan gave the McDonnells $50,000 cash at a time when their own financial "expert" estimated them to have less than $13,000 in cash and more than $30,000 in credit card debt.  Tr. 4156, 4163.  It also came at a time when the defendant needed Mr. Williams to extinguish his existing contractual obligation to pay for his daughter's wedding catering.  Tr. 4164–65.  As the defendant's expert conceded, Mr. Williams more than quadrupled the defendant's own expert's estimate of his cash flow in May 2011.  Tr. 4165.  In exchange, the defendant did not have to make ***a single payment*** for at least four years, and assuming he chose to repay in May 2015, the defendant would only have to pay a paltry 2% interest compounded annually.  Tr. 4540, 4542; Exh. 2 at 2.

---

Rachel McDonnell to vacation at Williams's Florida condominium; two iPhones purchased by Williams for the McDonnells; the cartons of free Anatabloc; and other items returned by the McDonnells after the investigation began. *See, e.g.*, Tr. 484–90, 3432–33, 3437–47, 4570, 4774–75, 4924, 5274–75, 5280–82, 5683–84, Exh. 869.

Moreover, the windfall of a loan in May 2011 came to the defendant at a time when the defendant's own financial expert acknowledged every one of the defendant's credit cards would have required monthly payments and had interest rates less favorable than what Mr. Williams provided to the defendant. Tr. 4144–49, 4162–63. Indeed, the defendant was unsuccessfully attempting to get refinancing for his underwater beach properties in the months before he obtained the loan from Mr. Williams, and his cash flow problems in the preceding years showed they generally lacked any realistic access to favorable loans—much less loans without any monthly payments and at below-market interest rates. *See, e.g.*, Exh. 644. That is why, of course, the defendant had resorted to a promotional balance transfer in April 2011 with an upfront charge of 4% in order to forestall—temporarily—interest rates between 7.75 and 10 percent. Tr. 4162–63. For all practical purposes, the Williams loan was as good as cash.

The loans in March and May 2012 were no different. The unwritten terms of the $50,000 loan in March 2012 did not require a single payment for three years, and the interest rate was again 2% compounded annually. Tr. 4214, 4680, 5231; Exh. 2 at 1. And again, according to the defendant's own financial expert, the March 2012 loan came at a time when the defendant's available cash situation would have been dire had it not been for Mr. Williams; indeed, without the $65,000 from May 2011, the defendant's available cash as of March 2012 would have barely exceeded $2,000. Tr. 4166–67. Similarly, at the time of the May 2012 loan, had it not been for Mr. Williams, the defendant's available cash would have been more than $70,000 in the red. Tr. 4168–69. Instead, the defendant again received an undocumented loan of $20,000 that required no payments for three years and came at only 2% interest compounded annually. As with the prior loans, the "terms" were really beside the point—or as Mr. Williams put it, they were "[w]hatever the ones were before." Tr. 807–808. And in between the March and May 2012

10

loans, the defendant's correspondence with his sister showed that the only other loan options even arguably available were for lesser amounts, would have required monthly payments, and came at far less favorable rates.  *See, e.g.*, Exh. 369.

In sum, the trial evidence established by a preponderance that the $120,000 in loans from Mr. Williams were at such favorable terms that the defendant could not have obtained them had they not been bribes, and the best estimate of their value is thus $120,000.

The scant case law addressing analogous circumstances in other bribe cases supports this approach.  First, in *United States v. Fitzhugh*, 78 F.3d 1326, 1330–31 (8th Cir. 1996), the Eighth Circuit addressed the district court's valuation of the *quo* in a commercial bank bribery case under U.S.S.G. § 2B4.1, which has an analogous provision to § 2C1.1(b)(2).  There, a bank official was commercially bribed in exchange for an oversecured loan from a financial institution, but the district court valued the *quo*, or the loan received through bribery, as the full face value of the loan.  *Id.* at 1331.  The Eighth Circuit reversed, finding that "the scanty evidence of record regarding the loan . . . suggests that its value, properly calculated would be far less than its face amount of $137,500."  *Id.*  But the Eighth Circuit went on to limit its holding, cautioning that "the value of the loan *would* equal the face amount of the loan if the borrower's promise to repay were worthless or unenforceable, and it *might* equal the face amount of the loan if the borrower, while able to and intending to replay, could not have obtained the loan at any price absent the bribe."  *Id.* at 1331 n. 2.

Following *Fitzhugh*, the First Circuit addressed a district court's valuation of a release of a personal loan guaranty by a financial institution as *quid* in another commercial bank bribery case.  *United States v. Wester*, 90 F.3d 592, 598–99 (1st Cir. 1996).  The district court valued the *quid* as the full face value of the released loan guaranty.  *Id.* at 598.  The First Circuit reversed,

citing *Fitzhugh* and finding that "the actual value of Wester's promised release from his personal guaranty for the $12.4 million loan depends on such factors as the likelihood of default and the worth of the collateral securing the loan.  It is unlikely that the economic value of the release comes close to $12.4 million." *Id.* at 599.

