**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **CRIMINAL NO. 3:14-CR-00012** |
| | ) | |
| **ROBERT F. MCDONNELL** | ) | **JUDGE JAMES R. SPENCER** |
| **MAUREEN G. MCDONNELL** | ) | |

**DEFENDANT ROBERT F. MCDONNELL'S
OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT**

# TABLE OF CONTENTS

I.     CORRECTIONS AND AMENDMENTS TO FACTUAL ASSERTIONS ...................... 1

II.    OBJECTIONS TO SENTENCING GUIDELINES CALCULATION ............................ 8

    A.     Value of the Things Obtained  (Guideline § 2C1.1(b)(2)).................................... 8

    B.     Adjustment for Obstruction of Justice (Guideline § 3C1.1) ............................... 14

    C.     Adjustment for Acceptance of Responsibility (Guideline § 3E1.1) ................... 25

    D.     Multiple Bribe Computation (§ 2C1.1(b)(1)) ..................................................... 26

CONCLUSION................................................................................................................... 28

# TABLE OF AUTHORITIES

**Page**

CASES

*Elliott v. United States*,
  332 F.3d 753 (4th Cir. 2003) ..............................................................25

*United States v. Aguilar-Portillo*,
  334 F.3d 744 (8th Cir. 2003) ..............................................................16

*United States v. Almonte*,
  No. 14-4145, 2014 U.S. App. LEXIS 16330 (4th Cir. Aug. 25, 2014) ..................................14

*United States v. Burnette*,
  981 F.2d 874 (6th Cir. 1992) ..............................................................16

*United States v. Fiala*,
  929 F.2d 285 (7th Cir. 1991) ..............................................................16

*United States v. Fitzhugh*,
  78 F.3d 1326 (8th Cir. 1996) ..............................................................9

*United States v. Johns*,
  27 F.3d 31 (2d Cir. 1994)..................................................................15

*United States v. Jones*,
  308 F.3d 425 (4th Cir. 2002) ..............................................................14

*United States v. Safavian*,
  461 F. Supp. 2d 76 (D.D.C. 2006) ..................................................16, 17

*United States v. Sun-Diamond Growers*,
  526 U.S. 398 (1999).........................................................................1

*United States v. Surasky*,
  976 F.2d 242 (5th Cir. 1992) ..............................................................16

*United States v. Wester*,
  90 F.3d 592 (1st Cir. 1996)................................................................10

*United States v. White Eagle*,
  721 F.3d 1108 (9th Cir. 2013) .........................................................9, 10

**STATUTES**

18 U.S.C. § 201(a)(3)........................................................................................................1

26 U.S.C. §§ 1274, 7872................................................................................................11

26 U.S.C § 7872.............................................................................................................11

**OTHER AUTHORITIES**

IRS.gov, Executive Compensation – Fringe Benefits Audit Techniques Guide
(02-2005)....................................................................................................................11

Justin Jouvenal, "Jurors' decision in McDonnell's trial based on 'overwhelming'
evidence," Washington Post, Sept. 4, 2014 ............................................................18

Laura Vozella and Rosalind Helderman, "McDonnell apologizes, repays loans",
Washington Post, July 23, 2013................................................................................26

NBC12 Interview: McDonnell Juror Kathleen Carmody, Undated...............................15

Stephen Gertzman, Federal Tax Accounting (2003) ....................................................11

Travis Fain, "Juror in McDonnell trial: I believe that verdict is correct", Daily
Press, Sept. 5, 2014 ...................................................................................................15

Pursuant to Rule 32(f) of the Federal Rules of Criminal Procedure, Robert McDonnell submits the following objections to the Draft Presentence Investigation Report ("PSIR") dated December 23, 2014.  Mr. McDonnell objects to certain factual characterizations and omissions in the PSIR, as well as the offense level calculations under the United States Sentencing Guidelines ("Guidelines").  A more appropriate calculation under the Guidelines results in an offense level of 20, leading to a Guidelines sentencing range of 33 to 41 months.

## I.      CORRECTIONS AND AMENDMENTS TO FACTUAL ASSERTIONS

Mr. McDonnell provides corrections to the following paragraphs from the PSIR's summary of the offense conduct.

Paragraph 23 is misleading because many of the actions listed in this paragraph are not "official actions" as defined by the relevant law as they do not constitute a "decision or action on [a] matter . . . pending . . . before any public official, in such official's official capacity."  18 U.S.C. § 201(a)(3).  *See United States v. Sun-Diamond Growers*, 526 U.S. 398, 407 (1999).

Paragraph 31 omits the fact that Mr. McDonnell, too, told his wife that she could not accept the dress.  *See* Trial Tr. 4461-4462 (R. McDonnell).

Paragraph 34 does not accurately characterize Mr. Williams's testimony about what he told Mr. McDonnell on the October 3, 2010 flight.  Mr. Williams never said that he "told [Mr.] McDonnell that Star Scientific needed the assistance of the Virginia government . . . ."  Rather, he testified that he told Mr. McDonnell that he wanted to conduct testing in Virginia and asked who he could speak with in government about how to go about doing that.  *See* Trial Tr. 660 (J. Williams).

Paragraph 36 omits the fact that Mr. McDonnell never instructed Dr. Hazel to take any action with respect to Star Scientific and never followed up on this meeting.  Mr. McDonnell's cabinet members were empowered to take whatever action they felt appropriate when Mr.

McDonnell asked them to take meetings. *See* Trial Tr. 4473 (R. McDonnell). Dr. Hazel also testified that it was common to attend meetings at the request of Mr. McDonnell, often on short notice, and that Mr. Williams did not make an "ask" at their meeting. *See* Trial Tr. 2188-89, 2198-99 (W. Hazel).

Paragraph 37 omits two important facts related to the February 3, 2011 event. First, Mr. Williams testified that Mr. McDonnell's remarks were generic statements supporting Virginia businesses, and not a specific endorsement of Star Scientific. *See* Trial Tr. 670-71 (J. Williams) ("Those remarks were related to, I think it's important that we have companies in Virginia with this entrepreneurial in pursuing ventures like this. This is sort of the backbone of Virginia, or companies that are pursuing technology like this, and, you know, we're proud to be supportive of this company."). Second, the OGV staffers who approved Star Scientific's use of photos of Mr. McDonnell from the event did so without consulting Mr. McDonnell and told Star that the text accompanying the photos could not be "explicitly promotional." Trial Tr. 1422-23 (M. Block).

Paragraph 38 omits the context that Mr. McDonnell and his sister, Maureen C. McDonnell, expected to need annual cash infusions to help cover debt service and expenses in the first few years after making this investment (an infusion they considered worthwhile in order to have a common space for the family and a long term asset they thought would appreciate in value). *See* Trial Tr. 4627-4628 (R. McDonnell); Trial Tr. 3998 (M. McDonnell). Moreover, Ms. McDonnell testified that she had access to assets that would have covered the shortfall had this really been a financial emergency, including from a large bonus she received just prior to the time of the loan from Mr. Williams to MoBo Real Estate Partners, LLC ("MoBo"). *See* Trial Tr. 4000 (M. McDonnell). Mr. McDonnell also had access to liquid assets, had substantially

2

reduced credit card debt by this time, and could have borrowed via other means if it were necessary. *See* Trial Tr. 4641 (R. McDonnell); Trial Tr. 4078 (J. Kosowsky).

