IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 3:14cr12 |
| | ) | |
| ROBERT F. MCDONNELL, | ) | |
| Defendant. | ) | |

### RESPONSE OF THE UNITED STATES TO
### DEFENDANT ROBERT F. MCDONNELL'S SENTENCING POSITION

The first Governor of Virginia to be convicted of a public corruption offense now asks this Court to impose a sentence that would be no punishment at all.  His nearly thousand-page set of sentencing materials underscores the fact  that the defendant still does not believe that he committed a crime, has not expressed any contrition for his crimes, and will not relent in shifting blame for his own actions to others.  And the defendant's request for leniency because of his prior public service, while simultaneously suggesting that a non-custodial sentence merely requiring additional public service would constitute adequate "punishment" for his crimes, is both unconvincing and self-contradictory.

Indeed, the defendant asks this Court not only for a downward variance from the advisory Guidelines range of 121–151 months of imprisonment; he asks this Court to send the message that corrupting a gubernatorial office in exchange for more than $175,000 deserves no imprisonment at all.  But as the United States argued in its initial sentencing position, a Guidelines sentence is appropriate in this case, and a Guidelines sentence is even more appropriate in light of the demonstrated lack of remorse and requests for special treatment throughout the defendant's sentencing pleadings.

A little over three years ago, in August 2011, delegate Phillip Hamilton was sentenced in this courthouse to 9 ½ years in prison for his crimes of bribery and extortion under color of official right.  That same day, the sitting Governor of Virginia, secretly in the thick of committing the same crimes, issued the following public statement: "Virginia has long been a state marked by honest, transparent and ethical governing by both parties.  Today's judgment is a reminder that no one is above the law."[1]  So too was the jury's verdict after this trial, and so too should be this Court's sentence.

## Argument

In his Sentencing Memorandum, *see* Doc. No. 582 ("RFM Sent'g Pos'n"),[2] the defendant asks this Court to vary downward from the advisory Guidelines range of 121–151 months to a non-custodial sentence of probation and 6,000 hours of community service.  In a telling window into his mindset, the defendant goes so far as to state that the community service proposals in his Appendix 7 "would be acceptable to Mr. McDonnell."  RFM Sent'g Pos'n at 49.  Of course, the question for the Court is not what is "acceptable to Mr. McDonnell," but rather what sentence is sufficient, but not greater than necessary, to account for the statutory factors set forth in 18 U.S.C. § 3553(a).  And as outlined in the United States' initial sentencing position and below,

---

[1] Frank A. Green, *Ex-delegate Hamilton sentenced to 9 1/2 years in corruption case*, RICHMOND TIMES-DISPATCH (August 12, 2011), *available at* http://www.richmond.com/archive/article_d1086d6d-a0c4-5da2-b4a0-1e25ae781920.html (last visited Dec. 29, 2014).

[2] The Court's Sentencing Order contemplates that the parties will file sentencing pleadings that outline, *inter alia*, "objections to the presentence investigation report" and any "motion for variance sentence."  Doc. No. 496, at ¶ 7.  The defendant sought, and was granted, an extension from the 30-page limit in the Local Rules to 50 pages.  *See* Doc. No. 580. Nevertheless, the defendant filed two separate pleadings: a 50-page "sentencing memorandum" and a 30-page "objections to the presentence report," as well as nearly 900 pages of attachments. *See* Doc. Nos. 582–90, 592.  For ease of response, the United States will file separate responses to each of the defendant's two pleadings.

those factors weigh strongly in favor of a Guidelines sentence and against a mere probationary term.

## I.      Nature and Circumstances of the Offense

First, the defendant's sentencing position is a reminder that he still does not accept the serious nature and circumstances of his offense, and that lack of appreciation only confirms the appropriateness of a Guidelines sentence.  For example, in an effort to minimize his role in the offense, the defendant claims that all he is guilty of is "poor judgment" in his "decision to accept" things that he persists in characterizing as "gifts."  RFM Sent'g Pos'n" at 29.  But the jury found that the defendant was guilty of far more than poor judgment in accepting gifts; it found that he was guilty of making the criminal choice to extort bribes under color of official right.  And the defendant's role in his offense was not a passive one; rather, as the scheme wore on, the defendant took an increasingly active role in negotiating and soliciting things of value from Williams.  The jury's verdict confirmed as much when it found him guilty but acquitted his wife of two bribes (the January 2012 golf and May 2012 loan) that the defendant solicited entirely on his own.

