IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 3:14cr12 |
| | ) | |
| ROBERT F. MCDONNELL, | ) | |
| Defendant. | ) | |

**RESPONSE OF THE UNITED STATES TO
DEFENDANT ROBERT F. MCDONNELL'S OBJECTIONS TO THE PRESENTENCE REPORT**

The United States of America, by undersigned counsel, hereby files its response to

Defendant Robert F. McDonnell's Objections to the Presentence Report ("PSR"), Doc. No. 592

("RFM Objections").[1]  In those objections, the defendant advances essentially five arguments,

namely that the PSR (i) requires "corrections and amendments" to two dozen paragraphs in its

brief description of the offense conduct, RFM Objections at 1–7; (ii) incorrectly applies a two-

level enhancement for an offense involving more than one bribe or extortion, *id.* at 26–28; (iii)

incorrectly applies a 10-level enhancement for the greater of the value of the bribe or official

action exceeding $120,000, *id.* at 8–13; (iv) incorrectly applies a two-level enhancement for

obstruction of justice, *id.* at 14–25; and (v) should have instead applied a two-level reduction for

acceptance of responsibility, *id.* at 25–26.  For the reasons stated below and in the United States'

initial sentencing position, however, each of the defendant's objections is wrong, and they should

---

[1] The Court's Sentencing Order contemplates that the parties will file sentencing
pleadings that outline, *inter alia*, "objections to the presentence investigation report" and any
"motion for variance sentence."  Doc. No. 496, at ¶ 7.  The defendant sought, and was granted,
an extension from the 30-page limit in the Local Rules to 50 pages.  *See* Doc. No. 580.
Nevertheless, the defendant filed two separate pleadings: a 50-page "sentencing memorandum"
and a 30-page "objections to the presentence report," as well as nearly 900 pages of attachments.
*See* Doc. Nos. 582–90, 592.  For ease of response, the United States will file separate responses
to each of the defendant's two pleadings.

therefore be overruled.  The PSR properly calculates the defendant's adjusted offense level as 32

and his criminal history category I, yielding an appropriate advisory Guideline range of 121–151

months.

I.      **The defendant's "corrections and amendments to the PSR" do not identify factual inaccuracies in the PSR, seek to relitigate side issues already litigated at trial, and are unnecessary to resolve in any event pursuant to Fed. R. Crim. P. 32(i)(3)(B).**

The Court should reject each of the defendant's "corrections and amendments to factual

assertions" in the PSR.  As an initial matter, the vast majority of the defendant's "corrections"

are not really corrections at all, but merely claimed omissions that he apparently believes

somehow mitigate his offense conduct.  *See* RFM Objections at 1–7 (objections to PSR ¶¶ 31,

36–40, 55, 60, 62, 68, 78, 82, 83, 85, 97, 113, 121).  As such, the defendant is not really

disputing the factual accuracy of the complained-of paragraphs in the PSR; those objections

should thus be overruled because a "mere objection" to the PSR without "an affirmative

showing" of inaccuracy is insufficient.  *United States v. Love*, 134 F.3d 595, 606 (4th Cir. 1998)

(internal quotations omitted).  The remaining objections are more about semantics than substance

and also fail to make an affirmative showing of inaccuracy.  *See, e.g.*, RFM Objections at 1

(claiming that PSR ¶ 34 is inaccurate because Mr. Williams testified that he told the defendant

that "he wanted to conduct testing in Virginia and asked who he could speak with in

government" versus the PSR's assertion that Mr. Williams told the defendant that "Star

Scientific needed the assistance of Virginia government").[2]

---

[2] To the extent the non-omission objections have any substance to them at all, they are little more than conclusory attempts to relitigate trial disputes that the jury either resolved against the defendant or that are easily resolvable against the defendant based on the preponderance of the evidence standard at sentencing.  *See, e.g.*, RFM Objections at 1 (objection to PSR ¶ 23, relitigating "official act" definition), 3–4 (objections to PSR ¶¶ 42–44, relitigating precise timing of the defendant's awareness of first Williams loan and wedding check), 6–7 (objection to PSR ¶ 100, relitigating the defendant's discussions with Williams regarding reportability), 7

The one thing that each and every one of the defendant's "corrections and amendments to factual assertions" has in common is that there is no reason to litigate them at the sentencing hearing, since the Court itself heard all of the testimony and examined the exhibits that were presented during the six-week trial.  The Federal Rules of Criminal Procedure provide that the Court does not have to rule on a disputed matter in the PSR if it "determine[s] that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing."  Fed. R. Crim. P. 32(i)(3)(B).  The United States thus asks that the Court find that (i) the PSR's findings are amply supported by a preponderance of the evidence at trial and (ii) the defendant's remaining objections are either overruled as factually inaccurate or unnecessary to resolve because they will not affect the sentencing or be considered in sentencing the defendant.[3]

## II.   The defendant's objection to the PSR's application of a two-level enhancement pursuant to U.S.S.G. § 2C1.1(b)(1) for an offense involving more than one bribe or extortion contradicts the jury's verdict and has no basis in law or fact.

The defendant contends that his crime did not involve more than one bribe or extortion. Rather, he claims that it involved only a "single incident of bribery involving a series of related payments made over time" and thus did not involve more than one bribe under U.S.S.G. § 2C1.1(b)(1).  RFM Objections at 26–27 (citing § 2C1.1(b)(1), cmt n. 2).  He argues that because Mr. Williams sought "the single, general intent of receiving support for Star Scientific," all of the

---

(objection to PSR ¶ 105's characterization of the defendant's official action in March 2012 cabinet meeting, which the Court resolved against the defendant, *see* Doc. No. 571, at 6–7).

[3] To be clear, the United States does disagree with the factual accuracy of several of the suggested "omissions" that the defendant wishes to include, as many of them either selectively quote the record or cite to discredited testimony by the defendant or other of his witnesses. As stated above, however, it is unnecessary for the Court to resolve those objections so long as the Court makes appropriate factual findings with respect to the sentencing enhancements at issue and explains its weighing of the 18 U.S.C. § 3553(a) factors.

things of value he received were related payments in a single bribe.  *Id.* at 27.  The defendant cites no law for this argument.

