**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **CRIMINAL NO. 3:14-CR-00012** |
| | ) | |
| **ROBERT F. MCDONNELL** | ) | **JUDGE JAMES R. SPENCER** |
| **MAUREEN G. MCDONNELL** | ) | |

**DEFENDANT ROBERT F. MCDONNELL'S
REPLY ON SENTENCING POSITION**

## INTRODUCTION

Both parties agree that Mr. McDonnell is a long-serving and caring public servant who made mistakes.  However, in its Opposition to Mr. McDonnell's sentencing position, the Government distorts what actually happened in his trial and mischaracterizes much of the law. This is not a typical public corruption case.  There has never been another case in which the Department of Justice provided transactional immunity to its sole cooperating witness not only for the crimes at issue, but also for defrauding thousands of shareholders and for stealing untold tax dollars from the United States Treasury.  The Government has cited no case, and the defense is aware of none, in which the convicted public official comes to Court after a lifetime of good works comparable in quality, quantity, and duration to Mr. McDonnell's.  The Government has cited no case, and the defense is aware of none, in which hundreds of people from all walks of life ask the Court to show mercy on a man who made mistakes but has otherwise lived an honorable life of faith, family, and service.[1]  The simple fact is that Mr. McDonnell is not a "heartland" public corruption defendant who fits within the Guidelines range, the true spectrum of which is far lower than the Government claims.

The Government is also wrong to claim that Mr. McDonnell has not already been severely punished and that spending three years confined in a remote location, living in spartan conditions, performing intensive community service would be no punishment at all.  It would, rather, be a serious punishment that would separate Mr. McDonnell from family and friends and preclude him from pursuing professional opportunities of his choice.  But by sentencing Mr. McDonnell to three years' intensive, unpaid community service rather than jail time—a length of time that approximates the properly calculated guidelines range—the Court could ensure that the

---

[1] Since filing its Sentencing Memorandum, the defense has received several new leniency letters to the Court on behalf of Mr. McDonnell, and those are consolidated at Exhibit A.

people of Virginia get something positive out of this tragic proceeding.[2]

## ARGUMENT

## I.   THE GOVERNMENT'S GUIDELINES CALCULATION IS WRONG

### A.   The Court Should Adopt the Corrections and Amendments to the PSIR

The Court should adopt the limited number of material corrections the defense has proposed, particularly because the Government's sentencing briefing has made the need for these corrections even more apparent.  A large part of the sentencing debate in this case relates to whether or not Mr. McDonnell's conduct falls within the so-called "heartland" of public corruption cases.  The Government has made a conscious effort to make Mr. McDonnell's conduct sound worse than what it charged and tried to the jury.  As a result, it is critical that the Presentence Investigation Report ("PSIR") accurately describe the offense conduct presented at trial, and not a revised or simplified version of that conduct.  The Government's citation to *United States v. Love*, 134 F.3d 595 (4th Cir. 1998), is not on point because that case merely stands for the concept that a defendant cannot make a "mere objection" without any factual support.  *See also United States v. Terry*, 916 F.2d 157, 162 (4th Cir. 1990) ("A mere objection to the finding in the presentence report is not sufficient.").  Mr. McDonnell is not making an unsupported objection that the PSIR is wrong.  Rather, he is showing, with citations to the record in support of each point, that the PSIR inaccurately characterizes the offense conduct because it paraphrases some testimony that should be quoted (*i.e.*, PSIR ¶ 34, paraphrasing rather than quoting Mr. Williams), oversimplifies the record (*i.e.*, PSIR ¶ 105, providing Lisa Hicks-Thomas's account of a staff meeting but not Sara Wilson's equally valid account), and omits

---

[2] The Government implies that the defense violated the Court's Sentencing Order by submitting its Sentencing Memorandum and PSIR Objections in two separate documents. Defense counsel specifically sought guidance from the Court's staff on that question and followed the instructions it received.  Because the Court has already received voluminous briefing, the defense responds to the Government's Opposition briefs in this consolidated reply.

details that are necessary for a fair and complete summary of the conduct that was argued to the jury (*i.e.*, PSIR ¶ 121, omitting the fact that Mr. McDonnell paid Donnie Williams for his work). Rather than "relitigating" anything, the defense is providing important context from the record. For that reason, the amendments should be adopted.

### B.    Mr. Williams Alleged Only One Bribe

The Government claims that the defense cites "no law" for its § 2C1.1(b)(1) objection, but that is not true.  The defense cites to the Guidelines commentary that controls this issue, and which directs that the relevant question is whether the quid alleged are "[r]elated payments that, in essence, constitute a single incident of bribery or extortion (e.g., a number of installment payments for a single action)."  If they are, they "are to be treated as a single bribe or extortion, even if charged in separate counts."  § 2C1.1 Commentary.

