IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)  No. 3:14cr12<br>ROBERT F. MCDONNELL, )<br>   Defendant. ) | |

**R**EPLY **S**ENTENCING **P**OSITION OF THE **U**NITED **S**TATES

     The United States of America, by undersigned counsel, hereby files its reply in support of its Sentencing Position, Doc. No. 591 ("Gov't Sent'g Pos'n"). In his response in opposition, Doc. No. 595 ("RFM Opposition"), the defendant doubles down on his request for this Court to sentence him—the first Governor of the Commonwealth of Virginia to be convicted for taking a bribe—to zero months in prison. In doing so, he persists in characterizing his conduct as mere "mistakes in judgment," ridicules the United States for arguing the Court should use "so-called 'common sense'" in evaluating his testimony, and claims that the legal theory in this Court's jury instructions "has no analog in reported case law." RFM Opposition at 1, 9. And the defendant concludes by claiming that performing 6,000 hours of community service in Southwest Virginia, the cities of Richmond or Memphis, or the countries of Haiti or Ethiopia would require him to endure "conditions analogous to those of prison." *Id.* at 25.

     The defendant's refusal to accept the jury's unanimous verdict makes clear that a Guidelines sentence is necessary in this case. His conduct was not a mistake; it was the product of conscious and repeated choices. The only reason to call common sense "so-called" is because it refutes his position. And the Court's jury instructions were well-supported by black-letter bribery law. Moreover, the defendant cannot claim to this Court that public service was his

calling and the reason he should receive leniency while simultaneously asserting that having to do more of it would be as bad as going to jail.

For those reasons, those stated in the United States' sentencing pleadings thus far, and those stated below, the United States respectfully asks this Court to adopt the findings of the Presentence Report ("PSR") and sentence the defendant to a term of imprisonment within that PSR's advisory Guidelines range.

## Argument

The parties have filed more than a thousand pages of sentencing materials thus far. The defendant has filed 963 of them, but both sides have thoroughly stated their positions. The Court knows the facts of this case and is well-aware of both the Guidelines and 18 U.S.C. § 3553(a) factors that it must apply in sentencing the defendant. The United States will attempt not to belabor prior points here but does address certain arguments below that may aid the Court in focusing on what actually remains at issue in this case.

**I.   The PSR accurately calculates the Guidelines range of 121–151 months.**

The defendant accuses the United States of "misapplying" and "dramatically inflat[ing]" the advisory Guidelines range. RFM Opposition at 1, 2. Of course, he does so without acknowledging that the Probation Office agrees not with him, but with the United States. Nevertheless, the United States acknowledges that it bears the burden to prove by a preponderance of the evidence—or more likely than not—that the PSR's findings of fact and applications of disputed Guidelines enhancements are correct. The United States has done so in

its other sentencing pleadings but briefly addresses two of the defendant's Guidelines arguments below.[1]

    A.    <u>The PSR accurately finds that the greater of the value of the bribes or official action proven by a preponderance of the evidence and foreseeable to the defendant in this case exceeded $120,000.</u>

The PSR bases its calculation of the value of the bribes the defendants received in this case on twelve items. The parties agree on the value, foreseeability, and nature as bribes of three of them that total $18,750.15: (1) the $15,000 wedding check in May 2011; (2) the $2,380.24 in golf in May 2011; and (3) the $1,369.91 in golf in January 2012. The parties disagree on the remaining items in three basic ways.

First, even though he does not contest the value of the shopping spree and Rolex, totaling $25,798.28, the defendant claims that sum cannot be included because he did not specifically know the value and source of those items at the time Williams provided them. *See* RFM Opposition at 8. In making this argument, however, the defendant betrays a fundamental misunderstanding of the law. The question at sentencing is what was reasonably foreseeable to the defendant, judged by a preponderance standard. *See* Gov't Sent'g Pos'n at 5–6.[2] And as the United States explained in its response to the defendant's objections to the PSR, there are only

---

[1] Further briefing is unnecessary regarding whether the defendant's offense involved more than one bribe or extortion under U.S.S.G. § 2C1.1(b)(1). The defendant was convicted of six separate instances of extorting six separate bribes, his relevant conduct included many more, and those bribes came in varied form because they were distinct bribes, not mere installments on a single payment. *See* Gov't Sent'g Pos'n at 3–4; Doc. No. 597 ("Gov't Resp. to RFM Objections"), at 3–6. The Court should apply the enhancement.

