**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **CRIMINAL NO. 3:14-CR-00012** |
| | ) | |
| **ROBERT F. MCDONNELL** | ) | **JUDGE JAMES R. SPENCER** |
| **MAUREEN G. MCDONNELL** | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT ROBERT F. MCDONNELL'S**
**MOTION # 51 – MOTION FOR RELEASE PENDING APPEAL**

The Court is scheduled to sentence Defendant Robert F. McDonnell on January 6, 2015.
Mr. McDonnell respectfully moves for release pending appeal pursuant to 18 U.S.C. § 3143(b)
and submits this memorandum of law in support of his motion. Mr. McDonnell has asked the
Court to exercise its discretion to impose a non-custodial sentence and, if this Court does so, his
motion will be moot; Mr. McDonnell will not request bond if his sentencing request is granted.
In the event that the Court disagrees with his sentencing request, however, he submits his motion
and this memorandum in advance of sentencing for the convenience of the Court.

## INTRODUCTION

Mr. McDonnell respectfully requests bond pending appeal. Mr. McDonnell recognizes
that this Court does not agree with his legal position. The standard for bond pending appeal,
however, is not whether Mr. McDonnell is likely to succeed on the merits. It is, rather, whether
his appeal will present a substantial question that, if resolved in his favor, would result in an
acquittal or new trial. Courts, including in this district, thus commonly grant defendants bond
pending appeal where they disagree with the defendant's legal position on what is, nonetheless, a
substantial question of law. As Judge Ellis explained when he granted bond pending appeal to

former Congressman Jefferson—a defendant who, Mr. McDonnell submits, raised issues less substantial than those at issue here—"I don't have any doubt that my reasoning is correct and that it is soundly based on existing authority, but it is an extension of existing authority."  Ex. B, Transcript, *United States v. Jefferson*, No. 1:07-cr-209 (E.D. Va. Nov. 18, 2009), at 49:11-14, 51:14-17.

Mr. McDonnell respectfully submits that, as in *Jefferson*, his appeal will present several substantial questions that, if resolved in his favor, would warrant either an acquittal or a new trial.  The most significant such question is whether the five actions the Government alleged in its Indictment and argued to the jury qualify as "official acts" under federal law.  This Court has recognized that there is an "apparent fine line" between "routine official duties and public corruption."  Mem. Op. New Trial Mot., Dkt. 567, at 4.  Mr. McDonnell intends to argue on appeal that his actions fall on the lawful side of that line.  Mr. McDonnell believes that the substantiality of that question is confirmed by both the absence of reported case law upholding a public official's corruption conviction on comparable facts, as well as several decisions from other circuit courts supporting Mr. McDonnell's position that the five acts at issue here do not rise to the level of "official acts" under the federal bribery laws.[1]  These decisions—particularly when considered alongside the at-best inexact statutory definition borrowed from the federal bribery statute, 18 U.S.C. § 201(a)(3)—illustrate that the central legal issue in this case, however it is ultimately resolved, is a substantial one.

---

[1] *See, e.g.*, *United States v. Urciuoli*, 513 F.3d 290, 295-96 (1st Cir. 2008); *Valdes v. United States*, 475 F.3d 1319, 1324-25 (D.C. Cir. 2007) (en banc); *United States v. Rabbitt*, 583 F.2d 1014, 1028 (8th Cir. 1978), *abrogated on other grounds by McNally v. United States*, 483 U.S. 350 (1987), *superseded by statute*, 18 U.S.C. § 1346; *United States v. Muntain*, 610 F.2d 964, 966-67 (D.C. Cir. 1979).

Here, Mr. McDonnell understands that the Government will not assert that he is dangerous or presents a flight risk, consistent with the position it has taken throughout these proceedings.  Nor is Mr. McDonnell appealing solely for purposes of delay.  And if the issue described above—or the others set forth below, involving the Court's voir dire of the jury in two separate respects—is resolved in Mr. McDonnell's favor, it would warrant either an acquittal or a new trial.  Accordingly, the dispositive question here is whether any of these issues constitutes a substantial question of law.  Mr. McDonnell respectfully submits that each of them does and he therefore requests that the Court grant the present motion.

## ARGUMENT

**I.    The Court Should Grant Bond Pending Appeal If Mr. McDonnell's Appeal Presents A "Close" Question That, If Decided In His Favor, Is Likely To Result In Acquittal Or A New Trial.**

The standard for granting bond pending appeal—where, as here, there is no risk of flight, no danger to the community, and the appeal is not taken solely for purposes of delay—is whether the appeal presents "a substantial question of law or fact" that, if successful, is "likely to result in reversal or an order for a new trial of all counts on which imprisonment has been imposed." *United States v. Miller*, 753 F.2d 19, 24 (3d Cir. 1985) (construing 18 U.S.C. § 3143(b)).  A defendant "need not show a likelihood of success on appeal," *United States v. Garcia*, 340 F.3d 1013, 1020 n.5 (9th Cir. 2003); rather, he need only show that his appeal presents "'a 'close' question or one that very well *could be* decided the other way.'"  *United States v. Steinhorn*, 927 F.2d 195, 196 (4th Cir. 1991) (quoting *United States v. Giancola*, 754 F.2d 898, 901 (11th Cir. 1985) (emphasis added)).  As the Supreme Court has explained in describing a similar standard:

> [The defendant] need not show that he should prevail on the merits.  He has already failed in that endeavor.  Rather, he must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues in a different manner; or that the questions are adequate to deserve encouragement to proceed further.

*Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983) (citation and alterations omitted).

In a recent, similar case—*United States v. Jefferson*—Judge Ellis explained this standard at length in the course of granting bond to that defendant pending his appeal.  That case, like this one, involved a dispute between the defendant and the Government over whether certain actions constituted "official" actions under federal law.  *See* Ex. B, Transcript, *United States v. Jefferson*, No. 1:07-cr-209 (E.D. Va. Nov. 18, 2009), at 46:19-20.  Judge Ellis, like this Court, had sided with the Government.  Judge Ellis nonetheless granted bond pending appeal, explaining that "I don't have to find that [the issue is]  likely to result in reversal.  If I felt that way, I wouldn't have ruled the way I ruled in the first place." *Id.* at 42:17-20.  Rather, Judge Ellis found that there was a "substantial question" because, although  "I don't have any doubt that my reasoning is correct and that it is soundly based on existing authority, [ ] it is an extension of existing authority." *Id.* at 49:11-14, 51:14-17.  And the reason "it [was] fair to say that that was an extension of existing law" was because "there weren't any facts . . . in prior cases" that were analogous to the facts there. *Id.* at 48:20-23.