Nearly two decades later, the Ninth Circuit addressed *Fitzhugh*'s relevance to a bribery case under § 2C1.1(b)(2). *United States v. White Eagle*, 721 F.3d 1108, 1121–22 (9th Cir. 2013). In *White Eagle*, the bribe was a loan modification facilitated in exchange for the defendant public official's assistance in covering up another loan fraud scheme. *Id.* at 1112.  The defendant public official had an existing loan agreement and was making regular payments, and a disinterested committee approved the loan modification. *Id.*  But because the modification was "fast-tracked" and granted "on unusually favorable terms," it constituted a bribe. *Id.* The district court found the bribe's value to be the face value of the loan modification, but the Ninth Circuit reversed. *Id.* at 1221–22.  Citing *Fitzhugh*, the Ninth Circuit determined that the district court's valuation analysis was faulty "because White Eagle was not bribed with a loan she was not expected to repay.  Instead, she received an expedited loan that appears to have issued on better terms than standard Credit Program loans." *Id.* at 1222. Thus, the Ninth Circuit remanded for a more refined valuation analysis, but in doing so it noted that the district court should also consider "whether White Eagle would have receive the loan at all absent . . . intervention." *Id.*

Finally, in *United States v. Renzi*, 769 F.3d 731, 741 (9th Cir. 2014), former Arizona Congressman Richard Renzi received a $200,000 payment from proceeds of a sale of land after extorting the purchasers into buying it from his coconspirator.  At the time, the coconspirator owed a debt to Renzi that was memorialized in a private promissory note and required annual payments at five percent interest. *Id.* at 739.  At sentencing, the trial court found the value of the

12

payment under § 2C1.1(b)(2) to be the $200,000 Renzi received, and it refused to net out the value of the forgiven debt or calculate the time value of early repayment under the private promissory note.  *Id.* at 757.  The Ninth Circuit affirmed.  *Id.* at 757–58.

Taken together and applied here, *Fitzhugh*, *Wester*, *White Eagle*, and *Renzi* make clear that Williams's loans to the McDonnells fall squarely within the types of payments that are best valued by looking to the full amounts of the payments made, notwithstanding their characterization as loans.  First, unlike the loans and debt forgiveness valued in *Fitzhugh*, *Wester*, and *White Eagle*, the Williams loans were not collateralized, were undocumented, and required no payments.  Similarly, unlike the loans or debt forgiveness in those cases, the Williams loans were not financial transactions with an otherwise legitimate financial institution. They were, more like the "credit" in *Renzi* against the existing, uncollateralized personal debt, unenforceable for all practical purposes.  Put differently, there is simply no credible evidence that the defendant could have obtained a no-payment, two-percent, four-year loan from any other individual, much less from a financial institution.[2]  As a result, the difference between the Williams loans and the defendant's alternative sources of cash are differences in kind, not degree, and the Williams loans were functionally equivalent to cash payments.[3]

---

[2] Indeed, despite repeated protestations that the Williams loans were not valuable, the defendant has still yet to identify an alternative route he had that would have permitted him to make no payments for four years in exchange for lump-sum front-end payments—or anything close.  Rather, the trial evidence showed that he had no such route, and a bribery defendant should not be able to claim that such laughably below-market, undocumented loans were worthless simply by asserting he had rich friends or relatives.  The valuation envisioned by *Fitzhugh*, *Wester*, and *White Eagle* is one of apples to apples—one bank loan to another; one loan term to another.

[3] Moreover, the evidence regarding the official actions sought in this case—all to obtain multimillion-dollar studies for Mr. Williams at state universities—also easily supports the PSR's application of a 10-level enhancement under an alternative valuation of the *quo* to be received.

13

**C.      The PSR appropriately applied a two-level enhancement pursuant to § 3C1.1 for obstruction of justice.**

The PSR correctly applied a two-level obstruction of justice enhancement pursuant to U.S.S.G. § 3C1.1 based on the defendant's false statements under oath.  The application notes provide that "types of conduct to which this adjustment applies" include "committing, suborning, or attempting to suborn perjury" and "providing materially false information to a judge."  *Id.* cmt. n. 4(B) and (F).  "A defendant's denial of guilt (*other than denial of guilt under oath that constitutes perjury*) . . . is not a basis for application" of the obstruction enhancement.  *Id.* cmt. n. 2 (emphasis added).  "There are three elements necessary to impose a two-level enhancement for obstruction of justice based on the defendant's perjurious testimony: the sentencing court must find that the defendant (1) gave false testimony; (2) concerning a material matter; (3) with willful intent to deceive."  *United States v. Perez*, 661 F.3d 189, 192 (4th Cir. 2011).  The court should make specific findings as to each element.  *Id.* at 193.  The defendant committed perjury in at least eight ways.