Paragraph 39 omits the context that Mr. McDonnell did not have anything to do with planning the shopping trip, did not know that Mr. Williams purchased clothes for Mrs. McDonnell on the shopping trip, and Mr. Williams never spoke with him about it. *See* Trial Tr. 1090 (J. Williams) ("A I don't recall -- I don't recall any conversations like that as I sit here. But Ms. McDonnell, I asked her was it okay. 'Is this okay to do this?' And she said yes, it is okay now that it was all about the inauguration. I took her for her word. Q Whatever she says, you don't discuss it with my client, do you? A She is the Governor's wife. Q Do you discuss it with my client or not? A No."); Trial Tr. 4482 (R. McDonnell) ("Q Okay. So you knew that Mary-Shea and your wife were going shopping; is that right? A Yes. Q Did you know that they were meeting with Mr. Williams? A Yes. Q And what was your understanding of that? A I didn't know. Again, I usually don't plan my wife's schedule. She's doing that on her own. But I knew that they were going to meet with Mr. Williams either for lunch or sometime in the afternoon and that he was going to show them some New York stores.").

Paragraph 40 omits the same context as Paragraph 39. *See also* Trial Tr. 1095 (J. Williams) ("Q Okay. That night, you sat next to my client at the Union League Club dinner. A I did. . . . Q And you certainly didn't discuss with him what you had been doing all afternoon with Ms. McDonnell and Mary-Shea, right? A No.").

Paragraphs 42 and 43 omit the fact that Mr. McDonnell had no knowledge of any supposed meeting between Mrs. McDonnell and Mr. Williams, and no one testified to the contrary. *See* Trial Tr. 4516 (R. McDonnell) ("Q All right. Were you aware earlier in May, back

to the 2nd of May, that Maureen had talked to Jonnie Williams supposedly at that point in time about this gift to Cailin? Did you know that date or anything? A No.").

In Paragraph 44, the statement that "Jonnie Williams subsequently spoke directly with [Mr.] McDonnell about the $50,000 loan" is not accurate if it is meant to imply that conversation took place in May 2011.  While Mr. Williams testified to that effect, Mr. McDonnell testified that he was not aware of the loan before Mrs. McDonnell received it.  Trial Tr. 4519-20 (R. McDonnell).  Mr. Williams has given multiple versions of this story over time.  *See* Trial Tr. 945-47 (J. Williams).

Paragraph 55 omits the fact that Mrs. McDonnell's remarks at the Roskamp event were described by attendees as off-the-cuff and unplanned, and that Mr. McDonnell had no knowledge of the remarks.  *See* Trial Tr. 1965 (M. Sutherland) ("Q Now, the speech that you mentioned, or the brief discussion that Ms. McDonnell provided or gave at Roskamp -- A I would say off-the-cuff remarks. Q It was impromptu, right? A Yes."); Trial Tr. 4524 (R. McDonnell) ("Q Did you know she was going to speak or did speak at that event? A I found out she spoke probably a month after the investigation started in March or so of last year.").

Paragraph 60 omits the fact that Mr. McDonnell had no knowledge that Star Scientific was using his name in discussions with researchers, did not authorize the use of his name, and never expressed any kind of support to those researchers.  *See* Trial Tr. 1576 (J. Clore) ("Q Now, at this point, had you ever talked to Bob McDonnell about this? A No. Q Okay. You never had a one-on-one meeting with him and he told you he wanted to do all this? A No.").

Paragraph 62 omits the fact that Mr. McDonnell had no knowledge about whether or not Mrs. McDonnell called to arrange for use of Mr. Williams's Ferrari.  *See* Trial Tr. 1118 (J. Williams) ("Q.  And my client never asked you to arrange to have a Ferrari there for him to

drive, did he? A No."); Trial Tr. 4564 (R. McDonnell) ("Q Did you have any knowledge of any potential discussion between your wife and Mr. Williams about getting it down there, getting the car down there for you to be able to use it in any way? A No.").

Paragraph 68 omits the fact that Ms. Huffstetler characterized her own email as a "blow-off" and testified that she did not plan to do anything to further Mr. Williams's goals. *See* Trial Tr. 1517-18 (M. Huffstetler).

Paragraph 78 omits the context that Mr. McDonnell had no knowledge of Mrs. McDonnell's discussions with Mr. Piscitelli about transferring the stock out of her name, a fact that was confirmed by Mr. Piscitelli. *See* Trial Tr. 2519 (J. Piscitelli) ("Q You didn't write that to Bob McDonnell, right? A No. Q You never talked to Bob McDonnell about that letter? A No.").

Paragraph 82 omits three important facts. First, Mr. McDonnell had no contact with the UVA administrators about this potential research. *See* Trial Tr. 2772 (S. Krueger) ("You never spoke with Bob McDonnell about Star or Rock Creek; isn't that correct? A That is correct."). Second, Star Scientific never followed up with UVA to pursue a potential Tobacco Commission application. *See* Trial Tr. 2781 (S. Krueger) ("Q Now, you testified that Star, or Rock Creek, never actually responded or got back to you guys about applying for any of these tobacco grants; is that correct? A That is correct."). Third, the former Executive Director of the Tobacco Commission testified that Star Scientific never applied for a Tobacco Commission grant, and that Mr. McDonnell never contacted the Tobacco Commission on behalf of Star Scientific. Trial Tr. 3774-77 (N. Noyes).

Paragraph 83 omits the fact that during this time, Virginia had no restriction on the amount of gifts and entertainment that state officials could receive. It also omits the fact that the

5

Court instructed the jury that "[t]here has been no suggestion in this case that Mr. McDonnell violated Virginia law."  Trial Tr. 6125 (Court's jury instructions).

Paragraph 85 omits the context that Mrs. McDonnell did not tell Mr. McDonnell that the watch came from Mr. Williams.  *See* Trial Tr. 4598 (R. McDonnell) ("Q And who did she say it was from when she gave it to you? A The package that I got said from Santa. But that's something my wife typically does. I mean, we've been doing that for years. I do that sometimes to her, too. She'll do that for the children, put from Santa on there. So anything from Santa I know is from Maureen.").

Paragraph 97 omits the fact that Mr. Eige testified that he is not sure whether he ever met with Mr. McDonnell on this topic, and that he followed up with Star's lawyer and told him that Mr. McDonnell could not get involved with these issues.  *See* Trial Tr. 1665 (J. Eige) ("Q Did you, in fact, make that request to Mr. Kilgore? A I did. I called -- Q What did he -- how did he react? A He seemed to completely understand. He agreed with my assessment; that this is something we can't help out and that he would talk to Jonnie and explain that this isn't something the Governor's Office can do.").