The defendant also attempts to minimize the nature of his crime by blaming "the *culture* of Virginia politics" and arguing that he merely "failed to resist this culture."  *Id.* at 30.  In support, the defendant again trots out his well-worn assertion that Virginia law "expressly permitted state officials to accept unlimited gifts of this nature."  *Id.*  But the defendant's argument is contrary both to state law and to his own stated beliefs at the time he was committing his crimes.  The defendant was not convicted of accepting gifts; he was convicted of accepting bribes, and bribes were unquestionably prohibited by state (and federal) law at the time of his conduct.  *See* Va. Code § 18.2-439.  And based on the defendant's real-time statements—

3

indeed, a statement he made one day before playing golf on Williams's tab and two days before Williams purchased a Rolex for him—he knew full well at the time that his conduct was not the norm for Virginia politics.  On August 12, 2011, when former Virginia delegate Phillip Hamilton was sentenced to more than nine years in prison, the defendant stated that "Virginia has long been a state marked by honest, transparent and ethical governing by both parties."[3]  But there was nothing honest, transparent, or ethical about the defendant soliciting more than $175,000 in things of value from Williams and concealing nearly all of it from the citizens of Virginia.  This Court should therefore reject the defendant's efforts to blame his actions on a "culture" that even he did not believe existed at the time of his crimes and that in any event could not provide an excuse for violating well-settled state and federal law.

The defendant's next attempt to minimize his offense is his tired assertion that the official action alleged (and now proven) in this case was not really official action at all.  *See* RFM Sent'g Pos'n at 30–31.  He asserts, among other things, that "access-oriented nature of the *quo* alleged . . . supports Mr. McDonnell's testimony that he never thought that anything he did with respect to Mr. Williams was illegal . . . ." *Id.* at 31.  But the Court has already rejected this argument, finding it "misguided" and holding that the defendant "assuredly did more for Williams than merely provide 'access.'"  Doc. No. 571, at 6.  Rather, as the Court held, the defendant "attempted to use his gubernatorial office to influence governmental decisions, specifically attempting to obtain research studies for Star Scientific." *Id.* at 7 (internal citation omitted).  And in doing so, the defendant "did more than just provide access to Williams; he directed his employees to take action on research studies for Anatabloc.  And he did so corruptly." *Id.* at 8.[4]

---

[3] *See supra* at n. 1.

[4] Indeed, as the United States argued in its initial sentencing position, Williams ultimately failed to receive the studies he sought at state universities in spite of the defendant's actions, not

Moreover, the defendant is flat wrong in his assertion that "it is undisputed that the actions he took related to Star are things that Mr. McDonnell routinely did for countless Virginia businesses." RFM Sent'g Pos'n at 32.  While it is true that the defendant agreed to and did perform official actions, the nature of the official action that the defendant promised and performed for Williams was different in kind than that provided to other businesses.  As Dr. William A. Hazel, Jr., the defendant's subordinate cabinet secretary testified, "[L]ooking from sitting here now four years into this, there was never anything quite like this that I saw.  I don't think I was ever looking at a product like this.  I don't think that there was the involvement that we had in terms of just the repeated contacts.  The Mansion event was unique.  That was the only time that happened.   Not that Mansion events were unique, but the whole arrangement that we just went through." Tr. 2215–16.