As noted in the Government's initial Sentencing Position, the jury's verdict found that the defendant extorted at least six separate, distinct bribes, and the plain language of § 2C1.1(b)(1) contradicts his argument.  *See* Doc. No. 591 ("Gov't Sent'g Pos'n") at 3.  Moreover, as the United States previously explained, the Second Circuit's analysis in *Arshad* is the prevailing test.  *See id.* at 3–4 (applying test in *United States v. Arshad*, 239 F.3d 276, 280–82 (2d Cir. 2001)).  And the defendant's objections unsurprisingly fail to apply this test, as the three *Arshad* factors plainly weigh against his argument.  First, Mr. Williams's payments were not made to influence "a single action," such as a sole piece of legislation or contract.  *Arshad*, 239 F.3d at 280 (internal quotation omitted).  Second, the defendant did not receive Mr. Williams's bribes on a "regular schedule of payments over a finite period of time toward a fixed final sum."  *Id.* at 281.  Third, Mr. Williams's bribes did not "involve the same payor and payee in each instance," nor were they "made in the same form and by the same means."  *Id.* at 282.

Defendant Arshad had claimed, like defendant McDonnell, that while his payments achieved "different immediate goals," they were "all 'related to the NYCHA contract'" and thus installment payments under § 2C1.1(b)(1).  *Arshad*, 239 F.3d at 281.  But the Second Circuit rejected this argument and noted that "[c]ourts confronted with similar situations have uniformly held that multiple payments meant to influence more than one action should not be merged together for purposes of § 2C1.1 *merely because they share a single overall goal* or are part of a larger conspiracy to enrich a particular defendant or enterprise."  *Id.* (citing *United States v. Middlemiss*, 217 F.3d 112, 124 (2d Cir. 2000)) (emphasis added); *United States v. Goodson*, No. 96-207-002, 2000 WL 680278, at *5 (E.D. La. May 25, 2000) (unpublished) (holding that

defendant's consistent "end goal . . . to protect his business . . . and enrich himself and others involved" was not enough to make multiple payments a single incident of bribery).

The defendant's objections here should be rejected for the same reasons. Mr. Williams's larger goal of state assistance with his product was broad, but he sought incremental official actions to effectuate it. The mere fact that the defendant agreed to take official action on an as-needed basis to further the master plan and then extorted things of value as the scheme wore on does not mean that he solicited only a singular bribe. *See also United States v. Kahlon*, 38 F.3d 467, 470 (9th Cir. 1994) (multiple "payments [that] were part of a larger conspiracy" can be the basis for the enhancement under § 2C1.1(b)(1), as long as they "were not installment payments for a single action"). To accept the defendant's argument to the contrary would mean that no matter how many times the defendant went back to Williams for more graft or no matter how many times he responded to Williams's requests for further official action with another (even implicit) bribe solicitation, he could never commit a second offense after he committed his first one. That cannot be and is not the law.

For that and similar reasons, the United States District Court for the District of Columbia rejected a defendant's nearly identical argument that the multiple bribe enhancement could not apply because the government proceeded to trial on a "stream of benefits" theory. *United States v. Ring*, 811 F. Supp. 2d 359, 374 (D.D.C. 2011). The court noted that § 2C1.1(b)(1) "speaks not of multiple 'schemes to defraud' but of multiple 'bribes.'" *Id.* It further differentiated cases with "a number of installment payments for a single action," as application note 2 contemplates, and cases like *Ring*, in which there were "multiple incidents of bribery." *Id.* at 374–75 (internal quotations omitted).

5

In sum, the defendant here engaged in multiple incidents of bribery and extortion, including all six counts for which the jury convicted him.  As such, § 2C1.1(b)(1) plainly applies.

III.   **The defendant's objections to the PSR's application of a 10-level enhancement pursuant to U.S.S.G. § 2C1.1(b)(2) for the greater of the value of the bribes or official action exceeding $120,000 misapprehend the applicable law, provide a flawed valuation methodology, and are factually inaccurate.**

Next, the defendant objects to the PSR's calculation under U.S.S.G. § 2C1.1(b)(2) of the greater of the value of the bribe or official action as exceeding $120,000.  As the United States noted in its initial sentencing position, the parties' disagreement on this enhancement boils down to two factual issues.  First, the defendant summarily asserts that the value of the bribes and extorted property is limited to the charged property set forth in Counts 6–11.  RFM Objections at 8 n. 1.[4]  Second, the defendant asserts that the value of the $120,000 in no-payment, multi-year, two-percent, undocumented loans that he obtained from Williams was a sum total of merely $939.92.  *Id.* at 12.  For the reasons stated in the United States' initial sentencing position and those outlined below, both of the defendant's arguments are wrong.  Moreover, the PSR's application of a 10-level enhancement pursuant to § 2C1.1(b)(2) is also supported on the alternative ground that any reasonably foreseeable estimate of the official action to be received in this case would have exceeded $120,000.

---

[4] Ironically, in the same breath that he asserts that the jury's verdict provides the only property at issue for purposes of assessing § 2C1.1(b)(2)'s enhancement, the defendant insists on mischaracterizing that verdict when he claims that "[t]he jury determined that Mr. McDonnell or his family members received several *gifts* from Mr. Williams" or refers to "[t]he sum total of the *gift items* the jury found were received by Mr. McDonnell."  RFM Objections at 8 (emphasis added).  But the jury found quite to the contrary; it found that the property charged in Counts 6– 11 were *bribes that the defendant extorted.*  What made them bribes instead of gifts was the *quid pro quo* agreement that the jury found was present beyond a reasonable doubt.

6

A.    The defendant's objection to the PSR's inclusion of $37,994.91 in things
      of value that were not charged in substantive counts is meritless.

The defendant relegates his argument that the things of value at issue for purposes of

§ 2C1.1(b)(2)'s enhancement are limited to charged property to a footnote in which he

conclusorily asserts the following: "While the jury heard testimony about some other gifts

received by Mr. McDonnell or members of his family, those other gifts were not a part of the

charged crime and the jury never determined whether or not they were related to the offense.

The value of those items therefore should not be counted toward the § 2C1.1(b)(2) total."  RFM

Objections at 8 n. 1.  This "argument" is fatally flawed in at least three respects.