That test, as well as the first factor of the test the Second Circuit suggested in *United States v. Arshad*, 239 F.3d 276 (2d Cir. 2001), shows that there was only one bribe alleged.  The Government cites to language from *Arshad* suggesting that most courts have imposed the multiple bribe increase where there are "multiple payments *meant to influence more than one action*" even if the payments "share a single overall goal."  *Id.* at 281 (emphasis added).  But the critical distinction is that Mr. Williams did not testify that he sought *more than one action* that shared a single goal.  Rather, he testified that he gave the gifts and loans in order to obtain a single, general action: to compel Mr. McDonnell to "help me move this product forward in Virginia."  Trial Tr. 804.  Because Mr. Williams could not identify any multiple specific actions he wanted from Mr. McDonnell in exchange for any particular gifts, even when asked repeatedly at trial, the more than one bribe increase is inappropriate.  *See, e.g.*, Trial Tr. 809 (J. Williams) ("I was loaning him money so that he would help our company.").

### C.    The Value of Things Obtained Is Far Less Than $120,000

3

**1.      The Non-Charged Gifts Should Not be Included in the Total Value**

The Government offers new "common sense" rationales about Mrs. McDonnell's shopping spree and the Rolex watch.  As to the shopping trip, the Government does not deny that Mr. McDonnell testified that he was not aware that Mr. Williams purchased anything for Mrs. McDonnell that day, and does not deny that Mr. Williams testified that he never told Mr. McDonnell about his purchases.  The Government nonetheless offers six pieces of "evidence" that it claims provide irrefutable proof of Mr. McDonnell knowing about the purchases: (1) Mr. McDonnell knew that Mrs. McDonnell wanted to buy a dress for her daughter's wedding; (2) after his wife went shopping, he saw that she had shopping bags (but did not look inside them); (3) there were multiple items purchased that day; (4) Mrs. McDonnell wore some of the items at events two and three months after the shopping trip, respectively, and Mr. McDonnell saw her at those events; (5) over 16 months earlier, Mr. Williams had purchased expensive alcohol at a bar one evening and made an offer to purchase an inauguration gown that was declined; and (6) in the late 1980s, Mrs. McDonnell had made several requests for money from acquaintances that Mr. McDonnell considered inappropriate, but none he was aware of since then.  Gov't PSIR Resp. at 8-9.  From this motley assortment of facts, the Government claims that the only possible conclusions are that Mr. McDonnell is lying, or that he deliberately refused to ask who purchased the items in the shopping bag because he knew Mr. Williams must have purchased them.  That is not plausible.

As to the watch, the Government cannot deny that Mr. McDonnell testified that he had no idea that a Christmas gift from his wife was really purchased by Mr. Williams, and that Mr. Williams testified that he never discussed the watch with Mr. McDonnell.  Nor can it deny that the watch was given to him in an off-brand, used watch box with no Rolex paperwork, which gave Mr. McDonnell reason to think the watch might either be used or a knock-off.  Trial Tr.

4599-4600.  In response, the Government once again turns to "common sense" that makes no sense at all.  The Government first argues it is "inexplicable" that Mr. McDonnell would have allowed his wife to take a cell phone photo of him with a Christmas gift she had given him, instead of telling her that he would refuse to have his photo taken because he suspected that her gift might not be a new Rolex.  Gov't PSIR Resp. at 9.  This argument is silly, as any of the millions of people each year who politely feign happiness at receiving unwanted holiday or birthday gifts could attest.[3]  Next, the Government claims that because Mr. McDonnell knew that Mr. Williams had previously provided gifts to family members, he should have immediately known that a Christmas gift from his wife really came from Mr. Williams.  Neither of these things proves by a preponderance that it was "reasonably foreseeable" to Mr. McDonnell that a Christmas gift from his wife was part of a bribery scheme.[4]

## 2. The Loans Cannot be Calculated at Face Value

The Government's first argument, that Mr. McDonnell's promise to repay the loan was "worthless and unenforceable," (Gov't PSIR Resp. at 12), contradicts everything the Government has said over the past year.  The Government has aggressively pursued felony charges against Mr. McDonnell for allegedly making false statements to two banks by failing to report enforceable debts he owed to Mr. Williams on his personal financial statements.  The

---

[3]The Government incorrectly claims in an aside that Mr. McDonnell "posed . . . 22 times" in the Ferrari.  Gov't PSIR Resp. at 9.  Mrs. McDonnell took 22 photos on her cell phone of Mr. McDonnell *while he was driving*.