[2] *See also United States v. Manrich*, 529 F. App'x 322, 325 (4th Cir. 2013) (unpublished). In *Manrich*, the defendant pled guilty to a bribery and extortion conspiracy for a scheme in which several police officers received bribes from an auto services repair shop in exchange for those officers bringing vehicles involved in accidents to that shop. *Id.* at 324. The officers were paid on a per-vehicle basis, and the defendant claimed that he should not be held responsible at sentencing for the full amounts that his fellow officers received. The Fourth Circuit panel rejected his claim: "That [the defendant] did not know the precise number of vehicles that the other officers brought to [the repair shop] is simply of no moment." *Id.* at 325.

3

two reasonable explanations for the defendant's denials about the shopping spree and Rolex: that he lied and did in fact know or that he decided not to ask precisely because the truth was reasonably foreseeable to him. *See* Gov't Resp. to RFM Objections at 8–10. Either way, the only real remaining question is whether they were more likely than not bribes.

And that leads to the parties' second remaining dispute regarding the § 2C1.1(b)(2) enhancement. The defendant concedes that he knew about the $12,206.63 provided through the Smith Mountain Lake boat rental, August 2011 golf outing, Chatham Bars vacation, and work by Donnie Williams.[3] He disputes, however, whether those items, as well as the Rolex and shopping spree, were more likely than not bribes. As set forth in the United States prior sentencing pleadings, there is ample evidence in the record to conclude that they were. *See* Gov't Sent'g Pos'n at 7–8; Gov't Resp. to RFM Objections at 10–11. The defendant essentially concedes as much with respect to the Smith Mountain Lake boat rental and August 2011 golfing trip, for which his only argument is the irrelevant contention that "[h]ad the Government really believed these were bribes, it could have and should have included them in the Indictment and proven them to the jury." RFM Opposition at 8. That is not the standard, but the defendant's attempt to redefine it is tantamount to an acknowledgement that the United States has met the one that actually applies. And the same is true about the shopping spree, Rolex, Chatham Bars vacation, and work by Donnie Williams. The defendant's arguments on those items are little more than repackaged arguments that the jury rejected on the substantive extortion counts—that the timing was not quite right, that some of the items predated or postdated the alleged official

---

[3] The defendant purports to dispute the value of the work performed by Donnie Williams at his home, but his only basis for doing so appears to be that he in fact paid that value. RFM Opposition at 7–8. But the defendant does not contest that he only paid for those items *after* he became aware of the law enforcement investigation in this case, and that payment is thus no more a defense to inclusion of that amount than his daughter's "repayment" of the wedding check was a defense to that count.

actions at issue, and the like. *See* RFM Opposition at 7–8. But based on the testimony of the defendant himself, this Court should reject those arguments. Tr. 4339 (R. McDonnell) ("[M]y rule of thumb is every contributor wants something. The reason they donate is they expect something."); *see also* Gov't Resp. to RFM Objections at 11 (citing Williams's testimony about the uncharged items and his general testimony at multiple points that all things of value he provided were part of the business transaction).

The parties' final dispute about the total value of the bribes, then, is over the three Williams loans totaling $120,000. The defendant agrees they should be included, but the parties disagree about their value. Importantly, though, in the event that the Court finds that the PSR correctly included the six "uncharged" things of value addressed above, the total value of the bribes excluding the loans would be $56,744.06, resulting in a 6-level enhancement pursuant to U.S.S.G. § 2C1.1(b)(2) based on those bribes alone. The only question for the Court is whether the value of the $120,000 in Williams loans to the defendant exceeded either the $13,255.94 in value required to impose an 8-level enhancement or the $63,244.94 in value required to impose the 10-level enhancement in the PSR.

The defendant has suggested that the Court should use one of two values: $0 or $939.92. *See* Doc. No. 592 ("RFM Objections"), at 12; RFM Opposition at 6–7. But as the United States has already explained, the defendant's suggested valuation method is not a method of valuation at all; rather, it shows little more than that the Williams loans were barely loans in the first place. *See* Gov't Resp. to RFM Objections at 14–15. The United States, by contrast, has proffered the Court at least four different ways that it can reasonably apply the 10-level enhancement.

- *First*, the Court could find that because the loans were factually unenforceable, the payments from Williams were as good as cash and thus worth $120,000. *See id.* at 12–13.