Similarly, in *United States v. Ring*, a case that arose out of the Jack Abramoff controversy, the district court granted release pending appeal because it recognized that the case raised novel and difficult questions about the application of the federal bribery laws in the lobbying context, where payment for access to public officials is commonplace.  The defendant there argued that his appeal presented a "substantial issue" within the meaning of § 3143(b) because his jury had been "the first in the United States to determine whether a registered federal lobbyist committed honest services fraud for conduct that was . . . intricately intertwined with legal lobbying efforts."  Sentencing Mem., *United States v. Ring*, No. 08-CR-274 (D.D.C. Sept. 30, 2011), Dkt. 290, at 32 (footnote omitted).  Mr. Ring specifically argued that it was an

"issue[] of first impression" whether emails sent by a Department of Justice attorney to Immigration and Naturalization Service employees constituted an "official act." *Id.* at 32-33. The district court agreed that, even though it believed the defendant's convictions were sound, the "challenging and novel questions of law regarding what is legal versus illegal lobbying" raised "substantial issues" that justified release pending appeal. Order*, United States v. Ring*, No. 08-CR-274 (D.D.C. Oct. 26, 2011), Dkt. 297, at 3.

In other federal corruption cases, courts of appeals have likewise granted defendants similar to Mr. McDonnell release pending appeal in light of the substantial legal questions that arise when the corruption laws are applied to novel facts. For example, in *United States v. Siegelman*, former Alabama governor Don Siegelman disputed the adequacy of the jury instructions governing Hobbs Act extortion in the context of campaign finance. *See* Ex. C, Siegelman's Mot. for Review of Dist. Ct.'s Jan. 2, 2008 Op. Denying Release Pending Appeal, & Mot. for Release Pending Appeal by This Ct., *United States v. Siegelman*, No. 07-13163-B (11th Cir. Feb. 19, 2008), at 4-14. After the district court denied release pending appeal twice (the second time after a remand in which the Eleventh Circuit directed it to set forth its reasons for denial), the Eleventh Circuit granted bond. *See* Ex. D, Order, *United States v. Siegelman*, No. 07-13163-BB (11th Cir. Mar. 27, 2008), at 1-2, 4. And in *United States v. Ryan*, former Illinois governor George Ryan was granted bail pending appeal by the Seventh Circuit after the district court had denied it. *See* Mem. Op. & Order, *United States v. Warner*, No. 02-CR-506 (N.D. Ill. Oct. 13, 2006), Dkt. 931, at 1, 4 (denying release pending appeal); Order, *United States v. Ryan*, No. 06-3528 (7th Cir. Nov. 28, 2006) (granting release pending appeal).

Moreover, as a general matter, bond is routinely granted pending appeal in cases that present complex legal issues where the defendant presents neither a flight risk nor any danger to

the community.   Thus, in the recent insider trading cases of hedge fund employees Todd Newman and Anthony Chiasson, the Second Circuit granted release pending appeal where the defendants argued that the district court had improperly instructed the jury on the elements of tippee liability for insider trading.  *See* Order, *United States v. Newman*, No. 13-1917(Con) (2d Cir. June 21, 2013), Dkt. 77.  Similarly, in the insider trading case of former Qwest CEO Joseph Nacchio, where the defendant disputed the district court's jury instructions regarding the materiality element of securities fraud, the Tenth Circuit granted release pending appeal.  *See* Application for Release Pending Appeal, *United States v. Nacchio*, No. 07-1311 (10th Cir. Aug. 2, 2007), Dkt. 2, at 9-14; Order, *United States v. Nacchio*, No. 07-1311 (10th Cir. Aug. 22, 2007), Dkt. 44, at 1.  And again, in the insider trading case of former Goldman Sachs director Rajat Gupta, where the defendant challenged multiple evidentiary rulings of the district court, the Second Circuit granted release pending appeal after the district court had denied it.  *See* Order, *United States v. Gupta*, No. 12-4448 (2d Cir. Dec. 6, 2012), Dkt. 47, at 1.

Notably, the courts in each of these cases granted bond pending appeal even though the courts of appeals in all but one of them ultimately rejected the defendants' arguments on the merits and affirmed all or most of the defendants' convictions.[2]  These cases thus underscore that, although Mr. McDonnell certainly believes that his legal positions are correct, the standard for bond pending appeal is markedly lower than that.  The question is not whether Mr.

---

[2] *See United States v. Gupta*, 747 F.3d 111, 140 (2d Cir. 2014) ("We have considered all of Gupta's arguments on this appeal and have found them to be without merit."), *petition for cert. filed*, Nos. 14-534, 14A240, 83 U.S.L.W. 3316 (U.S. Nov. 10, 2014); *United States v. Siegelman*, 640 F.3d 1159, 1190 (11th Cir. 2011) ("As to Siegelman, we affirm Counts 3, 5, 6, 7 and 17."); *United States v. Nacchio*, 555 F.3d 1234, 1259 (10th Cir. 2009) ("Based upon the foregoing, we AFFIRM Mr. Nacchio's conviction . . . ."); *United States v. Warner*, 498 F.3d 666, 704-05 (7th Cir. 2007) ("We AFFIRM the judgments of the district court convicting both Warner and Ryan."); *but see United States v. Newman*, __ F.3d __, 2014 U.S. App. LEXIS 23190, at **3-4 (2d Cir. Dec. 10, 2014) (reversing defendants' convictions).

McDonnell is right on the law, but whether the legal issues in his case are substantial ones that, *if* resolved in Mr. McDonnell's favor, would warrant an acquittal or new trial.  To be sure, each of the cases discussed above presented legal issues and factual scenarios different from those presented here.  But what they all have in common is that each involved relatively novel applications of federal criminal law or debatable evidentiary rulings, such that each defendant's appeal raised one or more legal issues that were "substantial."  Mr. McDonnell respectfully submits that, as explained below, the same is true here.

## II.     There Is A Substantial Question Whether Mr. McDonnell Performed Or Promised To Perform An "Official Act" That Is Likely To Result In Reversal If Mr. McDonnell's Appeal Succeeds.

Mr. McDonnell's appeal presents the substantial question whether a public official takes "official action" when he asks an aide a question, encourages a staffer to attend a meeting, or appears at a public event, without taking the further step of asking the aide, staffer, or any other government official to take any particular action on the government's behalf before, during, or after the meeting or event.  This case is the first to find that such actions qualify as "official" ones under federal law.  And indeed, this Court appears to have recognized the substantiality of this question in denying Mr. McDonnell's requests for a new trial or judgment of acquittal, noting that this issue requires "distinguish[ing] between the apparent fine line of routine official duties and public corruption."  Mem. Op. Denying New Trial, Dkt. 567, at 4.  The absence of prior precedent—coupled with the presence of precedent that supports Mr. McDonnell's position, *see supra* at n.1—make this issue the paradigm of a substantial question of law.  *See Steinhorn*, 927 F.2d at 196.