> 1.     <u>False testimony denying that he did, or agreed to do, anything in exchange for things of value.</u>

During his direct testimony, the defendant emphatically denied ever doing anything, or even having an agreement to do anything, for Williams or Star in exchange for things of value:

> Q:     Did you ever do anything for Williams or Star in exchange for any gifts, any loans, any money?
> A:     No.  Absolutely not.  I did not do that.
> Q:     Did you ever agree with Williams or your wife to do something for Williams or Star in exchange for gifts or loans?
> A:     No.
> Q:     Did you ever promise – and I use that term broadly – in any way, written, oral, nod, wink, anything –
> A:     No.
> Q:     -- to do something for Williams or Star in exchange for gifts or loans?
> A:     No, I did not.
> . . .

14

> Q:      Did you ever ask your wife or agree with her to try to help Star or Jonnie in return for anything that was ever given to you or anyone else in your family by him?
>
> A:      No.  Absolutely not.

Tr. 4852.  These factual assertions were not merely claims that the acts that he performed for Mr. Williams and Star were not "official acts" under the law.  Instead, these factual assertions were an attempt to convince the jury his actions in favor of Mr. Williams and Star were unrelated to the things of value that he and his family received.

Turning to the falsity element of the obstruction enhancement, as evidenced by its verdict, the jury determined that the defendant's testimony that he never did anything, or agreed to do anything, for Williams and Star in exchange for things of value was false.  *See* Tr. 6100 (Jury Instructions) (requiring the jury to find an agreement to exchange official acts for things of value).  This Court has already made the factual finding that "*substantial evidence* supports the jury's finding that McDonnell actually performed official acts in exchange for gifts and loans from Williams."  Mem. Op. Denying Def.'s Renewed Rule 29 Mot. at 4 (Docket No. 571) (emphasis added).  Any finding that the defendant's testimony was not false would be wholly inconsistent with the jury's verdict and this Court's prior factual findings.

Turning to the materiality element of the obstruction enhancement, it is difficult to imagine false testimony that could have been more material.  The Guidelines define materiality as "evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination."  § 3C1.1 cmt. n.6.  The central issue at trial was whether the defendant did official acts, or agreed to do official acts, in exchange for things of value.  He unambiguously denied doing so under oath, and even went further by claiming that he did not do, or agree to do, any acts (official or otherwise) in exchange for things of value.  If the jury had believed this testimony, it could not have convicted him on *any* of the counts of conviction.  *See*

15

Tr. 6100, 6113 (Jury Instructions) (requiring the Government to prove *quid pro quo* for both honest services fraud and Hobbs Act counts).  As such, the defendant's false testimony went to the heart of the Government's case.  *See United States v. Sun*, 278 F.3d 302, 314 (4th Cir. 2002) (affirming obstruction enhancement and stating that the materiality of the defendant's testimony was "obvious" because it "concerned the heart of the case, *i.e.*, whether he acted with the requisite criminal intent").

Turning to the willful intent to deceive element of the obstruction enhancement, the Court must find that the defendant's false testimony did not result from confusion, mistake, or faulty memory.  § 3C1.1 cmt. n.2; *United States v. Jones*, 308 F.3d 425, 428 n. 2 (4th Cir. 2002).  The defendant testified, unambiguously and emphatically, in response to questions from his attorney. It is difficult to imagine how a defendant could be confused, mistaken, or fail to remember whether he did anything, or agreed to do anything, in exchange for things of value.  The absence of confusion, mistake, or faulty memory is further buttressed here by the defendant's testimony on cross examination that he had extensively prepared with his attorneys for his testimony and that he had been preparing "every day" since he was indicted.  Tr. 4927–28.  Simply put, the defendant gave false testimony under oath about the central issue in this case in a willful effort to deceive the jury and win an acquittal.  As such, the sentencing Guidelines require that his base offense level be enhanced by two levels pursuant to § 3C1.1.

2.      <u>False testimony that the $15,000 wedding check was a gift to his daughter rather than himself.</u>

During his testimony, the defendant repeatedly claimed that the $15,000 check used for his daughter's wedding reception was a gift to his daughter, rather than him, and that was why he did not report it on his Statement of Economic Interest form.  "I understood the wedding gift was for Cailin, the $15,000."  Tr. 4516 (R. McDonnell); *see also* Tr. 4772 (same), 5111–12 (same).

16

Turning to the falsity of the testimony element, numerous facts and common sense flatly contradict any notion that the $15,000 payment from Mr. Williams was a gift to Cailin rather than the defendant in this case.  As an initial matter, the defendant was the one who signed the wedding contract, made the first two deposit payments, and intended to pay all along for his daughter's reception.  Based on those facts, the defendant's own financial "expert" conceded the debt paid by the check was the defendant's.  Tr. 4164–65.  In addition, as the defendant well knew at the time, Mr. Williams had only met Cailin McDonnell once at the time he agreed to pay the $15,000, and that meeting had lasted all of 10 to 15 minutes.  Tr. 319–21 (C. McDonnell). The defendant's misrepresentation to his press secretary at the time of the wedding that the family, as opposed to Mr. Williams, was paying for the reception costs provides additional evidence that he knew that the $15,000 was a gift to him, rather than his daughter.  Tr. 5113–14 (R. McDonnell); Tr. 2239 (T. Martin).