In Paragraph 100, the statement that Mr. McDonnell and Mr. Williams "discussed whether such a transfer would be reportable by either [Mr.] McDonnell or Mr. Williams and their mutual interest in making sure that it was not" is not accurate.  While Mr. Williams testified to that effect, Mr. McDonnell testified that Mr. Williams only discussed his (Williams') reportability requirements, which did not matter to Mr. McDonnell because he would have to report a personal loan whether it was in the form of cash or stock.  *See* Trial Tr. 4657-58 (R. McDonnell) ("Again, I'm memorializing what Mr. Williams is explaining to me. And he was explaining to me his reportability requirements. As a publicly traded company, he is the CEO,

6

and he said he has got various SEC filings that he would have to do. He mentioned this Form 4 that he would have to file with the SEC. Again, this didn't mean much to me because my reporting requirements were completely different from whatever his was, but I'm writing down what he told me his reporting requirements were.").

In Paragraph 105, the record is mixed about whether Mr. McDonnell "asked the Secretary of Administration and her staff member to reach out to the 'Anatabloc people' and meet with them to discuss Anatabloc®." One of the attendees, Sara Wilson, testified that she was certain that Mr. McDonnell did <u>not</u> say that, and that she even told her colleague immediately after the meeting that Mr. McDonnell did not say that. Trial Tr. 2658 (S. Wilson) ("A I participated in this conversation. And when we left the meeting, Lisa turned around and looked at me and said, 'He wants us to meet with these people.' And I said, 'I didn't hear that. He never asked' – 'there was no specific ask in the meeting.'"). Only Lisa Hicks-Thomas testified that Mr. McDonnell asked them to meet with Star. Trial Tr. 2676. Mr. McDonnell testified that he "might have said, 'You might want to reach out to them.' I just don't have a clear recollection of doing anything like that." Trial Tr. 4763.

Paragraph 113 omits the fact that Mr. McDonnell had no knowledge of Mrs. McDonnell's conversation with Mr. Piscitelli. Mr. McDonnell learned that Mrs. McDonnell was giving the stock to the children as a Christmas present in December 2012 just before that occurred. Trial Tr. 4703-4704 (R. McDonnell).

Paragraph 121 omits the fact that the McDonnells did, in fact, pay Donnie Williams, as well as the contractors hired by Donnie Williams, for their work. Trial Tr. 3022 (D. Williams).

II.     **OBJECTIONS TO SENTENCING GUIDELINES CALCULATION**

A.     **Value of the Things Obtained  (Guideline § 2C1.1(b)(2))**

The value of the items obtained by Mr. McDonnell in connection with his conviction under Guideline § 2C1.1(b)(2) is properly calculated as between $10,000 and $30,000.

The jury determined that Mr. McDonnell or his family members received several gifts from Mr. Williams.  The sum of the gifts charged in the Indictment (as enumerated in Counts 2, 7, 8, and 9) is as follows:

- $15,000 check for wedding catering on May 23, 2011;

- $2,380 in greens fees, caddie fees, merchandise, and dining expenses at Kinloch Golf Club on May 29, 2011; and

- $1,424 in greens fees, caddie fees, merchandise, and dining expenses at Kinloch Golf Club on January 7, 2012.

The sum total of the gift items the jury found were received by Mr. McDonnell or those acting with him is $18,804.[1]

The jury also found that the McDonnells received three loans from Mr. Williams.  At trial, all parties and every witness who testified on this topic agreed that these payments were loans, and therefore debts—not cash payments—that the borrowers were obligated to pay back with interest.  *See* Trial Tr. 5817-5818 (Government's Closing Argument: "All those things that Jonnie Williams gave and that the defendants here accepted, the $120,000 in loans . . . ."); Trial Tr. 936-37 (J. Williams testifying about agreeing with Mr. McDonnell to loan terms); Trial Tr. 4685 (R. McDonnell) ("Q: Did you consider these payments from Mr. Williams or his companies to be loans or gifts? A: No, they were clearly loans, what I wrote down

---

[1] While the jury heard testimony about some other gifts received by Mr. McDonnell or members of his family, those other gifts were not a part of the charged crime and the jury never determined whether or not they were related to the offense.  The value of those items should therefore not be counted toward the § 2C1.1(b)(2) total.

contemporaneously with my notes, and they were absolutely loans and with a balloon payment."). Mr. McDonnell confirmed during his testimony that the loans had in fact been paid back with interest prior to the indictment. Trial Tr. 4686-87 (R. McDonnell).

The Court cannot apply the full face value of these loans toward the § 2C1.1(b)(2) calculation because the value of the thing obtained by Mr. McDonnell is not equal to the cash value of the loan payments, as those loans created personal (for Mrs. McDonnell) and corporate (for MoBo) debts. Rather, the Court should calculate a reasonable approximation of the *actual benefit* the McDonnells received by accepting these loans from Mr. Williams—namely, the difference between the value of the loan received and one that would otherwise be available to Mr. McDonnell. That amount will be far less than the face value of the loans.

This principle has been affirmed by a variety of Circuit Courts that have analyzed the issue. In *United States v. Fitzhugh*, 78 F.3d 1326 (8th Cir. 1996), the Eighth Circuit noted that in performing a Guidelines calculation, "[t]he value of a transaction is often quite different than the face amount of that transaction" and concluded that "[w]hen a loan is obtained by bribes, it is likely to be at favorable terms, in which case its value will typically be the difference between the actual cost of the loan, and the cost of the same loan at fair market terms and conditions." *Id.* at 1331. That court overturned a district court sentence that relied on the face value of the loan, noting that "the scanty evidence of record regarding the [favorable] loan . . . suggests that its value, properly calculated, would be far less than its face amount." *Id.*

The Ninth Circuit has likewise overturned a sentence that relied on the face value of a loan when making a § 2C1.1(b)(2) calculation. *United States v. White Eagle*, 721 F.3d 1108 (9th Cir. 2013). In that case, a public official "was not bribed with a loan she was not expected to repay" but instead "received an expedited loan that appears to have issued on better terms than

standard Credit Program loans." *Id*. at 1122.  The court held that "because the district court rested its valuation decision on the face value of the loan and did not link its calculations to the value of the benefit [the official] received," it would remand the case so that the district court could place a proper value on the loan.  *See also United States v. Wester*, 90 F.3d 592, 598-99 (1st Cir. 1996) ("Obviously, if [the defendant] had been bribed with a one-dollar lottery ticket for a million dollar prize, no one would claim that the ticket should be valued at the full potential winnings. So, too, if he had been given a million-dollar term life insurance policy.").

Here, the jury found that Mr. McDonnell or those acting with him received the following loans from Mr. Williams (as enumerated in Counts 3, 4, 6, 10, and 11):

- $50,000 loan to Maureen McDonnell on May 23, 2011;
- $50,000 loan to MoBo on March 6, 2012; and
- $20,000 loan to MoBo on May 22, 2012.

Trial testimony and exhibits indicated that the May 23, 2011 loan was provided at a two-percent interest rate, with a balloon payment due in four years.[2]  The March and May 2012 loans to MoBo were provided at a two percent interest rate, each over a three-year term.[3]

The most logical way to place a value on the benefit to the McDonnells of the Williams loans is to attempt to determine the marginal difference between the cost to Mr. McDonnell of interest payments on the Williams loans and payments that would have been owed if Mr.