## II.      History and Characteristics of the Defendant

The defendant devotes approximately 20 pages of his sentencing memorandum to describing in detail his background and good works, his close family ties, and strong religious faith.  RFM Sent'g Pos'n at 1–20.[5]  Remarkably, he then goes on to argue that his good character and public service warrant a non-incarcerative sentence.  *Id.* at 22.  But leading by example, being committed to public service, and caring about one's constituents are the baseline expectations of our elected leaders, not exceptional characteristics that suffice to convert felony

---

because of them.  *See* Doc. No. 591 ("Gov't Sent'g Pos'n"), at 25–26.  That is why the Sentencing Guidelines caution that "[s]olicitations and attempts are treated as equivalent to the underlying offense."  § 2C1.1 cmt. background.  And in this regard, the defendant is wrong when he asserts that "the *quo* alleged is . . . outside the realm of a typical bribery case."  RFM Sent'g Pos'n at 30.  Rather, bribes from a businessman to a governor in exchange for official action to obtain multimillion-dollar research studies at state universities is well within the realm of a typical bribery case.

[5] The Guidelines make clear that family ties and responsibilities are not ordinarily relevant in determining whether a departure is warranted, *see* U.S.S.G. § 5H1.6, and that religion is not relevant in determining a sentence, *see* U.S.S.G. § 5H1.10.

convictions for bribery and extortion into momentary indiscretions meriting mere community service as a sanction.  Indeed, in all likelihood, the vast majority of the nation's governors are good, hard-working, civic-minded, generous, caring people.  That is as it should be.  And also in all likelihood not one of them would claim that those characteristics are a license to commit bribery without fear of jail time.

The defendant also appears to lack appreciation for the advantages that he enjoyed in his upbringing, instead claiming credit for all good he has done and accepting no blame for the crimes he has committed.  But despite the many letters of support that the defendant has been able to procure, his claimed good character is belied by: (1) the seriousness of the offense, discussed *supra*, (2) his willingness to blame everyone but himself, (3) his perjury under oath, and (4) his lack of any true remorse.

In assessing the defendant's character, the Court can, and should, take into account his trial strategy of attempting to place blame on everyone but himself.  As set forth in the Government's Sentencing Position, the defendant tried to blame his wife, Mr. Williams, his staff members, and even his children.  Gov't Sent'g Pos'n at 27.  He admitted what he had to, denied what he could, and blamed everyone else whenever able.  His attempt to place blame on his wife became gratuitous at times as evidenced by his testimony insinuating that he obtained separate counsel from his wife as a result of learning of her obstructive conduct, when the truth was that his decision to get separate counsel was completely unrelated to these events.  Tr. 4846–47, 4922–23.  Simply put, the Court was able to witness firsthand the defendant's willingness to blame others, and those actions speak volumes regarding his character.

The defendant's extensive perjury at trial similarly contradicts his claims of good character.  As detailed in the PSR, the defendant falsely and willfully testified under oath on at

least eight material issues. *See* PSR ¶ 126. The defendant's perjury is exacerbated by his status as an attorney and former chief law enforcement officer for the Commonwealth. The United States has no doubt that the many letters written by the defendant's supporters genuinely state their beliefs regarding the defendant's good character, but the bottom line is that the defendant's decision to perjure himself cannot be reconciled with claims that he is "a paragon of integrity," RFM Sent'g Pos'n at 23.

The defendant's utter lack of true remorse further undercuts his argument that he is somehow entitled to a non-Guidelines sentence based on his public service and good character. Here, the defendant's stated regret centers on his decision to accept what he calls "gifts" from Mr. Williams, but he has consistently denied any *quid pro quo* with Williams or ever doing anything in exchange for things of value. The defendant is not expressing true remorse. Instead, he is merely providing the functional equivalent of expressing regret at getting caught, rather than a genuine recognition of the seriousness of his criminal conduct. His claimed entitlement to a Guidelines adjustment for acceptance of responsibility underscores the problem.