First, as the United States noted in its initial sentencing position, although the six

additional things of value totaling $37,994.91 were not the basis for independent substantive

counts, they *were* within the scope of the "charged" *conspiracy* counts as those were described in

the Court's jury instructions.  *See* Gov't Sent'g Pos'n at 7–8.

Second, whether the jury made a specific finding with respect to those six things of value

is beside the point.  To be sure, the jury's verdict finding that the property charged in Counts 6–

11 were bribes is conclusive as to that property's inclusion.  But the question with respect to the

six additional things of value is whether it is more likely than not that it was reasonably

foreseeable to the defendant that those things of value were bribes.  *See* Gov't Sent'g Pos'n at 5–

6 (setting forth standard).   Tellingly, the defendant's footnote argument does not even pay lip

service to this reduced standard of proof applicable at the sentencing phase.

Third, and perhaps relatedly, the defendant does not even attempt to argue that the six

additional things of value supporting the PSR's calculation were not reasonably foreseeable

bribes proven by a preponderance of the evidence at trial.  Indeed, of the six additional

uncharged things of value, only two appear in the defendant's various objections to the PSR's

factual findings and thus appear to be disputed in any real sense. Those are the $19,289.28 shopping spree in April 2011 and the $6,500 Rolex. *See* RFM Objections at 3, 6.[5] With respect to the shopping spree, the defendant asserts that the PSR "omits the context that Mr. McDonnell did not have anything to do with planning the shopping trip, *did not know* that Mr. Williams purchased clothes for Mrs. McDonnell on the shopping trip, and Mr. Williams never spoke with him about it." *Id.* at 3 (emphasis added). For the Rolex, the defendant asserts that the PSR "omits the context that Mrs. McDonnell *did not tell* Mr. McDonnell that the watch came from Mr. Williams." *Id.* at 6 (emphasis added). Both of these assertions are factually implausible. But more importantly, even if the defendant's characterizations were correct, the things of value would still be reasonably foreseeable bribes proven by a preponderance of the evidence.

Starting with the shopping spree, the defendant conceded on direct and cross examination that he knew his wife went shopping with Mr. Williams in New York City in April 2011, that he knew the purpose was to purchase dresses for his daughter's wedding, and that he saw his wife with the shopping bags. Tr. 4482, 4984. Mr. Williams described the staggering volume of goods that he purchased, Tr. 1091, and the Court and jury both saw Special Agent David Hulser admit the trove of expensive items into the record, Tr. 3437–44; Exhs. 8, 23, 28–32, 34–37. The jury saw at least two photographs of the defendant in his wife's presence while she wore some of the items. Tr. 333, 1880; Exhs. 548, 550. The defendant conceded that he knew that the last time he, his wife, and Mr. Williams were in New York, Mr. Williams paid for a $5,000 bottle of cognac and offered to purchase an expensive inauguration gown. Tr. 4987. And the defendant

---

[5] The defendant also claims that the PSR "omits the fact that the McDonnells did, in fact, pay Donnie Williams" for the work performed at the defendant's home. RFM Objections at 7. But as explained in the United States' initial sentencing position, the payments made by the defendant to Donnie Williams did not occur until after law enforcement began investigating the scheme, and in any event, they substantially undervalued the work performed. *See* Gov't Sent'g Pos'n at 8. Thus, the defendant's objection is immaterial to the § 2C1.1(b)(2) analysis.

conceded that his wife had a history of making inappropriate requests for money. Tr. 4987.

Despite all of that, the defendant claimed at trial that he did not know that Mr. Williams

purchased the items in April 2011 or that he knew how much they cost; indeed he testified that

he did not even ask his wife about the cost and claimed that the possibility of Mr. Williams

paying did not even occur to him. Tr. 4484, 4987–88.

In light of the evidence above and common sense, however, there are only two reasonable

conclusions to draw about the defendant's denials. One is that the defendant lied and did in fact

know exactly who paid for the luxury spree. The other is that the defendant deliberately refused

to ask *precisely because* the true answer was reasonably foreseeable to him. Either way, the

value of the shopping spree is fairly attributable to him for sentencing purposes.

The same is true about the Rolex. Any dispute that it is more likely than not that the

value of the Rolex was reasonably foreseeable to Mr. McDonnell is dispelled by the 11 photos in

the record of him posing with the watch in a way that is inexplicable for someone who later

claims he thought the watch was fake. *Compare* Exh. 274 *with* Tr. 4601 ("There was a time that

I thought that, you know, maybe it's – I don't know. Maybe it's not – not real. I just didn't

know.") And any dispute that the source of that watch was reasonably foreseeable to the

defendant is dispelled by the other facts that he concedes he knew at the time he received the

Rolex. By that point, the defendant admits he knew that Mr. Williams had paid $15,000 for

Cailin McDonnell's wedding, written a $50,000 check to Mrs. McDonnell, twice paid for the

defendant to play at Williams's exclusive club, sent golf clubs and bags to the defendant and his

sons, paid for the vacation at Smith Mountain Lake, and provided a Ferrari that the defendant

posed in like he did with the Rolex—except 22 times instead of 11. Exhs. 183, 198.

Notwithstanding all of that knowledge, on direct examination the defendant testified, "But I – I –

I didn't interrogate my wife as to, you know, where did you get it, how much did it cost." Tr. 4601. But again, as with the shopping spree, there are only two reasonable interpretations of that denial: that it is a lie or that the defendant refused to ask *precisely because* the answer was reasonably foreseeable to him. And again, either way, the Rolex is fairly attributable to him.

Finally, it may well be that the defendant is really arguing—despite not saying so explicitly—that the six additional things of value, while reasonably foreseeable to him, simply were not bribes. But just like the things of value underlying Counts 6–11, the six additional things of value relied upon by the PSR were within the scope of the charged conspiracy, and there is ample evidence in the record to conclude by a preponderance of the evidence that they were bribes.