[4] The Government includes one new argument about the Chatham Bars trip, claiming that it occurred "in a time period when Mr. Williams was still seeking studies at state universities." Gov't PSIR Resp. at 11.  That would have been news to the University of Virginia administrator responsible for communicating with Star Scientific, Sharon Krueger, who testified that Star never followed up with UVA about any studies after an initial conference call in November 2011.  Trial Tr. 2781-82.  The prosecution also again claims that Donnie Williams "substantially undervalued" the work he performed, but has made no effort to meet its burden of proof of showing the difference between what the McDonnells paid Donnie and the supposed market value of that work.

premise of these charges was that the Williams loans were enforceable debts that the banks would have wanted to know about before deciding whether to approve a loan for Mr. McDonnell. If, as the Government now argues, the Williams loans were unenforceable cash payments because Mr. McDonnell "could simply refuse to pay without Williams having any recourse," (*id.* at 13), then there would have been no obligation to disclose them to the banks. Presumably the Government is not seriously saying that those fraud charges were frivolous and that it misled the Court and jury about their underlying facts.

Moreover, there is not an iota of evidence that "both parties knew that the loan would never be enforced." *Id.* at 12. Mr. Williams never said "the loan terms were beside the point," as the Government claims. *Id.* Rather, Mr. Williams testified that the terms of the second MoBo loan were "[w]hatever the ones were before," meaning the same two percent, three year terms as the first MoBo loan. Trial Tr. 807-08. Not once did anyone at trial suggest that they considered the loans to be unenforceable, and the Government never asked any witness that question because it knows that this is an imaginary theory. To the contrary, the evidence shows that the parties did consider the loans to be enforceable debts, and the Government is simply wrong when it claims that there are no documents reflecting the loans.[5] Documents in the record include: handwritten notes from both Mr. McDonnell and Mr. Williams reflecting the loan terms (GX-1); Starwood Trust general ledger entries listing Mrs. McDonnell's loan as a "loan receivable" and noting the terms (albeit with an typographical error in the listed terms) (GX-122 and 123); emails and text messages between Mr. McDonnell and Mr. Williams referring to the loans as loans (*e.g.*,

---

[5] The Government's previously undisclosed accounting expert, Special Agent Hulser, gets this wrong as well when he claims that "we did not recover any written loan documentation regarding loans between the defendants and Williams . . . ." Hulser Decl. ¶ 4. Special Agent Hulser is wrong, as he himself concedes two sentences later when he references Mr. McDonnell's handwritten notes documenting the loans.

GX-379); and numerous other checks, wire transfer records, and communications reflecting the loans.  Moreover, Jerri Fulkerson testified that Mr. Williams often loaned money without documentation, so there was nothing unusual about the handshake agreement with Mr. McDonnell.  Trial Tr. 525-26.[6]  And Mr. McDonnell did in fact repay the loans, with interest— and Mr. Williams accepted repayment—months before the indictment.

The Government's second argument is based on a faulty description of the case law.  The second exception from *United States v. Fitzhugh*, 78 F.3d 1326 (8th Cir. 1996), is not that the true value of a loan is its face value if the borrower could not have received the exact same loan with the exact same terms from a different source.  If that were the case, then *Fitzhugh* would not have required a comparison between the actual loan and a hypothetical alternative with different terms.  Rather, the rule is that the exception applies only if the borrower could not have received a loan for the same principal amount *at any terms* and from any source.  The Government clearly has not shown that here, as its own fall-back position demonstrates.[7]

### 3.    The Government's New Fall-Back Position on the Loan Valuation Does Not Support a 10-Level Increase

First, the Government critiques the defense's valuation proposal based on the Applicable Federal Rate ("AFR"), but it does not deny that this rate is the only IRS-approved method of

---

[6] In its footnote 7, the Government once again leaps at a perceived chance to call Mr. McDonnell a liar (here, by claiming that Mr. McDonnell lied to his sister that Mr. Williams suggested he might rent the beach houses).  Mr. Williams testified that he had no *actual* intention of renting the beach properties, but he never denied *telling* the McDonnells that he might be interested in doing that.

[7] The defense does not have the space to refute every instance of the Government distorting statements by Mr. McDonnell or his counsel, but one claim in Government footnote 9 starkly misrepresents the defense's arguments.  The Government claims that when the defense wrote that one of the reasons Mr. McDonnell was likely to have a number of loan options was that he was a "pillar of the Virginia community," it was "essentially claiming that he could have abused his public position to extract bribes or extort property from others."  Gov't PSIR Resp. at 13 n.9.  No.  The defense was, rather, making the basic economic point that character is a common basis by which lenders assess prospective borrowers.

imputing value to below-market loans.  The AFR is an imperfect proxy for market rate, to be sure, but it is the most reliable system the IRS has developed for providing a rate against which real-life loan terms can be compared for purposes of imputing income tax.  The Government is exactly right that the IRS "does not attempt to value the difference in loan terms to a particular borrower based on particular facts."  Gov't PSIR Resp. at 15.  That is because the IRS knows that attempting to divine the actual interest rate that would have been offered to a particular individual at a particular point in time months or years ago is inherently speculative.  Rather than engage in such guesswork, the IRS relies on the AFR, which is updated monthly and reflects current economic trends nationwide.  The Court should not be in the business of performing speculative economic analyses that even the IRS would resist.  For that reason, the AFR is the best available proxy against which to compare the Williams loans.