5

- *Second*, the Court could find that because the defendant could not have obtained anything resembling the same loan (no upfront payment, no payments for three or four years, no collateral, no written guarantee, and 2% interest) from another readily available source, the loans were as good as cash and thus worth $120,000. *See id.*[4]

- *Third*, the Court could find that even based on several assumptions in the defendant's favor, the difference between the cost of the Williams loans and the cost of obtaining the same amount through credit card cash advances would have been approximately $71,754.97, thus still exceeding the $63,255.94 necessary to apply the 10-level enhancement. *See id.* at 16–17.

- *Fourth* and finally, the Court could find based on the testimony in the record about the studies Williams sought and the value of those studies, the value of the official actions agreed upon and performed exceeded $120,000 even if the value of the bribes themselves fell some amount short. *See id.* at 17–18.[5]

---

[4] The defendant misstates the applicable legal standard when he claims that in order for face-value valuation to be appropriate, the United States "has to prove, by a preponderance of the evidence, that the defendant could not have obtained a loan of X dollars at *any* interest rate from *any* source." RFM Opposition at 4. Indeed, the defendant claims that is the standard "[b]ecause the 'price' of a loan is its interest rate *and repayment terms*." *Id.* (emphasis added). But these two sentences cannot both be correct, as the "repayment terms" include much more than just the interest rate on a loan. They include, among other things, whether there is collateral, whether an upfront payment is required, whether regular payments must be made, *and* what the interest rate is. The defendant, perhaps implicitly recognizing that the true value of the Williams loans came in not having to make any upfront or regular payments until 2015, attempts to read all of those important "repayment" terms out of the comparison. But the reason the Court should find that the value of the loans was $120,000—and certainly more than $63,255.94—is because the trial record makes clear that no loan the defendant could have obtained would have been comparable in any reliable way to the Williams loans.

[5] Indeed, with respect to the valuation of the official actions to be received, it is no defense that the value of the studies was never "reduced to specific terms." *See United States v. Quinn*, 359 F.3d 666, 680 (4th Cir. 2004). That is because "[f]or purposes of sentencing, there is no distinction between a solicitation of a bribe and a completed bribe." *Id.* As a result, in bribery cases, defendants may be held accountable for sentencing purposes for amounts that are "intended, 'even if this exceeds the amount . . . actually possible, or likely to occur, as a result of the defendant's conduct.'" *Id.* (quoting *United States v. Miller*, 316 F.3d 495, 502 (4th Cir. 2003)). In *Quinn*, the Fourth Circuit applied its prior analysis under § 2B1.1 for intended loss calculations to intended benefit analysis under § 2C1.1(b)(2). *Id.*; *see also United States v. Tejada-Beltran*, 50 F.3d 105, 109 (1st Cir. 1995) ("[F]ailure to consummate a bribe neither detracts from the donor's culpability nor renders the amount involved ineligible for use in setting the donor's offense level."); *United States v. Kinter*, 235 F.3d 192, 198 (4th Cir. 2000) (affirming *quo* valuation of $9.5 million in profits on illegally obtained contracts based on evidence

Regardless, as previously noted, the Court need not find a specific value at all; the Guidelines simply require that this Court determine the applicable range from U.S.S.G. § 2B1.1(b)(1)'s table. *See* Gov't Sent'g Pos'n at 6. And under any reasonable valuation method, the total value of the Williams loans exceeded $63,255.94, and the greater of the value of the bribes or official action exceeded $120,000. A 10-level enhancement is thus appropriate.[6]

    B.    <u>The PSR accurately found Mr. McDonnell's testimony at trial to be materially and willfully false in at least eight separate ways.</u>

In support of the PSR's assessment of a two-level obstruction enhancement, the United States has already detailed the falsity, materiality, and willfulness of the defendant's testimony at trial and will not retread this well-worn ground again. Despite the defendant's attempts to muddy the waters, the following facts should be dispositive regarding the obstruction enhancement:

- The defendant testified—on direct examination, repeatedly and unambiguously—that he never did any acts (official or otherwise), or agreed to do any acts (official or otherwise), in exchange for things of value. *See, e.g.*, Tr. 4852.

- The jury found beyond a reasonable doubt that the defendant agreed to, and did, perform official acts in exchange for things of value.

---

showing "expectation that the initial bribe would allow [the company] to get its 'foot in the door' and thereafter produce $60 million in revenues"); *United States v. Edwards*, 496 F.3d 677, 683 (D.C. Cir. 2007) (observing in *dicta* that lack of final authority over sought-after amount is not dispositive and asking "Why, after all, should a good bluffer receive a lower sentence because he does not actually hold all the cards?").