Success on this issue also would be "likely to result in reversal or an order for a new trial of all counts on which imprisonment has been imposed."  *Miller*, 753 F.2d at 24.  Mr. McDonnell's convictions are limited to public corruption counts and two derivative conspiracy

counts, all of which depend on the Fourth Circuit agreeing that the conduct at issue constituted "official action" under the federal bribery laws. Should the Fourth Circuit agree with Mr. McDonnell's position on this issue, it is likely to either dismiss Mr. McDonnell's convictions for insufficient evidence or order a new trial. *See generally* Renewed Rule 29 Mem., Dkt. 510, at 3-15; New Trial Mem., Dkt. 548 at 2-11.[3] This issue thus satisfies the test for granting bond pending appeal.

> **A.    There Is A Substantial Question Whether The Government Must Prove—And The Jury Must Find—That Mr. McDonnell Pressured Other Officials To Exercise Governmental Power On Behalf Of Mr. Williams.**

As Mr. McDonnell has argued previously, Supreme Court precedent draws a fundamental distinction between public officials (1) exercising their official powers in exchange for benefits, *i.e.*, making official decisions on government policy, and (2) providing superior access to government officials in exchange for benefits without trying to directly alter or influence any government policy. Because "government regulation may not target the general gratitude a candidate may feel toward those who support him or his allies, or the political access such support may afford," *McCutcheon v. Fed. Election Comm'n*, 134 S. Ct. 1434, 1441 (2014), only the former sorts of actions are "official" and thus illegal when undertaken in exchange for benefits. In other words, while it might be unseemly and might run afoul of state ethics provisions, it does not violate the federal bribery statutes for state public officials to conduct or arrange meetings, ask aides questions, or make public appearances in exchange for payments, as long as the official does not pressure other government officials into exercising governmental

---

[3] If Mr. McDonnell's substantive convictions are invalid, then the conspiracy convictions necessarily fall too. *See, e.g.*, *Ventimiglia v. United States*, 242 F.2d 620, 622 (4th Cir. 1957) ("[T]here can be no conviction for conspiracy to commit an offense against the United States if the act that the alleged conspirators agree to do has not been made unlawful, and is not planned to be accomplished in an unlawful manner.").

power in favor of the donor or gift-giver.  That is, in Mr. McDonnell's view, what the Supreme

Court meant in *Sun-Diamond*, when it interpreted the statutory text at issue here and explained

that "receiving [] sports teams at the White House, visiting [a] high school, and speaking to []

farmers about USDA policy"—whatever the action-taking official's motivations—"are assuredly

'official acts' in some sense" but "are not 'official acts' within the meaning of the statute" even

if those actions are connected to gifts given to the public official.  *United States v. Sun-Diamond*

*Growers of Cal.*, 526 U.S. 398, 407 (1999).  As the Court further explained: "[W]hen Congress

has wanted to adopt [ ] a broadly prophylactic criminal prohibition upon gift giving, it has done

so in a more precise and more administrable fashion." *Id.* at 408.

This Court has, of course, rejected Mr. McDonnell's position.  But in doing so, it appears

to have recognized that the distinction between "official" and non-official acts is unsettled,

noting that Mr. McDonnell challenges the "finer aspects" of the definition of "official act."

Mem. Op. New Trial Mot., Dkt. 567, at 4.  The Court thus recognized that "[t]his case hinges"

on arriving at a definition of "official act" that will allow the jury to draw the "fine line

[between] routine official duties and public corruption." *Id.*  Here, the Court drew that "fine

line" by focusing on Mr. McDonnell's "subjective intent." *Id.* at 4-5.  It therefore ruled that the

"five identified 'official acts'" satisfy the statutory definition because they pertained to certain

broadly defined governmental matters such as "Virginia business and economic development,"

*id.* at 7-8, (a "top priority in McDonnell's administration," *id.* at 7), were "taken specifically with

respect to Star Scientific," *id.* at 8, and were taken by Mr. McDonnell with the subjective

intent—as the jury "may have" inferred it—of helping Star Scientific obtain research studies

from Virginia universities.  *Id.* at 7-8; *see also* Mem. Op. Rule 29 Mot., Dkt. 571, at 6 ("The

alleged official actions in this case were within the range of actions on questions, matters, or

causes pending before McDonnell as Governor as multiple witnesses testified that Virginia business and economic development was a top priority in McDonnell's administration.").

Like Judge Ellis in *Jefferson,* this Court surely believes that its "reasoning is correct and that it is soundly based on existing authority."  Ex. B, Transcript, *United States v. Jefferson*, No. 1:07-cr-209 (E.D. Va. Nov. 18, 2009), at 49:11-14, 51:14-17.   But even if that is so, Mr. McDonnell respectfully submits that this question is nonetheless a "substantial" one.   The statutory definition of "official act" that the Government invokes has "not been altered to any substantial extent since [its] origin in the Act of July 13, 1866."  *United States v. Carson*, 464 F.2d 424, 433 (2d Cir. 1972) (citing Act of July 13, 1866, ch. 184, § 62, 14 Stat. 168).   Yet the Government has not identified a single decision finding that actions like Mr. McDonnell's are "official" and thus illegal under federal law if undertaken in exchange for payments.   On the other hand, numerous cases support Mr. McDonnell's position.   This authority, discussed below, underscores how the question presented in this case is substantial.

### B.   Decisions Of Other Courts Support Mr. McDonnell's Position That This Case Presents A "Substantial" Question Of Law.

Decisions in the Fourth Circuit and elsewhere underscore the substantiality of this legal question.   The closest Fourth Circuit case, *United States v. Jefferson*, involved a different legal issue that Mr. McDonnell has never raised: Whether "official action" included only the exercise of formal legislative powers or also included settled practices of congressmen that were designed to influence a governmental decision about a pending matter.   *Jefferson*'s holding that the bribery statutes reach beyond formal legislative acts thus does not control this case.   Moreover, Mr. McDonnell's arguments for why *Jefferson* should not be extended to this case are supported by decisions in other circuit courts which support Mr. McDonnell's position here.

### 1. The Fourth Circuit's Decision In *Jefferson* Arose From Different Facts And Resolved A Different Legal Question.

The Fourth Circuit's decision in *United States v. Jefferson*, 674 F.3d 332 (4th Cir. 2012), is not controlling here because that case arose from different facts and presented a different legal question. There, the primary issue was whether certain non-legislative settled practices of a congressman could be "official acts" or whether that statutory term was "limited to those activities involving questions pending or brought before Congress, such as voting on proposed legislation or conducting committee work." *Id.* at 336. The Fourth Circuit rejected that argument through a straightforward application of *United States v. Birdsall*, *see* 674 F.3d at 356 (rejecting "Jefferson's broad assertion that *Sun-Diamond* supersedes *Birdsall*"), which had held a century earlier that certain "settled practice[s]" could constitute official action even if not "prescribed by statute . . . [or] by a written rule or regulation," 233 U.S. 223, 230-231 (1914). The Court in *Birdsall* thus upheld the conviction of two Department of Indian Affairs officials who, in exchange for bribes, used their official position to urge the Commissioner of Indian Affairs to recommend leniency in favor of individuals convicted of illegal liquor trafficking with Indians. *See Jefferson*, 674 F.3d at 352. That holding comported with the "official act" requirement, because those officials were attempting to influence specific leniency decisions and were thus taking "action" on the "pending" "matter" of whether the bribe-paying person's convicted clients deserved lenient punishments. But neither *Jefferson* nor *Birdsall* held that *all* "settled practice[s]" of a public official are automatically "official acts." Instead, *Jefferson* emphasized that "[a]lthough *Birdsall* recognized that every act within the range of official duty comes *within the purview* of an 'official act,' the inquiry does not end there, and such an act *must yet adhere* to the definition confining an official act to a pending 'question, matter, cause, suit,

proceeding or controversy.'" *Jefferson*, 674 F.3d at 356 (quoting 18 U.S.C. § 201(a)(3)) (emphases added).