Turning to materiality, the defendant's false testimony that he believed that the $15,000 payment was a gift to his daughter was an effort to explain why he did not disclose the gift on his SOEI.  The testimony supported his attorney's claim in opening arguments that "Bob McDonnell never hid anything or tried to hide anything about Mr. Williams, and, ladies and gentlemen, any assertion to the contrary is simply not true."  Tr. 274.  This Court has previously held that the SOEI evidence "goes to concealment and may be probative of intent to defraud—an element of the charged crimes."  Mem. Op. on Pretrial Motions at 3 (Doc. No. 295).  As such, the defendant's false testimony trying to explain away the omission of the $15,000 from Mr. Williams on his SOEI was material.

Turning to the willful intent to deceive element, the defendant's testimony did not result from confusion, mistake, or faulty memory for the reasons already stated.

3.      False testimony that he did not know that Mrs. McDonnell had opened a
        Davenport account until June 5, 2011.

During his direct testimony, the defendant claimed that Mrs. McDonnell surreptitiously

opened a Davenport account and purchased Star stock in June 2011 without his knowledge.  The

defendant denied that he gave his wife any financial information on a sticky note for use on the

account opening forms.  Rather, he asserted that he did not learn of the account until after

Cailin's wedding, on June 5.  Tr. 5029.

> Q:     And your testimony is that you never discussed any of that with your wife,
>        right?  At this time, that you didn't provide her the information for the
>        sticky note [for the account opening forms].
> A:     No.  I didn't talk to her about it.

Tr. 5031–32; *see also* Tr. 4526.

These statements were false.  First, stockbroker John Piscitelli testified that Mrs.

McDonnell gave him "some rough financial information" by telephone to open the Davenport

account.  Tr. 2516.  Mr. Piscitelli testified that Mrs. McDonnell then said something to the effect

of "Well, I've got to check with Bob to get other information."  *Id*.  Second, the sticky note

contained precise financial information that Mrs. McDonnell would not have known without

consultation with the defendant.  On cross-examination, the defendant identified a Heritage Bank

financial statement that he submitted in June 2011.  Tr. 5030.  He acknowledged that on the third

page of the document, the difference between the mortgage balance and the market value was

roughly $400,000.  Tr. 5031.  The sticky note identified the McDonnells' "net-real estate" as

$400,000.  This evidence showed the falsity of the defendant's denial.

Moreover, it was material that the defendant helped Mrs. McDonnell open the Davenport

account instead of learning about the account five days later.  Throughout trial, the defendant

attempted to distance himself from the Davenport account, claiming that it belonged solely to his

18

wife. *See, e.g.*, Tr. 4546 ("No, that was her account.")  This helped the defendant argue that the

suspicious sale/repurchase of Star stock at the end of each year was the result of Mrs. McDonnell

and not an effort to avoid SOEI disclosures.  This was an attempt to rebut the consciousness of

guilt evidence.  And once again, the testimony was willful and without mistake.

> 4.  <u>False testimony that he didn't know that Mrs. McDonnell had bought back the Star stock in 2012.</u>

The defendant claimed to know—and not to know—about Mrs. McDonnell's purchase

and repurchase of Star stock at certain intervals in 2011 and 2012.  Specifically, he testified that

he did not know that Mrs. McDonnell had re-purchased the Star stock at the beginning of 2012

until shortly before Christmas 2012.  As such, according to him, he did not know about the

ownership of the Star stock when he was negotiating with Mr. Williams for loans in March and

May 2012.

> Q:   Did you learn anything from your wife about Star stock shortly before Christmas Day?
> A:   Yes.
> Q:   What did you learn, and when did you learn it?
> A:   I think it was sometime the week before Christmas.  She told me that she had bought Star Scientific stock early in the year.  She had rebought the stock that she had sold the previous year when I told her that it was going down, downhill, and she had sold it at the end of the year.  And she told me at the -- right before Christmas that she had repurchased the stock. And --
> Q:   Is that the first time you knew about that?  Was that the first time you knew about the repurchase?
> A:   That's when I learned that she still had stock, yes.

Tr. 4700.

The defendant's testimony was inconsistent with other evidence in the record.  He

admitted that he handled all of the family finances and opened all account statements, *except for*

*Davenport*, which he set aside without opening.  *See* Tr. 5122–23, 5283.  Moreover, during 2012

he sent emails and text messages to Mr. Williams that congratulated him on Star stock's success.

Tr. 5129.  These messages correlated with share price increases.  *See* Exh. 606.

This testimony was material because it further distanced the defendant from Star,

especially during the time period when he was negotiating with Mr. Williams for loans.  The

Government's theory was that, in fact, the defendant was trying to hide his financial relationship

with Star.  The defendant refuted this by claiming ignorance.  And again, the defendant's

testimony was willful and not by mistake; indeed, it was carefully and deliberately calculated as

part of a clear (but misleading) trial strategy.