---

[2] Trial Tr. 4542 (R. McDonnell) ("So at some point, and I don't remember when, after that, I believe I had a brief conversation with Mr. Williams just to be able to verify that those were in fact the terms, that it was four years, that it was two percent, that it was due in 2015, that it was a balloon payment. And I did that at some subsequent point.").

[3] Trial Tr. 4680 (R. McDonnell) ("You would have to read down further, because the actual final, the final agreement was the $50,000 loan that would be at interest rate of two percent over three years."); Trial Tr. 807-808 (J. Williams) ("Q: Did you have a conversation with the Governor about what the terms of this new $20,000 loan was going to be? A: I don't recall having that conversation. Q: So did you think it was going to be -- what did you think the terms were going to be? A: Whatever the ones were before.").

McDonnell had obtained a loan on the open market.  That difference—to the extent one exists—is the best approximation of the "value" of the loans.

Attempting to determine the terms of hypothetical loans that would have been offered by lending institutions to Mrs. McDonnell in May of 2011, and to MoBo in March and May of 2012, would, however, be an entirely speculative exercise.  A more reliable alternative is to apply the tool used by the Internal Revenue Service to impute a value to below-market or zero interest loans for purposes of assessing taxes on the borrower.  That tool is the Applicable Federal Rate ("AFR"), established by statute—*see* 26 U.S.C. §§ 1274, 7872—to impute interest income to short, medium, and long-term loans with below-market interest rates.  The short-term (defined as not over three years), mid-term (defined as over three years but not over nine years) and long-term (defined as over nine years) AFR is determined monthly by the Secretary of the Treasury, and historic rates are publicly available for each month.  *Id.* § 1274(d)(1)(A).[4]  A comparison of the interest rates Mr. Williams gave Mrs. McDonnell and MoBo, respectively, to the AFR published in those same months, provides a reliable estimate of the value to the McDonnells of those loans—in just the same way the IRS would place a value on a low- or no-interest loan received by a borrower for purposes of tax assessment.

An AFR analysis of the McDonnell loans yields the following calculations:

- Mrs. McDonnell received her $50,000 loan from Mr. Williams in May of 2011, at a 2 percent interest rate with payment due in four years.  The mid-term AFR for

[4] Historic AFR rates are available at http://apps.irs.gov/app/picklist/list/federalRates.html. For more on the IRS's use of the AFR, *see* Stephen Gertzman, Federal Tax Accounting (2003), Chapter 11, § 11 (discussing tax treatment of below-market loans under 26 U.S.C § 7872); Executive Compensation – Fringe Benefits Audit Techniques Guide (02-2005) at 3, *available at* http://www.irs.gov/Businesses/Corporations/Executive-Compensation---Fringe-Benefits-Audit-Techniques-Guide-(02-2005) (stating that 26 U.S.C. § 7872 applies to loans that "have either been at no cost or low cost").

May of 2011 was 2.44 percent.  The IRS-calculated value of the May 2011 loan to Mrs. McDonnell would therefore be $939.92.[5]

- MoBo received the $50,000 loan from Mr. Williams in March of 2012, at a 2 percent interest rate, with payment due in three years.  The short-term AFR for March of 2012 was 0.19 percent.  Under the IRS calculation, then, the Williams loan would not be considered a below market loan, and the IRS would not impute any income to MoBo as a result of the loan.  Therefore, no benefit should be imputed to Mr. McDonnell for this market rate loan.[6]

- MoBo received the $20,000 loan from Mr. Williams in May of 2012, at a 2 percent interest rate, with payment due in three years.  The short-term AFR for May of 2012 was 0.19 percent.  This loan, too, would not be considered a below market loan, and the IRS would not impute any income to MoBo as a result of the loan.  Therefore, no benefit should be imputed to Mr. McDonnell for this market rate loan.

This calculation results in an imputed benefit to the McDonnells of $939.92 as a result of accepting the loans from Mr. Williams.

The total value of gifts and loans received by Mr. McDonnell or those acting with him is therefore $18,804 plus $939.92, for a total of $19,743.92.  Guidelines § 2C1.1(b)(2) refers to the loss chart from § 2B1.1 to determine the total increase in offense level resulting from the value of the benefit received by the official.  That chart provides that any dollar amount more than $10,000 but not more than $30,000 results in an increase of four levels.[7]

---

[5] Two percent interest on $50,000 compounded annually for four years is $4,121.64.  2.44 percent interest on $50,000 compounded annually for four years is $5,061.53.  The difference between those two values is $939.92.

[6] If the Court were to impute some value to MoBo as a result of either of the MoBo loans, only half of that value should be allocated to Mr. McDonnell.  The evidence at trial established that MoBo is owned by both Mr. McDonnell and his sister, Maureen C. McDonnell, with each owning a 50% interest.  The Government has never alleged that Maureen C. McDonnell was "acting with" Mr. McDonnell in connection with the alleged corruption scheme, and so her share of the value from the loans should not count toward Mr. McDonnell's § 2C1.1(b)(2) total.

[7] The IRS also publishes higher rates of 175% AFR for mid-term loans and 130% AFR for short-term loans.  Even if the Court were to apply these inflated rates to the Williams loans, the result would not exceed $30,000 in value received by Mr. McDonnell when combined with the gift total.  The same holds true if the Court were to impute some less tangible value to the Williams loans—such as the time-value of not having to apply for a loan through a traditional lending institution—which surely would not exceed $30,000 when combined with the gift total.

It is possible that the Government will argue that the McDonnells and MoBo were in such financial straits that they could not possibly have received any market rate loan from a lending institution, and that, as a result, the full face value of the loans should be considered a benefit to Mr. McDonnell.   The evidence at trial, however, refuted this suggestion.   By May 2011, the McDonnells' credit card debt was substantially lower than it had been in prior years, and Mr. McDonnell's credit score was consistently excellent.   MoBo's financial situation was improving.   *See* Trial Tr. 4094 (J. Kosowsky).   Moreover, he was a pillar of the Virginia community, had never defaulted on any debt regardless of financial situation, and could be expected to see his earnings increase substantially upon leaving office in January 2014.   The idea that no bank or individual in Virginia would lend to the McDonnells is absurd.   Indeed, one of the witnesses at trial testified that he would have loaned Mr. McDonnell over $1 million no questions asked if Mr. McDonnell had requested such a loan.   *See* Trial Tr. 4299 (J. Damico) ("Q: And if he needed money from you in terms of your easy ability to do something for him, would there be a limit? A: Now, this is going to sound arrogant, and I don't intend it to, but I've been blessed. We have been very, very fortunate. I could write a check if I had my checkbook with me on the spot for seven figures. Yes, sir.").   Not only that, but the co-owner of MoBo, Maureen C. McDonnell was herself a successful businesswoman with excellent credit and access to substantial cash reserves.[8]   She, too, could have loaned Mr. McDonnell or MoBo $50,000 or $70,000 dollars, or co-signed for a loan with Mr. McDonnell.

---

[8] The Government conceded this point in its closing argument.  *See* Trial Tr. 5853 (Gov't Rebuttal Closing) ("How about sister Maureen?  There has been plenty of testimony from sister Maureen about this.  She is loaded.  Undisputed.")