Turning to the defendant's arguments regarding his public service, the defendant devotes significant energy to recounting supporters' letters extolling the defendant's good deeds as a public official. RFM Sent'g Pos'n at 6–17. The fact that the defendant was able to procure 440 letters in support is not insignificant, but there are approximately 8.26 million residents in Virginia, and the defendant violated his duty of honest services to each and every one of them. As one court has recognized in assessing the import of voluminous letters touting a public official defendant's good works, such letters "reflect[] merely the political duties ordinarily performed by public servants" and "if a public servant performs civic and charitable work as part of his daily functions, these should not be considered in his sentencing because we expect such

work from our public servants." *United States v. Serafini*, 233 F.3d 758, 773 (3d Cir. 2000); *see also United States v. Vrdolyak*, 593 F.3d 676, 682 (7th Cir. 2010) (reversing trial court's imposition of probationary sentence for public official because trial court gave undue weight to letters urging leniency for the defendant and ignored the fact that "[p]oliticians are in the business of dispensing favors; and while gratitude like charity is a virtue, expressions of gratitude by beneficiaries of politician's largesse should not weigh in sentencing").

More generally, good works are ordinarily not a proper basis for a lower sentence. One reason is that it would provide an unfair advantage for white-collar defendants. As the Fourth Circuit has recognized:

> [T]o allow any affluent offender to point to the good his money has performed and to receive a downward departure from the calculated offense level on that basis is to make a mockery of the Guidelines. Such accommodation suggests that a successful criminal defendant need only write out a few checks to charities and then indignantly demand that his sentence be reduced. The very idea of such purchases of lower sentences is unsavory, and suggests that society can always be bought off, even by those whose criminal misconduct has shown contempt for its well-being.

*United States v. McHan*, 920 F.2d 244, 248 (4th Cir. 1990); *see also United States v. Peppel*, 707 F.3d 627, 640–41 (6th Cir. 2013) (reversing overly lenient sentence for prominent businessman who pled guilty to securities fraud and money laundering; "[T]here is nothing to indicate that the support provided by Peppel to his family, friends, business associates, and community is in any way unique or more substantial than any other defendant who faces a custodial sentence. Further, Peppel's status in the community and chosen profession cannot alone be the basis for such a conclusion."); *United States v. Morken*, 133 F.3d 628, 630 (8th Cir. 1998) (downward departure reversed for businessman who performed substantial community service and raised money for charity, on grounds that it was "neither exceptional nor out of the ordinary for someone of his income and preeminence").

The United States acknowledges that the defendant's public service may be relevant to this Court's sentencing determination, but it does not create the virtual license to commit bribery that the defendant has imagined for himself.  The Court should, instead, take into account the defendant's public service in its determination of where within the applicable Guidelines range the sentence should fall.

## III.   Seriousness of the Offense; Promote Respect for the Law

The defendant's efforts to minimize his conduct also greatly underestimate the seriousness of the offense and the need for a Guidelines sentence to promote respect for the law. The Governor of Virginia has been convicted of bribery and honest services fraud—a first in the Commonwealth's 226-year history.  This requires a significant prison sentence, and the defendant's arguments to the contrary are unavailing.

### A.   The defendant's purported collateral consequences of the conviction do not obviate the need for a substantial prison sentence.

Troublingly, the defendant attempts at various points to cast himself as a *victim* in this case—claiming, for example, that he has "suffered tremendously" already and thus a non-custodial sentence is appropriate.  RFM Sent'g Pos'n at 41.  While it is true that the defendant will suffer collateral consequences of conviction, so do all of the other defendants who appear before this Court.  He specifically complains that his family will suffer if he is sent to prison, specifically noting that his youngest two 23-year-old sons "rely on Mr. McDonnell for guidance and support and would suffer greatly in his absence."  *Id.* at 42.  But almost every other defendant in every court in the country has a family, and many also have minor children dependent upon their care.  This defendant is no different than any other, and he is in fact fortunate that his children are grown and independent.