To begin with, all six items postdated the October 2010 flight on which Mr. Williams explained to the defendant that Williams wanted studies at state universities. The April 2011 shopping spree predated the solicitation of the $15,000 and $50,000 checks in May 2011 by only weeks. Similarly, the defendant concluded the Smith Maintain Lake trip (one of the six items) by driving Williams's Ferrari and, almost immediately upon arriving home, ordering a subordinate to send a staffer to a meeting the following morning "on the Star Scientific anatablock trials planned in va at vcu and uva." Exh 189, Tr. 4713. The defendant's wife solicited the Rolex the following morning in the time surrounding the same meeting. Tr. 723. That same day, the defendant and his wife exchanged at least three phone calls surrounding Mr. Williams's visit to the Governor's Mansion, and before Mr. Williams left, Mrs. McDonnell scheduled the August 30, 2011, Anatabloc launch event on her calendar. Exh. 582. Eleven days later, the defendant's staffers began to discuss the defendant's attendance at the launch event, Exh. 204, and the August 2011 golf outing (another of the six items) occurred the following day,

Exhs. 200, 583.  Mr. Williams purchased the Rolex the following day, Exh. 203, and three days

after that, the defendant agreed to attend the launch event, Exh. 208.

Based on the sequence of events alone, there is more than sufficient evidence to conclude

by a preponderance of the evidence that the defendants extorted the shopping spree, Smith

Mountain Lake trip, Rolex, and August 2011 golf from Mr. Williams just as much as they

extorted the property underlying Counts 6–11.  And the same is true of the Chatham Bars trip

and work performed by Donnie Williams, which both occurred in a time period when Mr.

Williams was still seeking studies at state universities.  *See, e.g.*, Tr. 820, 1568–69.  Indeed, Mr.

Williams testified that none of the items he purchased for the McDonnells was purchased out of

friendship; rather, all of them were part of the business relationship that the jury found to be a

bribery conspiracy.  *See, e.g.*, 727 (Rolex), 734–35 (shopping spree), 820 (Chatham Bars), 890

("Q: Just sitting here today, are you 100 percent sure that Bob McDonnell agreed to help your

company, Star Scientific, because of the loans and gifts that you gave him and his family?  Are

you 100% sure of that?  A:  I am 100 percent sure of that.  I believe that."), 1052 (shopping

spree), 1107–08 (golf), 1188, 1281.  In sum, the PSR reasonably—and indeed, conservatively—

included the six additional items worth approximately $37,994.91 in its § 2C1.1(b)(2)

calculation.[6]

B.     The defendant's objection to the PSR's valuation of the Williams loans at
       face value misapprehends the relevant inquiry under § 2C1.1(b)(2)

Next, the defendant objects to the PSR's conclusion that the most reasonable estimate of

the value of the Williams loans is their full face value, or $120,000.  In doing so, the defendant

cites, as the United States did, to *United States v. Fitzhugh*, 78 F.3d 1326 (8th Cir. 1996).  *See*

[6] As the United States has previously noted, the PSR's estimate is conservative because it does not include more than a dozen additional things of value worth thousands of dollars, and it understates the true value of some of the items it does include.  *See* Gov't Sent'g Pos'n at 8 n. 1.

RFM Objections at 9.  The defendant cites to *Fitzhugh* for the propositions that "[t]he value of a transaction is *often* quite different than the face amount of that transaction" and that a loan's "value will *typically* be the difference between the actual cost of the loan, and the cost of the same loan at fair market terms and conditions." *Fitzhugh*, 78 F.3d at 1331 (emphases added), *quoted in* RFM Objections at 9.  But the mere fact that a loan's value is "often" not its face value or is "typically" a matter of calculating differential terms does *not* mean that a loan's value is *never* its face value.  Rather, such a differential calculation is only appropriate, as *Fitzhugh* explains, where it is possible to compare "the *same* loan at fair market terms and conditions."  *Id.* (emphasis added).  That is, after all, why the Eighth Circuit made sure to emphasize in *Fitzhugh*—anticipating precisely the sort of argument that this defendant makes here—that "the value of the loan *would* equal the face amount of the loan if the borrower's promise to repay were worthless or unenforceable, and it *might* equal the face amount of the loan if the borrower, while able and intending to repay, could not have obtained the loan at any price absent the bribe."  *Id.* at 1331 n. 2.

The Williams loans fall squarely within this latter category for which face-value valuation is appropriate.  First, the defendant's "promise to repay [was] worthless and unenforceable."  The defendant knew that the loans were undocumented.  And as this Court previously ruled, the trial record includes "substantial evidence . . . that McDonnell knew what Williams was seeking, specifically, research studies for Star Scientific's Anatabloc product."  Doc. No. 571, at 5.  That is why, after all, Williams testified that the loan terms were beside the point.  *See, e.g.*, Tr. 807–08.[7]  Both parties knew that the loan would never be enforced and that

---

[7] It is also presumably why the defendant lied to his sister when he claimed that part of the reason for the facially below-market interest rate and lack of any periodic payments was that Williams might use the beach properties for his business.  *Compare, e.g.*, Tr. 3952 (Maureen C.

the defendant could simply refuse to pay without Williams having any recourse without exposing the bribe scheme.[8]

Moreover, as the United States explained in its initial sentencing position, the trial record establishes by a preponderance of the evidence that the defendant could not have obtained the "same" loan he got from Williams at fair market terms and conditions because any loan the defendant could have obtained would not have been the "same" in any sense of the word. *See* Gov't Sent'g Pos'n at 9–13. Put simply, the defendant could not have obtained *any* loan that required no payments and no collateral for four years in 2011 or for three years in 2012.[9]

---

McDonnell, the defendant's sister) ("Q: And did you discuss with Bob why you would do a balloon on this rather than a periodic payment?  A: I remember him mentioning, I think Maureen had also mentioned at some point prior, that Mr. Williams may want to come, he and his wife or family, and use the property or use it for business associates.") *with* Tr. 778 (J. Williams) ("Q: Did you have any intention of renting those beach houses?  A: No.")  Of course, neither the defendant nor Williams ever intended for any "rent" payments to be credited against the loans because the "terms" of the loans were immaterial to the bribe transaction.

[8] By contrast, the loans that courts have previously found should *not* be valued at face value were collateralized, documented loans with financial institutions. *See* Gov't Sent'g Pos'n at 11–13.  And valuing undocumented, uncollateralized loans between a bribe payor and a public official at face value is sensible, as otherwise any cash payment in a bribe scheme could simply be called a "loan" with a far-out "payment" date regardless of any actual intent to repay.