Second, the Government attempts to introduce improper and previously undisclosed expert testimony in the form of a declaration from its summary witness Special Agent Hulser.[8] Even if this declaration were procedurally proper, it fails to provide a reasonable approximation of the various other, hypothetical loan opportunities that would have been available to Mrs.

---

[8] As a procedural matter, the Government has waived the right to rely on a never-before-mentioned factual basis for this Guidelines enhancement in the form of opinion testimony the Government did not disclose until seven days before the sentencing hearing.  The Government could have provided the defense and the probation officer with Special Agent Hulser's analysis when the parties met with the Probation Office to discuss objections to the PSIR as directed by the Court.  It failed to do so, despite the fact that the loan valuation issue was a central topic of that meeting.  Because the Probation Office relied on the Government's original assertions about the value of the loans when preparing the PSIR, the Government has waived its opportunity to provide this new opinion testimony at this late stage.  Furthermore, even if the Government had provided adequate notice, Special Agent Hulser provides no basis whatsoever for the opinion testimony that forms the basis of his analysis, such as his unsupported assertions that "promotions typically expire after relatively short terms before converting balances to less favorable interest rates," (Hulser Decl. ¶ 6), and that "it is uncommon in my experience for credit card users to carry promotional balances in excess of those amounts for that length of time."  *Id*. For that reason, too, his testimony should be disregarded altogether.  If the Court does choose to consider the Hulser declaration, then it should also consider the declaration from the defense's accounting expert attached as Exhibit B, which responds to Special Agent Hulser's analysis.

McDonnell and MoBo in 2011 and 2012, respectively.  Special Agent Hulser attempts to recreate what it would look like if the McDonnells loaded $120,000 in debt on their credit cards and then made no payments against that debt for four years.  The critical piece missing from Special Agent Hulser's analysis, though, is any basis for concluding by a preponderance of the evidence that this would have been the McDonnells' *only* alternative to the Williams loans in 2011 or 2012, and thus an appropriate basis for the comparison *Fitzhugh* requires.  Because Special Agent Hulser simply chose the most expensive alternative to the Williams loans, rather than any number of the other potential bank or private loan options that Mr. McDonnell or MoBo might have had during that time period, his analysis is unhelpful.  Moreover, as shown in the attached declaration from the defense's accounting expert, Special Agent Hulser's analysis of the hypothetical credit card option does not withstand scrutiny.  His calculation is based on unjustified assumptions and omits details that would be needed to adequately test his conclusions.  He also provides two alternative valuations of the Williams loans via the credit card comparison, one 56% lower than the other, without justifying picking between them.

The closest the Government and Special Agent Hulser come to offering a reasonable data point against which to compare the Williams loans is by looking at the rate that was offered by Dr. Davis to MoBo in March of 2010.  That, at least, was an actual loan term that MoBo received from a real-life lender.  But the Davis comparison is still far too speculative because the Government articulates no basis for concluding that a rate that MoBo received in 2010 would have been the same rate it could have received from a different source in 2012.  Between 2010 and 2012, the U.S. economy generally improved and interests rates had fallen nationwide, as demonstrated by the significant decrease in AFR from March 2010 to March 2012.[9]  MoBo's

---

[9] See historic AFR, available at http://apps.irs.gov/app/picklist/list/federalRates.html.

specific financial situation had also improved by 2012, as its income rose and expenses fell from 2009 through 2012.  *See* RM-274-18; Trial Tr. 4093-94 (J. Kosowsky).  It is clearly more likely than not that MoBo would have had less expensive options than the Davis rate in 2012.  In fact, the Davis rate was even high for March 2010, as shown by the fact that MoBo paid off the Davis loan early in order to secure better rates from other sources.  *See, e.g.*, GX-369.  For all those reasons, the actual value of the Williams loans is likely to be much lower than $25,328.07.

### 4. The Government's "Value of the Action Received" Alternative is Entirely Speculative

The Government's final attempt to salvage a 10-level increase is equally unsupportable. § 2C1.1(b)(2) permits the Court to base the loss table increase on the value of "the benefit received or to be received in return for the payment," *provided that value can be demonstrated by the Government by a preponderance of the evidence*.  The Government has cited no cases supporting the idea that this figure can be rooted in the unrealistic hopes of the alleged bribe-payor.  To the contrary, the case law warns that the § 2C1.1(b)(2) valuation may not be based on speculation about the possibility of a low probability event coming to fruition.  *See United States v. Wester*, 90 F.3d 592, 598-99 (1st Cir. 1996) ("Obviously, if [the defendant] had been bribed with a one-dollar lottery ticket for a million dollar prize, no one would claim that the ticket should be valued at the full potential winnings. So, too, if he had been given a million-dollar term life insurance policy.").  As the Government itself admits, "conclusory assertions are not sufficiently reasonable" to support a finding under § 2C1.1(b)(2). Gov't Opp. at 13.