[6] In addition to the four listed alternatives, the United States has offered two other alternatives that would support an 8-level enhancement. Those are the $31,738.71 in additional interest expense for charging $120,000 in credit card debt and the $25,328.07 in additional interest expense for obtaining $120,000 in private, uncollateralized loans at the only rate the defendant ever actually managed to obtain elsewhere for such a loan before Williams. *See* Gov't Opposition to RFM Objections at 17 n. 14. Although it is worth noting that both methods understate the true value of the Williams loans, both would result in an advisory Guidelines range of 97–121 months, the high end of which is the same as the low end of the current advisory Guidelines range in the PSR.

- This Court has already determined that "*substantial evidence* supports the jury's finding that McDonnell actually performed official acts in exchange for gifts and loans from Williams." Doc. No. 571, at 4 (emphasis added).

The defendant understandably does not even try to argue that his testimony on this point was not material or willful. Instead, he claims that this is "mental state testimony" that cannot be readily categorized as true or false, so it should not form the basis of an obstruction enhancement. RFM Opposition at 9–10. But every day, the law requires that juries (like the one in this case) determine *as fact* whether conspiratorial agreements exist or whether a defendant has the requisite criminal intent. Under the defendant's logic, juries should never convict, as those are the types of facts that go to a defendant's mental state, which is essentially unknowable. But that is not the law.

Nor is it the law that a defendant who falsely testifies about the existence of *any* agreement or whether he did *anything* in exchange for things of value is permitted to avoid the obstruction enhancement. *See United States v. Stewart*, 686 F.3d 156, 176 (2d Cir. 2012) (rejecting defendant's argument that her trial testimony denying knowledge of or participation in the conspiracy could not serve as basis for obstruction enhancement because they were merely expressions of opinion); *United States v. Garcia*, 994 F.2d 1499, 1509 (10th Cir. 1993) (affirming obstruction enhancement where defendant denied his involvement in the conspiracy and holding that denial was a material matter which the defendant was not likely to have been confused, mistaken, or forgetful). This is especially true in this case, where the defendant also violated his oath in seven other instances of perjury. *See* Gov't Sent'g Pos'n at 16–24.[7]

---

[7] In his brief, the defendant also claims remorse but concedes that "[w]hat he cannot say—because it would not be true—is that he thought that he was committing a crime, or that he intended to provide what he believed were official actions in exchange for gifts and loans." RFM Opposition at 22. This statement denies the factual core of the jury's verdict and precludes

## II.   Section § 3553(a) Factors

The United States will not address the § 3553(a) factors individually here, as the parties have already devoted 63 pages to this analysis in earlier briefing. Suffice it to say, however, that the defendant's position essentially remains that he committed no crime, that his past good deeds entitled him to do what he did without fear of incarceration, and that there is no further need to deter the sort of conduct he engaged in.

A few points, however, merit brief discussion. ***First***, the defendant uses the word "aberrant" to describe his behavior at least four times in his sentencing pleadings thus far. *See* RFM Sentencing Position, Doc. No. 582, at 1, 22; RFM Opposition at 1. Whatever the defendant's definition of "aberrant" is, it is incompatible with that of the Guidelines, under which a downward departure for "aberrant behavior" is appropriate when the offense "(1) was committed without significant planning; [*and*] (2) was of limited duration; *and* (3) represents a marked deviation by the defendant from an otherwise law-abiding life." U.S.S.G. § 5K2.20(b) (emphases added). The defendant's 23-month conspiracy does not satisfy this standard. That is because "[a] single act of aberrant behavior suggests a spontaneous and seemingly thoughtless act[,] rather than one which was the result of substantial planning . . . [or] the result of a continued reflective process . . . ." *United States v. Glick*, 946 F.2d 335, 338 (4th Cir. 1991) (citations and quotations omitted) (discussing policy statement in U.S.S.G., Ch. 1, Pt. A, 4(d) before enactment of § 5K2.20). Time and time again throughout the conspiracy, the defendant went back to extort or solicit new bribes from Mr. Williams. His conduct was a pattern, not an aberration.

---

the application of a two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a).