In *Jefferson*, moreover, Mr. Jefferson's actions were plainly "official acts" under that statutory definition. There, unlike here, the evidence demonstrated that Mr. Jefferson used his official position to lobby numerous government officials to make specific governmental decisions on specific pending matters in favor of individuals and companies that had paid him bribes. For example, among many other things, Mr. Jefferson obtained a letter of endorsement from another congressman to help secure a contract with the Army for a bribe-paying company, *id.* at 342; he personally participated in meetings where he encouraged Export-Import Bank officials to fund the venture of a bribe-paying company, *id.* at 343; he personally met with foreign government officials to promote bribe-payors' specific ventures, *id.* at 344; and he obtained travel visas for representatives of a bribe-paying company, *id.* at 347. Thus, *Jefferson* correctly held that "official action" included actions to pressure other officials to make specific decisions on the government's behalf on specific pending matters. *Jefferson* did not and could not hold, however, that actions *not* designed to sway official decision-making in such circumstances also constitute "official action" merely because those actions happen to be settled practices. That decision is thus fully consistent with Mr. McDonnell's legal position here and does not support the Government's contrary view.

Here, unlike in *Jefferson*, Mr. McDonnell has never disputed that settled practices *are* official acts *if* they satisfy the statutory definition of "official act"—*i.e.*, making a "decision[] that the government actually makes" or pressuring someone else to do so. *Valdes*, 475 F.3d at 1325. This case raises a question entirely different from the one in *Jefferson*: Whether arranging a meeting, emailing an aide a question, suggesting that another aide conduct a meeting, or

appearing publicly at two events constitute "official acts," even though, unlike in *Jefferson*, Mr. McDonnell never made any decision on behalf of any governmental entity about any pending matter related to Mr. Williams nor directed or pressured any other government employee to do so. *Jefferson* does not address that issue, much less purport to resolve it.

### 2.    Eighth Circuit Law Supports Mr. McDonnell's Position.

Whereas *Jefferson* is distinguishable, decisions from other circuits support Mr. McDonnell's position.  For example, the Eighth Circuit's decision in *United States v. Rabbitt*, 583 F.2d 1014 (8th Cir. 1978), *abrogated on other grounds by McNally v. United States*, 483 U.S. 350 (1987), *superseded by statute*, 18 U.S.C. § 1346, an honest services fraud and Hobbs Act case, supports Mr. McDonnell's legal position.  There, the Eighth Circuit reversed the Hobbs Act conviction of a state legislator who "offered, for a fee . . . , to introduce [an architectural] firm to [state officials] who might be able to secure architectural contracts for it."  *Id.* at 1020. The court held that was not enough to support a Hobbs Act conviction.  As the court explained: "[W]hile Rabbitt's influence obviously helped these architects obtain state jobs, no testimony established that any state contracting officer awarded any contract to Berger-Field because of Rabbitt's influence or that Berger-Field believed Rabbitt's introduction was enough to secure the work."  *Id.* at 1028.  Or as the Eighth Circuit has subsequently explained, it reversed Mr. Rabbitt's conviction because he "promised only to introduce the firm to influential persons" and "did not promise to use his official position to influence those persons."  *United States v. Loftus*, 992 F.2d 793, 796 (8th Cir. 1993).

The Eighth Circuit's decision in *Rabbitt* directly supports Mr. McDonnell's argument that taking an official act requires more than providing a benefactor with access to other public officials so that the benefactor can discuss a matter the benefactor is concerned about with those officials.  It was not enough, in other words, for Mr. Rabbitt to recommend bribe payors "to state

contractors as qualified architects and thereby gain them a friendly ear" in pursuit of their ultimate goal of "obtain[ing] state jobs." 583 F.2d at 1028. To take "official" action, rather, the official must also take the *next* step of "us[ing] his official position *to influence* those persons." *Loftus*, 992 F.2d at 796 (emphasis added). This decision also suggests that subjective intent does not supply the basis for distinguishing between "ingratiation and access" and taking official acts. The Eighth Circuit held that Mr. Rabbitt's actions facilitating increased access were not official acts for honest services fraud or Hobbs Act purposes even though he took them with "intent to defraud." *Rabbitt*, 583 F.2d at 1025; *id.* at 1028. Mr. Rabbitt's actions thus did not qualify as "official acts" even though they were steps taken by a government official in a larger plan that ultimately involved someone exercising governmental power. As here, there was no evidence showing—or jury instruction requiring a finding that—Mr. Rabbitt "promise[d] to use his official position to influence those persons." *Loftus*, 992 F.2d at 796.

### 3. First Circuit Law Supports Mr. McDonnell's Position.

The First Circuit's decision in *United States v. Urciuoli*, 513 F.3d 290, 295-96 (1st Cir. 2008), also supports Mr. McDonnell's position. There, the court reversed the honest-services fraud conviction of a state senator who took payments in exchange for contacting "mayors and other local officials urging them to comply with Rhode Island law governing patient entitlement to be taken by ambulance to the hospital of the patient's choice." *Id.* at 294. The court held that there was "no indication that [the senator] invoked any purported oversight authority or threatened to use official powers in support of his advocacy." *Id.* at 296. The court specifically rejected the notion that "trad[ing] . . . on the reputation, network and influence that comes with political office" or using the "access and attention" that comes with a government title, or even the "(possibly improper) use of senate letterhead" were sufficient—standing alone—to qualify as improper official action. *Id.*

That, too, supports Mr. McDonnell's position.  Here, Mr. McDonnell asked an aide a question, appeared at two events, and asked two aides to meet with Mr. Williams.  But there is no evidence showing (or jury instruction requiring a finding) that he "invoked any purported oversight authority or threatened to use official powers in support of his advocacy."  *Id.  Urciuoli* thus supports Mr. McDonnell's argument that he did not engage in "official" action when he emailed Mr. Eige or encouraged Ms. Hicks-Thomas to meet with Star Scientific personnel.  Moreover, the evidence in *Urciuoli* made clear that the defendant had made payments to the public official specifically in exchange for providing him heightened access as part of a broader plan to convince local mayors to increase ambulance service to the bribe payor's hospital.  *See id.* at 292, 295.  Despite both a clear *quid pro quo* and a larger plan, the court held that these actions were not "official" actions under the bribery laws because the Government had not shown "by context or threat that [the official] sought deliberately to exploit" the "leverage" that his public office furnished.  *Id.* at 296.