> 5.  <u>False testimony that his direction to Secretary Hazel to send someone to
> the August 1, 2011 meeting with Mr. Williams was not *quo*.</u>

During his testimony, the defendant repeatedly claimed that his motivation in directing

Dr. Hazel to send a staffer to the August 1, 2011 meeting with Mr. Williams was to ensure that

someone was there to monitor the meeting to ensure that "no commitments or decisions were

made."  Tr. 4715.

> Q:    Why again did you send someone from Dr. Hazel's office to a meeting
>       that your wife set up with Jonnie Williams?
> A:    I learned, I believe, after we got back from the Smith Mountain Lake trip
>       that evening, it might have been 10:30, 11 o'clock, I don't remember
>       when, but it was after we got back, I think, and my wife told me that she
>       was -- she had this meeting on her calendar that was set up with Mr.
>       Williams and that it was to discuss clinical trials at MCV -- that is, VCU --
>       and UVA.  And she didn't seem to know any more about that.  *And I
>       thought about it, and I did not want to have Ms. Sutherland, Mr. Williams,
>       and my wife talking about that issue, whatever the status of it was, at that
>       point without having somebody with subject matter expertise.*  That's
>       when I sent that late-night e-mail.  My wife may have already been in bed.
>       I don't know. *I decided that I ought to have somebody that was an expert
>       that would at least be able to monitor that well and to go to that meeting.*
>       So I asked Dr. Hazel to send someone. . . .

Tr. 4912–13 (emphasis added).

Turning to the falsity element, the defendant's testimony above that his email to Secretary Hazel was motivated by his desire to ensure no commitments or decisions were made at the meeting, as opposed to being motivated by his desire to provide Mr. Williams with *quo*, is contradicted by the other evidence and common sense.  First, throughout the trial the defense focused on the fact that Mrs. McDonnell was not a public official and had no ability to perform official acts.  As such, his claim that he was motivated by his desire to ensure no decisions or commitments would be made makes no sense.  *See* Tr. 5068 (R. McDonnell) ("Q: So if your wife was not a public official and she can't make any decisions on official action, but you felt it was necessary to have someone there to make sure no decisions were made; is that right?  A: Yes.").  Second, he sent the email to Dr. Hazel shortly after arriving back at the Governor's Mansion from driving Mr. Williams's Ferrari—during which both defendants talked to Mr. Williams—from the defendants' vacation at Mr. Williams's estate at Smith Mountain Lake.   Tr. 4925, 5064–65 (R. McDonnell).  Third, he knew that Mr. Williams and his wife had other meetings but had never previously sent state representatives to those meetings to ensure no commitments or decisions were made.  Tr. 5069 (R. McDonnell).

Turning to materiality and willfulness, the same analysis applies to these false statements as applied to the defendant's claim that he never performed acts in exchange for things of value.

6.     False testimony that he intended for MoBo to operate at an annual loss.

The defendant testified that MoBo did not have any financial problems, but rather that he and his sister anticipated that the business would operate at an annual loss or "operating deficit."

> Q:     Now, MoBo is having financial problems?
> A:     No.
> Q:     No?  No severe financial problems?  No financial problems of any kind; is that right?
> A:     I'm not sure I understand your question.  We planned on an operating deficit every year, Mr. Dry, as I've said before.

21

Tr. 4932; *see also* Tr. 5245.

This testimony was false because it defies common sense.  Although his sister and former brother-in-law may have attempted to corroborate this theory, Tr. 2727, 3998, that does not make it any more believable.  The truth of the matter is that as the defendant told Sean Hannity in 2012, "if you spend more than you have for a period of time, you're going to go broke."  Tr. 5247–48; Exh. 756.

The defendant's after-the-fact explanation and assertion that this deficit was a "good business plan" was material to the case.  One of the Government's theories was that the defendant had a motive to seek payments from Mr. Williams because he needed cash for the MoBo properties.  By claiming that he didn't really need Mr. Williams' money, the defendant blunted this theory.  And he did so willfully, not by mistake or accident.

> 7.  <u>False statement that he forgot to include approximately $3,000 in Kinloch golf-related expenses on his 2011 SOEI.</u>

The defendant falsely testified that he "did not remember" to report his $3,300 of golf, food, and merchandise during 2011 from Mr. Williams on his SOEI.  Tr. 5105.  He had to disclose gifts with a value in excess of $50 on his SOEI, unless the gift was from a personal friend.  He conceded that Mr. Williams was not a personal friend in 2011.  Tr. 4773.

> Q:   So is it your testimony that you intentionally omitted the golf or that you just didn't remember?
> A:   In January of the year that I filled it out, there was nothing on the sheet to indicate that the golf had done, *and I did not remember* that those things had occurred.

Tr. 5105 (emphasis added).

The evidence at trial contradicted his testimony.  The defendant played golf on Mr. Williams's tab again only nine days before he completed and signed his 2011 SOEI.  Tr. 5105.

His testimony that he "did not remember" to report this gift is not credible, especially given evidence of the defendant's meticulousness. *See, e.g.*, Tr. 4980. Again, the defendant testified willfully and not by mistake.

8. False testimony that the MoBo loans provided by Mr. Williams were not to the defendant personally.

The defendant emphatically testified that Mr. Williams's two 2012 loans were made to MoBo, not him personally. Tr. 5233.