## B.      Adjustment for Obstruction of Justice (Guideline § 3C1.1)

Mr. McDonnell should not be assessed a two-point increase under Guideline § 3C1.1. The Fourth Circuit has made it clear that the obstruction enhancement "is not applicable merely because the defendant testified and subsequently was convicted." *United States v. Almonte*, No. 14-4145, 2014 U.S. App. LEXIS 16330, *1 (4th Cir. Aug. 25, 2014).   Rather, to apply this provision, the sentencing court must find by a preponderance of the evidence that "the defendant when testifying under oath (1) gave false testimony; (2) concerning a material matter; (3) with the willful intent to deceive (rather than as a result of confusion, mistake, or faulty memory)." *United States v. Jones*, 308 F.3d 425, 428 n.2 (4th Cir. 2002).   Moreover, the court "must specifically identify the perjurious statements and make a finding either as to each element of perjury or that encompasses all of the factual predicates for a finding of perjury." *Id*. (internal citations omitted).

Mr. McDonnell testified for more than four days during trial, answering questions about every facet of the Government's allegations against him.   During that testimony Mr. McDonnell addressed and admitted nearly all of the actions that formed the basis of his conviction, including knowingly receiving every gift and loan that was the basis of a count in the Indictment.[9]   He also acknowledged his role in each of the actions the Government alleged were "official acts," including attending the mansion lunch, requesting that a Department of Health and Human Resources staffer attend a meeting with Mr. Williams and the First Lady, sending an email to his counsel, failing to stop the First Lady's office from inviting Mr. Williams and his colleagues to a mansion reception, and possibly mentioning Anatabloc at a staff meeting.   While Mr. McDonnell disputes the legal consequences of those actions, he has never denied that they happened.

---

[9] Gifts about which Mr. McDonnell did not have real-time knowledge—including Mrs. McDonnell's New York shopping trip and the Rolex watch—were not charged in the Indictment.

14

Under these circumstances, there is no basis to claim that the jury did not believe that Mr. McDonnell was telling the truth.  Indeed, at least one juror who spoke to the media following the trial emphasized that she <u>did</u> believe Mr. McDonnell, but nevertheless (for reasons that are unclear) concluded that he had committed a crime.  This juror told the press that "*I did believe Bob*.  But again, I think the evidence, eventually, just spoke for itself – compiled, spoke for itself."[10]  The same juror also publicly stated that "*she found Bob McDonnell's testimony truthful*, but she also believed Jonnie R. Williams, Sr."[11]

None of the statements flagged by the PSIR are instances of false testimony:

1) The PSIR claims that Mr. McDonnell obstructed the administration of justice by testifying that he "never did anything, or ask Mrs. McDonnell to do anything, for Mr. Williams or Star Scientific in exchange for gifts or loans."  Mr. McDonnell's testimony on this point is as follows:

> Q Did you ever do anything for Williams or Star in exchange for
> any gifts, any loans, any money?
>
> A No. Absolutely not. I did not do that.

Trial Tr. 4852.  This statement cannot constitute obstruction under § 3C1.1 for three reasons.

First, the Commentary to Guideline § 3C1.1 expressly provides that "[a] defendant's denial of guilt (other than a denial of guilt under oath that constitutes perjury) . . . is not a basis for application of this provision."  § 3C1.1 (Application Note 2).  *See United States v. Johns*, 27 F.3d 31, 35 (2d Cir. 1994) (a defendant's "answer 'No' to the general question regarding his

---

[10] NBC12 Interview: McDonnell Juror Kathleen Carmody, Undated *available at* http://www.nbc12.com/Clip/10554499/interview-mcdonnell-juror-kathleen-carmody (emphasis added).

[11] Travis Fain, "Juror in McDonnell trial: I believe that verdict is correct", Daily Press, Sept. 5, 2014, *available at* http://articles.dailypress.com/2014-09-05/news/dp-nws-mcdonnell-juror-rail-20140905_1_mcdonnell-trial-bob-mcdonnell-guilty-verdict (emphasis added).

involvement in transactions other than those listed in the indictment . . . is squarely within the language" of the Commentary); *United States v. Surasky*, 976 F.2d 242, 245 (5th Cir. 1992) (defendant's statement "that he knew nothing about the escape attempt, nor had he seen or heard anything . . . is fairly described as a mere 'denial of guilt' within the meaning of U.S.S.G. § 3C1.1"); *United States v. Fiala*, 929 F.2d 285, 289-90 (7th Cir. 1991) (reversing an obstruction of justice enhancement imposed upon a motorist who, when asked by a state trooper if he had anything illegal the car, replied that he did not, even though there was marijuana in the vehicle). Under this standard, Mr. McDonnell's simple denial that he performed official actions in exchange for gifts cannot be considered obstruction.   And, while the Commentary excludes "denial[s] of guilt under oath that constitute[] perjury" from this exception, the fact that the testimony in question was a simple "unembellished denial" can be a factor the court can consider in finding that the testimony did not amount to perjury.  *See United States v. Aguilar-Portillo*, 334 F.3d 744, 748 (8th Cir. 2003) (upholding district court's finding that defendant who testified in his own defense at trial and "merely made unembellished denials" should not be given obstruction adjustment).

Second, courts have cautioned that a defendant's testimony about his own mental state may not be an appropriate basis for an obstruction adjustment because of the necessarily subjective nature of that testimony.  *See United States v. Burnette*, 981 F.2d 874, 878-79 (6th Cir. 1992) ("some essential elements of proof of criminal conduct, such as knowledge, intent, malice, and premeditation are sometimes so subjective that testimony about them cannot be readily categorized as true or false").  For example, in *United States v. Safavian*, 461 F. Supp. 2d 76, 88 (D.D.C. 2006), the court declined to apply the obstruction adjustment despite "contradictions and inconsistencies" in the defendant's testimony because the alleged false statements under oath

"were not based on objective, verifiable facts directly contradicted by documentary evidence or other witnesses" but rather "centered on his state of mind, his intent, and his willfulness." *Id*. at 88. While "the jury obviously found the willfulness and specific intent required to convict," the court "was reluctant to enhance [the defendant's] offense level under the clear and convincing standard in such subjective areas (as opposed to an objective fact, such as where a defendant gives a plainly false alibi in his testimony or attempts to place the blame for the crime on another person who could not possibly have committed the crime) and his lack of credibility." *Id*. Because Mr. McDonnell's testimony that in his own mind he did not do anything "in exchange" for gifts is necessarily subjective, it would be inappropriate to impose the obstruction adjustment on the basis of that testimony.