9

The defendant also laments other collateral consequences over the past year, but many have been of his own making.  For example, the defendant complains that he has suffered a financial burden from the costs of his legal defense.  *See id.* at 41 n. 47 (quoting a supportive letter that states the defendant "has spent his entire savings on legal fees trying to defend himself unsuccessfully").  But the defendant *chose* to incur many millions of dollars in defense costs, and he should not now be able to use that as a shield.  He also complains that he has suffered the loss of his "post-government teaching position."  *Id.* at 41.  But he simply ignores the fact that since he was convicted, he has been able to secure work as a consultant paying him $7,500 per month and he currently enjoys a total monthly income of approximately $12,432.  PSR ¶ 189.  The defendant's suggestion that the financial impact of his prosecution somehow justifies a lower sentence is simply unfounded.

Similarly, the defendant makes special note that "[h]is family has suffered tremendously through a trial that put their most private moments on public display . . . ."  RFM Sent'g Pos'n at 41.  But he *chose* to put on a defense that was an "X-ray machine into Bob's soul."  Tr. 264 (Opening, J. Brownlee).  As an attorney and former Attorney General, the defendant well knew that conspiracy law does not require co-conspirators to like each other.  Nor does it require co-conspirators to speak with any particular frequency; indeed, many conspiratorial agreements are made in the course of one conversation or simply an implicit agreement through conduct over time.  The defendant never testified that he lacked any communications with his wife during the timeframe of the conspiracy.  Rather, he complained that their conversations were primarily about "logistics."  Tr. 4411, 4436.  His extensive, salacious testimony about his decades of marriage and opinions about his wife's temperament was completely irrelevant to the charges.  The United States presented virtually no evidence on these topics.  This was not a legal defense.

10

Rather, it was the defendant's transparent effort to obtain jury nullification and garner public sympathy despite his crimes.  He cannot now complain of the personal impact of his decision to present this evidence.

      B.     The guidelines appropriately reflect the seriousness of his crime.

The defendant complains that U.S.S.G. § 2B1.1 "is not an appropriate measure of the seriousness of economic offenses."  RFM Sent'g Pos'n at 42.  He cites to the Sentencing Commission's recent notice that it intends to consider possible changes to § 2B1.1, 79 Fed. Reg. 49378-01, and the recent American Bar Association ("ABA") proposal to modify § 2B1.1.  *See* RFM Sent'g Pos'n at 42–43.  Notably, the Sentencing Commission's press release identified "'fraud on the markets' cases, with large loss amounts diffused over large numbers of victims who often have small losses," as their issue of particular note.[6]  But a careful review of the ABA's proposal reveals not just that the loss table is modified, but also additional points for culpability and victim impact.  In some instances, the ABA proposal actually *increases* sentencing ranges under § 2B1.1.[7]

These proposals are just that—proposals—and any refuge the defendant seeks is hypothetical.  They are focused on market manipulation schemes, investment scam artists, real estate straw purchasers, and similar economic crimes.  Neither of these policy proposals raises concerns about § 2B1.1 overstating the amount of elected officials' bribes.

---

[6] *U.S. Sentencing Commission Selects Policy Priorities for 2014–2015 Guidelines Amendment Cycle* (Aug. 14, 2014), *available at* http://www.ussc.gov/sites/default/files/pdf/news/press-releases-and-news-advisories/press-releases/20140814_Press_Release_Revised.pdf (last accessed Dec. 30, 2014)

[7] *See, e.g.*, ABA Proposal, Case Scenario 1, *available at* http://www.americanbar.org/content/dam/aba/uncategorized/criminal_justice/economic_crimes.authcheckdam.pdf (last visited Dec. 30, 2014).