[9] Similarly, the defendant's continued reliance on having wealthy friends and relatives is unpersuasive.  There is no support in the record for the notion that even a loan from his sister or from his wealthy college roommate would have been at terms comparable to the Williams loans. After all, had those really been readily available alternatives, the defendant surely would have sought them out in the past before racking up tens of thousands in credit card debt or relying on convenience checks and cash advances to make ends meet.  And regardless, it is difficult to imagine any convicted politician of the defendant's former stature unable to find someone to claim after the fact to be willing to loan large sums of money.  Such conclusory assertions are not sufficiently reasonable to provide a basis for comparison under § 2C1.1(b)(2).  Indeed, insofar as the defendant claims ready availability of similar loans based on his status as a "pillar of the Virginia community," RFM Objections at 13, he is essentially claiming that he could have abused his public position to extract bribes or extort property from others and thus did not need to from Williams. That is, of course, not the inquiry under § 2C1.1(b)(2).

C.   The defendant's proffered loan valuation methodology is flawed.

Next, the defendant asks this Court to conclude that the value of the Williams loans was less than either of the two rounds of golf for which the jury convicted him and less than many of the meals he ate on Williams's tab.  Specifically, the defendant claims that the value to him of the Williams loans was $939.92.  RFM Objections at 12.  In doing so, he attempts to convert the Internal Revenue Service ("IRS") estimation of the minimum plausible interest rate for *any* loan into an estimation of the interest rate that he could have obtained for an undocumented, uncollateralized loan requiring no payments for three or four years.  That estimation is the Applicable Federal Rate ("AFR").

But far from helping the defendant's cause, the AFR helps show why the Williams loans were barely loans at all.  In essence, the AFR provides a bare minimum interest rate below which the IRS concludes that loan terms are *so low* that *additional* interest income should be imputed to the lender (and imputed as paid by the borrower) even though the stated terms of the loans do not include that interest.  *See, e.g.*, *KTA-Tator, Inc. v. Comm'r.*, 108 T.C. 100, slip. op. at 9–12 (1997); *Mason v. Comm'r*, T.C. Memo. 1997-352, at *2–3 (July 31, 1997).  In other words, the AFR is the IRS method of saying that some loans have such favorable stated terms that they are not really believable, and in order to prevent people from circumventing gift-tax or other rules just by calling a cash transaction a loan, the IRS will treat the loan as having different terms than the lender and borrower claim to the government.[10]  Put differently, because loans given below AFR rates are so unfavorable to the lender that they are below the interest rates for essentially

---

[10] *See, e.g.*, *In re Suggs*, No. 10-4400-8-JRL, 2011 WL 710488, at *3 (Bankr. E.D.N.C. Feb. 22, 2011) (unpublished) (declining to apply AFR as interest rate in bankruptcy proceedings because "[t]he goal of imputed interest is to prevent wealthy individuals from avoiding taxes by loaning money to children in lower tax brackets who can invest the money in such a way that the investment income is taxed at a lower rate"; AFR is thus "not an acceptable rate of present value interest").

guaranteed investment vehicles, the IRS assumes that no reasonable person would make such a loan at arm's length.[11]

Notably, the first Williams loan would have fallen below this minimum threshold, meaning that Williams gave the loan at *such favorable terms* that the IRS would have treated those terms as essentially too good to be true and imputed different terms. *See* 26 U.S.C. § 1274(d)(1)(A); RFM Objections at 11–12. And the same would have been true of the second and third Williams loans had they required repayment at three years and one day instead of three years. *Id.* Thus, even by IRS standards, the Williams loans were either not believable or barely believable as loans in the first place.

More importantly, the AFR does not account for the value of a loan that does not require payments for three or four years, and the AFR does not attempt to value the difference in loan terms to a particular borrower based on particular facts. In sum, the only relevance of the AFR to this case is in pointing out just how favorable the Williams loan terms were.[12]

---

[11] *Cf. Davis v. Rutgers Cas. Ins. Co.*, 964 F. Supp. 560, 576 (D.N.J. 1997) (describing 52-week Treasury bill rate as comparable to the AFR and thus no more than an "approximation of the available return for a typical risk-free investment").

[12] The defendant also argues in a footnote that any value attributed to the March and May 2012 loans should only be partially attributable to the defendant because, he asserts, those were loans to MoBo Realty LLC and the defendant was a 50% partner in MoBo with his sister. *See* RFM Objections, at 12 n. 6. But the jury rejected this argument when it found that the entire $50,000 payment was a bribe extorted by the defendant as charged in Count 10. Nor is the argument factually defensible, as no reasonable reading of the record could conclude that the defendant or Williams considered the loan to be 50% bribe and 50% innocuous. Moreover, the better reading of the March and May 2012 loans is that they were loans to the defendants, not MoBo, but that the payment method requested by the defendants was merely to send it to MoBo. *See, e.g.,* Tr. 802; Exh. 380; Gov't Sent'g Pos'n at 23–24 (explaining false nature of the defendant's claim that the loans were made to MoBo).

D.     A valuation of the alternative loan terms the defendant had readily available provides an alternative basis to apply a 10-level enhancement.

Even assuming *arguendo* that some valuation less than the full face value of the Williams loans is appropriate, a closer inspection of the defendant's own financial expert's analysis shows that it is more likely than not that the value of the Williams loans exceeded the $63,255.94 necessary to reach the $120,000 threshold for a 10-point enhancement.  As set forth in the attached declaration, had the defendant sought to maximize the then-available cash advances on his credit cards in May 2011, March 2012, and May 2012 (and assuming that he maintained his existing debt balances in May 2011 instead of paying them off as the McDonnells did with the first Williams loan), the defendant would have had the capacity for approximately $100,239.05 in cash advances.  *See* Attachment 1, at ¶¶ 5, 15.  And assuming that the defendant made no monthly payments until March or May of 2015, as applicable, he would have incurred approximately $51,994.02 *more* in interest expense than he would have incurred on the Williams loans.  *See id.* ¶¶ 15–16.[13]  When combined with the $19,760.95 that he could not have obtained through cash advances, this provides an approximate value difference between the Williams

_____

[13] Importantly, as set forth in the attached declaration, this estimation makes several assumptions that are more favorable to the defendants than is plausible even just based on common sense.  For example, it assumes—contrary to reality—that the defendant could have foregone payments on cash advances on his credit cards for four years and that he could have done so without collection agencies at the Governor's Mansion steps or an irreparably damaged credit history.  It also assumes that the existing promotional rates of 2.99% and 0% on approximately $20,000 of the McDonnells' credit card debt as of May 2011 would have remained at those promotion rates until 2015, notwithstanding the defendant's expert's concession that such a promotion is not realistic.  Moreover, it does not account for the potential costs associated with a less favorable credit rating, which almost surely would have complicated the defendant's loan renewals with TowneBank and perhaps prevents his refinancing with Pentagon Federal Credit Union.  All of these are just a few of the ancillary consequences that make the "cash advance" alternative valuation one that would undervalue the Williams loans. *See* Attachment 1, at ¶¶ 4–11.