The Government's claim that Mr. Williams *hoped* his bribes would lead to a $2.5 to 3 million Tobacco Commission ("TIC") grant is the functional equivalent of basing the valuation on a lottery ticket.  Put simply, such grant was never going to happen, and no one took any steps to make it happen.  First, Mr. McDonnell never endorsed a TIC grant for Star or encouraged

anyone at the TIC to consider funding anatabine research.  Both his appointee on the TIC Board and the TIC Executive Director testified that Mr. McDonnell never mentioned Star to them. Trial Tr. 4229 (T. Haymore); 3777 (N. Noyes).  Second, the TIC Executive Director testified that even if Mr. McDonnell *had* pressured the TIC to provide a grant, the only way that such funds could be approved would be to go through a rigorous vetting process both by TIC's professional staff and in public committee sessions.  Trial Tr. 3769-76 (N. Noyes).  Given the skeptical reaction of the public health professionals who heard Mr. Williams's pitch, it is unlikely that Star's application would have survived this process.  Third, Star never even applied for a TIC grant.  After an initial conference call in November 2011 with UVA about a potential application, Star simply stopped following up.  Trial Tr. 2781-82 (S. Krueger).

### D.     Mr. McDonnell Has Not Obstructed Justice

1.     The fact that Mr. McDonnell said "I don't remember" approximately 80 times is not surprising, given that he testified for over four days about events that occurred as long as five years ago.  Mr. McDonnell made a good faith effort to prepare for his testimony by reviewing available documents and transcripts, unlike Mr. Williams, who did not review summaries of his own interviews with the Government prior to testifying.  Mr. Williams was thus unable to remember many specific details on cross-examination—including details of a meeting with prosecutors less than a week before his testimony—yet the Government insists that his testimony was entirely truthful.  The Government does not cite a single example of Mr. McDonnell's lack of memory that it claims is implausible.  Given that, this point is meaningless.

2.     The Government's attempt to turn the Eighth Circuit's opinion in *United States v. Aguilar-Portillo*, 334 F.3d 744 (8th Cir. 2003), into a case that supports its position on obstruction is unavailing.  In that case, the defendant testified and "denied that he participated in any conspiracy to distribute methamphetamine and denied several other material matters," but

was found guilty.  *Id*. at 748.   The sentencing court nevertheless declined to impose an obstruction enhancement for several reasons, including "several contradictions in various witnesses' testimony, a probable lie by one of the prosecution's witnesses, the fact that the jury deliberated for a day and a half, the fact that Mr. Aguilar-Portillo did not look evasive, *and the fact that he merely made unembellished denials*."   *Id*. (emphasis added).   All of those factors were properly considered by the district court because the decision whether to impose the obstruction enhancement "may be based on the experienced trial judge's express finding, based on the judge's personal observations" about whether the defendant lied to the jury, regardless of whether or not the jury returned a guilty verdict.   *Id*. at 749 (internal citations omitted).   This case contradicts the claim that failing to label Statement #1 obstruction would be "inconsistent with the jury's verdict and this Court's prior factual findings."  Gov't Sent. Memo. at 15.

3.     When the Government insists that Mr. McDonnell must have lied because he did not "admit[] that there was an agreement between him and Mr. Williams to exchange acts for things of value," Gov't PSIR Resp. at 21, it forgets that Mr. Williams also never said he entered into an agreement with Mr. McDonnell.  Rather, he testified that he met with Mrs. McDonnell, who said that *she* could help Star, and he simply assumed that Mr. McDonnell was doing things for him in exchange for the gifts.  To be sure, the jury found that Mr. McDonnell was at least partly motivated by the gifts and loans, but no one ever testified about the existence of an actual meeting of the minds between Mr. McDonnell and Mr. Williams, and that fact should weigh against a finding of obstruction under the *Aguilar-Portillo* standard discussed above.

4.     The Government's "sky is blue" analogy fails because the objection to obstruction is not based on a theory that the Government has not proved "subjective assertions regarding [Mr. McDonnell's] state of mind."  Gov't PSIR Resp. at 23.  Rather, the defendant contends that

the Government's "common sense" conjecture is an inadequate substitute for evidence that Mr. McDonnell falsely testified about anything.  In other words, the Government has not "presented evidence that the sky was in fact blue."  *Id*.  The fact that the Government thinks a speculative proposition like "Mrs. McDonnell could not possibly have written financial information on a sticky note without her husband's help" is equivalent in certainty to the proposition that the sky is blue shows the weakness of its argument on this point.

### E.    Mr. McDonnell Has Accepted Responsibility

Finally, the PSIR based its denial of the acceptance of responsibility decrease on the fact that it was also applying the obstruction increase.  Once the obstruction increase is deleted, there is no reason to deny the application of the acceptance of responsibility provision.  This is not "hubris and entitlement," but simply the proper application of Guideline § 3E1.1.