9

***Second***, a sentence of probation and community service is wholly insufficient to meet the objectives of § 3553(a).  Virtually every bribery defendant will possess the same skills as the defendant here: education, leadership skills, some business savvy, and an extensive Rolodex.  Under the defendant's logic, a probationary sentence would be the default punishment for such defendants, not the exception.  And a sentence of mere probation fails to provide any deterrence to the thousands of elected officials across this country.  "[T]he threat of spending time on probation simply does not, and cannot, provide the same level of deterrence as can the threat of incarceration in a federal penitentiary for a meaningful period of time." *United States v. Hayes*, 762 F.3d 1300, 1311 (11th Cir. 2014) (citations and quotations omitted) (reversing probationary sentence for bribe-payer as unreasonable).

***Third*** and finally*,* the defendant goes to great lengths to minimize his crimes in comparison to other corrupt politicians.  But the simple fact of the matter is that a politician is either corrupt or he is not.  "In a democracy, citizens elect public officials to act for the common good.  When official action is corrupted by secret bribes or kickbacks, the essence of the political contract is violated." *United States v. deVegter*, 198 F.3d 1324, 1328 (11th Cir. 1999) (citations and quotations omitted).  The defendant broke his political contract and violated his oath of office to the citizens of Virginia by extorting—both personally and through his wife—bribes from Mr. Williams.  *See* Va. Code § 49-1 ("I do solemnly swear (or affirm) that I will support the Constitution of the United States, and the Constitution of the Commonwealth of Virginia, and that I will *faithfully and impartially* discharge all the duties incumbent upon me as Governor, according to the best of my ability, so help me God.") (emphasis added).

He continues to make light of this breach of trust as providing mere "access" to government.  RFM Opposition at 22.  In the defendant's world, as Governor of Virginia could

10

secretly solicit any sum of money—no matter how high, and even if into his own pocket—in exchange for businesses being able to host and attend events at the Governor's Mansion or obtain meetings with the Governor's subordinates. And he could do so even if those are meetings and events were on the question or matter of that business receiving studies at state universities with state funding. Of course, no reasonable interpretation of bribery law could permit such conduct, nor does any reasonable interpretation of bribery law exclude what the defendant did. He corruptly and fraudulently accepted more than $175,000 in payments, golf, vacations, and luxury goods in exchange for actions that this Court described as "us[ing] his gubernatorial office to influence governmental decisions, specifically attempting to obtain research studies for Star Scientific" and "direct[ing] his employees to take action on research studies for Anatabloc." Doc. No. 571, at 7, 8 (internal citation omitted). The jury evaluated whether the actions he agreed to and did perform were "on" questions, matters, or the like pending before him, and they decided they were. They rejected, as did this Court, his "misguided" claim that he did no more than "merely provide 'access.'" *Id.* at 6. Because they did, they found that he, like any other bribery defendant, corrupted his office.

## Conclusion

The United States is not asking for an upward variance or upward departure. It is not asking for this Court to impose the most aggressive valuation calculation that could possibly apply in this case based on the official action involved. And it is not asking for this defendant to serve even the longest public corruption sentence imposed in this district in just the last six years. Rather, the United States is asking for a Guidelines sentence, as it does in the vast majority of cases. It is the defendant, by contrast, who is asking for the unprecedented: probation for a governor convicted of bribery who testified that he never agreed to do anything for anyone. The

Court should reject that invitation and instead sentence the defendant within the advisory Guidelines range.

        Respectfully submitted,
        DANA J. BOENTE
        United States Attorney

        JACK SMITH
        Chief, Public Integrity Section
        Criminal Division
        U.S. Department of Justice

By: _____/s/_____
        Michael S. Dry
        Jessica D. Aber
        Ryan S. Faulconer
        David V. Harbach, II
        Counsel for the United States
        U.S. Attorney's Office
        600 E. Main Street, Suite 1800
        Richmond, VA 23219
        Phone: 804-819-5400
        Fax: 804-771-2316
        Email: michael.s.dry@usdoj.gov
                jessica.d.aber@usdoj.gov
                ryan.faulconer2@usdoj.gov

## CERTIFICATE OF SERVICE

       I hereby certify that on January 2, 2015, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing ("NEF") to all counsel of record.

                               By:        /s/
                                        Ryan S. Faulconer
                                        Counsel for the United States
                                        U.S. Attorney's Office
                                        600 E. Main Street, Suite 1800
                                        Richmond, VA 23219
                                        Phone: 804-819-5400
                                        Fax: 804-771-2316
                                        Email: ryan.faulconer2@usdoj.gov