### 4.      D.C. Circuit Law Supports Mr. McDonnell's Position.

Like its sister circuits, the D.C. Circuit holds as settled law that merely taking action in one's official capacity or using government resources—even if part of an explicit quid pro quo where money is given in exchange for such action—is not sufficient to constitute "official action" under the federal bribery laws.  To take an "official" act, rather, D.C. Circuit case law affirms that an official must, at the very least, use his office to make a specific decision on the government's behalf (or must pressure someone else to do so).

The leading D.C. Circuit decision on this issue is the D.C. Circuit's *en banc* decision in *Valdes*.  There, a policeman was convicted of taking payments explicitly in exchange for using an official police database to perform searches for license plates, "ostensibly to get contact information on individuals who owed [the bribe payer] money."  475 F.3d at 1321-22.  The D.C.

Circuit held that conducting these searches for the alleged bribe-payer was not "official action" under the federal bribery laws.   The court rejected the Government's argument "that the bribery . . . statute should be construed broadly, to encompass essentially any action which implicates the duties and powers of a public official." *Id.* at 1322.   As the court explained, the term "official act" does not subsume "officials' moonlighting, or their misuse of government resources, or the two in combination"; rather, the Government must prove that the defendant exerted "inappropriate influence on decisions that the government actually makes." *Id.* at 1324-25.   Nor does the opinion suggest that what acts are "official" turns on the public official's subjective intent.   After all, the police officer in *Valdes* searched police databases explicitly in exchange for cash payments.   Instead, the test is an objective one that the actions in that case did not satisfy:   "[W]e do not believe that a release of information *can constitute* a 'decision or action on any question, matter, cause, suit, proceeding or controversy.'" *Id.* at 1329 (quoting 18 U.S.C. § 201 (a)(3)) (emphasis added).

Similarly, in *Muntain*, 610 F.2d at 966-67, a HUD official was convicted of allegedly accepting illegal gratuities after selling group automobile insurance policies to labor unions that he met as part of his official duties.   The official "frequently combine[d] the promotion of the automobile insurance with trips taken at government expense for the purpose of conferring with labor officials across the United States concerning official business." *Id.* at 966-67.   There, like here, "the Government contended that Muntain's efforts to promote, or to assist Fleming and Cordial in promoting, the group automobile insurance plan with labor officials, and his encouragement of HUD subordinates to assist in that promotion, fall within the proscription of § 201(g)." *Id.* at 967.   The D.C. Circuit, however, vacated the official's conviction, explaining: "To the extent that [the defendant's] use of his official position to promote a purely private

venture created an appearance of impropriety, his conduct is reprehensible, but it is not criminal." *Id.* at 967-68.  Moreover, like *Valdes,* the court's decision in *Muntain* involved a clear arrangement between the defendant and his benefactors to take the desired action in his official capacity in exchange for the alleged bribes.  *See id.* at 966 ("In exchange for his assistance, Muntain was to . . . share equally in any commissions that might be generated from the sale of insurance."); *see also id.* at 966-67 ("Muntain would frequently combine the promotion of the automobile insurance with trips taken at government expense for the purpose of conferring with labor officials across the United States concerning official business.").  Thus, like *Valdes, Muntain* suggests that the defendant's subjective intent is not relevant to distinguishing "official acts" from non-criminal ingratiation and access.

Finally, Mr. McDonnell's argument draws support from the District of Columbia District Court's jury instructions on the "official act" requirement in *United States v. Ring*, 706 F.3d 460 (D.C. Cir.), *cert. denied*, 134 S. Ct. 175 (2013), a recent honest services case applying the D.C. Circuit decisions discussed above.  The district court's instructions in that case were very different from this Court's instructions here.  There, the court instructed the jury on the distinction that Mr. McDonnell will urge on appeal: that trading gifts for "ingratiation and access" is not federal bribery, while trading gifts for specific decisions the government actually makes is.  To illustrate the point, it is worth reviewing that district court's instructions in detail:

> *Standing alone, providing gifts of meals and tickets to public officials are not crimes, even if they are provided by someone seeking to curry favor or influence with those officials.*  It is not illegal to give a thing of value to a public official merely to build a reservoir of good will that might ultimately affect one or more unspecified acts now or in the future.  Offering hospitality to a public official through payments for entertainment, sports events and the like would not constitute violations of the illegal gratuities or honest services wire fraud statutes if the intent of the Defendant was simply to cultivate a personal, professional, business or political—I'm sorry—cultivate a personal, business, or political friendship.

[. . .]

Lobbyists often use hospitality to cultivate personal and political relationships with public officials. . . .  [T]here is nothing illegal about this practice.  *The fact that gifts or hospitality might make a public official willing to take a lobbyist's phone call or might provide the lobbyist greater access to the official's appointment schedule is not enough by itself to demonstrate the lobbyist's intent to . . . deprive the public of the government official's honest services.*

[ . . . ]

Official act.  In general, an official act . . . means any decision or action on any question, matter, cause, suit, proceeding or controversy which may at any time be pending or which may, by law, be brought before any public official in such official's official capacity or in such official's place of trust or proffer.  The six terms, question, matter, cause, suit, proceeding, or controversy, *refer to a class of questions or matters whose answer or disposition is determined by the Government.*

An act may be official even if it was not taken pursuant to responsibilities explicitly assigned by law.  Rather, official acts include those activities that have been clearly established by settled practice as part of an official—public official's position.  Therefore, official act includes the exercise *of both formal official influence such as a legislator's vote on legislation and informal official influence such as the legislator's behind-the-scenes influence on other public officials in the legislative or executive branches.*

[ . . . ]

*Mere favoritism, as evidenced by a public official's willingness to take a lobbyist's telephone call or to meet with a lobbyist is not an official act.*  In addition, sharing information with the lobbyist or helping to develop a lobbying strategy does not constitute an official act.

Ex. A, Trial Tr. Day 12, *United States v. Ring*, No. CR 08-274 (D.D.C.), Dkt. 270, at 36:8-39:21 (emphasis added).  Consistent with these instructions, the D.C. Circuit in *Ring* emphasized the difference between "making a purely informational inquiry" and acting in one's "official capacity to *influence* the visa application process."  *Ring*, 706 F.3d  at 470.

The *Ring* instructions thus forbade that jury from convicting Mr. Ring solely for purchasing increased access and required the jury to find more than that—namely, that the relevant officials exerted actual influence on a question or matter whose answer or disposition is

determined by the Government.   There is a substantial   question whether the Government's
evidence in this case could have cleared those hurdles since, as discussed, Mr. McDonnell did
not make or promise any actual government decision in favor of Mr. Williams or Star, nor did he
ask anyone else to do so.   And even if it could, there is likewise a substantial question whether
this Court's instructions required the jury to make either of those findings, given that, among
other things, they did not contain any limiting language like those found in the *Ring* instructions.
The *Ring* instructions further underscore that the "official act" question is a substantial one.