> Q: Okay. And isn't it true, sir, that, I mean, you knew that the March 6th, 2012, loan from Mr. Williams was really a loan to you personally, didn't you?
>
> A: Mr. Dry, that is absolutely false. It is not. It was a loan to MoBo. That's what we negotiated.

Tr. 5253.

But the defendant's testimony was false because Mr. Williams made the loans to the defendant and simply paid the money to the recipient of the defendant's choice—in this case, MoBo. Mr. Williams testified that he made the check out to MoBo because either the defendant or his wife asked him to. Tr. 802 ("Q: Why is the check written to MoBo Realty, sir? A: That's who I was asked to have the check made out to. Q: Asked by whom? A: I believe Maureen or the Governor, one or the other."); Exh. 380 (text message from Mr. Williams to the defendant asking "[T]ell me who to make it [the loan] out to and address").

In addition, the defendant's sister and MoBo partner testified that at the time of the loan, she had "never met Mr. Williams" and had never talked to him about the terms of the loan. Tr. 4031. The beach properties' title and mortgages were held in the defendant's name, not MoBo's. The defendant's sister was further questioned at trial:

> Q: But basically you are telling the jury that Mr. Williams was giving a loan to an entity that had lost money every year and had zero assets. Is that your testimony?

23

> A:    Well, I mean, the entity was just a bank account and an article of incorporation.  Obviously, Bob and I had assets, but we didn't keep any assets in MoBo as we looked at, so no, we didn't keep a lot in the bank account and we didn't keep assets as MoBo.
>
> Q:    Because MoBo was you and your brother, right?
>
> A:    We are the two principals of MoBo, but I think from a tax and legal standpoint, it is different.  Again, I'm no lawyer, but it is different, yes.

Tr. 4032.

The defendant's false testimony about the holder of Mr. Williams's loans was material because it affected his SOEI reporting obligations.  If Mr. Williams's loans were made to MoBo, then the defendant did not have to report them on his SOEI.  If the loans were made to him personally, as the United States argued, they would have to be reported and the public would see a financial relationship between the two.  This pertained to the Government's argument that he intentionally structured transactions to avoid reporting requirements.  The defendant made these statements willfully and not by mistake.

## II.    The Sentencing Factors of Section 3553(a)

All of the factors of 18 U.S.C. § 3553(a) militate toward a Guideline sentence, but four hold particular importance:  nature and circumstance of the offense, §3553(a)(1); history and characteristics of the defendant, § 3553(a)(1); seriousness of the offense, § 3553(a)(2)(A); and affording adequate deterrence, § 3553(a)(2)(B).

### A.    Nature and Circumstances of the Offense

First, a Guideline sentence is appropriate in this case because of the nature and circumstances of the defendant's crime, which was neither isolated nor the product of a single criminal choice.  Rather, the defendant has been convicted of a bribery conspiracy that lasted nearly two full years, and the defendant repeatedly made conscious decisions to continue that conspiracy time and again over that time.  Indeed, as it went on, the defendant seized control of

24

the conspiracy, as reflected by his text-message negotiation with Mr. Williams for the last $20,000 loan, a transaction for which the jury acquitted Mrs. McDonnell. And although there was substantial evidence that the defendant's actions—at least in soliciting the loans—were motivated by financial distress, his crime is even more serious because he repeatedly chose to take it a step further. On direct examination, when he tried to explain away his decision to drive Mr. Williams's Ferrari, the defendant stated, "I hadn't driven much at all for probably three of four years before that. So at some point, I'm entitled to be normal, to drive." Tr. 4565. That quote encapsulates the greed that motivated him. No one is "entitled" to drive a Ferrari, wear a Rolex, spend thousands of dollars on a single round of golf, or participate in a clam bake that costs more than $5,000 for eight people—or for that matter, own more than three vacation homes worth millions of dollars. And such conduct is hardly "normal." What is normal is public servants—his protection detail, his staff, and thousands of subordinate state employees— adhering to their duty of honest services even when it comes with a small paycheck. The defendant chose not to abide by that norm, instead utilizing his power to quench his appetite for the things of value to which he believed he was "entitled," all while wasting the time of his staff, university researchers, and others in Virginia government with assistance to a person that his own staff described as "a snake oil salesman," Tr. 1340, and the "Tic Tac Man," Tr. 2194–95.

Moreover, the fact that law enforcement detected the bribe scheme and that it was not fully successful does not diminish the egregiousness of the defendant's conduct. Throughout the proceedings, the defendant has attempted to focus the jury's attention on the purported limited amount of *quo* that Mr. Williams received. And while it is true that Mr. Williams never obtained the research studies that he sought, the reason that Mr. Williams did not receive the full *quo* that he paid for had nothing to do with the defendant or his actions. Rather, it was the result of the

good judgment of honest public servants who worked in the Governor's Office or at state universities.  *See* Tr. 2205–06 (W. Hazel) (describing that he was "frustrated" by the addition of Star employees and affiliates to the Health Care Leaders Reception and, in turn, he "basically determined that we could not pay for those other people. If that's expressing your frustration, yeah, I was not excited to see these outsiders or people I would not consider leaders involved"); 1667 (J. Eige) ("Well, as I mentioned before, this was just not something the Governor's Office should be involved with."); 2574–76 (M. Kent) (describing his pushback on Star press release); 1908–09 (M. Sutherland) (same).  Simply put, the defendant should not be given credit that the bribery scheme was not more successful when the lack of success was in spite of his efforts, not because of them.