Third, § 3C1.1 does not apply to this statement because it was true. Mr. McDonnell honestly testified that in his mind, he did not do anything for Mr. Williams or Star Scientific "in exchange" for gifts or loans. He also candidly testified about the things he did do for Mr. Williams, and explained that those things were "what I thought was the routine access to government that any donor, non-donor, gift giver, non-gift giver would be able to get in terms of meetings, having the Governor present for a check presentation, having people to Mansion events." Trial Tr. 4367. There is no testimony or evidence in the record suggesting that this was false testimony intended to deceive. Not even Mr. Williams testified that he had talked to Mr. McDonnell about providing gifts "in exchange" for any particular actions. Nor can the verdict be viewed as an indication that the jury disbelieved Mr. McDonnell's testimony about his mental state. Jurors have indicated to the media that their decision-making process was as follows: "members of the panel examined each gift and said to themselves: 'Would the McDonnells have

17

received these gifts if Bob McDonnell weren't governor.'"[12]  Even though the jury apparently answered that question in the negative, that does not mean that they believed Mr. McDonnell took any actions for Mr. Williams "in exchange" for the gifts.  And even if the jury, contrary to that statement to the media, precisely followed the Court's instructions, those instructions directed the jury to convict "[i]f you find beyond a reasonable doubt that a public official solicited or received a thing of value *at least in part in exchange* for the performance of official action."  Trial Tr. 6053 (Court's jury instructions) (emphasis added).  The jury might have believed Mr. McDonnell's testimony that he did not do anything "in exchange" for gifts that he would not have done anyway, but still convicted if they concluded that some part of his motivation was related to the gifts.  Indeed, the Government has never disputed that Mr. McDonnell was at least partly motivated by a genuine belief that Star Scientific was a promising Virginia company that might provide economic benefits to the Commonwealth.

2) Mr. McDonnell honestly testified that he and Cailin considered the $15,000 catering check to be Mr. Williams's wedding gift to Cailin, and no testimony or evidence at trial contradicted that.  In fact, the check from Starwood Trust expressly said "Wedding gift" in the memo line.  *See* Trial Tr. 416 (J. Fulkerson) ("Q What about the memo line that says, 'Wedding gift,' whose idea was it to put that there? A Mr. Williams.").  Cailin also testified that she considered the check to be a wedding gift to her and her husband, and they sent Mr. Williams a thank you note and later thanked him in person.  Trial Tr. 367-68 (C. Young).  While Mr. Williams testified that Mrs. McDonnell asked for his assistance with paying for the wedding, he confirmed that Mr. McDonnell had no part of that conversation.  *See* Trial Tr. 1098 (J. Williams)

---

[12] Justin Jouvenal, "Jurors' decision in McDonnell's trial based on 'overwhelming' evidence," Washington Post, Sept. 4, 2014, *available at* http://www.washingtonpost.com/local/virginia-politics/2014/09/04/1cda7d94-3464-11e4-a723-fa3895a25d02_story.html.

("Q Bob McDonnell is not part of that conversation, correct? A No. She just said that he said it was okay for her to help us.").  Moreover, Mr. McDonnell never denied that he too benefited from the gift, since he had wanted to pay for the catering at Cailin's wedding.  Even if one concludes that the jury found that Mr. McDonnell did things for Mr. Williams in exchange for the catering gift, whether the gift technically went to the defendants or Cailin is irrelevant to that determination.[13]

3) The PSIR claims that Mr. McDonnell testified that he "did not know that his wife had opened a Davenport stock account in June 2011."  That is incorrect.  Mr. McDonnell testified that he did learn that his wife opened a Davenport stock account in June 2011, just a few days after she opened the account: "I learned about it the day after the wedding.  That would have been the 5th.  Most of the company had gone at that point.  This was the afternoon of June 5th.  We were taking Cailin to the airport, I know, the next morning to start her honeymoon.  And I believe we were upstairs at the kitchen table.  There was just my wife and I.  And she told me that when she had been down at Roskamp, that she had bought stock in Star Scientific."  Trial Tr. 4526.  To the extent the PSIR means to suggest that Mr. McDonnell actually knew about the account on the day it was opened, there was no testimony or evidence at trial that would support such a conclusion.

4) Mr. McDonnell honestly testified that he did not know that his wife still held Star Scientific stock in her name after she told him that she had sold it in late 2011.  He also honestly testified that he did not know that she had repurchased the stock in 2012.  There was no testimony or evidence at trial to the contrary, including from Mr. Williams or from the stock

---

[13] The technical distinction is relevant only to the issue of whether or not the gift should have been reported on Mr. McDonnell's SOEI, but as noted above, the Court expressly stated that there was no suggestion that Mr. McDonnell violated state disclosure laws

broker, John Piscitelli.  To the contrary, Mr. Piscitelli corroborated Mr. McDonnell's account by

testifying that Mr. McDonnell had nothing to do with the sale and repurchase of the stock:

> Q The next transaction on December 19th, you had a call, you said, with Ms. McDonnell, correct?
>
> A Yes.
>
> Q Again, same question. Bob McDonnell wasn't on that call, was he?
>
> A He was not.
>
> Q You never talked to him about it?
>
> A I did not.
>
> Q Ms. McDonnell never said that she had talked to him about it?
>
> A She did not tell me that, no.
>
> Q And then there was this -- you repurchased -- or you purchased other stock in January, right?
>
> A Yes.
>
> Q Bob McDonnell wasn't involved in that, right?
>
> A He was not.

Trial Tr. 2520.  Nor is there any reason to think that the jury disbelieved Mr. McDonnell's

testimony on this point, since the stock purchase and sale were not conduct for which Mr.

McDonnell was indicted or convicted.

5) Mr. McDonnell truthfully testified that he requested that a staffer from the Department

of Health and Human Resources attend the August 1, 2011 meeting with Mr. Williams and Mrs.

McDonnell because he wanted someone on hand to monitor the meeting.  Trial Tr. 4716.  He

also testified honestly that he was not aware of her scheduled meeting until Mrs. McDonnell told

him about after they arrived in Richmond the night before the meeting.  *Id*.  No testimony or

evidence at trial contradicted this account.  No one at trial testified that Mr. McDonnell knew

that Mr. Williams wanted to meet with anyone at the Department of Health and Human

Resources, or that he arranged the meeting in exchange for use of the Smith Mountain Lake

house.  There is also no basis for reading the jury verdict as a determination that Mr. McDonnell

set up this meeting in exchange for the use of the house, since no counts in the indictment related

to this gift.

6) The PSIR claims that Mr. McDonnell testified that he "intended his company, MoBo,

to operate at an annual loss."  That assertion mischaracterizes Mr. McDonnell's testimony.  Mr.

McDonnell never testified that he "intended" MoBo to operate at an annual loss.  Rather, he

testified that when his family purchased the MoBo properties, their long-term objective was for

the investments to ultimately yield positive returns as property values rose over time.  In the

near-term, they expected (not intended) that rental income would likely not cover all debt service

and expenses.  The family thought these short-term cash infusions were a worthwhile tradeoff

because the properties gave the family a shared vacation place and would potentially be a wise

long-term asset to pass on to the children.  Mr. McDonnell testified as follows:

> Q All right. And did you understand or have any sense of whether
> or not the rental income would cover the debt service on the
> purchase of the properties in addition to the expenses that you
> might incur in terms of either managing the properties or keeping
> them up?
>
> A Yes. We knew it would cover the debt service and the principal
> on all the loans, but it would not -- it was not going to cover all of
> the other expenses for the property.
>
> Q All right. That is unless rents rose dramatically?
>
> A Well, we -- yes. As rents rose and -- you know, the rates were a
> little bit higher at that time. So we figured maybe down the road
> we'd refinance and reduce the expenses. So our -- the business
> proposition was that we'd have capital appreciation in the long run

in the property, but also as we paid down the -- paid down the debt, that we'd -- we'd have capital accumulation as the mortgage balances on all those loans went down. So long term, it would have made sense. And, you know, frankly, maybe hold on to it long enough, it might be something, an asset we'd pass on to the kids at a later time.