And while complaining about the loss table in § 2B1.1, the defendant ignores the fact that the advisory Guidelines range under U.S.S.G. § 2C1.1 may very well *understate* the seriousness of his offense in several respects.  For example, § 2C1.1 does not provide an enhancement that adequately captures the power of his former position as a governor who oversaw 110,000 state employees, 132 state agencies, and a $96 billion budget.  *See* Tr. 4351–52.  To be sure, he received a four-level enhancement because the offense "involved an elected public official or any public official in a high-level decision-making or sensitive position."  § 2C1.1(b)(3).  But this is the same enhancement that agency administrators, jurors, law enforcement officers, and low-level elected officials receive.  *Id.* at cmt n. 4; *see also United States v. Dodd*, 770 F.3d 306 (4th Cir. 2014) (private correctional officers); *United States v. ReBrook*, 58 F.3d 961, 970 n. 12 (4th Cir. 1995) (applying predecessor to § 2C1.1(b)(3) to lottery commission attorney earning $25,000 per year), *abrogated on other grounds by Neder v. United States*, 527 U.S. 1 (1999); *United States v. Richards*, 674 F.3d 215 (3d Cir. 2012) (director of human resources for a county government); *United States v. Hill*, 645 F.3d 900 (7th Cir. 2011) (city deputy liquor commissioner); *United States v. Johnson*, 605 F.3d 82 (D.C. Cir. 2010) (public school special police officer); *United States v. Reneslacis*, 349 F.3d 412, 416 (7th Cir. 2003) (low-level INS intake official); *United States v. Guzman*, No. 09-50802, 2010 WL 2546123, at *1 (5th Cir. June 24, 2010) (unpublished) (prison guard).  The defendant's status, authority, and compensation as Governor of Virginia well exceeded any of these positions.  But yet he received the same four-level enhancement as them.

Similarly, as noted *supra* and as the United States argues in greater detail in its response to the defendant's objections to the PSR filed contemporaneously with this pleading, the PSR's application of only a 10-level enhancement for the greater of the value of the bribes or official

action to be received does not account for the fact that the official actions the defendant promised and performed were actions on obtaining what would have been multimillion-dollar studies for Williams and his company, and the trial evidence could arguably support as much as an 18-level enhancement on this basis.

## IV.   Need to Prevent Unwarranted Disparities

The defendant's arguments about what he claims are unwarranted sentencing disparities are little more than a continuation of his effort to minimize his conduct.  For example, the defendant persists in his argument that "*no* elected official has ever been convicted of federal corruption offenses on the basis of conduct similar to" his.  RFM Sent'g Pos'n at 36.  But this is not true.  Unfortunately, countless elected officials have been convicted and imprisoned for providing official acts in exchange for bribes—precisely as the defendant has done.  The matter is far more black-and-white than the defendant argues: an elected official is either engaged in bribery or he is not.  And after a six-week trial, a jury has spoken: the defendant repeatedly extorted and accepted bribes.

As such, this Court should properly consider the sentences imposed on other elected officials "with similar records who have been found guilty of similar conduct."  *See* 18 U.S.C. § 3553(a)(6).  But many elected officials accept responsibility and plead guilty.  And the Fourth Circuit has recognized that "'defendants who cooperate with the government and enter a written plea agreement are not similarly situated to a defendant who provides no assistance to the government and proceeds to trial.'"  *United States v. Jeffery*, 631 F.3d 669, 679 (4th Cir. 2011) (quoting *United States v. Docampo*, 573 F.3d 1091, 1101 (11th Cir. 2009)).

The defendant cites various cases for the proposition that other elected officials received downward variances from the advisory Guidelines.  *See* RFM Sent'g Pos'n at 37–38.  Excluding

those referenced that involved guilty pleas, it is true that some elected officials who are convicted at trial are sentenced to below-Guidelines sentences.  But some are not.  *See, e.g.*, *United States v. Ganim*, 510 F.3d 134 (2d. Cir. 2007) (After a ten-week trial, former mayor of Bridgeport, Connecticut, was convicted of various racketeering and public corruption offenses; Guideline range was 87–108 months, and 108 months was imposed).