16

loans and the defendant's cash advance "capacity" of $71,754.97—still enough to exceed

$120,000 when combined with the value of the other bribes. *Id.* ¶ 16.[14]

> E.   Valuation of the official action to be received in this case would also
> support a 10-level enhancement pursuant to § 2C1.1(b)(2).

Even assuming, however, that the value of the bribes does not exceed $120,000, there is

ample record evidence to support a finding that the value of the official action to be received by

Mr. Williams would have exceeded $120,000.  In this respect, it is important at the outset to

remember that bribes are, at their essence, financial transactions.  Thus, as § 2C1.1(b)(2)'s

background commentary notes, "because it is likely that the payer of . . . a bribe expect[s]

something in return that would be worth more than the value of the bribe," the value of the

official action will ordinarily be the greater value.  Put differently, if the "value" of a bribe does

not provide at least a theoretical return on a bribe payor's investment, then there would be no

economic reason—even setting aside the risk of detection—to make such a financial transaction.

Here, the ultimate benefit sought as a result of the bribe scheme was research studies at state

universities.  The record establishes that Star Scientific was willing to and did award eight

$25,000 seed grants to Virginia state university researchers—including two grants handed out at

---

[14] Alternatively, even if the defendant were able to use his full credit card "capacity" instead of merely cash advances, the attached declaration explains that the additional interest expense would have been approximately $31,738.71, which would still result in a total bribe valuation of more than $70,000 and an 8-level enhancement instead of a 10-level one. *See* Attachment 1 at ¶ 18.  Similarly, even if the defendant were able to obtain loan terms at the same rate offered by Dr. Paul Davis, the only other private lender who actually loaned him money, *see* Exh. 60, he would have incurred $25,328.07 in additional interest expense above and beyond the Williams interest expense.  *See* Attachment 1 at ¶¶ 19–20.  Of course, both of these are inadequate valuations of the Williams loans because neither the defendant's credit card companies nor Dr. Davis were willing to loan him money without requiring monthly payments. Nor is it at all likely from the record that the defendant could have purchased more than $30,000 in speculative stock and renovated his beach houses on a credit card or convinced Dr. Davis to increase his loan amount without a corresponding increase in interest rate or some requirement for collateral.

the Anatabloc launch at the Governor's Mansion—to fund the *planning* process for what would ultimately be a multimillion-dollar application by those researchers to the Tobacco Commission for a grant that would relieve Star Scientific of the need to pay for the studies itself.  Indeed, the most aggressive valuation of the greater of the *quid* or *quo* in this case would be the $2.5–3 million in Tobacco Commission funding for studies at state universities that Williams expected to receive in exchange for his bribes and extorted property.  *See, e.g.*, Exhs. 171, 187. But neither the United States nor the PSR seek to apply that aggressive calculation, which would result in a 16-level or 18-level enhancement instead of a 10-level one.[15]  However, based on the defendant's awareness of Star Scientific's willingness to write $25,000 checks as part of the planning process, his discussions with Williams about Tobacco Commission funding, and his receipt of an email showing a list of the eight check recipients, it was reasonably foreseeable to the defendant that, at a minimum, the benefit Williams expected from the university studies exceeded $120,000.  *See, e.g.*, Tr. 709; Exhs. 231, 312.  Thus, even assuming the Court calculates the value of the bribes as somehow falling below $120,000, the 10-level enhancement is nonetheless also warranted based on the value of the benefit to be received by Williams and Star Scientific.

**IV.    The defendant's objections to the PSR's application of a two-level enhancement for obstruction of justice mischaracterize his trial testimony, fail to apply the correct legal standard, and would result in an absurd narrowing of the obstruction enhancement if accepted.**

Pursuant to U.S.S.G. § 3C1.1, the two-level obstruction of justice enhancement is applicable based on the defendant's material and willful false testimony under oath.  "A defendant's right to testify does not include a right to commit perjury."  *United States v.*

---

[15] Notably, this calculation would have resulted in an advisory Guidelines range of either 235–293 months or 292–365 months.

*Dunnigan*, 507 U.S. 87, 96 (1993).  As the Supreme Court has acknowledged, § 3C1.1's

sentencing enhancement

> furthers legitimate sentencing goals relating to the principal crime, including the
> goals of retribution and incapacitation. It is rational for a sentencing authority to
> conclude that a defendant who commits a crime and then perjures herself in an
> unlawful attempt to avoid responsibility is more threatening to society and less
> deserving of leniency than a defendant who does not so defy the trial process. The
> perjuring defendant's willingness to frustrate judicial proceedings to avoid
> criminal liability suggests that the need for incapacitation and retribution is
> heightened as compared with the defendant charged with the same crime who
> allows judicial proceedings to progress without resorting to perjury.

*Id.* at 97–98 (internal citations omitted).

The PSR accurately lists eight separate instances of perjury by the defendant at trial.

PSR ¶ 126.  While the defendant disputes that he provided *any* false testimony, the United States

addressed the falsity, materiality, and willfulness of each instance of perjury in its opening

sentencing memorandum.  *See* Gov't Sent'g Pos'n at 14–24.  As such, the United States will not

belabor those points again but, instead, will focus on specific arguments raised in the defendant's

sentencing memoranda.