## II.    THE GOVERNMENT MISAPPLIES 18 U.S.C. § 3553(a)

### A.    Mr. McDonnell's Requested Sentence Reflects The Nature And Circumstances Of The Offense.

1.    Mr. McDonnell has never attempted to minimize his role in what happened.  To the contrary, he has forthrightly admitted his involvement throughout this proceeding.  For example, Mr. McDonnell readily admitted that he played golf at Mr. Williams's club, (Tr. 5022), personally negotiated the first MoBo loan with Mr. Williams, (*id*. at 4665), and solicited the second MoBo loan from Mr. Williams, (*id*. at 4683).  The Government's accusation of minimization has no support other than harsh words and stray quotations from a legal filing drafted by Mr. McDonnell's attorneys.  Mr. McDonnell's actual testimony simply does not support the Government's contrived narrative.

2.    The Government attempts to manufacture consciousness of guilt evidence out of a high-level statement Mr. McDonnell issued while he was governor concerning the conviction

of Delegate Philip Hamilton.  *See* Opp. at 3-4.  It is telling that the Government feels the need to plumb the depths of Lexis-Nexis to find something—anything—that suggests Mr. McDonnell understood he was committing a serious crime when he engaged in the conduct at issue here. The absence of any evidence that Mr. McDonnell wantonly took his actions while *knowing* they were criminal is an important circumstance of the offense.

3.      The Government next attacks Mr. McDonnell's "tired" assertion that his actions were not official ones under federal law.  While the Government correctly quotes this Court's opinion stating that Mr. McDonnell's actions sought to influence governmental decisions, it is important to note that the instructions the Court gave the jury did not require it to make that finding.  To the contrary, the Government opposed, and the Court declined to give, an instruction requiring the jury to find that Mr. McDonnell attempted to actually influence any governmental decision.  *See* Mr. McDonnell Proposed Jury Instruction No. 58, ECF #287 ("conduct was intended to or did in fact influence a specific official decision the government actually makes").

4.      Finally, the Government claims that the things Mr. McDonnell did for Mr. Williams were different from what he did for any other business.  Its only support for this claim, however, is a quote from Dr. Hazel.  Dr. Hazel's statement makes clear, though, that much of what he believed to be unique was the unusual nature of Mr. Williams' product (a product that Dr. Hazel disliked and believed was illegitimate) and the planning for a Healthcare Leaders event with which Mr. McDonnell had little advance involvement.  Nothing in Dr. Hazel's statement purports to say whether any particular action that Mr. McDonnell personally took was unusual or atypical.

## B.      Mr. McDonnell's Requested Sentence Reflects The History And Characteristics Of The Defendant.

1.      The Government argues that public officials are supposed to be upstanding

citizens and that Mr. McDonnell therefore deserves no mercy in recognition of his life-long record of public service as a soldier, prosecutor, delegate, Attorney General, and Governor. The Government cites no authority for this assertion and that is because it does not make sense. The sentencing statute expressly directs courts to consider a defendant's personal history and personal characteristics in order to ensure that the sentence imposed is "sufficient, but not greater than necessary." How Mr. McDonnell has lived his life is obviously a central part of that analysis. Factoring that lifetime of service into fashioning an appropriate sentence is not a "license to commit bribery," as the Government caustically claims. It is a fair and just application of the same sentencing laws that govern every defendant's sentencing. Mr. McDonnell deserves the same consideration the Court would show any other defendant who came to his sentencing after a lifetime of service, including military service, like the one Mr. McDonnell has led.

2.     The Government makes the adjective-laden claim that "[t]he defendant's utter lack of true remorse further undercuts his argument that he is somehow entitled to a non-Guidelines sentence based on his public service and good character." Opp. at 7. This, too, is wrong. Mr. McDonnell is clearly remorseful for his actions, as he explained at trial when he said that he blames himself for being in this position, and well in advance of trial when he publicly apologized to the people of Virginia on multiple occasions. That is not regret at getting "caught"; it is profound regret that he did not dismiss Mr. Williams at the beginning and thus spare himself and his family this tragic series of events. While Mr. McDonnell does not agree with the Government about the scope of the laws underlying his conviction, that does not mean he is not deeply remorseful for his actions. He is.