> **C.** **It Is A "Close" Question Whether The Government's Five Identified Actions Are "Official" Acts Under Federal Law.**

As the foregoing discussion shows, the Fourth Circuit's decision in *Jefferson* did not
resolve the question presented here, whereas a significant body of case law from other circuits
supports Mr. McDonnell's interpretation of the "official act" requirement.   Consequently, a
reasonable jurist could conclude that Mr. McDonnell's understanding of the law is correct.   And
if that is so, then the Government failed to prove that the five acts at issue were "official" ones
under federal law and this Court's jury instructions did not adequately apprise the jury of the
scope of the federal bribery laws.

On the first point, as the Court's opinions note, the Government has identified five
supposed "official acts" that Mr. McDonnell took during the course of the alleged conspiracy:

> (1) arranging a meeting between Mr. Williams and Molly Huffstetler, an official
> from Virginia's Health and Human Resources department, Trial Tr. Vol. XXV, at
> 5869:17-18, 6040:11-13;
>
> (2) attending an event at the Executive Mansion during which representatives
> from Star Scientific, including Mr. Williams, met officials from certain Virginia
> universities, *id.* at 5843:15-5844:9;
>
> (3) asking his counsel and policy advisor Jasen Eige, in an email, to "Please see
> me about Anatabloc issues at VCU and UVA," *see id.* at 6040:24-6041:8;

(4) attending a reception for leaders in the Virginia health care community, *id.* at 5869:19-20, 6041:9-6042:2;

(5) asking two of his staffers, Lisa Hicks-Thomas and Sarah Wilson, to arrange a meeting with representatives from Star Scientific, *id.* at 5869:20-23, 6042:7-11. *See also* Gov't Opp'n Mot. Dismiss, Dkt. 146, at 23 ("Mr. McDonnell took official action when he ordered a subordinate to take a meeting, attended an event at a state facility, and directed a cabinet official to arrange a meeting . . . .") (emphasis omitted).

Each of these actions is critical to the Government's case, because, among other reasons, it is impossible to tell which actions the jury relied on to convict, and the Government's only evidence of an agreement is the timing between Mr. Williams' gifts and Mr. McDonnell's five supposedly "official" actions. *See* Trial Tr. Vol. XXV, at 6046:17-18 ("[T]he timing in this case establishes the pro in the quid pro quo agreement.").

Here, it is at least reasonable to conclude that the Government did not prove that any of these five actions, much less of all them, amounted to Mr. McDonnell exerting "inappropriate influence on decisions that the government actually makes," *Valdes*, 475 F.3d at 1325, or "invok[ing] any purported oversight authority or threaten[ing] to use official powers in support of his advocacy," *Urciuoli*, 513 F.3d at 296. Indeed, the Government told the jury that it need not find any effort by Mr. McDonnell to influence—or "pressure"—anyone to make a governmental decision on Mr. Williams' behalf. *See* Trial Tr. Vol. XXV, at 6042:17-19 ("When you get these jury instructions, ladies and gentlemen, you look for the word pressure. It doesn't appear anywhere."). Nor did the Government call any witness who testified that Mr. McDonnell attempted to influence him or her to make any decision on the government's behalf for Mr. Williams, much less "threaten[] to use official powers in support of his advocacy," *Urciuoli*, 513 F.3d at 296. To the contrary:

- Two key witnesses who had interactions with Mr. McDonnell related to Anatabloc—Mr. Eige and Dr. Lazo—testified that they did not believe Mr. McDonnell wanted them to do anything at all. *See* Trial Tr. Vol. VII, at 1668:13-16 (Mr. Eige) ("I have a

recollection that [Mr. McDonnell] never followed back up with me or never pushed back or never directed me to actually go forward and try to make something happen with the universities."); Trial Tr. Vol VIII, at 1793:11-1795:9 (Dr. Lazo) (Mr. McDonnell merely asked whether "there was some scientific validity" to the studies, asked whether "there was any reason to explore this further," and asked whether this could be "good for the Commonwealth"; describing Mr. McDonnell's position as "more of an interrogative type . . . of questioning"); *id.* at 1810:3-12 (affirming that Mr. McDonnell did not "come up to you and grab your arm, pull you to the corner, and say, 'Listen, I really want you to go research this stuff'").

- The other two key witnesses—Ms. Huffstetler and Ms. Hicks-Thomas—testified that they did not believe Mr. McDonnell wanted them to do anything besides hear what Mr. Williams had to say—that is, provide "access" rather than make any particular decision on the government's behalf. *See* Trial Tr. Vol. VII, at 1517:10-25 (Ms. Huffstetler) (she had "no doubt" that she was free to "blow off" Mr. Williams following her meeting); *id.* at 1524:10-14 (she felt no "pressure" to do anything for Mr. Williams); Trial Tr. Vol. XI, at 2680:1-3 (Ms. Hicks-Thomas) ("Q: Governor McDonnell never came back to you and said 'Did you meet with them? Did you take care of that?' A: Never.").

The testimony of these witnesses demonstrates that there is at least a substantial question here whether the Government presented sufficient evidence of Mr. McDonnell (1) exerting "inappropriate influence on decisions that the government actually makes," *Valdes*, 475 F.3d at 1325, or (2) merely providing "the political access" that federal law permits a public official to provide to "those who support him or his allies." *McCutcheon*, 134 S. Ct. at 1441.

Moreover, if Mr. McDonnell's legal theory is correct, then this Court's jury instructions did not adequately apprise the jury of the scope of the "official act" requirement. Here, the Court's jury instructions did not require the jury to find that Mr. McDonnell made or influenced others to make a governmental decision about any pending matter that pertained to Mr. Williams. Rather, the Court instructed the jury, among other things, that "[o]fficial action as I just defined it includes those actions that have been clearly established by settled practice as part of a public official's position, even if the action was not taken pursuant to responsibilities explicitly assigned by law"—a definition which "include[s] acts that a public official customarily performs, even if those actions are not described in any law, rule, or job description." Trial Tr. Vol. XXVI, at

6102:23-6103:5. The Court further instructed the jury that "official action can include actions taken in furtherance of longer-term goals, and an official action is no less official because it is one in a series of steps to exercise influence or achieve an end." *Id.* at 6103:10-14. But it declined to give Mr. McDonnell's proposed instruction that the definition of official act "refer[s] to a class of questions or matters whose answer or disposition is determined by the government." McDonnell Prop. Jury Instructions, Dkt. 287, No. 58. The Court likewise declined to give Mr. McDonnell's proposed instruction that "merely arranging a meeting, attending an event, hosting a reception, or making a speech are not, standing alone, 'official acts,' even if they are settled practices of the official." *Id.* And it opted against Mr. McDonnell's request to instruct the jury that "[a] government official's decisions on who to invite to lunch, whether to attend an event, or whether to attend a meeting or respond to a phone call are not decisions on matters pending before the government." *Id.* At a minimum, reasonable jurists could disagree—as the *Ring* instructions illustrate—on whether jury instructions that define "official act" as the Court did here while omitting the types of limitations Mr. McDonnell requested satisfy the legal standard Mr. McDonnell has advanced. This is particularly true in a case where, as here, guilt turned on the fine line between impermissible official acts and permissible ingratiation and access. This, too, thus presents a substantial question of law on appeal.