### B.      History and Characteristics of the Defendant

Unlike the majority of defendants who come before this Court, the defendant was raised in a very close, stable family, where his parents "emphasized the importance of family, service to others and the country, and being kind to others."  PSR ¶ 151.  He had the opportunity for higher education and, indeed, obtained both undergraduate and law degrees.  PSR ¶¶ 152, 154.  As a career public servant and former Attorney General, PSR ¶¶ 155, 157, he was especially qualified to understand the gravity of his crimes.  He understood the power and trust given to elected officials and that corruption benefits the few at the expense of the many.  Despite the advantages of his family upbringing and educational opportunities, the defendant chose to violate the trust of the Commonwealth's citizens to line his pockets.

Moreover, the defendant continues to blame others and fails to accept any real personal responsibility for his actions.  Now he claims to "accept[s] full responsibility for accepting travel, golf, and loans from Mr. Williams," but caveats that "there were no legal limits"

precluding this.  PSR ¶ 128.  He purports to "accept[s] full responsibility for my failings as a

husband and father," but implies that the cause of this crime was "members of my family,

particularly my wife and son, [] develop[ing] close friendships with Mr. Williams." *Id.*  He

admits "grave errors of judgment," but fails to admit his *quid pro quo* agreement with Mr.

Williams. *Id.*

And throughout these proceedings, the defendant has tried to shift blame to everyone but

himself.  The defendants engaged in a joint trial strategy in which the defendant claimed that his

wife's personality somehow was to blame for the bribe scheme.  *See* Tr. 4306, 4391, 4402, 4404,

4412, 4418, 4419, 4443, 4444, 4446, 4448, 4452, 4677 (thirteen times during the defendant's

direct examination in which he described Mrs. McDonnell's "yelling" or "anger").  He then

blamed his sons for keeping gifts from Mr. Williams despite his counsel, even when he refused

himself to return gifts he knew were excessive.  *See* Tr. 4555 ("And we had some discussion, and

I think, as he testified . . . but at the end of the day he opted to retain that gift.")  Then the

defendant blamed Mr. Williams for giving him a Notre Dame golf bag without appropriate gift

documentation.  "The system was supposed to be that if any kind of gift came to the Mansion,

they were supposed to be, I mean . . . those were logged . . . ."  Tr. 4556; *see also* Tr. 4568

(noting that he never got a receipt for the Kinloch golf outings).  The defendant explained his

staff members' "system" for ensuring proper gift disclosures on his annual Statements of

Economic Interests, but admitted that it was "my fault" if gifts were not listed.  Tr. 4569, 5104.

It is well-settled that "lack of remorse is a fact that a district court can consider in its

evaluation of the § 3553(a) factors."  *United States v. Sweat*, 573 F. App'x 292, 298 (4th Cir.

2014); *see also United States v. Keskes*, 703 F.3d 1078, 1090–91 (7th Cir. 2013) ("A lack of

remorse is a proper sentencing consideration 'because it speaks to traditional penological

interests such as rehabilitation (an indifferent criminal isn't ready to reform) and deterrence (a remorseful criminal is less likely to return to his old ways).'" (citation omitted)); *United States v. Mitchell*, 681 F.3d 867, 884–85 (6th Cir. 2012) (bribery case; distinguishing lack of remorse, where defendant persisted in denying his involvement following jury verdict, from exercise of trial right); *United States v. Cruzado-Laureano*, 527 F.3d 231, 236–37 (1st Cir. 2008) (rejecting argument that including lack of remorse in section 3553 analysis was unfair "double counting" where court also denied downward offense level adjustment for acceptance of responsibility); *United States v. Smith*, 424 F.3d 992, 1016–17 (9th Cir. 2005) (approving district court's above-Guidelines sentence in a tax protestor fraud case based in part on defendant's lack of remorse). Even a cursory examination of the defendant's acceptance of responsibility statement in the PSR makes clear that whatever remorse he has centers on the fact that he was caught, rather than acknowledgement and responsibility for his criminal conduct.

### C.      Seriousness of the Offense; Promote Respect for the Law

It is difficult to overstate the seriousness of the offense given the unique position of trust that governors hold in our democratic system.  The defendant stands before this Court as only the twelfth governor in the United States—and the first governor of Virginia—to be convicted of a public corruption offense.  This is not a case where a low-level government employee with limited decision-making authority accepted a bribe to augment his relatively small salary.  As governor, the defendant had the most power of any government official in Virginia and enjoyed a six-figure salary, free housing in the Executive Mansion, a private retreat at government expense, a chef, a butler, and a security detail.