Trial Tr. 4627-4628. Every witness who testified about MoBo corroborated this account,[14] and there is no basis for viewing the jury verdict as a finding to the contrary.

7) Mr. McDonnell honestly testified that he did not remember the Kinloch golf outings when he completed his Statement of Economic Interest forms in early 2012. No witness contradicted this testimony, and it is far from surprising that a Governor who was working around the clock failed to recall two specific golf outings that occurred five months and eight months, respectively, prior to the time he filled out the disclosure form. That is why Mr. McDonnell testified that he relied on the system that was in place for staffers to flag gifts and determine the value for reporting purposes. Trial Tr. 4773. Mr. McDonnell's scheduler, Monica Block, corroborated this testimony and confirmed that she should have followed up to determine whether or not the golf outings were gifts:

> Q Okay. And was it one of your duties that if you were to accept a gift, to contact the giver of that to try to get the value of it so it can be logged?
>
> A Yes.

---

[14] *See* Trial Tr. 2727 (Michael Uncapher) ("THE COURT: I have a question. It was the understanding from the beginning that they were going to be looking at 50 and $60,000 -- THE WITNESS: That there was a shortfall, yes. THE COURT: All right. Go ahead. BY MR. SMALL: Q Am I correct that the reason for that is that this was viewed more as a family gathering place than as a day-to-day profit/nonprofit investment, right? A Yes."); Trial Tr. 3998 (Maureen C. McDonnell) ("Q Right. And you ended up having a 50 to $60,000 shortfall pretty much every year, right? A Yes. I think I said anywhere from 40 to 60. There is a range in which there would be a shortfall, yes. Q But that was more than you had planned on, right, at the outset? A You know, I don't know that I would necessarily say that. I think Bob and I discussed what was palatable for us would be it might be anywhere from 20 to 30--excuse me, 40 to 60, so 20 to 30 out of pocket each year, or loan each year. It was somewhere in that range, if I am to look back to the 2005-2006 time frame.").

Q Okay. Would you also use the calendar, his calendar, to also confirm these kinds of things?

A Yes. I basically looked at anything at the end of every month, anything in the last month on the calendar that I would have touched that might have been a gift, like a flight or something like that.

Q Okay. It is your experience Governor McDonnell himself didn't follow up on these things. It was a staff responsibility.

A That was our job, yeah.

. . .

Q And would you know who was paying when the Governor was playing golf at Kinloch; would you have known that?

A I don't think so, no.

Q Okay. So would you typically ask?

A I didn't, and I probably should have.

Trial Tr. 1460-1461, 1479.  Mr. McDonnell also candidly testified that he did not consider Mr. Williams to be a personal friend at the time he filled out the January 2012 SOEI, and that the failure to list the golf was a mistake.  Trial Tr. 4773.  Mr. McDonnell was not charged with knowingly submitting false SOEI forms (in fact, the Court specifically instructed the jury that there was no suggestion of a violation of state disclosure laws), and so the jury's verdict cannot be interpreted as a finding that Mr. McDonnell's testimony was not truthful.

8) Mr. McDonnell truthfully testified that the two loans provided by Mr. Williams in 2012 were provided directly to MoBo, and not Mr. McDonnell personally.  This testimony was corroborated by a number of witnesses, including Mr. Williams:

Q Why is the check written to MoBo Realty, sir?

A That's who I was asked to have the check made out to.

23

Q Asked by whom?

A I believe Maureen or the Governor, one or the other.

Q One or the other?

A Yes.

Q Did you know what MoBo Realty was?

A Somewhere through here, I had learned what it was from the brother-in-law, I believe, earlier on talking about it.

Q Okay. And what was your understanding when you wrote this check of what MoBo Realty -- instructed Ms. Fulkerson to write the check, what MoBo was?

A MoBo Realty was, I don't know the legal entity of it, but it was a partnership owned by the Governor and his wife, and the Governor's sister and her husband.

. . .

Q Now, what was this $50,000 for? What was it?

A It was additional money to help them out with the beach property.

Trial Tr. 802-803 (J. Williams).  This testimony was also corroborated by trial exhibits, including

the loan check, text message communications about the loans indicating that the loans were to

MoBo, and repayment checks from MoBo.  Of course, Mr. Williams might have provided the

MoBo loans because he knew Mr. McDonnell personally, but that does not make a loan to an

LLC the same thing as a personal loan.  There is no support in any other testimony, evidence, or

the jury's verdict, for a conclusion that this was not a loan to the LLC.  In fact, the jury's not

guilty verdict on Counts 12 and 13 supports this conclusion because the jury agreed with the

testimony of Towne Bank president William Sessoms, among others, that a debt to an LLC not

supported by a personal guarantee does not need to be reported on a personal financial statement. Trial Tr. 3093 (W. Sessoms).

C.    **Adjustment for Acceptance of Responsibility (Guideline § 3E1.1)**

The PSIR states that Mr. McDonnell "has not acted in a manner consistent with acceptance of responsibility" because of the supposed false statements listed in paragraph 126. As demonstrated above, none of those statements was false.

Moreover, Mr. McDonnell has consistently and emphatically accepted responsibility for his actions and poor judgment that led to this situation.  Guideline § 3E1.1 provides for a two-level decrease "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense."  While this adjustment does not typically apply to a defendant who goes to trial, the Commentary to the Guidelines makes clear that "[c]onviction by trial . . . does not automatically preclude a defendant from consideration for such a reduction."  § 3E1.1 Commentary.  A defendant who has been convicted at trial is still entitled to the adjustment if he "goes to trial to assert and preserve issues that do not relate to factual guilt," such as to make a "challenge to the applicability of a statute to his conduct."  *Id.*

The Fourth Circuit, echoing the Guidelines Commentary, has affirmed that a defendant is "entitled to the Responsibility Adjustment, despite exercising her right to trial, if she admitted the factual elements of the charges against her and did not falsely deny her relevant conduct." *Elliott v. United States*, 332 F.3d 753, 766 (4th Cir. 2003).

Mr. McDonnell is entitled to this adjustment despite exercising his right to trial because he freely admitted, and never denied, every relevant action that formed the basis of his conviction.  During his testimony, Mr. McDonnell admitted receiving every item of value that was the basis of a count in the Indictment (the catering check, golf, and loans), and admitted his role in the various actions the Government alleged were "official acts."  What Mr. McDonnell

25

contested—both then and now—is the applicability of the Honest-Services Wire Fraud statute and Hobbs Act to that acknowledged conduct.[15]  Never before has any public official been convicted of participating in a bribery scheme for the kinds of access-oriented "official acts" alleged in this case.  Because there was very little dispute at trial about the key facts underlying the charges, the trial does not preclude the application of this adjustment.