And the defendant fails to acknowledge that virtually all elected officials convicted of corruption—especially governors—are serving substantial prison terms in line with the Guidelines range here.  Below is a sampling of recent federal public corruption sentences following convictions at trial against high-level elected officials across the country:

- *United States v. Blagojevich*, No. 1:08cr888 (N.D. Ill. 2011), *appeal pending*, No. 11-3853 (7th Cir.) (elected governor convicted at second trial on counts including honest-services fraud, extortion, and conspiracy to commit bribery; sentenced to 168 months)

- *United States v. Dimora*, No. 1:10cr387 (N.D. Ohio 2012), *aff'd* 750 F.3d 619 (6th Cir. 2014) (elected county commissioner convicted at trial of racketeering, bribery, and extortion; sentenced to 336 months)

- *United States v. Jefferson*, No. 1:07cr209 (E.D. Va. 2009), *aff'd in part and vacated and remanded in part* 674 F.3d 332 (4th Cir. 2012) (congressman convicted at trial on counts including honest-services fraud, bribery, and racketeering; sentenced to 156 months)

- *United States v. Hamilton*, No. 3:11cr13 (E.D. Va. 2011), *aff'd* 701 F.3d 404 (4th Cir. 2012) (elected state legislator convicted at trial of bribery and extortion; sentenced to 114 months)

- *United States v. Ryan*, No. 1:02cr506 (N.D. Ill. 2006), *aff'd sub nom. United States v. Warner*, 498 F.3d 666 (7th Cir. 2007) (governor convicted at trial on racketeering and tax charges; sentenced to 78 months)

- *United States v. Kilpatrick*, No. 2:10cr20403 (E.D. Mich. 2013), *appeal pending* No. 13-2500 (6th Cir.) (former Detroit mayor convicted by jury of racketeering conspiracy involving extortion, bribery and fraud; sentenced to 336 months)

- *United States v. Nagin*, No. 2:13cr11 (E.D. La. 2014), *appeal pending* No. 14-3081 (5th Cir.) (former New Orleans mayor convicted by jury of honest-services wire fraud and federal-program bribery; sentenced to 120 months)

The defendant's proposed non-custodial sentence of community service is completely disparate from any other comparable defendant.  The probationary sentences that he cites, *see* RFM Sent'g Pos'n at 47–48, involve either general fraud defendants or low-level elected officials.  The defendant was the Governor of the Commonwealth of Virginia and was convicted of engaging in a 23-month bribery scheme.  Mere probation would be far out of the heartland of sentences imposed on other elected officials, especially those who failed to accept responsibility and proceeded to trial—and in particular those who perjured themselves.

Finally, the defendant's efforts to compare his potential sentence to Jonnie Williams's fate should be rejected.  *See* RFM Sent'g Pos'n at 40.  The Fourth Circuit has made clear that comparing the sentences of defendants who cooperated with criminal investigators to those of defendants who did not—regardless of why some were in a position to help and others were not—is comparing apples and oranges. For this reason, Congress could not have intended that disparities resulting from the exercise of prosecutorial discretion could be determined to be "unwarranted."  *United States v. Perez-Pena*, 453 F.3d 236, 243 (4th Cir. 2006).  As the Eleventh Circuit noted:

> [D]efendants who cooperate with the government and enter a written plea agreement are not similarly situated to a defendant who provides no assistance to the government and proceeds to trial.  There is no unwarranted disparity even when the sentence the cooperating defendant receives is substantially shorter.  On a practical level, it would seem patently unreasonable to endorse a regime in which a defendant could steadfastly withhold cooperation from the authorities and then cry foul when a coconspirator benefits from rendering substantial assistance to the government.

*Docampo*, 573 F.3d at 1101 (internal citations and quotations omitted).

In sum, a sentence within the advisory Guidelines range will avoid unwarranted disparities.

## V.      Need to Deter Future Criminal Conduct

The defendant claims that a Guidelines prison term—or any prison term—is unnecessary because his trial and conviction alone are "powerful deterrents" to other elected officials. RFM Sent'g Pos'n at 34. But while they may be deterrents in some sense, they are by no means powerful deterrents if the only punishment for them is little to no punishment at all.