The defendant's claim that during his testimony he "addressed and admitted nearly all of

the actions that formed the basis of his conviction," RFM Objections at 14, is simply wrong.  At

trial, the defendant merely admitted the conduct that he could not deny because there was

documentary evidence or witness testimony that he could not impugn.  *See, e.g.*, Exhs. 134, 320,

352, 379.  Despite being able to remember the minutiae of his legislative accomplishments

during his 16 hours of direct testimony, his testimony during the approximately eight hours of

cross examination was replete with claims that he could not remember key facts related to the

corruption charges.  *See* Tr. 4924–5331 (defendant invoked "I don't remember" on

approximately *83* separate occasions during the Government's cross examination).  The

19

defendant's claimed lack of memory could, in and of itself, arguably form the basis of an obstruction enhancement, as it simply was not credible. The defendant's attempt at revisionist history in which he tries to portray himself as fully admitting all of the relevant facts, but merely disputing the legal consequences of those facts, is simply not supported by the record.[16]

Moreover, each of the defendant's claims that he did not give false testimony on the eight occasions listed in the PSR is meritless. First, he claims that his testimony in which he denied ever doing *anything*, or *agreeing to do anything*, in exchange for things of value is not false because it was merely a denial of guilt. RFM Objections at 15–16 (citing *United States v. Johns*, 27 F.3d 31, 35 (2d Cir. 1994); *United States v. Sarasky*, 976 F.2d 242, 245 (5th Cir. 1992); *United States v. Fiala*, 929 F.2d 285, 289–90 (7th Cir. 1991)). But each of the cases he cites in support are inapplicable here because those are cases where the defendant did not testify under oath and because § 3C1.1 explicitly exempts such non-testimonial general denials as a basis for the obstruction enhancement. *See* § 3C1.1 cmt n. 2 ("A defendant's denial of guilt (*other than a denial of guilt under oath that constitutes perjury*) . . . is not a basis for application of this provision." (emphasis added)).

The defendant cites only one case pertaining to trial testimony in support of his claim that a denial of guilt even under oath cannot form the basis of the obstruction enhancement. *See* RFM Objections at 16. But *United States v. Aguilar-Portillo*, 334 F.3d 744, 748 (8th Cir. 2003), actually stands for the opposite proposition. In *Aguilar-Portillo*, the government argued that the district court erroneously created an "exculpatory no" exception to the obstruction enhancement

---

[16] The defendant's efforts to cherry-pick conclusory statements in a single post-trial interview with a single juror are similarly misplaced and mischaracterize the record. *See, e.g.*, RFM Objections at 15 nn. 10–11. Of course, post-trial interviews with jurors are wholly irrelevant and should not be considered by the trial or appellate court for any purpose, much less for evaluating the appropriate sentence.

and that the district court was required to find obstruction because of the jury's guilty verdict.
*Id.* at 748–49.  The Eighth Circuit rejected the government's second argument and held that the
trial court was not strictly bound by the jury's verdict.  Significantly, however, the court made
clear that there is no "exculpatory no" doctrine for trial testimony as it pertains to the obstruction
enhancement, stating:

> [W]e agree with the government that there can be no such thing as an
> 'exculpatory no' defense when the question before the district court is whether the
> defendant has obstructed justice, since a simple denial of guilt can be as
> perjurious as any other false statement as long as the defendant willfully intended
> to provide false testimony . . . .

*Id.* at 749 (*citing Dunnigan*, 507 U.S. at 94).  As such, even if this Court were to find that the
defendant's testimony was merely a denial of guilt, that would not foreclose the obstruction
enhancement.

But the defendant's testimony was not merely a denial of guilt, as he did far more than
simply claim his innocence.  Had the defendant admitted that there was an agreement between
him and Mr. Williams to exchange acts for things of value (and that he actually did acts in
exchange for things of value), but claimed his innocence because those acts were not official
under the law, then his argument would be at least colorable.  But the defendant testified
repeatedly and unambiguously that he never did any acts (official or otherwise), or agreed to do
any acts (official or otherwise) in exchange for things of value.  *See, e.g.*, Tr. 4852.  These
factual assertions were squarely rejected by the jury, and this Court has already determined that
"*substantial evidence* supports the jury's finding that McDonnell actually performed official acts
in exchange for gifts and loans from Williams."  Docket No. 571, at 4 (emphasis added).

The defendant's argument that his false statement was limited to his mental state and that
would somehow preclude the obstruction enhancement is similarly unavailing.  His argument

boils down to a claim that since there was no direct proof that *in his mind* there was an

agreement or that he did acts in exchange for things of value, the obstruction enhancement

should not be applied.  But this Court's instructions to the jury at trial are equally applicable

here:

> The intent of a person or the knowledge that a person possesses at any given time
> may not ordinarily be proved directly *because there is no way of directly
> scrutinizing the workings of the human mind.*  In determining the issue of what a
> person knew or what a person intended at a particular time, you may consider any
> statements made or acts done by that person and all other facts and circumstances
> received in evidence which may aid in your determination of that person's
> knowledge or intent.

Tr. 6124 (emphasis added).  Just as the jury was able to find criminal intent despite the lack of

direct proof regarding the inner workings of the defendant's mind, this Court can find—and

effectively already has found in denying the defendant's Rule 29 motion—that the defendant

perjured himself when he claimed that there was no agreement and he never did anything in

exchange for things of value.  *See United States v. Stewart,* 686 F.3d 156, 176 (2d Cir. 2012)

(rejecting defendant's argument that her trial testimony denying knowledge of or participation in

the conspiracy could not serve as basis for obstruction enhancement because they were merely

expressions of opinion).

The only case cited by the defendant in which a court denied an obstruction enhancement

based on concerns regarding the subjective nature of the defendant's testimony is *United States

v. Safavian*, 461 F. Supp. 2d 76, 88 (D.D.C. 2006).  *See* RFM Objections at 16–17.  As an initial

matter, the district court's reasoning in *Safavian* is far from clear given its finding that "much of

Mr. Safavian's testimony at trial was not credible."  *Safavian,* 461 F. Supp. 2d at 88.  But it

appears that the district court relied heavily on the incorrect standard of proof for imposition of

the obstruction enhancement, as it applied a clear and convincing standard rather than the

preponderance of the evidence standard that applies at sentencing proceedings. *Id.* at 88 n. 6. In any event, whatever limited precedential value the district court's opinion in *Safavian* had, it was subsequently overturned on other grounds in *United States v. Safavian*, 528 F.3d 957 (D.C. Cir. 2008). The United States is unaware of any other case in which a court refused to impose an obstruction enhancement based on concerns that the defendant's perjurious testimony was subjective in nature and, therefore, difficult to directly rebut.