3.     The Government attempts to undercut Mr. McDonnell's good works by arguing

15

that letters "touting a public official defendant's good works . . . 'reflect merely political duties ordinarily performed by public servants'" and therefore should not be considered at sentencing. Opp. at 7-8 (quoting *United States v. Serafini*, 233 F.3d 758, 773 (3d Cir. 2000)).   But the Government ignores that a majority of the letters focus on good deeds that went above and beyond actions ordinarily performed by a public official.   Many of the letters describe Mr. McDonnell's exceptional generosity and unique ability to care for those in need.   *See* Sent. Memo. at 1-26.   The letters provide countless examples of Mr. McDonnell going beyond mere political duty to improve the lives of those around him.   *See id.*   These extraordinary actions are far beyond those typically performed by public servants and they demonstrate how false the Government's caricature of Mr. McDonnell is.   Not surprisingly, the Government has failed to cite any example of a public servant who had an extraordinary record of service like Mr. McDonnell but who was sentenced as if that record did not matter at all.   These selfless acts are absolutely the kind of "exceptional" good works that warrant a below-Guidelines sentence.   *See, e.g.*, *United States v. Cooper*, 394 F.3d 172, 175 (3d Cir. 2005) (affirming downward departure where defendant's community and charitable activities were truly exceptional); *United States v. Thurston*, 544 F.3d 22, 26 (1st Cir. 2008) (same); *Serafini*, 233 F.3d at 773-77 (same); *United States v. Woods*, 159 F.3d 1132, 1136 (8th Cir. 1998) (same).

Similarly inapplicable are the Government's cases noting that a downward departure would be inappropriate for an affluent defendant based on a history of charitable donations.   Mr. McDonnell is not just an affluent person who wrote painless checks; he is not wealthy at all, as the Government went to great pains pointing out at trial.   Rather, he has devoted his entire life to the service of others, as demonstrated by the many letters recounting his charitable deeds.

**C.     Mr. McDonnell's Requested Sentence Properly Reflects The Seriousness Of The Offense.**

1.      It well established that a defendant's collateral consequences are an important part of fashioning an appropriate sentence, as the many decisions Mr. McDonnell cited in his Sentencing Memorandum at pages 32-33 make clear.   The Government cites no contrary authority.  The Court should therefore factor the wide-ranging consequences that Mr. McDonnell has suffered and will continue suffering—consequences far beyond those that face the typical defendant, whose life and family are not torn to shreds on the front page of every paper—in fashioning a just sentence here.

2.      The Government takes Mr. McDonnell to task for sharing the personal details of his marriage at trial, noting that the "United States presented virtually no evidence on these topics" and claiming that this "was not a legal defense."  Opp. at 10-11.  The Government has known from the beginning, however, that the McDonnells had a deeply troubled marriage and that their marital dynamics played a major role in the relationship with Mr. Williams.   The Government "presented virtually no evidence on these topics" not because they are irrelevant, but because the Government's litigation strategy was to cast the McDonnells as smooth operators who hatched and coordinated their plot like two sophisticated criminals.  That strategy enabled the Government to present an over-simplified version of what happened, while capitalizing on the maelstrom that rained upon Mr. McDonnell when his and his wife's lawyers were forced to complete the picture (including by voluntarily producing marital communications).   Sharing these facts was not a litigation "choice," as the Government cynically claims.  It was a truthful, searingly difficult explanation of what happened.

And it was legally necessary.   The gravamen of conspiracy is the agreement and the Government's central evidence of conspiracy was the fact of the McDonnells' marriage.  Once the Government decided to indict a married couple as co-conspirators, it was obviously relevant

that the marriage involved few communications and little coordination of conduct—both facts that undercut finding an agreement. The jury ultimately found the defendants guilty of the conspiracy charges, but it is nonsensical to blame Mr. McDonnell for sharing the truth in defense to the Government's allegation that he conspired with his wife.

3.     The Government next attempts to lessen the importance of the American Bar Association's ("ABA") proposal to modify the § 2B1.1 economic loss table, which was motivated by a concern that the current loss table unfairly generates overly long sentences for no justifiable penalogical reason. The proposal is not limited to "market manipulation schemes" and similar economic crimes. Opp. at 11. Rather, it overhauls the loss table for all sentences, including those based on Guideline § 2C1.1. The new loss table dramatically reduces the offense level increase for each economic level, such that the amount of value involved would have to be *$5 million* before the 10-level increase sought by the Government in this case would be imposed.

Absurdly, the Government also argues that the ABA proposal might *increase* Mr. McDonnell's sentence by adding points for culpability or victim impact. Opp. at 11. The idea that Mr. McDonnell is either a "high culpability offender" or that there is some unidentified extraordinary "victim impact" that would lead to additional points is incorrect.[10]

### D.     Mr. McDonnell's Requested Sentence Will Deter Others From Similar Conduct.

The Government has provided no evidence or coherent argument for why sentencing Mr. McDonnell to a decade in prison is necessary to deter other public officials from engaging in similar conduct. The Government is delusional if it thinks that other public officials have

---

[10]  The Government contends that § 2C1.1 "does not provide an enhancement that adequately captures the power of [Mr. McDonnell's] former position as governor." Opp. at 12. But § 2C1.1 already imposes a 2-level enhancement for being a public official, plus another 4-level enhancement for being an elected public official.

watched the complete and total destruction of Bob McDonnell and thought to themselves that they ought to take their chances and accept free golf, travel, or low-interest loans from a man like Jonnie Williams. Mr. McDonnell has been publicly humiliated for over a year in a way that virtually no other defendant has to endure—humiliation that has provided a thousand-fold multiplier effect to this prosecution's deterrent value. The Government has not provided any support beyond some general quotes from Judge Ellis in a different case discussing a different defendant—a defendant to whom he gave a sentence that was *half* the Guidelines range—to support its assertion that a decade-plus sentence is necessary for general deterrence. It is not.