For these reasons, as well as the absence of any other reported case holding that public officials take official action under the federal bribery laws when they ask an aide a question, encourage a subordinate to meet with a benefactor on a matter of interest to the benefactor, or attend certain events—without taking the next step of seeking to make or influence a particular action on the government's behalf in favor of the benefactor—this Court's decision can fairly be described as an extension of existing authority. Just as Judge Ellis—and the other judges

discussed above—granted bond pending appeal in similar circumstances, *see supra*, Mr. McDonnell respectfully requests that this Court grant bond pending appeal here.

III.    **There Is Also A "Substantial Question" Whether This Court's Voir Dire Of The Jury Was Adequate In Two Respects.**

Mr. McDonnell's appeal will present at least two additional substantial questions, either of which, should he succeed, would result in a new trial.  Each of these issues thus supplies an independently sufficient basis for granting him bond pending his appeal.  *First*, Mr. McDonnell submits that whether the Court conducted sufficient voir dire on pretrial publicity in this case, where such publicity was extensive and often extremely negative, presents a substantial question on appeal.  *Second*, Mr. McDonnell submits that a substantial question also exists on the issue whether this Court erred by declining to follow the procedures outlined in *United States v. Resko*, 3 F.3d 684, 688 (3d Cir. 1993), given evidence presented during the trial that the jurors were prematurely deliberating.

A.    **Reasonable Jurists Could Disagree About Whether The Court's Voir Dire On Pretrial Publicity Was Sufficient In This Case.**

Trial courts abuse their discretion in conducting voir dire on pretrial publicity if (1) the "pretrial publicity about the case raised a significant possibility of prejudice" and (2) "the district court's voir dire procedure failed to provide a reasonable assurance that prejudice would be discovered if present."  *United States v. Pratt*, 728 F.3d 463, 470 (5th Cir. 2013) (citation omitted), *cert. denied*, 134 S. Ct. 1328 (2014); *see also, e.g.*, *United States v. Lancaster*, 96 F.3d 734, 740 (4th Cir. 1996).  Mr. McDonnell respectfully submits that there is a substantial question whether those requirements are satisfied here.  This issue thus satisfies § 3143(b).

Here, it is essentially undisputed that there was a great deal of negative publicity during the run-up to Mr. McDonnell's trial.  *See* New Trial Mem., Dkt. 548, at 16-18 & Ex. A; Gov't's Resp. in Opp'n to Def. Robert F. McDonnell's Mot. for a New Trial, Dkt. 530, at 14-21

(omitting any attempt to refute the existence of substantial negative pretrial publicity).  In light of this publicity, both the Government and Mr. McDonnell suggested that it would be appropriate to conduct individualized voir dire of jurors who admitted in their juror questionnaires to knowledge of the case, in order to ensure that any juror prejudice would be discovered.  *See* Trial Tr. Vol I, at 137:14-19  ("[I]n an abundance of caution, at least for those individuals that have said that they have very closely or somewhat closely followed the case, it might be advisable for us to do some limited inquiry or bring them up or something so that there's no issue on the record, unless Mr. Asbill has changed his position on this.") (Government); *id.* at 138:10-139:11 (requesting individualized questioning about pretrial publicity) (defense).  The Court nonetheless declined to ask the venire members individualized questions about their opinions or their exposure to publicity.  *Id.* at 139:19-20.

Instead, the Court limited its in-court voir dire on the issue of pretrial publicity to two questions.  After acknowledging that the "case has generated a lot of media interest" the Court first asked the approximately 150 prospective jurors to stand up "if you have read, heard or seen something in the media."  *Id.* at 140:17-25.  Almost everyone stood.  The Court then asked whether, "[b]ased on what you have heard or read or seen relating to this case, if you are, in your mind, able to put aside whatever it is that you've heard, listen to the evidence in this case and be fair to both sides, then I want you to sit down."  *Id.* at 141:2-9.  Everyone sat.  *See id.* at 141:20-21.  Based on this, the Court informed the parties that it was "satisfied with . . . the responses," *id.* at 141:14-15, and declined to ask any additional questions of the venire members who had been exposed to pretrial publicity despite the defense reiterating its request for specific inquiry into each venire member who had been exposed to publicity, *id.* at 141:20-24 ("I can't trust the

credibility of that without a further inquiry and I can't make any judgments or arguments to you without any further inquiry.") (defense).

The Court did voir dire a handful of individual jurors whose answers to the limited, Court-selected questions on the juror questionnaire gave the defense specific cause for concern, *see id.* at 145:2-155:12; Mem. Op. Denying New Trial, Dkt. 567, at 15, but it did not individually voir dire all or most of the jurors who admitted in their questionnaires or by standing in the courtroom that they had been exposed to pretrial publicity. The Court similarly declined to include a question in the questionnaire that asked prospective jurors whether they had formed any opinions about the guilt or innocence of the defendants based on their exposure to pretrial publicity. Neither the defense nor the Court thus knew which prospective jurors had formed fixed (or tentative) opinions about the defendants' guilt or innocence prior to being seated.

There is a substantial question of whether these procedures were legally sufficient in a case that involved such a large amount of publicity, virtually all of it negative.[4] The Fourth Circuit has expressed a preference for the following procedure where prejudicial publicity is brought to a trial court's attention: "'[T]he court must ascertain if any jurors who had been exposed to such publicity had read or heard the same. Such jurors who respond affirmatively must then be examined, individually and outside the presence of the other jurors, to determine the effect of the publicity.'" *United States v. Hankish*, 502 F.2d 71, 77 (4th Cir. 1974) (quoting *Margoles v. United States*, 407 F.2d 727, 735 (7th Cir. 1969)). That is why, in *United States v.*

---

[4] *See, e.g.*, Robert McCartney, *Indictment Shows McDonnell As a Man in Denial*, Washington Post, Jan. 23, 2014, at B1 (claiming that Mr. McDonnell was "brought down" by "a toxic mix of personal money worries, an assertive wife, a taste for luxury, and a culture of coziness between politicians and rich supporters"); A. Barton Hinkle, Commentary, *McDonnell Family Values*, Richmond Times-Dispatch, May 12, 2013, at E3 (accusing Mr. McDonnell of "[h]iding behind legal technicalities" and "making a mockery" of "personal responsibility" and "family values").