Moreover, the defendant's crimes have only further undermined public confidence in the integrity of public officials.  Indeed, the defendant himself attempted to use the public's cynicism

as part of his legal strategy in his efforts to claim that all politicians behave like him.  *See* PSR

¶ 128 ("I allowed myself to become part of the culture of unlimited gifts and donations that has

permeated Virginia politics.").  But the defendant's crime was not simply "politics as usual" in

the Commonwealth or anywhere else.  Elected officials cannot accept things in value in

exchange for official actions.  This is illegal under Virginia state law, *see* Va. Code § 18.2-439,

and the federal bribery statutes.  As the Eleventh Circuit recently held:

> Bribery cannot properly be seen as a victimless crime, for in a sense it threatens
> the foundation of democratic government. Putting aside the financial havoc it can
> cause, bribery tears at the general belief of the citizenry that government officials
> will carry out their duties honestly, if not always competently. And that harm,
> though it may at times appear intangible, is real.

*United States v. Hayes*, 762 F.3d 1300, 1309 (11th Cir. 2014).  The same is true here.

### D.     Need to Deter Future Criminal Conduct and Protect the Public

While it is unlikely that the defendant will ever again be in a position to run for elected

office, the sentence imposed must also be sufficient to deter other public officials.  *See United*

*States v. Phinazee*, 515 F.3d 511, 515-16 (6th Cir. 2008) (deterrence for § 3443(a) purposes

includes both specific and general deterrence).  Put differently:

> We need not resign ourselves to the fact that corruption exists in government.
> Unlike some criminal justice issues, the crime of public corruption can be
> deterred by significant penalties that hold all offenders properly accountable.  The
> only way to protect the public from the ongoing problem of public corruption and
> to promote respect for the rule of law is to impose strict penalties on all
> defendants who engage in such conduct, many of whom have specialized legal
> training or experiences.  Public corruption demoralizes and unfairly stigmatizes
> the dedicated work of honest public servants.  It undermines the essential
> confidence in our democracy and must be deterred if our country and district is
> ever to achieve the point where the rule of law applies to all – not only to the
> average citizen, but to all elected and appointed officials.

*United States v. Spano*, 411 F. Supp. 2d 923, 940 (N.D. Ill. 2006).

Furthermore, assessing deterrent value is not as simple as asking whether a defendant

would be willing to commit a particular crime if the price were a certain prison sentence:

> The problem with deterrence always is that you have not only the price to be paid if you are caught, but the chances of your being caught.  And while economists know how to discount this probability, we don't have reliable statistics on the good way to do it.  If you are a corrupt public official and you are an optimist, there's a much better chance you're going to do it than if you're a pessimist.  So the issue of who would trade 5 years in prison to be corrupt or 10 to 20 years, whatever the figure is, is not the question that we are supposed to ask.

Sentencing Tr. 243–44, *United States v. Blagojevich*, No. 08 Cr. 888, Doc. No. 1035 (N.D. Ill. Dec. 7, 2011).  Given the difficulty in detecting public corruption, anything less than a Guideline sentence in this case could easily lead other public officials to believe that the potential benefits of corruption outweigh the costs.  As such, a sentence within the Guideline range is necessary for general deterrence.

## III.   Conclusion

For all of the aforementioned reasons, a sentence within the advisory Guideline range is warranted, appropriate, reasonable, and sufficient—but not more than necessary—in this case.[4]

---

[4] The United States initially objected to the draft PSR's preliminary finding that the defendant was unable to pay a fine because that finding relied upon the defendant's outstanding legal fees without specifying the amount of those legal fees.  The revised PSR lists the defendant's outstanding legal fees as approximately $4,415,691 to the law firms of Jones Day, Williams Mullen, Reed Smith, and Caplin & Drysdale as of June 2014 (before the trial began). PSR ¶¶ 187, 192.  This figure does not include the legal fees attributable to the defendant's co-lead counsel, the law firm of Holland & Knight.  PSR ¶ 192.  In light of that, the United States withdraws its objection.

Respectfully submitted,

DANA J. BOENTE
United States Attorney

JACK SMITH
Chief, Public Integrity Section
Criminal Division
U.S. Department of Justice


By:_____/s/_____
    Michael S. Dry
    Jessica D. Aber
    Ryan S. Faulconer
    David V. Harbach, II
    Counsel for the United States
    U.S. Attorney's Office
    600 E. Main Street, Suite 1800
    Richmond, VA 23219
    Phone: 804-819-5400
    Fax: 804-771-2316
    Email: michael.s.dry@usdoj.gov
           jessica.d.aber@usdoj.gov
           ryan.faulconer2@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on December 23, 2014, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing ("NEF") to all counsel of record.

By:        /s/
       Ryan S. Faulconer
       Counsel for the United States
       U.S. Attorney's Office
       600 E. Main Street, Suite 1800
       Richmond, VA 23219
       Phone: 804-819-5400
       Fax: 804-771-2316
       Email: ryan.faulconer2@usdoj.gov