Mr. McDonnell has also consistently accepted responsibility for his actions.  Months before the indictment, he issued a public statement expressing that he was "deeply sorry for the embarrassment certain members of my family and I brought upon my beloved Virginia and her citizens."[16]  During his testimony at trial, Mr. McDonnell continued to accept responsibility. Trial Tr. 4851 (R. McDonnell) ("Q: Who do you blame for being here? A: I -- I hold myself accountable for the reasons that we're here.").  And Mr. McDonnell has made clear in his written statement and in his meeting with the Probation Office that he continues to accept responsibility for his poor judgment.

Under these circumstances, Mr. McDonnell should receive a two level decrease for accepting responsibility.

### D.     Multiple Bribe Computation (§ 2C1.1(b)(1))

The offense in this case did not involve more than one bribe or extortion because the Government alleged only a single incident of bribery involving a series of related payments made over time.

---

[15] Mr. McDonnell also challenged the bank fraud counts and was acquitted on those charges.

[16] Laura Vozella and Rosalind Helderman, "McDonnell apologizes, repays loans", Washington Post, July 23, 2013, *available at* http://www.washingtonpost.com/local/virginia-politics/mcdonnell-apologizes-repays-loans/2013/07/23/60fc9c1a-f3b9-11e2-9434-60440856fadf_story.html.

The fact that there was more than one payment does not necessarily trigger the multiple bribe increase of § 2C1.1(b)(1). The Commentary to that provision explains: "Related payments that, in essence, constitute a single incident of bribery or extortion (e.g., a number of installment payments for a single action) are to be treated as a single bribe or extortion, even if charged in separate counts." § 2C1.1 Commentary. At trial the Government argued to the jury that what Mr. Williams wanted from Mr. McDonnell was generally for "the Governor could help him solve [his business] problems by legitimizing, promoting, and obtaining research studies for those products." Trial Tr. 203 (Gov't Opening Statement). The Government argued to the jury that all of the payments Mr. Williams made were intended to secure that same general assistance.

Mr. Williams, too, testified that he provided a series of gifts and loans to the McDonnells with the single, general intent of receiving support for Star Scientific in return:

> Q: Okay. Why did you agree to loan $50,000 and give $15,000 to the Governor?
>
> A: I needed -- I needed his help.
>
> Q: Help personally?
>
> A: Not personally. I needed the -- I needed the help of -- what I was trying to do was I discovered this compound in the tobacco plant that I believed that would lower the health care costs. I know that he controls the medical schools here in Virginia. And so I needed his help with the testing of this to help me implement this into the system, and I needed the credibility that comes with that office and with the state of Virginia for letting people know about the benefits of Anatabine.

Trial Tr. 683 (J. Williams). Mr. Williams repeatedly confirmed that each of the gifts he provided to the McDonnell family were intended to procure this same generally-defined "help" for Star Scientific. Not once did Mr. Williams testify that any particular gift was made in exchange for some specific action by Mr. McDonnell, let alone multiple specific actions.

When asked what he expected to get in return for providing the second (MoBo) loan to Mr. McDonnell, Mr. Williams said that he "***expected what had already happened***, that [Mr. McDonnell] would continue to help me move this product forward in Virginia." Trial Tr. 804 (emphasis added). *See also id*. 734-35 (Mr. Williams testifying that he provided the plane trips, shopping spree, loan, catering, golf trips, and "maybe some other things" because "I thought it was good for our company"); *id*. at 756-57 (Mr. Williams testifying that he provided the MoBo loans "because [the McDonnells] are helping me . . . [w]ith these meetings, with introductions, the launch at the Governor's Mansion, the credibility that they are lending to what I'm doing"); *id*. at 809 (Mr. Williams testifying that he provided the second MoBo loan "so that [Mr. McDonnell] would help our company").

Because the Government alleged only that Mr. Williams's gifts and loans amounted to a series of payments in exchange for Mr. McDonnell's general support of Star Scientific, the "more than one bribe" increase does not apply here.

## CONCLUSION

After careful review of the Sentencing Guidelines manual and evidence introduced at trial, the defense believes that an appropriate calculation for Mr. McDonnell yields a guidelines sentence of 33 to 41 months. That sentence is derived from the following Guideline provisions:

- o Guideline § 2C1.1 controls the sentence for the relevant offenses. Under that provision, the base offense level is 14.

- o § 2C1.1(b)(3) increases the offense level by 4 if the offense involved an elected public official or any public official in a high-level decision-making or sensitive position. Mr. McDonnell was an elected public official.

- o § 2C1.1(b)(2) increases the offense level by an amount related to the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, whichever is greatest. Here, that calculation results in an increase of 4 levels.

28

- o § 3E1.1 decreases the offense level by 2 if the defendant has accepted responsibility.  Mr. McDonnell has accepted responsibility for his actions and only exercised his right to trial in order to challenge the applicability of the Hobbs Act and Honest-Services Wire Fraud statute to his conduct and to challenge the bank-related counts on which he was acquitted.

- o § 2C1.1(b)(1) increases the offense level by 2 if the offense involved more than one bribe or extortion.  This enhancement does not apply to Mr. McDonnell's conduct.

- o § 3C1.1 increases the offense level by 2 only if the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice. This enhancement does not apply to Mr. McDonnell's conduct.

In sum, the Sentencing Guidelines calculation for Bob McDonnell's conduct results in an offense level of 20.  Mr. McDonnell's Criminal History Category is I, and so his Guidelines range is 33 to 41 months.

Dated: December 23, 2014                  Respectfully submitted,


                                       /s/ Jonathan A. Berry
                                       Henry W. Asbill (*pro hac vice*)
                                       Mary Ellen Powers (*pro hac vice*)
                                       Noel J. Francisco (*pro hac vice*)
                                       Owen T. Conroy (*pro hac vice*)
                                       Hilary K. Perkins (*pro hac vice*)
                                       Jonathan A. Berry (VSB No. 81864)
                                       JONES DAY
                                       51 Louisiana Avenue, N.W.
                                       Washington, D.C. 20001
                                       Telephone: (202) 879-3939
                                       Facsimile: (202) 626-1700

                                       John L. Brownlee (VSB No. 37358)
                                       HOLLAND & KNIGHT LLP
                                       800 17th Street, N.W.
                                       Suite 1100
                                       Washington, D.C. 20006
                                       Telephone: (202) 828-1854
                                       Facsimile: (202) 955-5564

                                       *Counsel for Robert F. McDonnell*

## CERTIFICATE OF SERVICE

I, Jonathan A. Berry, am a member of the Bar of this Court.  I hereby certify that on this 23rd day of December, 2014, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, causing it to be served on all registered users.


Dated: December 23, 2014                    Respectfully submitted,


                                            /s/ Jonathan A. Berry
                                            Jonathan A. Berry (VSB No. 81864)
                                            JONES DAY
                                            51 Louisiana Avenue, N.W.
                                            Washington, D.C. 20001
                                            Telephone: (202) 879-3939
                                            Facsimile: (202) 626-1700
                                            Email: jberry@jonesday.com

                                            *Counsel for Robert F. McDonnell*