The legislative history of the adoption of the Sentencing Reform Act shows that Congress agreed, as it viewed deterrence as "particularly important in the area of white collar crime." S. Rep. No. 98-225, at 76 (1983). Prior to the adoption of the Guidelines, Congress was concerned that "[m]ajor white collar criminals often are sentenced to small fines and little or no imprisonment," which "[u]nfortunately . . . creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business." *Id.* Congress did not suggest that all white-collar criminals must be sentenced to imprisonment, but it recognized that a probationary sentence "may be grossly inappropriate . . . in cases in which the circumstances mandate the sentence's carrying substantial deterrent or punitive impact." *Id.* at 91–92, *see United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (internal alterations, quotations, and citation omitted)); *see also United States v. Thurston*, 456 F.3d 211, 218 (1st Cir. 2006) ("One of the goals of the entire guidelines regime was to minimize discrepancies in the treatment of 'white collar' and 'blue collar' offenses. From the outset of the guideline regime, the Sentencing Commission determined that the penalties for white collar crime had to be

increased because of the inequity in the pre-guideline sentencing practice of punishing economic crimes less severely than other apparently equivalent behavior." (internal alterations, quotations, and citation omitted)).

Moreover, despite the ebb and flow of sentencing policy, courts of appeals continue to "emphasize[] the importance of general deterrence in white-collar crime." *United States v. Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012); *see also United States v. Kuhlman*, 711 F.3d 1321, 1328 (11th Cir. 2013) (vacating a downward variance as substantively unreasonable because it "fails to achieve an important goal of sentencing in a white-collar crime prosecution: the need for general deterrence").

Put simply, if this Court were to consider the reputational harm and purported shame "suffered" by the defendant (as a result of his own decisions) as sufficient deterrents, as he asks, it would be treating him differently than all other defendants.  But the Sentencing Guidelines are—rightly—"entirely neutral as to the race, sex, national origin, creed, and socioeconomic status of offenders."  28 U.S.C. § 994(d)(11).  And "[i]t is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction." *Prosperi*, 686 F.3d at 47 (citing U.S.S.G. §§ 5H1.2 (stating that "[e]ducation and vocational skills are not ordinarily relevant in determining whether a departure is warranted"), 5H1.5 ("Employment record is not ordinarily relevant to determining whether a departure is warranted."), 5H1.10 (stating that, *inter alia*, socioeconomic status is not relevant in determining a sentence)).

In sum, as Judge T. S. Ellis, III stated in describing the need for general deterrence in bribery cases, "public corruption is a cancer that needs to be surgically removed," and one of the

only ways of doing so is for significant terms of imprisonment for those who engage in it to serve as a warning "beacon" to those who consider engaging in it.[8]  A sentence within the advisory Guidelines range here would thus be warranted for general deterrence purposes alone, and a sentence of community service would provide no general deterrent at all to other public officials.

<u>**Conclusion**</u>

For all of the aforementioned reasons and those outlined in the Government's Sentencing Position, this Court should impose a sentence within the advisory Guidelines range.


Respectfully submitted,

DANA J. BOENTE
United States Attorney

JACK SMITH
Chief, Public Integrity Section
Criminal Division
U.S. Department of Justice

By: _____/s/_____
Michael S. Dry
Jessica D. Aber
Ryan S. Faulconer
David V. Harbach, II
Counsel for the United States
U.S. Attorney's Office
600 E. Main Street, Suite 1800
Richmond, VA 23219
Phone: 804-819-5400
Fax: 804-771-2316
Email: michael.s.dry@usdoj.gov
        jessica.d.aber@usdoj.gov
        ryan.faulconer2@usdoj.gov

---

[8] *See* Jonathan Tilove, *William Jefferson sentenced to 13 years in prison*, THE TIMES-PICAYUNE (Nov. 13, 2009), *available at* http://www.nola.com/politics/index.ssf/2009/11/william_jefferson_sentenced_ye.html (last accessed Dec. 30, 2014).

**CERTIFICATE OF SERVICE**

I hereby certify that on December 30, 2014, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing ("NEF") to all counsel of record.


By:  _____/s/_____
Ryan S. Faulconer
Counsel for the United States
U.S. Attorney's Office
600 E. Main Street, Suite 1800
Richmond, VA 23219
Phone: 804-819-5400
Fax: 804-771-2316
Email: ryan.faulconer2@usdoj.gov