Moreover, the defendant's protracted parsing of the trial testimony in an effort to explain away his false statements makes clear that his arguments, if accepted, would essentially render § 3C1.1's application to trial perjury meaningless. For example, throughout his objections to the eight instances of perjury recited in the PSR, the defendant attempts to caste his factual testimony at trial as merely subjective assertions regarding his state of mind, argues that none of the trial evidence directly rebutted his state of mind, then claims that the obstruction enhancement thus cannot apply. *See, e.g.*, RFM Objections at 18 ("Mr. McDonnell honestly testified that *he and Cailin considered* the $15,000 catering check to be Mr. Williams's wedding gift to Cailin, and no testimony or evidence at trial contradicted that." (emphasis added)). Under the defendant's reasoning, if he testified at trial that the sky was green and the United States presented evidence that the sky was in fact blue, the obstruction enhancement should not be applied because the United States failed to present direct evidence that the defendant did not subjectively believe that the sky was green. But that is not the burden the United States bears; the only thing the United States must show is that it is more likely than not that the defendant testified falsely concerning a material matter and with a willful intent to deceive. The United States has already detailed the facts supporting the imposition of the obstruction enhancement

under this standard for each of the eight separate instances of false testimony, and it is
unnecessary to repeat those facts here. *See* Gov't Sent'g Pos'n at 16–24.

Suffice to say, the Court had the benefit of observing the defendant's testimony firsthand,
and when compared to all of the other evidence in the case and common sense, the defendant's
testimony was simply not credible.  Given the materiality and the willfulness of the defendant's
false testimony, the PSR correctly enhances the defendant's offense by two levels for obstruction
of justice.

**V.      The defendant does not satisfy his burden with respect to his claim that the PSR
erred in denying him a two-level reduction for acceptance of responsibility.**

The defendant's claim that he is entitled to a reduction of his offense level for acceptance
of responsibility is another reminder of the defendant's hubris and sense of entitlement.  The
defendant has never accepted responsibility for his crimes.  Instead, he has expressed regret for
his "poor judgment" in accepting gifts and loans and he has attempted to explain his actions as
allowing himself "to become part of the culture of unlimited gifts and donations that has
permeated Virginia politics."  PSR ¶ 128.  But he was not convicted of accepting gifts; he was
convicted of accepting bribes.  And he has never admitted that he accepted bribes, much less
accepted responsibility for doing so.

The Guidelines place the burden on the defendant to "clearly demonstrate[] acceptance of
responsibility for his offense" in order to qualify for the two-level reduction in his offense level.
U.S.S.G. § 3E1.1(a).  Importantly, "[t]his adjustment is not intended to apply to a defendant who
puts the government to its burden of proof at trial by denying the essential factual elements of
guilt, is convicted, and only then admits guilt and expresses remorse."  *Id.* cmt n. 2.  The
Guidelines provide, however, that "[i]n rare situations a defendant may clearly demonstrate an
acceptance of responsibility for his criminal conduct even though he exercises his constitutional

right to a trial." *Id.*  The example offered by the Sentencing Commission is where "a defendant

goes to trial to assert and preserve issues that do not relate to factual guilt (*e.g.*, to make a

constitutional challenge to a statute or a challenge to the applicability of a statute to his

conduct)." *Id.*

The defendant does not qualify for this narrow exception because he did not merely go to

trial to assert and preserve issues unrelated to factual guilt.  In his effort to get acceptance of

responsibility, the defendant claims that he freely admitted his conduct and merely contested,

and continues to contest, the applicability of the honest-services wire fraud statutes and Hobbs

Act to that conduct.  *See* RFM Objections at 26.  The fact that the defense was premised in part

on a legal dispute regarding what constituted an official act, however, does not entitle him to

acceptance of responsibility.  *See United States v. Collins*, 550 F. App'x. 143, 147–48 (4th Cir.

2014) (unpublished) (affirming trial court's denial of acceptance of responsibility, despite fact

that defense was based on legal arguments that defendants actions did not constitute gambling as

a matter of law, because defendant's testimony sought to minimize his membership in the

gambling organization).

As set forth in the discussion regarding obstruction of justice, the defendant denied his

factual guilt by falsely denying under oath doing *anything*, or *agreeing to do anything*, in

exchange for things of value.  Tr. 4852.  These denials, as well as the other perjurious testimony

by the defendant, were factual in nature and unrelated to preserving issues for appeal unrelated to

factual guilt.  As such, the defendant is not entitled to a reduction for acceptance of

responsibility.  *See United States v. Smoot*, 690 F.3d 215, 224–25 (4th Cir. 2012) (affirming

denial of acceptance of responsibility despite fact that defendant did not testify at trial or present

any evidence but merely argued during closing that the Government had presented insufficient

evidence regarding the interstate commerce element because court held that by making such argument, defendant was  challenging his factual guilt); *United States v. Dickerson*, 114 F.3d 464, 470 (4th Cir. 1997) (reversing district court's reduction for acceptance of responsibility where defendant admitted to lying before the grand jury but insisted his lies were not material because court held that materiality was an element of the offense and amounted to a challenge to his factual guilt).

## VI.   Conclusion

For all of the aforementioned reasons and those in the United States' initial sentencing position, the defendant's objections to the PSR should be overruled.

Respectfully submitted,

DANA J. BOENTE
United States Attorney

JACK SMITH
Chief, Public Integrity Section
Criminal Division
U.S. Department of Justice

By: _____/s/_____
    Michael S. Dry
    Jessica D. Aber
    Ryan S. Faulconer
    David V. Harbach, II
    Counsel for the United States
    U.S. Attorney's Office
    600 E. Main Street, Suite 1800
    Richmond, VA 23219
    Phone: 804-819-5400
    Fax: 804-771-2316
    Email: michael.s.dry@usdoj.gov
           jessica.d.aber@usdoj.gov
           ryan.faulconer2@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on December 30, 2014, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing ("NEF") to all counsel of record.

By:      _____/s/_____
        Ryan S. Faulconer
        Counsel for the United States
        U.S. Attorney's Office
        600 E. Main Street, Suite 1800
        Richmond, VA 23219
        Phone: 804-819-5400
        Fax: 804-771-2316
        Email: ryan.faulconer2@usdoj.gov