E.    **Mr. McDonnell's Requested Sentence Is Necessary To Prevent Unwarranted Disparities And Unwarranted Similarities.**

1.    The Government continues to refuse to acknowledge that there is a meaningful difference between obtaining valuable government contracts for bribe payers (William Jefferson) or appointing bribe payers to the United States Senate (Rod Blagojevich), and asking Jasen Eige a question or suggesting that Lisa Hick-Thomas meet with someone. This basic distinction takes Mr. McDonnell's case outside the heartland of corruption cases. Imposing a sentence of three years' intensive community service far from the defendant's home thus would not create any unwarranted disparities. The Government provides a list of public officials, but furnishes no explanation of how their conduct does or does not compare to Mr. McDonnell's conduct here.

2.    Finally, in considering the need to avoid unwarranted disparities, it is imperative that the Court consider the extraordinarily generous treatment the Government has given to the man who initiated the entire scheme at issue. Mr. Williams, who the Government labeled a "criminal," did not even have to admit that he did anything illegal, let alone face criminal charges for conspiracy or bribery. Mr. Williams has also escaped prosecution for stealing from the Treasury Department via his multi-year (and possibly ongoing) tax fraud, for repeatedly

19

stealing from his shareholders via his multiple securities frauds, and for additional crimes that were included in his broadly worded transactional immunity agreements.   Those are serious crimes whose victims suffered concrete losses.   Yet rather than demand that Mr. Williams confess in exchange for a lenient sentence, the Government gave him a total pass, such that this ordeal has not even affected his "ability to operate and move forward in business."  Trial Tr. 883.

The Government cites two cases to justify its request that Mr. McDonnell serve a decade in prison while Mr. Williams "moves forward in business" unhindered, but those decisions only prove how wrong the Government is.  In those cases, the Government required its cooperator to enter a plea agreement and take responsibility for his crimes.[11]  The difference there was thus a difference in the quantum of punishment, not a categorical difference between no punishment and draconian punishment.  The Government asks this Court to endorse the difference between (1) letting Mr. Williams walk away without any criminal record, free to defraud and cheat—as he has done repeatedly in the past—and (2) condemning Mr. McDonnell to eleven felony convictions *and* over a decade in prison for conspiring with Mr. Williams in just one of Mr. Williams' many criminal schemes.   Such a staggering disparity would not only be "unwarranted," but would, if created, constitute a miscarriage of justice that could only erode the public's respect for the law and its faith in the evenhandedness of our justice system.

## CONCLUSION

Probation with full-time, rigorous community service for a term of 6,000 hours is a sentence that is sufficient, but not greater than necessary, in this first-of-its-kind corruption case.

---

[11] *United States v. Docampo*, 573 F.3d 1091, 1101 (11th Cir. 2009) ("We have held that defendants who cooperate with the government *and enter a written plea agreement* are not similarly situated to a defendant who provides no assistance to the government and proceeds to trial." (emphasis added)); *see also United States v. Perez-Pena*, 453 F.3d 236, 243 (4th Cir. 2006) (discussing the difference between "defendants who have not been offered plea bargains" and ones who "had been offered and had accepted plea bargains").

Dated:  January 2, 2015

Respectfully submitted,


/s/ Jonathan A. Berry
Henry W. Asbill (*pro hac vice*)
Noel J. Francisco (*pro hac vice*)
Owen T. Conroy (*pro hac vice*)
James M. Burnham (*pro hac vice*)
Hilary K. Perkins (*pro hac vice*)
Jonathan A. Berry (VSB No. 81864)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700

John L. Brownlee (VSB No. 37358)
HOLLAND & KNIGHT LLP
800 17th Street, N.W.
Suite 1100
Washington, D.C. 20006
Telephone: (202) 828-1854
Facsimile: (202) 955-5564

*Counsel for Robert F. McDonnell*

**CERTIFICATE OF SERVICE**

I, Jonathan A. Berry, am a member of the Bar of this Court.  I hereby certify that on this 2nd day of January, 2015, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, causing it to be served on all registered users.

Dated: January 2, 2015                    Respectfully submitted,

                                          /s/ Jonathan A. Berry
                                          Jonathan A. Berry (VSB No. 81864)
                                          JONES DAY
                                          51 Louisiana Avenue, N.W.
                                          Washington, D.C. 20001
                                          Telephone: (202) 879-3939
                                          Facsimile: (202) 626-1700
                                          Email: jberry@jonesday.com

                                          *Counsel for Robert F. McDonnell*