*Bakker*, 925 F.2d 728, 733-34 (4th Cir. 1991), the trial court "questioned potential jurors about exposure to pre-trial publicity including specific media reports, about exposure to the opinions of others, about the juror's personal opinions about the case, and about whether media attention during the trial would influence a juror's decisions" and the Fourth Circuit held that this "careful" voir dire was the "proper way" to impanel jurors in high-publicity cases and protect a defendant's Sixth Amendment right to an impartial jury.  Consistent with this standard, courts have set aside convictions where a trial court relied "solely on a juror's assertion of impartiality," rather than conducting "a sufficiently probing inquiry to permit the court to reach its own conclusion." *Pratt*, 728 F.3d at 470.

It is true that the Court required prospective jurors to complete a questionnaire.  But the questionnaire only asked jurors whether they had "*expressed* an opinion about this case or about those involved to anyone."  New Trial Mem., Dkt. 548, Ex. B at 23 (emphasis added).  It never asked the prospective jurors the critical question whether their exposure to pretrial publicity had caused them to *form* an opinion about the defendants' guilt or innocence.  Nor did the questionnaire ask prospective jurors what publicity they had seen, whether they found the reporting to be credible, and what specifically they remembered from the media reports.  The questionnaire omitted such questions even though the parties had requested them, *see, e.g.*, New Trial Mem., Dkt. 548, Ex. C at 31 ("Based on what you have read, heard, seen, and/or overheard in conversations, please tell us what opinions, if any, you have formed about the guilt or innocence of Robert F. McDonnell." ), and, as a result, asked no question that directly inquired about "the impact" that "both past and future media attention would have upon potential jurors." *Bakker*, 925 F.2d at 733.  Given that, Mr. McDonnell respectfully submits that the use of a questionnaire does not preclude this issue from being a substantial one on appeal.

Should the Fourth Circuit agree with Mr. McDonnell on this issue, he will be entitled to a new trial.  *See, e.g.*, *United States v. Beckner*, 69 F.3d 1290, 1293-94 (5th Cir. 1995).  This issue therefore satisfies 18 U.S.C. § 3143(b) and thus provides a separate basis for granting Mr. McDonnell bond pending his appeal.

### B.  Reasonable Jurists Could Disagree About Whether The Court Erred By Declining To Voir Dire The Jury About Premature Deliberations.

"[W]hen jury misconduct (including improper intra-jury influences) has been alleged, the district court should: ascertain whether the misconduct actually occurred; if it did, determine whether it was prejudicial; and if there are no grounds for a new trial, specify the reasons it decided misconduct did not occur, or occurred but was non-prejudicial."  *Resko*, 3 F.3d at 691 (citing *United States v. Richman*, 600 F.2d 286, 295 (1st Cir. 1979)).  Here, following a report that a juror had discussed the case with an attorney, the Court interviewed both the attorney and the juror in chambers during the trial.  Mr. Watson (the lawyer) told the Court and the parties that Mr. DeNitto (the juror) had called to tell Mr. Watson that he (Mr. DeNitto) was the foreman of the jury and that the jurors were "all over the place," a phrase that suggested the jurors were not only deliberating but had formed opinions on guilt or innocence.  Based on this evidence, the Court struck Mr. DeNitto from the jury.

The defense asked the Court to inquire with the other jurors whether they had been prematurely deliberating.  The Court declined to do so.  *See* Aug. 12, 2014 In-Chambers Tr., Dkt. 547, at 11:2-3 ("Your request is noted and denied.").  Mr. McDonnell subsequently requested a new trial on this basis and the Court gave two reasons for rejecting that request.  *First*, the Court found that "[Mr.] DeNitto's alleged statement that the jurors were 'all over the place' did not provide sufficient indicia of premature deliberations."  Mem. Op. Denying New Trial, Dkt. 567, at 17.  Mr. McDonnell submits, however, that a reasonable jurist might conclude

that evidence of Mr. DeNitto soliciting an attorney's "guidance" on how he should discharge his duties as the "foreman" of a jury in which the jurors were "all over the place," Aug. 12, 2014 In-Chambers Tr., Dkt. 547, at 7:10-23, provided sufficient indicia of premature deliberations to warrant further inquiry.

*Second*, the Court determined that it "had enough information [based on the interviews of both Watson and DeNitto] to make a reasoned determination that [McDonnell] would suffer no prejudice due to the jury misconduct." Mem. Op. Denying New Trial, Dkt. 567, at 18 (quoting *Resko*, 3 F.3d at 691) (alterations in original). Mr. McDonnell submits that here, too, it is a substantial question whether, under *Resko*, this Court was required to voir dire the jury *before* making that determination. *Resko*, for example, states that "when jury misconduct (including improper intra-jury influences) has been alleged, the district court should" first "ascertain whether the misconduct actually occurred," and then, "*if it did*, determine whether it was prejudicial." *Resko*, 3 F.3d at 691 (emphasis added). The purpose of this process is to ensure that the Court possesses sufficient information to assess prejudice. The Fourth Circuit may determine, as the Third Circuit did in *Resko*, that the current record does not supply the "means to evaluate the district courts' determinations that the premature discussions resulted in no prejudice to the defendants." *Resko*, 3 F.3d at 693.

Should the Fourth Circuit agree with Mr. McDonnell on this issue, he will be entitled to a new trial. *Id.* at 695 ("[W]e must vacate and remand for retrial."). This issue thus likewise satisfies the standard in § 3143(b) and supports Mr. McDonnell's request for bond pending appeal.

## CONCLUSION

For the foregoing reasons, Mr. McDonnell respectfully requests that this Court grant his motion for bond pending appeal.


Dated: January 5, 2015                    Respectfully submitted,


                                          /s/ Jonathan A. Berry
                                          Henry W. Asbill (*pro hac vice*)
                                          Noel J. Francisco (*pro hac vice*)
                                          James M. Burnham (*pro hac vice*)
                                          Jonathan A. Berry (VSB No. 81864)
                                          JONES DAY
                                          51 Louisiana Avenue, N.W.
                                          Washington, D.C. 20001
                                          Telephone: (202) 879-3939
                                          Facsimile: (202) 626-1700

                                          John L. Brownlee (VSB No. 37358)
                                          HOLLAND & KNIGHT LLP
                                          800 17th Street, N.W.
                                          Suite 1100
                                          Washington, D.C. 20006
                                          Telephone: (202) 828-1854
                                          Facsimile: (202) 955-5564

                                          *Counsel for Robert F. McDonnell*

## **CERTIFICATE OF SERVICE**

I, Jonathan A. Berry, am a member of the Bar of this Court.  I hereby certify that on this 5th day of January, 2015, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, causing it to be served on all registered users.


Dated: January 5, 2015                    Respectfully submitted,


                                          /s/ Jonathan A. Berry
                                          Jonathan A. Berry (VSB No. 81864)
                                          JONES DAY
                                          51 Louisiana Avenue, N.W.
                                          Washington, DC 20001
                                          Telephone: (202) 879-3939
                                          Facsimile: (202) 626-1700
                                          Email: jberry@jonesday.com

                                          *Counsel for Robert F. McDonnell*